# Exhibit 9

## IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

Case No.: HC/S 26/2016
Sub Case No.: HC/SUM 862/2018
Filed: 19-February-2018 08:33 PM
Hearing Date : 21-February-2018
Hearing Time : 3:30 PM
Hearing Type : Pre-Trial Conference
Attend Before: Registrar

Between

ELEMENT SIX TECHNOLOGIES LIMITED
(United Kingdom Registration No. 08206603)

...Plaintiff(s)

And

IIa TECHNOLOGIES PTE. LTD.
(Singapore UEN No. 200516961K)

...Defendant(s)

And

IIa TECHNOLOGIES PTE. LTD.
(Singapore UEN No. 200516961K)

...Plaintiff(s) in Counterclaim

And

ELEMENT SIX TECHNOLOGIES LIMITED
(United Kingdom Registration No. 08206603)

...Defendant(s) in Counterclaim



## SUMMONS FOR WITHDRAWAL OF INTERROGATORIES

To:  Solicitors for the Plaintiff and Defendant in Counterclaim
AMICA LAW LLC
30 Raffles Place #14-01 Chevron House
Singapore 048622
Tel No.: 63036210
Fax No.: 63036222
Email: jason.chan@amicalaw.com
File Ref No.: JC/MP/NIC/20120280
Solicitor in charge: 1. CHAN KWOK CHUAN JASON,
2. NICHOLAS ONG WEI LUN,
3. PANG SZE RAY, MELVIN

Let all parties concerned attend before the Court on the date and time to be assigned for a hearing of an application by the Defendant for the following orders:

1. The following paragraphs of the Plaintiff's interrogatories without order dated 18 December 2017 (the **"Interrogatories"**), a copy of which is annexed hereto, be withdrawn:

   i. Paragraphs 2(a) to 2(d), 3(a) to 3(d), 4(a) to 4(f), 5(a) to 5(d), 7(a) to 7(d), 8(a) to 8(d), 9(a) to 9(f), 10(a) to 10(d), 12(a), 12(b), 13(a) to 13(d), 14(a) to 14(d), 15(a) to 15(f), 16(a) to 16(e) and 17(b);

2. The Plaintiff shall not serve further interrogatories without order;

3.  Costs of this application by paid by the Plaintiff to the Defendant; and

4.  Such further and other orders that this Honourable Court shall deem fit.

This application is made pursuant to Order 26 Rule 3(2) of the Rules of Court and/or the inherent jurisdiction of the Court.

The grounds of the application are:

1.  further set out in the affidavit of MEHTA VISHAL JATIN, filed in support of this application herein.

1.  180214 - Annexure - Summons for Withdrawal of Interrogatories

> 180214 - Annexure -
> Summons for
> Withdrawal of
> Interrogatories.pdf
> 501 KB

Issued by :

Solicitors for the Defendant and Plaintiff in Counterclaim

Drew & Napier LLC
10 Collyer Quay #10-01 Ocean Financial Centre
Singapore 049315
Tel No.: 65350733
Fax No.: 65354906
Email: mail@drewnapier.com
File Ref No.: TY/MKJN/JYO 375178
Solicitor in charge: 1. TONY YEO SOO MONG,
2. MERYL KOH JUNNING,
3. YEO JAVIER

VINCENT HOONG
REGISTRAR
SUPREME COURT
SINGAPORE

Close   Print

## IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 26/2016

Between

### ELEMENT SIX TECHNOLOGIES LIMITED
### (REG NO. 08206603)

...Plaintiff

And

### IIa TECHNOLOGIES PTE. LTD.
### (REG. NO. 200516961K)

...Defendant

### INTERROGATORIES

On behalf of the abovenamed Plaintiff for the examination of the abovenamed Defendant:

1.    Please answer the following:

(a)    Did the Defendant in Singapore make, dispose of or offer to dispose of, import, use
       and/or keep, whether in part or otherwise, any single crystal CVD diamond material
       in any form, including as-grown and gemstone, which was designated the identifier
       "LG10061905", regardless of when the aforesaid designation took place and whether
       the aforesaid designation was by the Defendant or a third party?

2.    Please answer the following:

(a)    Is or was Gemesis Diamond Company a "related party" of the Defendant as used in
       the publicly available document titled "Reports and Financial Statements for the year
       ended 31 March 2012" (the "**2012 Report**") filed by the Defendant under its former

1

name, Gemesis Company Pte. Ltd. which the Defendant had authorized for submission to the Accounting and Corporate Regulatory Authority ("**ACRA**")?

(b)     If the answer to (a) is yes, did the Defendant provide any single crystal CVD diamond material in any form, including as-grown and gemstone, to the Gemesis Diamond Company between 1 April 2011 and 31 March 2012 which was accounted for as "trade receivables" in the 2012 Report?

(c)     If the answer to (b) is yes, was there any condition attached to the provision, the effect of which would result in Gemesis Diamond Company providing single crystal CVD diamond material in any form, including as-grown and gemstone, which was made and/or supplied by the Defendant only?

(d)     If the answer to (c) is yes, please specify the condition(s) stated therein, including any effective date(s) and end date(s) thereof.

3.     Please answer the following:

(a)     Is or was Gemesis Diamond Company a "related party" of the Defendant as used in the publicly available document titled "Reports and Financial Statements for the year ended 31 March 2013" (the "**2013 Report**") which the Defendant had authorized for submission to ACRA?

(b)     If the answer to (a) is yes, did the Defendant provide any single crystal CVD diamond material in any form, including as-grown and gemstone, to the Gemesis Diamond Company between 1 April 2012 and 31 March 2013 which was accounted for as "trade receivables" in the 2013 Report?

(c)     If the answer to (b) is yes, was there any condition attached to the provision, the effect of which would result in Gemesis Diamond Company selling single crystal CVD diamond material in any form, including as-grown and gemstone, which was made and/or supplied by the Defendant only?

2

(d)     If the answer to (c) is yes, please specify the condition(s) stated therein, including any effective date(s) and end date(s) thereof.

4.     Unless the answer to **2(b)** or **3(b)** is yes, please answer the following:

(a)     Did the Defendant directly supply single crystal CVD diamond material in any form, including as-grown and gemstone, to Gemesis Diamond Company in or before 2012?

(b)     If the answer to (a) is yes, was the CVD diamond material synthesized by the Defendant in Singapore?

(c)     If the answer to (a) is yes, was there any contractual or quasi-contractual relationship, understanding, arrangement or collaboration between the Defendant and Gemesis Diamond Company in or before 2012 pursuant to which Gemesis Diamond Company would distribute single crystal CVD diamond material in any form, including as-grown and gemstone, which was made and/or supplied by the Defendant?

(d)     If the answer to (c) is yes, did the contractual or quasi-contractual relationship, understanding, arrangement or collaboration between the Defendant and Gemesis Diamond Company in or before 2012 provide that Gemesis Diamond Company was to sell single crystal CVD diamond material in any form, including as-grown and gemstone, which was made and/or supplied by the Defendant only?

(e)     If the answer to (c) is yes and the answer to (d) is no, please describe the nature of such relationships, understandings, arrangements or collaborations, including specifying the effective date(s) and end date(s) (if any) thereof.

(f)     If the answer to (c) is no, please specify each year in or before 2012 wherein the Defendant directly supplied single crystal CVD diamond material in any form, including as-grown and gemstone, to Gemesis Diamond Company.

5.    Unless the answer to **2(b)** or **3(b)** is yes, please answer the following:

    (a)    Did the Defendant indirectly supply single crystal CVD diamond material in any form, including as-grown and gemstone, to Gemesis Diamond Company in or before 2012?

    (b)    If the answer to (a) is yes, please indicate if the supply chain which led to the indirect supply of single crystal CVD diamond material in any form, including as-grown and gemstone, to Gemesis Diamond Company in or before 2012 included any of the following entities:

        i.    The Defendant's subsidiaries, Helios International Pte Ltd and Nozomi Technology Inc;

        ii.    The Defendant's holding company, JRD International Ltd (as it then was); and

        iii.    The two key suppliers/customers which the Defendant purchased raw materials from for processing, and then sold the finished product to, as indicated in the 2013 Report.

    (c)    If the answer to (b)(iii) is yes, please identify the two key suppliers, including specifying their respective registration number, country of incorporation and registered address.

    (d)    If the answer to (a) is yes and the answer to (b) is no, please describe the supply chain which led to the indirect supply of single crystal CVD diamond material in any form, including as-grown and gemstone, to Gemesis Diamond Company in or before 2012, including identifying all the entities in said supply chain.

6.   Please answer the following:

   (a)   Did the Defendant in Singapore make, dispose of or offer to dispose of, import, use and/or keep, whether in part or otherwise, any single crystal CVD diamond material in any form, including as-grown and diamond plate, which was designated the identifier "2PCVD303004N", regardless of when the aforesaid designation took place and whether the aforesaid designation was by the Defendant or a third party?

7.   Please answer the following:

   (a)   Is or was Microwave Enterprises, Ltd. a "related party" of the Defendant as used in the publicly available document titled "Reports and Financial Statements for the year ended 31 March 2014" (the "**2014 Report**") which the Defendant had authorized for submission to ACRA?

   (b)   If the answer to (a) is yes, did the Defendant provide any single crystal CVD diamond material in any form, including as-grown and diamond plate, to the Microwave Enterprises, Ltd. between 1 April 2013 and 31 March 2014 which was accounted for as "trade receivables" in the 2014 Report?

   (c)   If the answer to (b) is yes, was there any condition attached to the provision, the effect of which would result in Microwave Enterprises, Ltd. selling single crystal CVD diamond material in any form, including as-grown and diamond plate, which was made and/or supplied by the Defendant only?

   (d)   If the answer to (c) is yes, please specify the condition(s) stated therein, including any effective date(s) and end date(s) thereof.

8.   Please answer the following:

   (a)   Is or was Microwave Enterprises, Ltd. a "related party" of the Defendant as used in the publicly available document titled "Reports and Financial Statements for the year

5

ended 31 March 2015" (the "**2015 Report**") which the Defendant had authorized for submission to ACRA?

(b)     If the answer to (a) is yes, did the Defendant provide any single crystal CVD diamond material in any form, including as-grown and diamond plate, to the Microwave Enterprises, Ltd. between 1 April 2014 and 31 March 2015 which was accounted for as "trade receivables" in the 2015 Report?

(c)     If the answer to (b) is yes, was there any condition attached to the provision, the effect of which would result in Microwave Enterprises, Ltd. selling single crystal CVD diamond material in any form, including as-grown and diamond plate, which was made and/or supplied by the Defendant only?

(d)     If the answer to (c) is yes, please specify the condition(s) stated therein, including any effective date(s) and end date(s) thereof.

9.     Unless the answer to **7(b)** or **8(b)** is yes, please answer the following:

(a)     Did the Defendant directly supply single crystal CVD diamond material in any form, including as-grown and diamond plate, to Microwave Enterprises, Ltd. in or before 2014?

(b)     If the answer to (a) is yes, was the CVD diamond material synthesized by the Defendant in Singapore?

(c)     If the answer to (a) is yes, was there any contractual or quasi-contractual relationship, understanding, arrangement or collaboration between the Defendant and Microwave Enterprises, Ltd. in or before 2014 pursuant to which Microwave Enterprises, Ltd. would distribute single crystal CVD diamond material in any form, including as-grown and diamond plate, which was made and/or supplied by the Defendant?

(d)     If the answer to (c) is yes, did the contractual or quasi-contractual relationship, understanding, arrangement or collaboration between the Defendant and Gemesis Diamond Company in or before 2014 provide that Microwave Enterprises, Ltd. was to sell single crystal CVD diamond material in any form, including as-grown and diamond plate, which was made and/or supplied by the Defendant only?

(e)     If the answer to (c) is yes and the answer to (d) is no, please describe the nature of such relationships, understandings, arrangements or collaborations, including specifying the effective date(s) and end date(s) (if any) thereof.

(f)     If the answer to (c) is no, please specify each year in or before 2014 wherein the Defendant directly supplied single crystal CVD diamond material in any form, including as-grown and diamond plate, to Microwave Enterprises, Ltd., and the terms of such supply.

10.   Unless the answer to **7(b)** or **8(b)** is yes, please answer the following:

(a)     Did the Defendant indirectly supply single crystal CVD diamond material in any form, including as-grown and diamond plate, to Microwave Enterprises, Ltd. in or before 2014?

(b)     If the answer to (a) is yes, please indicate if the supply chain which led to the indirect supply of single crystal CVD diamond material in any form, including as-grown and diamond plate, to Microwave Enterprises, Ltd. in or before 2014 included any of the following entities:

   i.   The Defendant's subsidiaries, Sungate Oriental Limited and Helios International Pte Ltd;

   ii.  The Defendant's intermediate and ultimate holding companies, Spring Field Group Limited and IIa Holdings Group Limited; and

7

iii. The two key suppliers/customers which the Defendant purchased raw materials from for processing, and then sold the finished product to, as indicated in the 2014 and 2015 Reports.

(c)     If the answer to (b)(iii) is yes, please identify the two key suppliers/customers, including specifying their respective registration number, country of incorporation and registered address.

(d)     If the answer to (a) is yes and the answer to (b) is no, please describe the supply chain which led to the indirect supply of single crystal CVD diamond material in any form, including as-grown and diamond plate, to Microwave Enterprises, Ltd. in or before 2014, including identifying all the entities in said supply chain.

11.     Please answer the following:

(a)     Did the Defendant in Singapore make, dispose of or offer to dispose of, import, use and/or keep, whether in part or otherwise, any CVD diamond material in any form, including as-grown and gemstone, which was designated the identifier "LG10226420", regardless of when the aforesaid designation took place and whether the aforesaid designation was by the Defendant or a third party?

12.     Please answer the following:

(a)     Did the Defendant in Singapore use any method(s) of heat treating at or above 1200°C of single crystal CVD diamond material in or before 2015?

(b)     If the answer to (a) is yes, please identify the particular method(s) used and specify the following details:

        i. temperature,

        ii. pressure, and

        iii. descriptions of the initial and final colours of the CVD diamond material.

8

13.     Please answer the following:

   (a)     Is or was Pure Grown Diamonds, Inc. a "related party" of the Defendant as used in
           the publicly available document titled "Reports and Financial Statements for the year
           ended 31 March 2015" (the "**2015 Report**") which the Defendant had authorized for
           submission to ACRA?

   (b)     If the answer to (a) is yes, did the Defendant provide any single crystal CVD diamond
           material in any form, including as-grown and gemstone, to the Pure Grown
           Diamonds, Inc. between 1 April 2014 and 31 March 2015 which was accounted for
           as "trade receivables" in the 2015 Report?

   (c)     If the answer to (b) is yes, was there any condition attached to the provision, the
           effect of which would result in Pure Grown Diamonds, Inc. selling single crystal
           CVD diamond material in any form, including as-grown and gemstone, which was
           made and/or supplied by the Defendant only?

   (d)     If the answer to (c) is yes, please specify the condition(s) stated therein, including any
           effective date(s) and end date(s) thereof.

14.     Please answer the following:

   (a)     Is or was Pure Grown Diamonds, Inc. a "related party" of the Defendant as used in
           the publicly available document titled "Reports and Financial Statements for the year
           ended 31 March 2016" (the "**2016 Report**") which the Defendant had authorized for
           submission to ACRA?

   (b)     If the answer to (a) is yes, did the Defendant provide any single crystal CVD diamond
           material in any form, including as-grown and gemstone, to the Pure Grown
           Diamonds, Inc. between 1 April 2015 and 31 March 2016 which was accounted for
           as "trade receivables" in the 2016 Report?

9

(c)     If the answer to (b) is yes, was there any condition attached to the provision, the effect of which would result in Pure Grown Diamonds, Inc. selling single crystal CVD diamond material in any form, including as-grown and gemstone, which was made and/or supplied by the Defendant only?

(d)     If the answer to (c) is yes, please specify the condition(s) stated therein, including any effective date(s) and end date(s) thereof.

15.     Unless the answer to **13(b)** or **14(b)** is yes, please answer the following:

(a)     Did the Defendant directly supply single crystal CVD diamond material in any form, including as-grown and gemstone, to Pure Grown Diamonds, Inc. in or before 2015?

(b)     If the answer to (a) is yes, was the CVD diamond material synthesized by the Defendant in Singapore?

(c)     If the answer to (a) is yes, was there any contractual or quasi-contractual relationship, understanding, arrangement or collaboration between the Defendant and Pure Grown Diamonds, Inc. in or before 2015 pursuant to which Pure Grown Diamonds, Inc. would distribute single crystal CVD diamond material in any form, including as-grown and gemstone, which was made and/or supplied by the Defendant?

(d)     If the answer to (c) is yes, did the contractual or quasi-contractual relationship, understanding, arrangement or collaboration between the Defendant and Pure Grown Diamonds, Inc. in or before 2015 provide that Pure Grown Diamonds, Inc. was to sell single crystal CVD diamond material in any form, including as-grown and gemstone, which was made and/or supplied by the Defendant only?

(e)     If the answer to (c) is yes and the answer to (d) is no, please describe the nature of such relationships, understandings, arrangements or collaborations, including specifying the effective date(s) and end date(s) (if any) thereof.

10

      (f)     If the answer to (c) is no, please specify each year in or before 2015 wherein the Defendant directly supplied single crystal CVD diamond material to Pure Grown Diamonds, Inc..

16.    Unless the answer to **13(b)** or **14(b)** is yes, please answer the following:

      (a)     Did the Defendant indirectly supply single crystal CVD diamond material in any form, including as-grown and gemstone, to Pure Grown Diamonds, Inc. in or before 2015?

      (b)     If the answer to (a) is yes, please indicate if the supply chain which led to the indirect supply of single crystal CVD diamond material in any form, including as-grown and gemstone, to Pure Grown Diamonds, Inc.in or before 2015 included any of the following entities:

            i.   The Defendant's subsidiaries, Sungate Oriental Limited and Helios International Pte Ltd;

           ii.   The Defendant's intermediate and ultimate holding companies, Spring Field Group Limited and IIa Holdings Group Limited;

          iii.   The two key suppliers/customers which the Defendant purchased raw materials from for processing, and then sold the finished product to, as indicated in the 2015 Report; and

          iv.   The three major customers located in Hong Kong, India and United Arab Emirates, as indicated in the 2016 Report.

      (c)     If the answer to (b)(iii) is yes, please identify the two key suppliers/customers, including specifying their respective registration number, country of incorporation and registered address.

11

(d)     If the answer to (b)(iv) is yes, please identify the three major customers, including specifying their respective registration number, country of incorporation and registered address.

(e)     If the answer to (a) is yes and the answer to (b) is no, please describe the supply chain which led to the indirect supply of single crystal CVD diamond material in any form, including as-grown and gemstone, to Pure Grown Diamonds, Inc. in or before 2015, including identifying all the entities in said supply chain.

17.     Please answer the following:

(a)     Did the Defendant in Singapore make, dispose of or offer to dispose of, import, use and/or keep, whether in part or otherwise, any single crystal CVD diamond material in any form, including as-grown and diamond plate,, which was designated the identifier "2PCVD505005N", regardless of when the aforesaid designation took place and whether the aforesaid designation was by the Defendant or a third party?

(b)     If the answer to (a) is yes, has the process that was used to make the CVD diamond material having the identifier "2PCVD505005N" been used to make single crystal CVD diamond material intended for the making of gemstones?

Note:

• "related party", as used in Interrogatories 2, 3, 7, 8, 13 and 14, refers to an entity or person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common or joint control with, the entity in governing the financial and operating policies, or that has an interest in the entity that gives it significant influence over the entity in financial and operating decisions, it also includes members of the key management personnel or close members of family of any individual referred to herein and others who have the ability to control, jointly control or significantly influence by or for which significant voting power in such entity resides with, directly or indirectly, any such individual. This includes

12

parents, subsidiaries, fellow subsidiaries, associates, joint ventures and post-employment benefit plans, if any (as defined in the Reports and Financial Statements aforementioned).

- "directly supply", as used in Interrogatories 4, 9 and 15, means the provision of goods (whether for consideration or otherwise) to a third party wherein ownership of said goods passes from the supplier to the third party without any other party acquiring ownership of said goods in between, regardless of whether the condition/characteristics of said goods changed from the time it left the supplier's possession power and/or custody by, for example, cutting, polishing annealing, doping, irradiation or otherwise.

- "indirect supply" and "indirectly supply", as used in Interrogatories 5, 10 and 16, means the provision of goods (whether for consideration or otherwise) to a third party wherein ownership of said goods passes to one or more entities before being acquired by said third party, regardless of whether the supplier intended said third party to acquire ownership of said goods and regardless of whether the condition/characteristics of said goods changed from the time it left the supplier's possession power and/or custody by, for example, cutting, polishing annealing, doping, irradiation or otherwise.

The above interrogatories are to be answered within 14 days from the date of service.

Mehta Vishal Jatin, the Chief Executive Officer of the Defendant, is required to answer all of the above interrogatories.

Dated this 18ᵗʰ day of December 2017

**Amica Law LLC**

Solicitors for the Plaintiff

To:     The Defendant and/or its solicitors

**Drew & Napier LLC**

10 Collyer Quay

#10-01 Ocean Financial Centre

Singapore 049315

Plaintiff; Susan Jane Fletcher Watts; 12th; 19.03.2018

## IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

Case No.: HC/S 26/2016
Sub-Case No.: HC/SUM 862/2018

Between

### ELEMENT SIX TECHNOLOGIES LIMITED
(REG NO. 08206603)

...Plaintiff(s)

And

### IIa TECHNOLOGIES PTE. LTD.
(REG NO.  200516961K)

...Defendant(s)

## AFFIDAVIT

I, **SUSAN JANE FLETCHER WATTS** (United Kingdom Passport No. 099207495), care of Element Six (UK) Ltd, Global Innovation Centre, Fermi Avenue, Harwell Oxford, Didcot, Oxfordshire OX11 0QR, UK do solemnly and sincerely affirm and say as follows:-

1.      I am a UK and European Patent Attorney acting as Consultant Patent Attorney (and formerly Head of Intellectual Property) for the Plaintiff and its affiliated companies in the Element Six group. I am duly authorised by the Plaintiff to make this affidavit on its behalf.

2. The matters deposed to in this affidavit, which I verily believe to be true to the best of my knowledge, information and belief, are either within my personal knowledge and/or are derived from records to which I have access.

3. I make this affidavit in reply to the 18th affidavit of Mehta Vishal Jatin ("**18th MVJ**") dated and filed on 19 February 2018 in support of the Defendant's application HC/SUM 862/2018 ("**Application**") for an order that:-

   a) The following paragraphs of the Plaintiff's interrogatories without order dated 18 December 2017 (the **"Interrogatories"**) be withdrawn:

   (i) Paragraphs 2(a) to 2(d), 3(a) to 3(d), 4(a) to 4(f), 5(a) to 5(d), 7(a) to 7(d), 8(a) to 8(d), 9(a) to 9(f), 10(a) to 10(d), 12(a), 12(b), 13(a) to 13(d), 14(a) to 14(d), 15(a) to 15(f), 16(a) to 16(e) and 17(b);

   (collectively, the "**Contested Interrogatories**");

   b) The Plaintiff shall not serve further interrogatories without order;

   c) Costs of this application by paid by the Plaintiff to the Defendant; and

   d) Such further and other orders that this Honourable Court shall deem fit.

4. In response, I humbly request that the Defendant's Application be refused with costs to the Plaintiff.

**A.    BACKGROUND**

3

5.     On 12 January 2016, the Plaintiff commenced the suit HC/S 26/2016 (the "**Suit**") against the Defendant. The Plaintiff's case is that the specified claims of its patents, Singapore Patent No. 115872 ("**SG '872**") and Singapore Patent No. 110508 ("**SG '508**") (collectively, the "**Patents**"), have been infringed by the Defendant's products and manufacturing process:

    a)    In brief, SG '872 is concerned with single crystal CVD diamond material with certain optical properties, in particular low optical birefringence, indicative of low strain, suitable for use in, or as, an optical device or element. There are both product and process claims in SG '872.

    b)    SG '508 is concerned with a method of heat treating a single crystal CVD diamond to produce a diamond of a desired colour (including colourless).

6.     With regard to its case on infringement of the Patents, the Plaintiff relies on 4 samples of CVD diamond material obtained before the commencement of trial, which the Plaintiff found to be infringing and which the Plaintiff believes to have originated from the Defendant in Singapore:

    a)    Sample 1 is a single crystal CVD diamond gemstone and was purchased from Gemesis Diamond Company on 16 April 2012. There is evidence showing that Sample 1 has been heat treated.

    b)    Sample 2 is an optical grade single crystal CVD diamond plate and was purchased from Microwave Enterprises on 12 May 2014.

c)    Sample 3 is a single crystal CVD diamond gemstone and was purchased from Pure Grown Diamonds, Inc. on 27 October 2015. There is evidence showing that Sample 3 has been heat treated.

d)    Sample 4 is an optical grade single crystal CVD diamond plate and was purchased directly from the Defendant in Singapore.

(collectively, the "**Samples**")

7.    The Plaintiff has expressly particularized its grounds for believing that Samples 1 to 3, while not directly purchased from the Defendant, were made from CVD diamond material synthesised by the Defendant in Singapore in its Statement of Claim (Amendment No. 1) dated 12 April 2016 ("**SOC**"), Particulars of Infringement (Amendment No. 1) dated 12 April 2016 ("**POI**") and Reply and Defence to Counterclaim (Amendment No. 3) dated 7 July 2017 ("**Reply**"). The Plaintiff has further disclosed relevant documents to support the aforementioned claims in the Plaintiff's List of Documents dated 7 October 2016 ("**PLOD**"). Sample 4 was directly purchased from the Defendant and the Plaintiff has adduced quotations, invoices and email correspondence in support of its claim.

8.    In summary, the grounds as pleaded in the Plaintiff's SOC and Reply are as follows:

Sample 1

a)    Sample 1 was purchased via the website of Gemesis Diamond Company

(formerly known as The Gemesis Corporation) at http://www.gemesis.com by a Mr. Chuiguan Ng as instructed by the Plaintiff's Singapore counsel.

b) Gemesis Diamond Company (formerly known as The Gemesis Corporation) and the Defendant are both owned and controlled by the Mehta family.

c) The Defendant's website at http://2atechnologies.com/2a-diamond-properties/gem-quality-diamonds/ stated that "Jewellery using diamonds grown by lla Technologies are available through our partner Gemesis at http://www.gemesis.com."

d) The website of Gemesis Diamond Company, http://www.gemesis.com, redirects to the website of Pure Grown Diamonds, Inc., http://www.puregrowndiamonds.com. Both the Defendant and Pure Grown Diamonds, Inc. are part of the IIa Holdings Group.

e) The product code of Sample 1 (LG10061905) has an identical format to the product code for Sample 3 (LG10226420) which was obtained from Pure Grown Diamonds, Inc.

Sample 2

a) Sample 2 was purchased from Microwave Enterprises.

b) The sales quote from Microwave Enterprises (MWE Quote # 13-2051, IIa

Quote #1314-121 dated 24 February 2014) for the sale of the diamond sample expressly states that "*[t]he following quotation is for Lab Grown, CVD single crystal diamond plates, produced by lla Technologies Pte Ltd*" and even included the Defendant's quotation number on the same Microwave Enterprises invoice, as disclosed in the PLOD.

c)      On the website of Microwave Enterprises at http://www.mwe-ltd.com, Microwave Enterprises admitted that:

> "*Our manufacturing partner is the industry leader in grown diamond technology and manufacturing capability, lla Technologies Pte Ltd, located in Singapore.*
>
> ...
>
> *In 2013, the company teamed with one of our customers and the largest producer of lab grown diamond materials in the world, lla Technologies. Under the collaboration, [Microwave Enterprises] now distributes and sells lab grown diamond materials in the North American market place.*"

d)      The product code of Sample 2 (2PCVD303004N) has an identical format to the product code for Sample 4 (2PCVD505005N) which was obtained directly from the Defendant.

Sample 3

a)   Sample 3 was purchased from Pure Grown Diamonds, Inc.

b)   Pure Grown Diamonds, Inc. and the Defendant are both owned and controlled by the Jatin Mehta family. From 26 February 2014 or earlier up to as late as 6 January 2015, Suraj Mehta was the sole director of Pure Grown Diamonds, Inc. (then known as Gemesis, Inc.).

c)   The Defendant is a part of IIa Holdings Group, which also owns Pure Grown Diamonds, Inc.

d)   The official Facebook page of the Defendant at https://www.facebook.com/IIaTech/ actively advertises for and runs articles on Pure Grown Diamonds, Inc.

Relationship between Gemesis Diamond Company and Pure Grown Diamonds, Inc.

a)   At least as of 21 March 2016, http://www.gemesis.com redirects to http://www.puregrowndiamonds.com. The former is the website of Gemesis Diamond Company and the latter is the website of Pure Grown Diamonds, Inc.

b)   As of 2 January 2014, the privacy policy stated on http://www.gemesis.com/privacy is identical to the privacy policy stated on http://www.puregrowndiamonds.com/privacy as on 21 March 2016.

8

c)   As of 9 January 2014, the contact number listed on
http://www.gemesis.com/about/contact is the same contact number listed
for http://www.puregrowndiamonds.com, namely, 866-799-8885, as of 21
March 2016.

Relationship among Gemesis Diamond Company, Pure Grown Diamonds, Inc.,
and the Defendant

a)   The Gemesis Corporation was incorporated in the US in the State of
Delaware (File No 2672225) on 9 October 1996.

b)   On 26 August 1998, The Gemesis Corporation was registered to transact
business in the State of Florida as a foreign corporation (Doc No
F98000004848).

c)   In January 2010, members of the Mehta family, amongst others, acquired
50.1% of The Gemesis Corporation.

d)   On 1 December 2011, The Gemesis Corporation's name was changed to
Gemesis Diamond Company in the State of Florida.

e)   At least until in or around April 2012, Gemesis Diamond Company was
involved in the offer for sale and/or sale of CVD gemstone diamonds
through its website at http://www.gemesis.com.

f)   On 13 September 2012, Gemesis Acquisition Corporation was incorporated

in the State of Delaware (File No 5212499).

g)    On 21 September 2012, Gemesis Acquisition Company merged with and into Gemesis Diamond Company – at the time of the merger, Gemesis Acquisition Corporation owned 99% of the outstanding shares of Gemesis Diamond Company.

h)    From 16 April 2013 or earlier to at least 24 March 2016, the website of the Defendant stated that "Jewellery using diamonds grown by IIa Technologies are available through our partner Gemesis at www.gemesis.com."

i)    On 30 April 2013, Gem Company was incorporated in the State of Delaware (File No 5327015).

j)    On 10 May 2013, Gem Company was registered to transact business in the State of New York as a foreign corporation (DOS ID 4401481).

k)    On 10 May 2013, Gemesis Diamond Company was registered in the State of New York as a 'fictitious' name for Gem Company. As stated on the relevant register of the New York State Department of State Division of Corporations extract, a fictitious name is used when the actual name of a foreign entity is unavailable for use in New York State.

l)    As pleaded by the Defendant, on 15 May 2013, Gem Company changed its corporate name to Gemesis, Inc.

m)     As of 15 May 2013 and up to as late as 28 July 2015, Suraj Mehta was President of Gemesis, Inc.

n)     On 23 May 2013, Gemesis, Inc. was registered to transact business in the State of Florida as a foreign corporation (Doc No F13000002247).

o)     On 7 Jun 2013, Gem Company changed its registered name in the State of New York to Gemesis, Inc.

p)     From 26 February 2014 or earlier up to as late as 6 January 2015, Suraj Mehta was the sole Director of Gemesis, Inc.

q)     On 28 July 2015, Gemesis, Inc. changed its corporate name to Pure Grown Diamonds, Inc.

r)     On 25 Jan 2016, Gemesis, Inc. changed its registered name in the State of Florida to Pure Grown Diamonds, Inc.

s)     As pleaded at paragraph 4(a) of the Defence and Counterclaim (Amendment No. 3) dated 23 June 2017 ("**DCC**"), the Defendant admits that it was formerly known as The Gemesis Company (S) Pte. Ltd. On 14 November 2012, the Defendant changed its name to IIa Technologies Pte. Ltd.

9.     Copies of the aforementioned documents are annexed hereto and marked as "<u>**SFW-29**</u>".

10.     With regard to Sample 2, I also note from the Answers to Interrogatories filed by the Defendant on 19 February 2018 that the Defendant has admitted that it "*sold single crystal CVD diamond material which the Defendant designated the identifier "2PCVD303004N""* in response to Interrogatory 6(a).

11.     A copy of the Answers to Interrogatories is annexed hereto and marked as "**<u>SFW-30</u>**".

12.     In response, the Defendant has merely provided bare denials in its DCC. Rather than providing any particulars, it simply denies(a) knowledge of Samples 1 to 3; (b) that Samples 1 to 3 were made from CVD diamond material grown by the Defendant in Singapore; and (c) that even if Samples 1 to 4 were originally made from CVD diamond material grown by the Defendant or obtained from the Defendant in Singapore, it has no knowledge of whether the condition and/or characteristics of the samples had changed from the time it left the Defendant's possession, power and/or custody.

13.     In parenthesis, by the last allegation, it is reasonable to conclude that there is indeed every possibility that the Samples are obtained from the Defendant, or else there would have no need to provide that sort of proviso. Even more significantly, the Defendant has **<u>not</u>** denied their relationships with all the various companies identified above, nor provided any form of explanation or clarification thereof.

14.     Furthermore, the Defendant failed to provide any form of relevant discovery in relation to its aforementioned denials.  The Defendant's List of Documents dated 7

October 2016 ("**DLOD**") even refused to disclose any documents in relation to Sample 4, and its refusal is particularly glaring for Sample 4 since Sample 4 was purchased directly from the Defendant in Singapore. A quick perusal of the DLOD will demonstrate that the Defendant has no intention of providing any form of relevant discovery.

15.    In fact, the Defendant's refusal to disclose or reticence in disclosing any form of relevant discovery in relation to Samples 1 to 3 and/or its method(s) of manufacture, in spite of the Plaintiff's claims as supported by documents disclosed in the PLOD, can also be seen from how the Defendant responded to the Plaintiff's comprehensive request for specific discovery of certain categories of relevant documents relating to the aforesaid dated 18 December 2017:

   a)    With regard to the categories of documents which the Defendant is agreeable to disclosing, the Defendant had merely provided 3 sheets of documentation, i.e. the quotation, invoice and purchase order of Sample 2.

   b)    With regard to categories of documents which the Defendant claims not to have in its possession, custody or power, it has agreed to affirm this on affidavit but have refused to provide its affidavit before 28 March 2018, which is the date when the parties are directed to file their respective specific discovery applications.

   c)    The Defendant has refused to provide the remaining categories of documents.

16.   Copies of correspondence relating to the Plaintiff's request for specific discovery
are likewise annexed under "**SFW-30**".

17.   Further, the Plaintiff has also pleaded the following:

a)   At paragraph 4(a) of the SOC:

"*4. In particular, the Plaintiff complains of the following acts:*

*(a) The manufacture, use, importing, disposal, offer to dispose of and/or*
*keeping whether for disposal or otherwise of, synthetic single crystal CVD*
*diamonds, which infringe the above stated claims of the Patents, within*
*Singapore by the Defendant, which is* ***subsequently exported to various***
***customers and/or distributors in a variety of countries***."

b)   At paragraph 5 of the Reply:

"*5. Regarding paragraph 4(eA) of the DC, the Plaintiff avers that Pure*
*Grown Diamonds, Inc., The Gemesis Corporation (now known as Gemesis*
*Diamond Company) and the Defendant* ***are all related companies in a***
***supply chain dealing with the manufacture (including synthesis and post-***
***synthesis processing), distribution and eventual sale of CVD diamonds***."

18.   In other words, the Plaintiff's case is clear from the SOC and I am advised that it is
incumbent for the Defendant to provide documents that will either prove these
allegations or disprove these allegations, as well as any documents that will lead to
a train of enquiry with respect to these allegations.  In response, the Defendant has

again made a bare denial and failed to provide any form of discovery in its DLOD in relation to these issues of exporting from Singapore or relationships with the aforementioned companies.

19.    Based on the above, the Defendant has made it clear on multiple occasions that it is challenging the provenance and chain of custody of Samples 1 to 4. This was similarly repeated by the Defendant in the 18th MVJ, which expressly states that the Defendant "*puts in issue the **provenance** and **chain of custody** of all [4 Samples]*" (at paragraph 16 of the 18th MVJ).

20.    Accordingly, two core issues in the Suit which the Plaintiff seeks to address using the Interrogatories relate to the provenance and chain of custody of the Samples 1 to 3. To be more precise, the issues are:

a)    Were Samples 1 to 3 (purchased from Gemesis Diamond Company, Microwave Enterprises and Pure Grown Diamonds, Inc respectively (collectively, the "**Relevant Third Parties**") respectively) made from CVD diamond material manufactured by the Defendant and/or were the Samples supplied by the Defendant?

b)    If Samples 1 to 3 were not directly supplied by the Defendant to the Relevant Third Parties, were they nonetheless *__indirectly__* supplied to the Relevant Third Parties through one or more intermediary companies? For example the Defendant may have manufactured the CVD diamond material, then shipped it to another company to be cut and polished into a gemstone,

and this other company may have shipped the gemstone directly to the Relevant Third Party.   If so, what is the chain of custody relating to Samples 1 to 3 such that the single crystal CVD diamond material made and/or supplied by the Defendant eventually ended up being sold by the Relevant Third Parties?

21.   The facts leading up to this Application are not in dispute and are set out at paragraphs 20 to 27 of the 18th MVJ.

## B.   THE APPLICATION

22.   I have been advised and verily believe that the Contested Interrogatories are relevant to the issues in the Suit and necessary either for disposing fairly of the cause or matter or for saving costs. They are not oppressive and do not amount to an abuse of process. I will leave it to the Plaintiff's solicitors, Amica Law LLC ("**AL**"), to make the relevant legal submissions at the hearing.

23.   I will first set out the 4 broad classes of questions that the Interrogatories fall under and explain, briefly, why these Interrogatories are important to the Suit in question and how the Defendant's contentions as stated in the 18th MVJ are misplaced:

**Interrogatories 2(a)-(d), 3(a)-(d), 7(a)-(d), 8(a)-(d), 13(a)-(d), 14(a)-(d)**

24.   Interrogatories 2(a)-(d), 3(a)-(d), 7(a)-(d), 8(a)-(d), 13(a)-(d), 14(a)-(d) are intended to establish whether CVD diamond material in any form, which were accounted for in the Defendant's financial statements, were provided by the Defendant to the

Relevant Third Parties during the relevant time frames with condition(s) attached, the effect of which would result in the Relevant Third Parties **only** selling such CVD diamond material to the general public which was supplied by the Defendant alone ("**Direct Supply based on Financial Reports Interrogatories**"). Copies of these reports on the Defendant's financial statements are annexed hereto and marked as "**SFW-31**".

25.   In particular, the Direct Supply based on Financial Reports Interrogatories are premised on publicly-available reports of the Defendant's financials produced by third-party auditors and submitted by the Defendant to the Accounting and Corporate Regulatory Authority ("**ACRA**").

26.   Interrogatories 2(a)-(d) and 3(a)-(d) relate to Sample 1 and are based respectively on the documents titled "Reports and Financial Statements for the year ended 31 March 2012" ("**2012 Report**") and "Reports and Financial Statements for the year ended 31 March 2013" ("**2013 Report**").

27.   Interrogatories 2(a)-(d) are identical to Interrogatories 3(a)-(d), save for the references to the different Reports and the different time frames. As the Plaintiff is seeking to determine whether the Defendant had provided any single crystal CVD diamond material to the Relevant Third Parties **prior to or during the period** which Samples 1, 2 and 3 were purchased by the Plaintiff from the Relevant Third Parties, it is necessary to reference both the 2012 and 2013 Reports for Sample 1 since Sample 1 was purchased from Gemesis Diamond Company on 16 April

2012. Similarly, Interrogatories 7(a)-(d) and 8(a)-(d) relate to Sample 2 whereas Interrogatories 13(a)-(d) and 14(a)-(d) relate to Sample 3.

28.   Further, the Plaintiff has pleaded, *inter alia*, that infringing CVD diamond material synthesised by the Defendant in Singapore was "*subsequently **exported to various customers and/or distributors in a variety of countries***" (at paragraph 4(a) of SOC) and that "***Pure Grown Diamonds, Inc. [i.e. relating to Sample 3]**, The Gemesis Corporation (now known as **Gemesis Diamond Company [i.e. relating to Sample 1])** and the Defendant are all **related companies in a supply chain dealing with the manufacture (including synthesis and post-synthesis processing), distribution and eventual sale of CVD diamonds**" (at paragraph 5 of Reply). Additionally, the relationships between the Defendant and the respective Relevant Third Parties as well as the relationships among the Defendant and the Relevant Third Parties have been set out above.

29.   Given the Plaintiff's pleadings above, Interrogatories relating to the question of whether each of the Relevant Third Parties is a "related party" of the Defendant would therefore be relevant and one of the ways of establishing whether the Relevant Third Parties are "*related companies [vis-à-vis the Defendant] in a supply chain dealing with the manufacture (including synthesis and post-synthesis processing), distribution and eventual sale of CVD diamonds*" would be through such reports on financial statements. Interrogatories relating to "trade receivables" of related parties of the Defendant would likewise be relevant. For reference, trade receivables are generally amounts billed by a business to its customers when it delivers goods or services to them in the ordinary course of business.

30.     Additionally, getting such information through audit reports submitted to a Singapore regulatory body would also be helpful because transactions relating to diamond material and products tend to be complex and involve opaque supply chain processes.

31.     I have previously explained this earlier in my 9th affidavit dated 30 June 2017 and I reproduce the relevant extracts as follows:

> "*17.     The process of obtaining Neutral Samples (diamond materials originating from the Defendant) is particularly complex due to the fundamental nature and composition of CVD diamonds and the nature of the supply chain through which they are processed and sold…*
>
> *18.     First, **diamonds are neither homogenous nor fungible**, which means that the characteristics of a diamond vary from diamond to diamond…*
>
> *22.     Secondly, **diamond products do not typically bear any indications of origin on the diamond material itself**. The absence of such indicators makes it **particularly challenging to identify these goods and ensure their integrity**. The lack of any indicators of origin, coupled with the complex and opaque supply chain process mentioned above, are likely to be points of contention used by the Defendant to support its arguments to question the integrity of the Samples.*

> 23.     Further, even when indicators (whether of origin or not) may be found laser-inscribed on the girdle of diamond material for use in gems e.g. gemstones, the lack of any industrial and/or worldwide standards for regulating such indicators further adds to the difficulty and complexity."

32.   A copy of my 9th affidavit without enclosures is annexed under "**SFW-30**".

33.   The Defendant through its solicitors, Drew & Napier LLC ("**DN**"), has also relied on the same reasoning stated above to seek discovery of certain categories of documents from the Plaintiff, as evidenced at paragraph 3 of its letter to AL dated 14 February 2018:

> "...As you know, *our client [i.e. the Defendant] has put in issue the provenance of the Trap-Purchased Diamonds*. Accordingly, the evidence relating to *chain of custody* of these Trap-Purchased Diamonds is clearly relevant and necessary to the proceedings. This is further compounded by the fact that, as admitted by your client in the 9th affidavit of Susan Jane Fletcher Watts dated 30 June 2017 filed in these proceedings, "*diamond products do not typically bear any indications of origin on the diamond material itself [and] [t]he absence of such indicators makes it particularly challenging to identify these goods and ensure their integrity*" (emphasis added). *In the premises, every handling, transfer of possession and/or custody of the Trap-Purchased Diamonds is relevant and material to the issue of provenance*, and our client is unable to agree to your client's limitation at your paragraphs 3(a) and 3(b) ..."

34.    A copy of the aforementioned letter is likewise annexed under "**SFW-30**".

35.    I have also been shown a copy of a document by the Institute of Singapore Chartered Accounts titled "Singapore Standard on Auditing – SSA 500 – Related Parties" and I draw attention to the parts describing the nature of related party relationships and transactions, which appear particularly relevant in the context of this Suit and aforementioned issues:

"*Nature of Related Party Relationships and Transactions*

*2. Many related party transactions are in the normal course of business. In such circumstances, they may carry no higher risk of material misstatement of the financial statements than similar transactions with unrelated parties. However, the nature of related party relationships and transactions may, in some circumstances, give rise to higher risks of material misstatement of the financial statements than transactions with unrelated parties. For example:*

**Related parties may operate through an extensive and complex range of relationships and structures, with a corresponding increase in the complexity of related party transactions.**

**Information systems may be ineffective at identifying or summarizing transactions and outstanding balances between an entity and its related parties.**

> *__Related party transactions may not be conducted under normal__*
> *__market terms and conditions__; for example, __some related party__*
> *__transactions may be conducted with no exchange of__*
> *__consideration__*."

36.   A copy of the document titled "Singapore Standard on Auditing – SSA 500 –
      Related Parties" is annexed hereto and marked as "__SFW-32__".

37.   Since transactions relating to diamond material and products tend to be complex
      and involve opaque supply chain processes and that, for instance, *"[r]elated
      parties may operate through an extensive and complex range of relationships and
      structures, with a corresponding increase in the complexity of related party
      transactions"*, only the Defendant is able to provide information or clarity on their
      own transactions, processes and relationships.

38.   Further, if it were established based on the Defendant's responses to the Direct
      Supply based on Financial Reports Interrogatories that there were commercial
      transactions between the Defendant and the Relevant Third Parties, and that such
      transactions require the Relevant Third Parties to sell CVD diamond material made
      and/or supplied by the Defendant __only__ during the period which the Plaintiff
      purchased Samples 1 to 3 from the Relevant Third Parties, then issues relating to
      the provenance of Samples 1 to 3 would be quickly disposed of. This is elaborated
      below.

__Interrogatories 4(a)-(f), 9(a)-(f), and 15(a)-(f)__

39.     The crux of Interrogatories 4(a)-(f), 9(a)-(f), and 15(a)-(f) is similar to that of the Direct Supply based on Financial Reports Interrogatories, except that these are more general in nature and answers required only if the Defendant's response to whether it had provided any single crystal CVD diamond material in any form to the Relevant Third Parties which was accounted for as "trade receivables" in the Direct Supply based on Financial Reports Interrogatories is in the negative (**"Direct Supply Interrogatories"**).

40.     Interrogatories 4(a)-(f) relate to Sample 1, Interrogatories 9(a)-(f) relate to Sample 2, and Interrogatories 15(a)-(f) relate to Sample 3.

41.     Accordingly, each (a)-(f) series of questions in Interrogatories 4, 9 and 15 is actually made up of 1 key question about Sample 1 to 3 respectively, which is then broken down to largely "yes" or "no" sub-questions so that Mr Mehta Vishal Jatin can easily answer them.

42.     Answers to the Direct Supply Interrogatories would be relevant and material to the dispute over provenance of Samples 1 to 3.

43.     This is because if there was such a contractual relationship during the relevant period between the Defendant and Gemesis Diamond Company such that the latter was to sell single crystal CVD diamond material made and supplied by the Defendant **only**, then Sample 1 as purchased from Gemesis Diamond Company during the relevant period must, in all likelihood, have been made and supplied by the Defendant. The parties can then move on to ascertain the extent of the

monopoly claims of SG '872 and SG '508, which involves issues of infringement and validity insofar as these relate to construction of the claims, as opposed to being bogged down by the vacuum of information provided by the Defendant in relation to the investigation of the alleged factual infringement.

44.   In fact, even in the alternative, if the Defendant were to answer the Interrogatories in the manner which indicates or suggests that it did not directly supply single crystal CVD diamond material to Gemesis Diamond Company in or before 2012, then, assuming that such response were honest and trustworthy, the Plaintiff would become aware of the case it has to answer in relation to the investigation of the alleged factual infringement of, for instance, Sample 1, as opposed to being left in the dark by the Defendant's bare denials in the DCC and the lack of any form of disclosure in the DLOD in this regard.

**Interrogatories 5(a)-(d), 10(a)-(d), 16(a)-(e)**

45.   Interrogatories 5(a)-(d), 10(a)-(d), 16(a)-(e) are intended to ensure that the Defendant do not attempt to evade the Direct Supply based on Financial Reports Interrogatories based on the mere technicality, namely, that it did not ***directly*** provide CVD diamond material to the Relevant Third Parties because, for instance, the material went through third-party middlemen or intermediaries before arriving at the Relevant Third Parties ("**Indirect Supply Interrogatories**").

46.   With regard to paragraph 30(b) of 18th MVJ, given that answers to interrogatories will be affirmed on oath, and that the deponent is only required to state that the

contents are within his personal knowledge or derived from documents which he has access to and information provided to him, the Defendant could easily provide answers as to whether such indirect supply had occurred to the best of its knowledge. Hence, it is surprising that the Defendant is claiming that the Indirect Supply Interrogatories are "*unfair and impossible to answer*", particularly for Mr Mehta Vishal Jatin, who is the CEO of the Defendant and has already filed 18 affidavits on behalf of the Defendant for this Suit.  I cannot see how it is unfair or impossible for him to answer the interrogatory.

47.    In fact, if it was true that the Defendant's CVD diamond material was indirectly supplied to the Relevant Third Parties during the relevant time frame, then it becomes important for the Plaintiff to acquire information from the Defendant about the supply chain which led to such indirect supply. This is why the Indirect Supply Interrogatories included questions on the supply chain of Samples 1 to 3 and whether the Defendant's subsidiaries, holding company and/or key suppliers/customers as identified in reports of the Defendant's financials were part of the supply chain.

48.    Additionally, if the answers are confidential in nature, I have been advised and verily believe that confidentiality is not a bar to disclosure, particularly since a confidentiality proposal such as a confidentiality club or non-disclosure agreement could be given. In this regard, the Plaintiff is willing to enter into a confidentiality club and limit access to such information to the Plaintiff's solicitors and myself. It will be necessary for me to have access to such information as I serve as the Consultant Patent Attorney for the Plaintiff, I am the person at the Plaintiff who is

responsible for the direction of this Suit and I instruct the Plaintiff's solicitors and counsel on behalf of the Plaintiff.

49.      Given the aforementioned explanation, it is evident that that the Plaintiff is not attempting to fish for information that is not material or relevant to the present Suit.  As explained, everything is directed towards the issues in the Suit, including the issues relating to provenance and chain of custody of the Samples, as the Defendant had expressly admitted to in the 18th MVJ.

**Interrogatories 12(a)-(b) and 17(b)**

50.      Interrogatories 12(a)-(b) relate to the method claims of SG '508 and, in particular, the following:

a)      Claim 1 of SG '508 provides "*[a] method of producing single crystal CVD diamond of a desired colour includes the steps of providing single crystal CVD diamond which is coloured and heat treating the diamond under conditions suitable to produce the desired colour.*"

b)      Claim 44 of SG '508 provides "*[a] method according to any one of the preceding claims wherein the heat treatment is carried out in a temperature range of 1200°C - 2500°C under diamond stabilising pressure or in an inert or stabilising atmosphere.*"

51.      In contrast to what was alleged by the Defendant at paragraph 30(d) of 18th MVJ, Interrogatories 12(a)-(b) have specified claim and temporal limits, as follows:

a)   Claim 1 read with Claim 44 of SG '508 indicates that the lowest temperature range for heat treatment according to the patent invention is preferably 1200°C, which is why Interrogatory 12(a) sought an answer to the question of whether the Defendant in Singapore used any method(s) of heat treating at or above 1200°C of single crystal CVD diamond material in or before 2015.

b)   The temporal limit of "in or before 2015" would also cover Samples 1 and 3, which were purchased on 16 April 2012 and 27 October 2015 respectively.

52.   Interrogatories 12(a)-(b) are particularly relevant given that the Plaintiff has disclosed in its PLOD technical reports which revealed that Samples 1 and 3 have been heat treated. Copies of these technical reports are annexed hereto and marked as "**SFW-33**".

53.   Additionally, with regard to the Defendant's claim that its method of manufacture is a "*manufacturing and/or commercial secret*" at paragraph 30(d) of 18th MVJ, I have been advised and verily believe that confidentiality is not a bar to disclosure, particularly since a confidentiality proposal such as a confidentiality club or non-disclosure agreement could be given. In this regard, I reiterate that the Plaintiff is willing to enter into a confidentiality club in the manner already described above.

54.   Interrogatory 17(b) seeks to determine whether the process that has been used to make the CVD diamond material having the identifier "2PCVD505005N" – an

27

identifier which the CVD diamond plate of Sample 4 bears – has also been used to make CVD diamond material intended for the making of gemstones. The Defendant has not explained why it was unable to provide answers to this Interrogatory.

55.     For the above reasons, I respectfully pray that the Application be refused, with costs to the Plaintiff.


Affirmed by the abovenamed              )

**SUSAN JANE FLETCHER WATTS**        )        *Susan J. Fletcher Watts*

in the United Kingdom                   )

on the 17 th day of March 2018          )


Before Me,

_____

**A NOTARY PUBLIC**

RICHARD GARETH GRIFFITHS
Solicitor & Notary Public
Downend Lodge
Chieveley
ENGLAND RG20 8TN

This affidavit is filed on behalf of the Plaintiff.



This is the Exhibit marked "**SFW-29**"

referred to in the 12th Affidavit of

**SUSAN JANE FLETCHER WATTS**

affirmed in the United Kingdom

on this ⎰ ⎱ day of March 2018

Before Me,

_____

**A NOTARY PUBLIC**

RICHARD GARETH GRIFFITHS
Solicitor & Notary Public
Downend Lodge
Chieveley
ENGLAND RG20 8TN



# Hello, Chuiguan Ng

Thank you for your order from Gemesis. Once your package ships we will send an email with a link to track your order. If you have any questions about your order please contact us at customerservice@gemesis.com or call us at 866-799-8885 24/7.

Your order confirmation is below. Thank you again for your business.

## Your Order #100005382 (placed on April 16, 2012 8:05:10 AM EDT)

**Billing Information:**

Chuiguan Ng
Blk 130, Simei Street 1
#09-250
Singapore, 520130
Singapore
T: 6598194467

**Payment Method:**

Credit Card
Credit Card Type:
Visa
Credit Card Number:
xxxx-7436

**Shipping Information:**

Chuiguan Ng
Blk 130, Simei Street 1
#09-250
Singapore, 520130
Singapore
T: 6598194467

**Shipping Method:**

International - FedEx

| Item | Sku | Qty | Subtotal |
|------|-----|-----|----------|
| 0.40 ct ROUND DIAMOND | D00000000000000005173 | 1 | $734.96 |
| | | Subtotal | $734.96 |
| | | Shipping & Handling | $100.00 |
| | | Grand Total | $834.96 |

Thank you again, Gemesis

**30**

# INVOICE

## Gemesis Diamond Company

**10530 PORTAL CROSSING #103 LAKEWOOD RANCH**
**FLORIDA-34211 :USA**
**Phone: (941) 840-6000**
**Fax:     (941) 840-6019**

**Email : www.gemesis.com**

| | |
|---|---|
| **Invoice No #:** | INV-REF/01-JAN-12/31 |
| **Date :** | 04/16/2012 |
| **Customer PO#** | |
| **Payment Terms :** | |
| **Shipped Via :** | |

**Sold To**
**Chuiguan Ng**

Blk 130, Simei Street 1 #09-250
Singapore,520130  SG
Contact#

**Ship To**
**Chuiguan Ng**

Blk 130, Simei Street 1 #09-250
Singapore,520130  SG
Contact#

**All Prices in**

| # | Style# | Customer Style # | Qty | Carat Weight | Description | UOM (Each or Per Carat) | Unit Cost | Total Cost |
|---|--------|------------------|-----|--------------|-------------|-------------------------|-----------|------------|
| 1 | D0000000000000000006173 DM-RND-VS2-H-4.80MM (4.7-4.95)-VGD-NONE-NONE | | 1 | 0.400 | LG10061905 | Per Pieces | $734.96 | $734.96 |

| Notes : | | | | | |
|---------|---|---|---|---|---|
| Tracking# | | 1 | 0.400 | Subtotal | $734.96 |
| | | | | TOTAL DUE | $0.00 |

### THANK YOU FOR YOUR ORDER.

Disclosure: All diamonds from Gemesis are lab-created,guaranteeing a socially and ecologically responsible point of origin.

**Page 1 of 1**

the person(s) affected by an ...
arising from the disclosure or publication of this report or any part thereof.

# HS INTELLECTUAL PROPERTY SERVICES

101 Upper Cross Street
#04-38, People's Park Centre
Singapore 058357
Telephone : (65) 6533 1248
Facsimile  : (65) 6533 9210

Our reference : HS/IP/038/12

20 April 2012

Mr Jason Chan
M/s Amica Law LLC
30 Raffles Place, #18-03/04
Chevron House
Singapore 048622.



Dear Sirs,

GEMSEIS DIAMOND COMPANY
TRAP-PURCHASE

We refer to your recent instructions to our firm to conduct a trap-purchase of a diamond from the aforenamed United States of America incorporated business entity.

On 16 April 2012, an online trap-purchase of a round diamond was conducted from Gemesis Diamond Company via its website @ www.gemesis.com. The diamond ordered/purchased has the underlisted details :

            Shape    : Round
            Weight   : 0.40 ct
            Colour   : F
            Cut      : Ideal
            Clarity  : VS2
            Price    : USD 734.96

The same day, an email confirmation of the order was received from Gemesis Diamond Company giving details of the order no. (#100005382), billing information, payment method, shipping information and shipping method (via FedEx). The total cost includiong shipping and handling charges is stated as USD 834.96. A copy of this email confirmation is attached hereto as reference.

On 20 April 2012, a self-collection of the order was made at one of the FedEx centres located at 6 Changi South Street 2. An invoice from Gemesis Diamond Company (invoice no # : INV-REF/01-JAN-12/31) attached together with the package is attached hereto as referemnce.

contd ..../Page 2

.......................................................................................
The information contained herein is complied with the Strictest Confidence. The contents may not be communicated to the person(s) affected by it. HS Intellectual Property Services undertakes no responsibility whatever for any liability arising from the disclosure or publication of this report or any part thereof.

## HS INTELLECTUAL PROPERTY SERVICES

HS/IP/038/12 .... Page 2

The FedEx package containing the order (unopened) is forwarded together with this report for your necessary attention.

Should you have any other queries concerning this matter, please contact us.

Our invoice billed for the services rendered in the conduct of this matter is also enclosed hereto frop your kind attention.

Yours sincerely,

Ng Chui Guan
for HSIPS

enc : Order confirmation email from Gemesis Diamond Company
      Invoice from Gemesis Diamond Company
      HS invoice HS/028/12



# Hello, Chuiguan Ng

Thank you for your order from Gemesis. Once your package ships we will send an email with a link to track your order. If you have any questions about your order please contact us at customerservice@gemesis.com or call us at 866-799-8885 24/7.

Your order confirmation is below. Thank you again for your business.

## Your Order #100005382 (placed on April 16, 2012 8:05:10 AM EDT)

**Billing Information:**

Chuiguan Ng
Blk 130, Simei Street 1
#09-250
Singapore, 520130
Singapore
T: 6598194467

**Payment Method:**

Credit Card
Credit Card Type:
Visa
Credit Card Number:
xxxx-7438

**Shipping Information:**

Chuiguan Ng
Blk 130, Simei Street 1
#09-250
Singapore, 520130
Singapore
T: 6598194467

**Shipping Method:**

International - FedEx

| Item | Sku | Qty | Subtotal |
|------|-----|-----|----------|
| 0.40 ct ROUND DIAMOND | D00000000000000000006173 | 1 | $734.96 |
| | | Subtotal | $734.96 |
| | | Shipping & Handling | $100.00 |
| | | Grand Total | $834.96 |

Thank you again, Gemesis

**34**

# INVOICE

## Gemesis Diamond Company

**10530 PORTAL CROSSING #103 LAKEWOOD RANCH**
**FLORIDA-34211 :USA**
**Phone: (941) 840-6000**
**Fax:    (941) 840-6019**

**Email : www.gemesis.com**

| | |
|---|---|
| **Invoice No #:** | INV-REF/01-JAN-12/31 |
| **Date :** | 04/16/2012 |
| **Customer PO#** | |
| **Payment Terms :** | |
| **Shipped Via :** | |

**Sold To**
**Chuiguan Ng**

Blk 130, Simei Street 1 #09-250
Singapore,520130  SG
Contact#

**Ship To**
**Chuiguan Ng**

Blk 130, Simei Street 1 #09-250
Singapore,520130  SG
Contact#

All Prices in

| # | Style# | Customer Style # | Qty | Carat Weight | Description | UOM (Each or Per Carat) | Unit Cost | Total Cost |
|---|--------|------------------|-----|--------------|-------------|-------------------------|-----------|------------|
| 1 | D00000000000000000006173 DM-RND-VS2-H-4.80MM (4.7-4.95)-VGD-NONE-NONE | | 1 | 0.400 | LG10061905 | Per Pieces | $734.96 | $734.96 |

| Notes : | | | | | | |
|---------|---|---|---|---|---|---|
| **Tracking#** | | 1 | 0.400 | **Subtotal** | | **$734.96** |
| | | | | **TOTAL DUE** | | **$0.00** |

### THANK YOU FOR YOUR ORDER.

Disclosure: All diamonds from Gemesis are lab-created,guaranteeing a socially and ecologically responsible point of origin.

**Page 1 of 1**

the person(s) affected by ...
arising from the disclosure or publication of this report or any part thereof.



11 October 2012
Vol.27 ♦ No.728



*By Chaim Even-Zohar*

# Jatin Mehta:
## New Global Gem-Quality Synthetic Diamond Czar



Gemesis Lab in Florida in 2007

The four last remaining officers and directors of the **Gemesis Diamond Company**, as well as most of the **U.S.** gem-quality synthetic diamond producer's shareholders, have been compelled to sell all their shares to a newly created **Delaware company called Gemesis Acquisition Corporation**. This new "parent" company made an offer of US$0.30 per share to purchase the some 40 million outstanding shares (!) held by groups of shareholders of the company founded by General **Carter W. Clarke** and members of his family in 1996.

The exodus of the old shareholders from Gemesis was completed on 12:01 AM, September 24, 2012, when "all shares

**DIAMOND INTELLIGENCE BRIEFS**

A Confidential Service for Executives in the Diamond and Diamond Jewelry Business

**36**

ED.TORIAL

have been automatically cancelled and ceased to exist." Some of the long-time minority shareholders bitterly lament that, due to dilution and the low appraisal of the share value, they are getting about 1/150th of their original investment. Many may even have lost more.



Though the documents reaching the shareholders don't specifically state the identities of the promoters, it is clear that this action was initiated by the 50.1 percent shareholders of Gemesis, i.e., the **Jatin Mehta** family and associated parties. Formally, without needing consent (apparently) from minority shareholders, the Gemesis Diamond Company has merged with the Gemesis Acquisition Corporation, the parent. All stocks of the "parent" were converted into common stocks of Gemesis. However, the holders of the Gemesis common stocks were only given the choice to accept US$0.30 cash, upon surrendering of the certificate. Their journey with Gemesis is over.

*Jatin Mehta*

### The 'Rescuing Angel' Took it All...

What preceded this exodus? Let's look at the background. Gemesis, according to its own website, is the "principal producer of gem-quality lab-created diamonds and jewelry" and "has the world's largest facilities comprised of High Pressure-High Temperature (HPHT) and Chemical Vapor Deposition (CVD) diamond production." Indeed, in the past decade, Gemesis has been selling considerable amounts of gem-quality rough and polished diamonds to the international markets.

In early 2010, **Florida**-based Gemesis had been teetering on the edges of bankruptcy. Not because the business was a disaster (it was actually picking up), but because the company faced cash-flow challenges and had defaulted on a loan. Jatin Mehta (directly or indirectly) came in as a "rescuing angel" agreeing "to invest US$8.4 million over the next three years." (As these shares were to be purchased over a period of 18-24 months, it must be assumed that, by now, these shares have been fully paid for.)

After Jatin Mehta came in, the Gemesis board informed shareholders that "the investment agreement provides a consistent source of capital for Gemesis as we retool the Company with the objective to further reduce our production costs and expand our market." What the shareholders apparently didn't know is something DIB disclosed earlier this year, namely, that Jatin Mehta created an additional



synthetic production company (based on CVD-technology) also named Gemesis, in **Singapore**. (See "The Mystery of Two Gemesis Companies under One Hat," DIB #709, May 21, 2012.) Jatin Mehta, apparently, saw the "growth" of the Gemesis company not in the U.S.-based company (in which there are 49.9 percent minority shareholders), but rather in the 100 percent-family owned Singapore Gemesis.

The terms of the January 31, 2010, equity agreement (the entry of the "angel" agreement) provided Jatin Mehta with "the ability to appoint a majority of the board of directors during the term of the investment." Oddly, he chose not to exercise that right. He didn't need to, though, as it soon became apparent that his CEO, **Stephen Lux**, and CFO, **Bernard A. "Skip" Wagner**, both Gemesis shareholders and directors, were faithfully looking after his interests.

That by itself still may become a point of contention in the near future in a Delaware courtroom, where Gemesis shareholders still have some hundred



*Stephen Lux*

days to file a petition demanding a determination of the fair value of the shares which they had to sell for $0.30 per share. The Gemesis board consists of only four individuals: Gemesis founder **Carter W. Clarke**, **Gene Josephs**, Lux and Wagner. In a note to the Gemesis shareholders, it states "the Board of Directors of Gemesis has determined that US$0.30 per share is fair value." There was no explanation at all on how they arrived at that price.

### Losing $1 on every $1 sold?

When the Jatin Mehta family made the aforementioned US$8.4 million investment in Gemesis, this was based on US$0.40 a share – which represented a "distress" value as the company would otherwise undoubtedly have faced bankruptcy. Since then, promising developments in the company have taken place – including the relocation of production facilities to Malaysia and the launch of an internet sales website.

However, the opaque corporate structure and possible transfer-pricing issues, or internal group accounting, may have eroded the value of the U.S. Gemesis company. Or is that erosion only on "paper"? Just to illustrate: the last available financial records are for the first nine months of 2011. In that period, the U.S. Gemesis company reports total sales of merely US$2.24 million, at a cost of sales of US$4.32 million. In the first three quarters of 2011, the diamond market was buoyant. Why would someone sell US$2.24 million at loss margins of US$2.08 million?

Selling at a great loss is sometimes unavoidable when one needs cash. But in the same reporting period, the Gemesis cash position doubled from US$617,000 to

**E**DITORIAL

US$1.27 million. Why sell a diamond if, for every dollar sold, you lose an additional dollar? After all, the company has a good product and shouldn't worry about inventory depreciation. Maybe the cost of sales was inflated? It may have included expenses incurred in the "other" Gemesis?

### The Jatin Mehta Impact on Gemesis USA

When shareholders agreed to have an Indian diamond and jewelry tycoon as majority shareholder, they had all the reasons to believe, to quote the relevant document, that they had a "consistent source of capital" to expand the company's activities.

So what happened between Jatin Mehta and the Gemesis minority shareholders? In an e-mail to Chairman Clarke we noted that some of the shareholders are wondering whether the extensive Singapore businesses value – which the majority shareholder has established using the Gemesis brand, promoting his [own] business by using the Gemesis name, using the know-how, expertise, etc., are also reflected in this low company valuation? If the name Gemesis helped the growth of the Singapore company, shouldn't there be a benefit to the "original" Gemesis? (See related box.)

A back-of-the-envelope calculation will show that the Jatin Mehta family paid US$8.4 million for 50.1 percent of the Florida-based Gemesis company two years ago, and is now paying US$6 million to buy out the remaining 49.9 percent minority shareholders and management. *In other words: the company value is about 30 percent lower today than the "distress" value which the company had when Jatin came to rescue the cash-flow and protect the company against aggressive lenders to whom it had defaulted.*

The last available balance sheet shows some US$11.6 million in assets, including US$7.5 million in property and equipment, and some US$3 million in cash, receivables and inventories. At US$2.4 million liabilities, the company was virtually debt free. At US$0.30 per share – it's a steal.



Gemesis Florida Lab Facility

### Business Improved Prior to Jatin Mehta's Entry

The Gemesis business proposition makes sense and the company also had good years. In the first eleven months of 2008, for example, which was a bumper year for jewelry sales, the company was quite profitable. It sold US$7.5 million worth of rough and polished at an operating margin of 26 percent.

In 2009, like the rest of the diamond world, Gemesis revenues plunged. Its total sales came to only US$1 million, but towards the end of the year – just before Jatin Mehta came in – the company was improving nicely. A clearly confident Stephen Lux then told shareholders that "the majority of these [2009] sales were in the last four months of the year. They represented a mix of polished and rough sales. Essentially, all sales were overseas in end markets such as **Israel, India, China,** and other **south east Asian** countries, suggesting the resistance to cultured or lab-grown diamonds may be less there. A significant polished sale was made in **Canada,**" he added.

"The technology effort continues to be effective with significant gains in several areas. Larger diamonds have been achieved, *with high quality stones exceeding four carats being sold for the first time,*" said Lux at that time. "Process improvements to achieve a more uniform yellow color are being implemented. Finally, blue diamonds are being produced in limited commercial quantities," he added.

The problem was cash – not business. So why did the business sour after Jatin Mehta assumed control? Or didn't it? We don't know – but neither do the minority shareholders who are now forced to sell their holdings in Gemesis.

### Questioning the Company Appraisal

Jatin Mehta is a successful and accomplished business man. If he and/or his family, within two years after making his initial entry, succeeded in getting total 100 percent control and ownership, one can only salute him.

Minority shareholders, however, raise serious questions about the behavior of their board. In our e-mail to Chairman Carter Clarke, we conveyed that some stakeholders believe that there had been a "grand design" to get them all out (or ousted) from

**ED**ITORIAL

the moment the Jatin Mehta family came in. We didn't receive a response.

Disenfranchised minority shareholders are asking questions. No explanations for the valuation were given; to the contrary. Shareholders were told that the old September 2011 financials that had been previously presented to the shareholders "are the most recent financial statements that have been prepared by Gemesis in connection with an annual report." (These were figures DIB reported already in May.)

Board members have a fiduciary duty to always act for the good of the organization, rather than for the benefit of themselves. It is, therefore, also interesting to see whether any of the current officers will feature again in the future Gemesis – or maintain their positions, even though they have sold their shares.

As already mentioned, unhappy shareholders have still some hundred days to file a petition in a Delaware Court demanding a determination of the fair value of the shares. The current management and board members have indicated that "Gemesis is under no obligation to and has no present intention to file such a petition." So if the majority shareholder imposed a certain value, the board clearly (and freely) agreed to it as well.

### Respecting the Privacy of Private Companies

There is considerable incongruity between the Gemesis name-recognition, its perceived impact on the market, the stories conveyed to the international press, and the figures which are reflected in the financial documents.

As CEO Stephen Lux has made clear many times, Gemesis is a private company and their internal affairs are none of our business. I am the first to say that Lux is absolutely right. But the very moment Gemesis and/or its majority shareholder seems to



Gemesis Lab Diamonds

be involved in unethical, if not fraudulent, business practices by engaging (or allowing others to engage in) the selling of their synthetic diamonds as natural diamonds, they forfeit the right to privacy.

If the trust and confidence of the consumer in diamonds is being endangered, the company's affairs become a matter of great concern to all of us. As trade journalist, we will continue to find any piece of information our readers need to know – to protect their own and industry's interest and integrity.

### The New Synthetics Czar

It seems that, shortly, **Jatin Mehta** will emerge as the world's dominant *Gem Quality Synthetic Diamond Czar*. His market position will make him the synthetics price-setter. Unless, of course, De Beers' Element Six gets into the market – something that doesn't see imminent.

Formally, the **Gemesis Diamond Company** has now merged with the **Gemesis Acquisition Corporation**. It seems logical to expect that the other Gemesis companies (Singapore) will somehow also be merged in the same company. This will greatly enhance efficiencies, transparency and governance.

We have always championed the case for synthetics, cultured or man-made diamonds to become an integral part of the diamond market. The product is beautiful; there is considerable demand for it – and it has a great future. Jatin Mehta has now a splendid opportunity to "disassociate" himself from some of the past "mishaps" and use his new position to become the market leader in gem quality synthetics – and also be the leader in terms of the highest standards of disclosure throughout his product's value chain.

If he lives up to these standards, I think that even those original shareholders – who are now bitter about not reaping the fruits of the visions and ideals they had some 15



**39**

years ago – will probably find some consolation if, at the end of the day, their years of pioneering efforts have not gone totally to waste. It remains painful, realising that well over US$50 million has been invested (and mostly burned) from 1996, to where the company is today.

Now the burden of proof – and the ultimate responsibility – is only on one man: Jatin Mehta. As I have written before, I know him as a good person and I want to believe that he will not disappoint the market and the industry. And, if, God forbid, he does? We shall never be more than a pen-stroke away. ♦



A photograph of the undisclosed synthetic diamonds submitted to the IGI in Antwerp.

### The Jatin Mehta Connection

Jatin Mehta is founder and Chairman of **India's** publicly listed **Su-Raj Diamonds and Jewellery Ltd.,** which changed its name to **Winsome Diamonds and Jewellery Ltd.** in the aftermath of the publicity surrounding the (divested) **New York**

**Su-Raj Diamonds** company's involvement in undisclosed synthetic diamond sales. (See: "Exposing the Fraudulent Undisclosed Synthetic Diamond Trail," *DIB #710,* May 30, 2012.)

Jatin's Winsome Diamonds boasted a record annual US$1 billion-plus turnover (for the year ending March 2012). He saw his Indian company grow by 29 percent year to year, producing a (rather low) US$22 million pretax profit. But Winsome is not connected to Gemesis. The synthetic business represents a long-time personal fascination of Jatin Mehta. Even before his investment in Gemesis, he seemed greatly committed to the development of a gem synthetics market.

After assuming control of Gemesis in 2010, Jatin Mehta moved the company's synthetic production facilities from **Lakewood, Florida,** to **Malaysia,** as there, according to the Gemesis CEO **Stephen Lux,** "governmental financial incentives will benefit the company."

In a previous exposé, we also disclosed the establishment of **The Gemesis Company (S) Pte. Ltd.** located in **Singapore.** This is a sophisticated state-of-the-art facility producing synthetic gem diamonds using the CVD method. This Singapore company lists **Jatin Mehta's** wife, **Sonia,** and an offshore (**Nassau**-based) company, **JRD International Ltd.,** as its only two shareholders. Both **Sonia** and Jatin's **son, Vishal Jatin Mehta,** serve on the board of the Singapore company.

The Singapore Gemesis company was not owned by the same shareholders as the U.S.-based Gemesis company. Though Gemesis CEO Stephen Lux assured us earlier this year that he was in charge of all global Gemesis synthetic diamond sales, there were no indications that he had anything to do with the running of the Singapore company. A quite idiosyncratic structure emerged, as with non-identical shareholdings the different companies faced enormous transfer-pricing challenges to protect the "old" shareholders in the U.S. Gemesis company.

A Special Resolution Notice proposing the name change from Su-Raj Diamonds and Jewellery Limited to Winsome Diamonds and Jewellery Limited.



## 4 CORNERS OF THE GLOBE

### INDIA

## GJEPC Elections Foster Leadership Changes in Indian Industry

India's **Gem and Jewellery Export Promotion Council** (GJEPC) has announced changes in leadership following the organization's biennial elections at the end of September.

**Vipul Shah**, Chief Executive Officer and Managing Director of **Asian Star Co.**, has been elected to serve as GJEPC Chairman for the forthcoming 2012-2014 term. Among his industry experience, Shah has previously served as Convener of the GJEPC's Banking, Insurance and Taxation committee and has been a member of the Committee of Administration for the past two years. (See box below for more background on Vipul Shah.)

Elected as GJEPC Vice-Chairman is **Pankaj Parekh**, who, in 1997, was the first person to be elected from eastern India in the GJECP's Central Managing Committee, set up by the Ministry of Commerce. Since then, within the GJEPC, Parekh has held several posts in Central and Regional Committees and is now the Regional Chairman of the Eastern region. (See box, right, for more background on Pankaj Parekh.)

Elected to serve as members of the GJEPC's Diamond Panel Committee for the next two years are **Saunak J Parikh** of **Mahendra Brothers Exports Pvt. Ltd., Mumbai**, and **Nirav J Bhansali** of **Prism Enterprises Pvt. Ltd.**, Mumbai, who will succeed the committee's newly retired members **Bakul Mehta, Vasant Mehta** and **Kanubhai D Shah**.

Additionally, **Ajesh N Mehta** from **Navinchandra Exports Pvt Ltd.** has been elected to the GJEPC's Diamond Reserved category, and **Colin P. Shah** of **Kama Schachter Jewellery Pvt. Ltd.**, Mumbai, has been elected to the Gold Jewellery Panel for the 2012-2014 term, replacing the newly retired **Vijay Kapoor**.

Commenting on the outcome of the elections, outgoing GJEPC Chairman **Rajiv Jain** said, "It is a pleasure to see the selection of four budding young people onto the panel governing the functioning of the GJEPC Committee. It is a good sign for the future of the Council and the industry."

While Jain is no longer the GJPEC Chairman, he remains in the position of Regional Chairman for the Jaipur Region. Other GJEPC Regional Chairmen are: **Anil Sankhwal** for New Delhi, **Princeson Jose** for the South, **Pankaj Parekh** for the East, and **Chandrakant Sanghavi** for Gujarat.

### Vipul Shah, GJEPC Chairman


Vipul Shah

**Vipul P Shah**, Chief Executive Officer and Managing Director of **Asian Star Co. Ltd.**, is described as "a visionary" with enriched experience in the diamond industry and "undisputed" expertise in financial matters. He is well traveled and has thorough knowledge of current global business trends as well as deep insight of future needs of the diamond market.

Shah's broad strategic vision, business acumen and professional conduct have contributed significantly in transforming a manufacturing company to a value-added, vertically integrated business partner. He has been instrumental in establishing Asian Star's jewelry business and global distribution network. Under his dynamic leadership and able guidance, the company has attained the status of being one of India's leading diamantaires.

Shah has been an active spokesperson and an ardent supporter of all activities that promote the Indian diamond industry.

### Pankaj Parekh, GJEPC Vice-Chairman


Pankaj Parekh

**Pankaj Parekh** belongs to a family of jewelers that goes back several generations. While he obtained a bachelor degree in mechanical engineering in 1967, Parekh left engineering for the family jewelry business in 1988. However, instead of venturing into local business, he started his own business of jewelry exports.

Among his leadership experience within the industry, in June 2000, Parekh served as a member of a government delegation to **Israel**, which was led by the then Chief Minister of West Bengal, **Jyoti Basu**, and MP and Chairman of the **West Bengal Industrial Development Corporation Ltd.** (WBIDC), **Somnath Chatterjee**. During this delegation he initiated the idea of the "**Manikanchan**" **Gem and Jewelry Park** for West Bengal. He was subsequently inducted as a member in the Board of the Manikanchan Gem and Jewelry Park by WBIDC in 2001, and has played a key role in the creation of Manikanchan, which was inaugurated in November 2003.

Parekh has also led, or been a member of various gem and jewelry industry delegations, organized by the **Council to Countries e.g. Italy, Latin America, Bangladesh, Myanmar, Middle-East**, etc., which includes attending of the BIMSTEC (**Bangladesh, India, Myanmar, Sri Lanka & Thailand Economic Co-operation**) meetings in November 2002 in Sri Lanka, and in July 2003 in Mumbai. Additionally, Parekh was a trade nominee in the Board of the **Bureau of Indian Standards' Precious Metals Sectional Committee** (BIS MTD 10) for the hallmarking of precious metal jewelry under the Indian government's Ministry of Consumer Affairs.

Parekh is also the Chairman of the Eastern Region of the **Indo-Italian Chamber of Commerce and Industry**, among other philanthropic activities.

**4** CORNERS OF THE GLOBE



ZIMBABWE

## KP Chair to Address Zimbabwe Diamond Conference 2012

The current Chair of the **Kimberley Process Certification Scheme** (KPCS), U.S. Ambassador **Gillian Milovanovic**, will be a keynote speaker at the upcoming Zimbabwe Diamond Conference 2012 in **Victoria Falls**. The conference, which is scheduled for November 12-13, aims to enable in-depth discussion of issues specifically related to the African diamond industry.

"I look forward to an opportunity to present to the conference the vision which this Chairmanship has sought to pursue and to preview for participants the proposals which can be expected to be the focus of the KP Plenary's work 27-30 November in **Washington DC**," Ambassador Milovanovic writes in a letter to Zimbabwe Mines Minister **Obert Mpofu**.

"It is time to close the ranks and to look at the bright future and prosperity diamonds will bring to the African continent," states Minister Mpofu in his welcoming of Ambassador Milovanovic to the international diamond conference.

### Conference Speakers, Attendees

Among the Conference's speakers are: **World Diamond Council** President **Eli Izhakoff**; **World Federation of Diamond Bourses** President-Elect **Ernie Blom**; **Dubai**



Gillian Milovanovic

**Multi Commodities Centre** Authority Executive Chairman **Ahmed Bin Sulayem**; **Dubai Diamond Exchange** Chairman **Peter Meeus**; **Diamond Dealers Club of New York** President **Reuven Kaufman**; **Antwerp World Diamond Centre** President **Stephane Fischler**; **Shanghai Diamond Exchange** President **Lin Qiang**; and a former Chairman of the **Gem and Jewellery Export Promotion Council**, **Vasant Mehta**.

The following African ministers of mines will also be attending the Conference: **Martin Kabwelulu Labilo**, Minister of Mining of the Democratic Republic of Congo; **Susan Shabangu**, Minister of Mineral Resources of the Republic of South Africa; and **Isak Katali**, Minister of Mines and Energy of the Republic of Namibia.

"With the attendance of so many key officials, both from the producing countries and from the industry, the Zimbabwe conference will enable us to examine together how to optimize the role of diamond resources in the economic development of the region," says WDC President Eli Izhakoff. "And how appropriate is it that we will do that in one of Africa's true gems, Victoria Falls, one of the seven natural wonders of the world."



BOTSWANA

## Botswana Diamond Exports down 82% in August

**Botswana**'s diamond exports for August 2012, which include both rough and polished, totaled US$95.9 million, signifying a year-over-year decrease of 82 percent in value, according to the **Bank of Botswana**'s data. Compared to July exports, Botswana saw a 63.2 percent decline in value last month.

For the first eight months of the year, Botswana's exports totaled US$2.37 billion, down 36 percent from the January to August period of 2011.

In 2011 Botswana exported almost US$5 billion worth of diamonds, an increase of 56 percent in value compared to 2010, whose exports totaled US$3.2 billion, the bank data shows.

The bank's figures are sourced from the **Diamond Trading Company Botswana, Teemane Manufacturing Co., Leo Schachter Botswana, Statistics Botswana**, among other exporters.

TANZANIA

## Small-Scale Miners, Dealers Appeal to Govt. for Gems, Minerals Business Center

In an effort to promote trade in the country's gemstones and industrial minerals, the government of **Tanzania** has been asked to spend half of its allocated budget for small-scale miners this financial year to construct a miners' business center that will be used for both local and international gemstone and mineral shows, reports the *Tanzania Daily News*.

Speaking at the recent annual meeting of **Eastern Zone of Tanzania Small Gemstone Dealers Organisation** (TASGEDO) in **Dar es Salaam**, TASGEDO Chairman **Paulo Mbwambo** said the proposed building should have a conference hall that can be used to hold trade shows showcasing Tanzanite, sapphires, ruby, **diamonds** and industrial minerals such as copper, iron, nickel and uranium.

"All Tanzanians with gemstone or industrial minerals would be able to bring to the show for foreigners to purchase easily and consequently enable the government to increase its revenue," Mbwambo told the news source.

At the meeting, Mbwambo also reportedly addressed the recent announcement by the **Ministry for Energy and Minerals** regarding the increase in license fees for gemstone and minerals miners, dealers and exporters, despite the fact that even the previous license fees were beyond the reach of some dealers and miners. According to the TASGEDO chairman, the idea had been raised and implemented without consulting the small-scale miners and gemstone and minerals dealers. He therefore publicly called for the ministry to arrange a joint meeting with the country's minerals stakeholders so as to get their views on the new fees with the express hope of reducing them, reports the *Tanzania Daily News*.

**42**

**4** CORNERS OF THE GLOBE

## Belgium's Polished Trade Declines in September

**BELGIUM**

**Belgium**'s polished diamond exports during September fell 19 percent by value to US$1.3 billion and 16 percent by volume to 617,783 carats as compared to September 2011, according to data released by the **Antwerp World Diamond Centre** (AWDC). Polished imports for the month also declined 23 percent by value to US$1.2 billion and 22 percent by volume to 612,253 carats year over year.

Meanwhile, September rough diamond exports and imports experienced increases. Belgium exported 9.8 million carats of rough diamonds worth S$1.1 billion during September, an 8 percent rise in value and a 68 percent rise in volume year over year. Rough imports for the month totaled 7.4 million carats worth US$1.1 billion, a 5 percent rise in value and a 2 percent rise in volume as compared to September 2011.

During the January to September 2012 period, Belgium's polished diamond exports declined 21 percent by volume and 10 percent by value as compared to the same period in 2011. Some 5.2 million polished carats worth US$10 billion were exported in total.

Polished imports during this nine-month period also showed year-over-year declines in volume and value of 18 percent and 5 percent, respectively. Some 5.8 million carats of polished diamonds worth US$10 billion were imported in total.

Belgium exported 75.2 million carats of rough diamonds worth US$9.8 billion during the same period, declines in volume of 12 percent, and in value of 13 percent, year over year. Rough imports during January to September also fell by double digits. Some 64 million carats of rough totaling US$9 billion were imported, signifying a 20 percent decline in volume and a 15 percent decline in value as compared to the same period in 2011.

| Belgium's Polished Diamonds | | | | | | |
|---|---|---|---|---|---|---|
| | Jan-Sept 2012 | | Jan-Sept 2011 | | Change % | |
| | Carats | US$ | Carats | US$ | Carats | US$ |
| Exports | 5,248,858 | 10,003,298,546 | 6,651,768 | 11,071,548,744 | -21.09 | -9.65 |
| Imports | 5,760,414 | 10,025,331,889 | 7,051,123 | 10,585,878,486 | -18.31 | -5.30 |

| | Sept 2012 | | Sept 2011 | | Change % | |
|---|---|---|---|---|---|---|
| | Carats | US$ | Carats | US$ | Carats | US$ |
| Exports | 617,783 | 1,331,401,437 | 731,221 | 1,641,162,531 | -15.51 | -18.87 |
| Imports | 612,253 | 1,179,220,061 | 780,161 | 1,530,831,849 | -21.52 | -22.97 |

| Belgium's Rough Diamonds | | | | | | |
|---|---|---|---|---|---|---|
| | Jan-Sept 2012 | | Jan-Sept 2011 | | Change % | |
| | Carats | US$ | Carats | US$ | Carats | US$ |
| Exports | 75,153,352 | 9,836,074,322 | 85,810,909 | 11,314,190,324 | -12.42 | -13.06 |
| Imports | 64,017,915 | 9,060,296,173 | 79,870,714 | 10,710,117,965 | -19.85 | -15.40 |

| | Sept 2012 | | Sept 2011 | | Change % | |
|---|---|---|---|---|---|---|
| | Carats | US$ | Carats | US$ | Carats | US$ |
| Exports | 9,771,298 | 1,146,779,481 | 5,829,822 | 1,059,878,566 | 67.61 | 8.20 |
| Imports | 7,439,607 | 1,074,424,048 | 7,287,468 | 1,027,493,136 | 2.09 | 4.57 |

| Belgium's Polished Diamond Exports by Country | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Jan-Sept 2012 | | Change 2011 | | Sept 2012 | | Change % | |
| | Carats | US$ | Carats | US$ | Carats | US$ | Carats | US$ |
| U.S. | 888,372 | 2,676,036,140 | 6.31 | -9.41 | 69,900 | 247,251,017 | 0.40 | -27.96 |
| Hong Kong | 1,222,877 | 2,525,901,149 | -7.75 | -2.63 | 265,467 | 649,565,906 | 7.78 | -6.83 |
| Israel | 386,913 | 960,382,452 | -20.23 | -19.87 | 22,962 | 67,400,755 | -46.94 | -29.72 |
| Switzerland | 485,771 | 951,373,258 | -22.57 | 1.38 | 39,302 | 61,566,010 | -51.14 | -54.57 |
| UAE | 467,196 | 550,788,213 | -24.99 | 1.55 | 40,062 | 61,807,537 | 2.86 | 26.40 |
| India | 495,758 | 382,648,550 | -59.66 | -55.95 | 46,134 | 37,972,349 | -49.44 | -38.86 |
| China | 234,546 | 351,848,819 | 4.52 | 5.48 | 21,170 | 41,299,801 | -32.96 | -7.94 |
| France | 131,835 | 285,078,054 | -13.95 | 8.08 | 15,222 | 33,088,029 | -7.69 | -31.19 |
| UK | 46,838 | 204,384,456 | -12.42 | -19.80 | 6,431 | 15,705,432 | 1.35 | -37.65 |
| Italy | 222,566 | 189,748,012 | -21.75 | -6.28 | 26,745 | 25,254,990 | 9.85 | 3.26 |
| Others | 666,185 | 925,109,443 | | | 64,388 | 90,489,608 | | |
| **Total** | **5,248,858** | **10,003,298,546** | | | **617,783** | **1,331,401,437** | | |

*Source: Diamond Office at Antwerp World Diamond Centre (AWDC)*

**43**

DIGGING THE DIBT


Namdeb Operations

## Firestone Diamonds Sees Improved Quality, Value of Liqhobong Diamonds

**Firestone Diamonds plc** reports that "good progress" was made in improving the quality and value of diamonds recovered from its **Liqhobong** mine in **Lesotho** following the planned shutdown at the mine's pilot plant in July 2012.

The mine's pilot plant was shut down for 14 shifts in July to be fitted with equipment necessary to reduce diamond breakage of the larger stones. According to Firestone Diamonds, while the retrofitting was successful, returning the plant to a steady state of production took longer than anticipated due to technical challenges as well as extremely cold weather and heavy snowfalls in Lesotho in August.

As a result, the plant only returned to steady state conditions during mid-September. However, since mid-September, Firestone notes that it has seen a marked increase in the recovery of higher quality white and undamaged stones and the higher run rate has continued into early October.

### Higher Value Stones

Amongst the largest stones recovered in August and September were three yellow stones weighing 27, 17 and 15 carats and three white stones weighing 12.4, 9.2 and 9.1 carats.

"The change in the amount of whiter stones recovered is also encouraging which should continue on an upward trend as the mine plan calls for more of the higher grade, larger stone bearing areas of the pit to be mined during the remainder of the year," says **Tim Wilkes**, Chief Executive Officer of Firestone Diamonds.

The feed for the pilot plant is expected to improve in grade and quality over the coming weeks as more of the K5 higher grade rock that historically carries the bigger stones will be exposed in the open pit.


Liqhobong Plant

## Namdeb, MUN Reach Two-Year Wage Deal

The management at **Namdeb** and the **Mineworkers Union of Namibia** (MUN) have successfully concluded wage negotiations, which have resulted in a two-year agreement for the period of 2012/2013 and 2013/2014. The deal follows an earlier salary dispute that began this past spring and that hit an impasse when, in August, Namdeb management requested an unresolved dispute certificate.

As part of concluding the two-year wage settlement, the company, a mining joint venture between **De Beers** and the government of Namibia, and MUN have committed to safety, productivity improvements and continued relationship-building.

According to a Namdeb statement, the agreement, which is effective retroactively from April 1, 2012, provides for a sliding-scale increase in wages for employees in the bargaining unit as well as increases in a number of allowances. The increases in the 2012/2013 basic wages range between 8.5 percent and 10 percent depending on the grade of the employee, while the increase to 2013/2014 wages is 7.5 percent across the board.

The mediation panel that brokered the agreement comprised Regional Councilor **Eliphas Iita**; Oranjemund Mayor **Henry Coetzee**; SWAPO party Regional District Coordinator **Silas Shituula**; Oranjemund Town Council Management Committee Chairman **Toivo Auala**; and Deputy Mayor **Xungileni Ntinda**.

"…there is joy in our community that we have been able to settle this matter. We do not want instability in Oranjemund the newest town in Namibia. We want to see Namdeb growing to the benefit of all its stakeholders," said the Mayor of Oranjemund, Henry Coetzee, at the agreement's signing.

A year ago, Namdeb and MUN found themselves in conflict over housing and utility allowances, drawing the intervention of Namibia's State House to break a deadlock that caused a month-long strike, reportedly costing De Beers US$16 million in profits. At the end of that strike, both parties vowed to work together to restore trust and rebuild their relationship.

DIGGING THE DIRT



Drilling at Petra's Cullinan Mine in SA

## Miners at Petra Diamonds' SA Operations Return to Work after 4-Day Strike

An estimated 600 employees at **Petra Diamonds** ended a strike Saturday that began early last week at the miner's operations in **South Africa**, Reuters reports, citing a union spokesman. The sit-in strike over working conditions and wages started on October 2, and was similar to several of its kind that hit South Africa's mining sector within the past weeks.

"The Petra Diamond strike has ended. There was no deal. They just agreed to return to work," **Lesiba Seshoka**, spokesman for the **National Union of Mineworkers**, told the news source. The workforce reportedly returned to posts late Friday.

Petra Diamonds, which has interests in operating mines in **South Africa** and **Tanzania**, doubled production to 2.2 million carats in fiscal 2012. Group production is expected to increase approximately 30 percent to 2.85 million carats in fiscal 2013.

## Mountain Province Diamonds Files $47 Million Rights Offering

**Mountain Province Diamonds Inc.** has filed a rights offering circular with the **Toronto Stock Exchange** (TSX) and the securities regulators in each of the provinces of **Canada** (with the exception of **Quebec**), regarding a rights offering to raise gross proceeds of approximately C$47.1 million. These proceeds will be used to fund the company's 49 percent share of the initial capital costs for the **Gahcho Kué** diamond mine in Canada's **Northwest Territories**, a joint venture with **De Beers Canada Inc.** (who owns the remaining 51 percent interest), and for general corporate purposes.

According to the miner, proceeds from the rights offering are expected to be sufficient to cover Mountain Province's share of the initial capital costs through to the completion of permitting of Gahcho Kué in 2013.

Under the rights offering, each registered holder of Mountain Province common shares, as of a record date to be determined in conjunction with the TSX, will receive one right for each share held. Notes Mountain Province: "Six rights plus the sum of C$3.50 are required to subscribe for one share. The rights will expire on a date to be announced, after which unexercised rights will be void and without value. The rights will be listed on the TSX. Shareholders who fully exercise their rights may subscribe pro-rata for any additional shares not otherwise subscribed for before the expiry date," further explains the company.

"We have received wide support for a broad placement of common shares. However, given that the Company's shares are currently trading below the C$5 level of the last placement completed in October 2010, the Board considers a rights offering to be fairer and in the best interest of current shareholders," says **Patrick Evans**, Mountain Province President and CEO.

The rights offering is subject to regulatory approval, including that of the TSX.

## Argyle Mine to Receive World's Largest Underground Mine Automation System

**Rio Tinto** has ordered underground mining automation system for its wholly owned **Argyle** diamond mine in an effort to accelerate its underground operation efficiency. The advanced **AutoMine** automation system, scheduled for delivery in 2012-2013, will also enhance the mine's safety and achieve production improvements, according to **Swedish** mine automation technologies provider **Sandvik Mining**.

Included in the AutoMine system order for the Argyle mine are 11 electric loaders



Argyle's Underground Block-Cave Project

and two diesel loaders, which will be operated from three stations in a Sandvik surface control room. The system delivery also reportedly includes Sandvik's recently launched Draw Control product that enables accurate tracking, reporting and overall management of manual production loading during the mine's development phase.

According to Sandvik, the Argyle production structure is fully designed for automation when fully operational, and the mine's AutoMine automation systems will be the largest underground mining automation installation in the world to date.

**45**

**B**RIEFLY NOTED

### Industry Leaders to Gather in Mumbai for 35th World Diamond Congress

Key players in the diamond industry from the **World Federation of Diamond Bourses** (WFDB) and the **International Diamond Manufacturing Association** (IDMA) are gathering in **Mumbai** next week for the **35th World Diamond Congress**, which aims to create a platform for key players to interact with one another and plan the industry's road ahead. Also attending the Congress, scheduled for October 14-17, will be ministerial heads from countries associated with the diamond industry.

The Congress's agenda includes the election of the new WFDB president, as well as the executive and key positions associated with the organization. International, high-ranking industry and governmental speakers will also be addressing attendees, including the South African Minister of Minerals and Mines, **Susan Shabangu**, who will serve as a keynote speaker.

During the Congress, the strategy and implementation of a new development for the WFDB, the **World Diamond Mark**, will also be presented to members. According to the WFDB, this development will bring with it major changes in how the organization interfaces with retail outlets across the world. This new financial model and marketing development puts diamond marketing in the hands of the WFDB, which has developed this product as an all-inclusive diamond strategy to ensure that diamonds secure their place in the luxury goods market.

Congress participants are also scheduled to visit diamond-based factories, including in Surat. A list with all speakers who will be addressing delegates is available on the WDC's official website, at http://www.diamondcongress2012.com/WDC/index.aspx, as is information on the event's schedule and program, participating organizations, the hosts, the sponsors, information about registration, the venue hotel and room booking, social tours and post-congress optional programs.

Additionally, in preparation for the Congress, IDMA has launched a new Facebook page to which the IDMA communications team will post as many Congress updates, discussions, presentations and visuals as possible. The IDMA Facebook page can be found at: http://www.facebook.com/

### Rio Tinto to Exhibit Argyle Pink Diamonds at Kensington Palace

More than US$60 million worth of jewelry featuring diamonds from **Rio Tinto's Argyle** diamond mine will be showcased in an exhibition at **Kensington Palace** titled "Out of the Vault: Pink Diamonds and Royalty."

The 40 rare and valuable items of pink diamond jewelry on display in London are sourced from luxury jewelers and designers from the **U.S., Australia, Japan, China, India** and **Europe**.



Argyle Pink Diamonds

According to Rio Tinto Diamonds, the inspiration for this pink diamond jewelry exhibition came from Her Majesty the Queen's Diamond Jubilee. In the year of her coronation, the Queen was gifted a solitaire pink diamond (The Williamson Pink) gifted to her and set in the center of a flower spray brooch created by **Cartier**.

"We therefore consider it fitting in this Jubilee year, for Argyle Pink Diamonds to celebrate the special relationship that rare pink diamonds have played, and continue to play, in royal occasions," says **Josephine Johnson**, Manager of Argyle Pink Diamonds.



James Courage

### RJC Board Names Successor to RJC Chairman Matt Runci

The Responsible Jewellery Council (RJC) has announced that James Courage, Chief Executive Officer of Platinum Guild International (PGI), will succeed Dr. Matt Runci as RJC Chairman. Courage will assume the position of RJC Chairman-elect upon Matt Runci's retirement on December 31, 2012. Runci served as RJC Chairman for almost eight years.

Courage, whose appointment was unanimously endorsed by the RJC Board, has more than 30 years of extensive experience in the jewelry industry, with De Beers in the 1980s and from 1996 with the Platinum Guild; he has worked and lived in Europe, Africa and Asia.

Commenting on his appointment, Courage says: "I am fortunate to be assuming the chairman's role of an organisation exhibiting exceptional institutional health... In assuming the role as non-executive Chairman, I look forward to assisting RJC's Members, its Board and its Management Team build on the successes of Matt's term, so as to achieve the RJC's mission: To advance responsible ethical, social and environmental practices, which respect human rights, throughout the diamond, gold and platinum group metals jewellery supply chain, from mine to retail," concludes Courage.

Courage will be formally confirmed as Chairman by the full RJC membership at the RJC's Annual General Meeting in May next year.

**46**

**O**FF THE SHELF

## Cartier, Tiffany Ranked among Top Global Luxury Brands

**Cartier** and **Tiffany & Co.** are the top jewelry names on the "Best Global Brands" list from international branding consultancy **Interbrand**, which publishes the report of the world's 100 most valuable brands on an annual basis.

Cartier ranked 68th, up from last year's 70th place ranking, while Tiffany ranked just behind it at 70th, also up from last year's 73rd place ranking, reports *JCK Online*. The other luxury names on the list include **Louis Vuitton** (#17), **Gucci** (#38), **Hermès** (#63), **Burberry** (#82), and **Prada** (#84).

"Despite the current economic landscape, all of the luxury brands in this year's report increased their brand value. As the meaning of luxury shifts, this year's top luxury brands reflect a changing global consciousness – with success dependent not only upon a portfolio of superior products and superb quality of service, but also a strong cohesive brand, a formidable digital presence, and reputation that is timeless, elevated, and refined," says a company statement.

To develop its report, Interbrand says it examines financial performance of the branded products or service, the role the brand plays in influencing consumer choice, and the strength the brand has to command a premium price, or secure earnings for the company.

**Coca-Cola** held the list's "number one" spot, followed by **Apple, IBM, Google**, and **Microsoft**.

## Christie's New York Sale to Feature Diamonds Larger than 50 Carats

**Christie's New York** is holding its first jewelry auction of the fall season on October 16, where a total of 372 lots will be offered and expected to achieve in excess of US$35 million. Highlighting the two-session **Magnificent Jewels** sale at Christie's **Rockefeller Center** saleroom will be a trio of diamond jewels weighing more than 50 carats each, as well as a rare double strand of large natural pearls.

### Top Diamonds

The New York sale's top lot is a pair of diamond ear pendants, with a pear-shaped fancy yellow diamond of 52.78 carats and a pear-shaped white diamond of 50.31 carats mounted in yellow and white gold and surmounted by circular-cut fancy yellow and white diamonds. Their pre-sale estimate is US$4.5-6.5 million.



A pair of diamond ear pendants of 52.78 and 50.31 carats on offer at Christie's New York

Other highlights include a pear-shaped D-color flawless diamond of 50.52 carats mounted in platinum (whose pre-sale estimate is available from Christie's upon request); and an oval-cut fancy intense yellow, internally flawless diamond of 68.35 carats with a pre-sale estimate of US$2.2-US$3.2 million.

### Other Highlights

The auction will also include a rare double-strand natural pearl necklace formed of 120 large-sized individual pearls and more than 130 signed jewels by **Buccellati, Bulgari, Cartier, Graff, Marina B., Oscar Heyman & Brothers, Tiffany & Co.,**

**Van Cleef & Arpels, David Webb, Harry Winston** and **Raymond Yard**, among others.

Christie's is also offering a selection of jewels by **Marina B**, granddaughter of **Sotirio Bulgari**, and, as a special fundraising item within the sale, a pair of pearl and diamond ear clips by the **Indian** designer **Viren Bhagat**.

**DIB**

DIAMOND INTELLIGENCE BRIEFS, available only by subscription, is published on a weekly basis to ensure a speedy dissemination of information indispensible to executives in the diamond and diamond jewelry business. While the information herein is carefully compiled from sources believed reliable, no responsibility for its accuracy can be assumed and no representation of warranty expressed or implied is made as to their completeness or correctness.

Diamond Intelligence Briefs may not be reproduced, distributed, published or used otherwise for any purpose but for the personal information of the subscriber without the prior written consent of the publisher.

1 year subscription - US$590 * Individual issues of DIB are available for US$25

website: www.diamondintelligence.com

**Editorial and Research Management:**
Chaim Even-Zohar, Editor
Rachel Segal, Managing Editor
Anat Hod, Graphics

**Subscriptions and Circulation:**
Jacqueline Reardon
CEZ Holdings Ltd.
Silver Bldg., 7 Abba Hillel St.,
Ramat Gan, Israel
P.O.B. 3441, Ramat Gan 52136, Israel
Tel: 972-3-5750196, Fax: 972-3-5754829
office@tacy.co.il
www.diamondintelligence.com

© Copyright 2012
by Diamond Intelligence Services Inc.

 **TECHNOLOGIES**

  

Home | About Us | Technology | Products And Applications | Sustainability | Contact Us | News Links

## Gem Quality

Diamonds have always been known for their beauty and mystery. The diamond is a transparent jewel with unparalleled brilliance and fire, reflecting more light than any other gem in the world. It has captured the hearts and imaginations of generations of women and its aspirational value only grows year after year.

The beauty of the diamond roots in its physical characteristics. There is no material in the world that can match it, except itself. Grown diamonds have the same optical, physical and chemical properties as a mined diamond.

### LAB CREATED vs MINED

| Diamonds | Chemical Composition | Crystalline Structure | Refractive Index | Dispersion | Hardness | Density |
|----------|----------------------|-----------------------|------------------|------------|----------|---------|
| LAB CREATED | C | CUBIC | 2.42 | 0.044 | 10 | 3.52 |
| MINED | C | CUBIC | 2.42 | 0.044 | 10 | 3.52 |

The mystery of a diamond comes from the history of each diamond. The youngest diamonds is thought to be almost 900 million years old. This is made possible by one simple fact; the diamond is the hardest material on the planet and this allows for it to survive through these years. For Nature to do this 200 km underground is amazing, and to see Nature work in our back yard is as romantic and mysterious as it is humbling. We are privileged to be at the beginning of its creation.

Jewellery using diamonds grown by IIa technologies are available through our partner Gemesis at www.gemesis.com

Copyrights reserved by IIa Technologies Pte. Ltd. © 2013 | ISO Certified 14001:2004 / 9001:2008 | Terms & Conditions          Powered by IIa Technologies Pte. Ltd.

# Redirect Check

This site is used to chase the redirection of URLs. Feel free to use this site at will.

## Usage:

Enter a URL in the box to the right. The headers of each redirection will be displayed below.

## Redirect Trace:

[                          ] [ Trace ]

## Results:

```
http://www.gemesis.com

HTTP/1.1 301 Moved Permanently
Date: Thu, 24 Mar 2016 09:52:09 GMT
Server: Apache
Location: https://www.puregrowndiamonds.com/
Cache-Control: max-age=300
Expires: Thu, 24 Mar 2016 09:57:09 GMT
Vary: Accept-Encoding
Content-Length: 242
Content-Type: text/html; charset=iso-8859-1

https://www.puregrowndiamonds.com/

HTTP/1.1 200 OK
Date: Thu, 24 Mar 2016 09:51:56 GMT
Server: Apache/2.2.29 (Unix) mod_ssl/2.2.29 OpenSSL/1.0.1e-fips mod_bwlimited/1.4 PHP/5.4.36
X-Powered-By: PHP/5.4.36
Set-Cookie: frontend=44e766f1ae617f791753d4262ea08282; expires=Fri, 25-Mar-2016 09:51:57 GMT; path=/
Cache-Control: max-age=0, no-cache, no-store, must-revalidate
Expires: Wed, 11 Jan 1984 05:00:00 GMT
Vary: Accept-Encoding,User-Agent
Pragma: no-cache
Transfer-Encoding: chunked
Content-Type: text/html; charset=UTF-8
```



**50**



MICROWAVE ENTERPRISES

**Quote**

Microwave Enterprises
860 Aviation Parkway, Suite 900
Morrisville, NC 27560-9204
PH: (919) 462-1919 Voice 244
FAX: (919) 462-1927

| | |
|---|---|
| Date: | 02/24/14 |
| MWE Quote #: | 13-2051 |
| IIa Quote #: | 1314-121 |

**Prepared For:**
Andrey Jarmola
Department of Physics
University of California
366 LeConte Hall #7300
Berkeley, CA 94720-7300

**Description:**
*The following quotation is for Lab Grown, CVD single crystal diamond plates, produced by IIa Technologies Pte LTD. Products listed are optical grade, single crystal diamond with orientation and size as noted below and small quantity orders.*

| S/N | DESCRIPTION | ITEM CODE | Quantity | UNIT PRICE (USD) |
|---|---|---|---|---|
| 1 | Lab Grown diamond plates (3.0mm x 3.0mm x 0.4mm; Top/bottom <100>, edges <110>; Basic Polished; Optical Grade) | 2PCVD3030004N | 20 | $101.00 |
| 2 | Lab Grown diamond plates (3.0mm x 3.0mm x 0.4mm; Top/bottom <100>, edges <110>; Basic Polished; Electronic Grade) | 2PCVDEG3030004 | 20 | $490.00 |
| 3 | Lab Grown diamond plates (3.0mm x 3.0mm x 0.4mm; Top/bottom <100>, edges <110>; Basic Polished; Electronic Grade) | 2PCVDEG5050004 | 20 | $1,645.00 |
| | | | Subtotal: | |
| | | | Bank/Freight/Ins Charges | |
| | | | GST @0% | |
| | | | TOTAL | |

**Terms and Conditions**
**Payment Terms: In Advance**
**Delivery Date: 8-10 weeks**
**Trade Term: Ex Work (MWE)**
**Validity: Quote is Valid for 30 days from date of issue**

For Microwave Enterprises, Ltd.

Richard S. Garard, CEO

We look forward to working with you!
www.mwe-ltd.com

**51**

 **MICROWAVE  ENTERPRISES**

# Invoice

**Microwave Enterprises, LTD**
**860 Aviation Parkway, Suite 900**
**Morrisville, NC  27560-9204**
**PH: (919) 657-0996**
**FAX: (919) 462-1929**

|  |  |
|---|---|
| **Date:** | 12-May-14 |
| **Invoice #:** | 3086 |
| **Customer PO #:** | BB00361673 |

|  | **Bill To:** |  | **Ship To:** |
|---|---|---|---|
| Attn: | Andrey Jarmola | Attn: | Andrey Jarmola |
| Company Name: | UC Berkeley | Company Name: | UC Berkeley |
| Address: | 2195 Hearst Ave | Address: | LeConte Hall RM151 |
| Address: | Warren Hall, Ste 159 | City, ST Zip: | Berkeley, CA 94720 |
| City, ST Zip: | Berkeley, CA 94720 |  |  |

| SHIP DATE | SHIP VIA | F.O.B | TERMS |
|---|---|---|---|
| 06/27/14 | FEDEX | Morrisville, NC | In Advance |

| QUANTITY | UNIT | DESCRIPTION | ITEM CODE | UNIT PRICE (USD) | EXTENSION |
|---|---|---|---|---|---|
| 20 | Each | Lab Grown diamond plates (3.0mm x 3.0mm x 0.4mm;  Top/bottom <100>, edges <110>; Basic Polished; Optical Grade) | 2PCVD303004N | $101.00 | $2,020.00 |
| 15 | Each | Lab Grown diamond plates (3.0mm x 3.0mm x 0.4mm;  Top/bottom <100>, edges <110>; Basic Polished; Electronic Grade) | 2PCVDEG303004 | $490.00 | $7,350.00 |
| 5 | Each | Lab Grown diamond plates (5.0mm x 5.0mm x 0.4mm;  Top/bottom <100>, edges <110>; Basic Polished; Electronic Grade) | 2PCVDEG505004 | $1,645.00 | $8,225.00 |
|  |  |  |  |  |  |

|  |  |
|---|---|
| Subtotal: | $17,595.00 |
| Sales Tax (if applicable) |  |
| Shipping | $        70.00 |
| TOTAL | $    17,665.00 |

**Wire Transfer Instructions:**
  **Bank:  Wells Fargo N.A. - Winston Salem, NC**
  **For the Benefit of Microwave Enterprises, LTD**
  **Account # 6952461447**
  **ABA # 053000219**
  **Swift Code: WFBIUS6S**

**Checks Payable To:**
  **Microwave Enterprises, Ltd**
**Payment Terms:**
  **Due In Advance from Invoice**
  **Payable USD**

*THANK YOU FOR YOUR BUSINESS!*

*www.mwe-ltd.com*

3/11/2016     Microwave Enterprises - Properties and Applications     Case 1:18-mc-00418-PGG   Document 5-10   Filed 09/07/18     Page 69 of 99

**52**

This is Google's cache of http://www.mwe-ltd.com/lab-grown-diamonds.asp. It is a snapshot of the page as it appeared on 26 Feb 2016 08:57:13 GMT.
The current page could have changed in the meantime. Learn more

Full version          Text-only version          View source                    Tip: To quickly find your search term on this page, press Ctrl+F or ⌘-F (Mac) and use the find bar.

  MICROWAVE  ENTERPRISES

Contact Us      Find What You Need      SEARCH

**LAB GROWN
DIAMOND MATERIAL**
-------------------------------------------
**Properties & Applications** (/lab-grown-diamonds.asp)

Single Crystal Diamond (/single-crystal-diamond.asp)

Polycrystalline Diamond (/polycrystalline-diamond.asp)
-------------------------------------------

## Properties & Applications

Diamonds are treasured worldwide as gems for their brilliance, beauty and rarity. The mechanical, thermal, and optical properties of diamond are far superior to any other material known to man. As a result, the potential of diamond for industrial applications extend over many market sectors and into almost all areas of science. The problem for broad adoption of diamond material has been the cost of natural diamond and the inferior properties of some lab grown processes.

Microwave CVD diamond has equivalent properties and characteristics as natural diamond, but with repeatable consistent and eco friendly processing. MWE provides the US market with CVD diamond material produced by IIa Technologies, Pte. IIa Technologies host the largest CVD diamond manufacturing facility in the world, where they have transitioned from producing type IIa rough diamond for the gem market to similar material, produced and finished for the industrial and scientific communities.

To further broaden our diamond material product base, Microwave Enterprises offers lab grown diamond from select lab grown diamond producers, inclusive of CVD, single and polycrystalline as well as high quality HPHT materials. As such, MWE provides our customers the broadest range of lab grown diamond available from any other supplier.





# MICROWAVE ENTERPRISES

Contact Us    Find What You Need    SEARCH

**Home** | **About MWE** | **CVD Diamond Equipment** | **Lab Grown Diamond Material** | **Research Collaboration** | **News** | **Links**

**LAB GROWN
DIAMOND MATERIAL**

Properties & Applications
▸ Single Crystal Diamond
Polycrystalline Diamond

## Single Crystal Diamond

The single crystal diamond material supplied by Microwave Enterprises is all Type IIa, single crystal diamond. Our manufacturing partner is the industry leader in grown diamond technology and manufacturing capability, IIa Technologies Pte, Ltd., located in Singapore.



High quality single crystal, CVD diamond is used in the following areas:

- Optical Applications - UV, IR and MW Windows, laser optics components
- Mechanical Applications - Precision tooling, surgical tools, wire draw dies, wear parts
- Electronic Applications - Radiation detectors, beam monitors, diodes, quantum computing
- Thermal Applications - Heat spreaders

| Property (Actual Values) | Si | GaAs | GaN | SiC | Si3N4 | Al2O3 | IIa Technologies Diamond |
|---|---|---|---|---|---|---|---|
| Thermal conductivity (W/mK) | 148 | 55 | 130 | 490 | 15 | 35 | 2200 |
| Thermal expansion coefficient at 300K (ppm/C) | 2.5-4.2 | 5.7-6.9 | 3.2-5.6 | 4.0-5.8 | 3.2 | 7.2-8.3 | 1.0-3.8 |
| Dielectric constant | 11.9 | 13.1 | 9 | 9.66 | 7.5 | 9.8 | 5.7 |
| Electric Breakdown field (kV/cm) | 300 | 400 | 3000 | 2200 | 1000 | 10000 | 10000 |
| Electron mobility at 300K (cm2/Vs) | 1500 | 8500 | 1000 | 900 | - | - | 2200 |
| Hole mobility at 300K (cm2/Vs) | 450 | 400 | 350 | 115 | - | - | 1600 |
| Saturated carrier velocity (x 107 cm/s) | 1 | 1.2 | 2.2 | 2 | - | - | 2.7 |
| Hardness | 7 | 4.5 | 6 | 9 | 8.5 | 9 | 10 |
| Optical transparency (nm) | >1107 | >870 | >365 | >384 | >248 | >354 | >236 |
| Radiation hardness (displacement threshold in eV) | 15 | 10 | 10 to 20 | 21.8 | - | - | 43 |
| Bulk modulus (dyn cm-2) | 10.2 x 1011 | 7.53 x 1011 | 20.4 x 1011 | 22 x 1011 | 19.5 x 1011 | 22.8 x 1011 | 44.2 x 1011 |

860 Aviation Parkway, Suite 900 | Morrisville, NC 27560 • 919-657-0996 • Sitemap • Privacy Policy • © 2014 Microwave Enterprises, LTD All rights reserved.

http://www.mwe-ltd.com/lab-grown-diamonds.asp    GO

Case 1:18-mc-00418-PGG   Document 5-10   Filed 09/07/18   Page 71 of 99

JUL  SEP  FEB
◄ 28 ►
2013 **2014** 2016

Close ✖

**54**

5 captures
6 Mar 14 – 21 Mar 16





## MICROWAVE ENTERPRISES

Contact Us     Find What You Need     SEARCH

| Home | About MWE | CVD Diamond Equipment | Lab Grown Diamond Material | Research Collaboration | News | Links |

**LAB GROWN
DIAMOND MATERIAL**

▸ Properties & Applications
Single Crystal Diamond
Polycrystalline Diamond

## Properties & Applications

Diamonds are treasured worldwide as gems for their brilliance, beauty and rarity. The mechanical, thermal, and optical properties of diamond are far superior to any other material known to man. As a result, the potential of diamond for industrial applications extend over many market sectors and into almost all areas of science. The problem for broad adoption of diamond material has been the cost of natural diamond and the inferior properties of some synthetic processes.

Microwave CVD diamond has equivalent properties and characteristics as natural diamond, but with repeatable consistent and eco friendly processing. MWE provides the US market with CVD diamond material produced by IIa Technologies, Pte. IIa Technologies host the largest CVD diamond manufacturing facility in the world, where they have transitioned from producing type IIa rough diamond for the gem market to similar material, produced and finished for the industrial and scientific communities.

Microwave Enterprises is pleased to have a relationship with IIa Technologies and the corresponding ability to offer their diamond materials to our customers.



2atechnologies.com



860 Aviation Parkway, Suite 900 | Morrisville, NC 27560  •  919-657-0996  •  Sitemap  •  Privacy Policy  •  © 2014 Microwave Enterprises, LTD All rights reserved.



**MICROWAVE ENTERPRISES**

Contact Us          Find What You Need        SEARCH

| Home | About MWE | CVD Diamond Equipment | Lab Grown Diamond Material | Research Collaboration | News | Links |

**ABOUT MWE**

▶ History

Contact Us

Employment

## Microwave Enterprises History

MWE was formed following the spinout of the Lambda Plasma Division of Lambda Technologies, Inc. The founders and principles of MWE have over 25 years experience in the development of CVD equipment and processes for lab grown diamond. The microwave equipment products of MWE are based on patented technology exclusively licensed from Michigan State University. Microwave CVD products based on this technology were the first to be moved from the laboratory into production of lab grown diamond in the late 1980's and it was the first technology to incorporate 915MHz into the diamond CVD process. Today, MWE produces a complete range of fully automated microwave CVD



equipment. Our CVD equipment and process technology is currently in use for the following applications:

- Polycrystalline Diamond Films
- Nano and Ultranano Crystalline Diamond films
- Single Crystal Diamond material

In 2013, the company teamed with one of our customers and the largest producer of lab grown diamond materials in the world, IIa Technologies. Under that collaboration, MWE now distributes and sells lab grown diamond materials in the North America market place. The focus for diamond material sales is development and production applications in the scientific and industrial markets and support of research for advanced applications.

The combination of equipment and process experience plus a marketing collaboration with the largest CVD diamond manufacturer, places Microwave Enterprises in a unique position to service and support the diamond community in all areas of research as well as for the legacy industrial diamond applications.



**PURE GROWN DIAMONDS**

CERTIFIED & SUSTAINABLE

**PURE GROWN DIAMONDS INC.**
28 WEST 44TH STREET,
SUITE 1204,
N.Y.C, NEW YORK
USA
Phone No :    646-652-8927
Fax No :    646-808-3449
EMail :
Web Site :  http://www.puregrowndiamonds.com/

# Invoice

| | |
|---|---|
| **Invoice No :** | SA-1510-00178 |
| **DATE :** | 27/Oct/2015 |
| **Remark# :** | |
| **Payment Terms :** | 0 |
| **Packing List No. :** | |

| Buyer | Consignee |
|---|---|
| MRS. AYAKO LAWSON<br>2 ASTOR CLOSE<br>MAIDENHEAD, SI61XQ<br> U.K.<br><br>Tel      : 441628298790<br>Fax      :<br>EMail    : | MRS. AYAKO LAWSON<br>2 ASTOR CLOSE<br>MAIDENHEAD, SI61XQ<br> U.K.<br><br>Tel      : 441628298790<br>Fax      :<br>EMail    : |

| SNo | Description | Pcs | CTS | RATE<br>US $ / CTS | AMOUNT<br>US $ |
|---|---|---|---|---|---|
| 1 | LAB GROWN CUT & POLISHED DIAMONDS | 2 | 0.840 | 1,958.44 | 1,645.09 |
| | DISCOUNT AMT | | | | (0.00) |
| | SHIPPING AMT | | | | 100.00 |
| | OTHER CHARGES AMT | | | | 0.00 |
| | TAX AMT | | | | 0.00 |
| | TOTAL | 2 | 0.840 | | 1,745.09 |

Amount In Words :-        US DOLLAR - ONE THOUSAND SEVEN HUNDRED FORTY-FIVE AND NINE CENTS ONLY

| | FOR | FOR |
|---|---|---|
| 1.The above mentioned items are **LAB GROWN DIAMONDS** and/or jewelry that  contains of Lab Grown Diamonds.These diamonds are grown by man.<br><br>2. The origin of these diamonds, as well as the process to grow these diamonds,are in a fully conflict free and ecologically friendly environment.<br><br>3. They are optically, chemically and physically identical to mined diamonds.<br><br>4. All subsequent future sales of these diamonds must be accompanied  by appropriate disclosure as to their origin. | **PURE GROWN DIAMONDS INC.** | **MRS. AYAKO LAWSON** |

**PURE GROWN DIAMONDS INC.**
28 WEST 44TH STREET,
SUITE 1204,
N.Y.C, NEW YORK
USA
Phone No :    646-652-8927
Fax No :      646-808-3449
EMail :
Web Site : http://www.puregrowndiamonds.com/

PURE GROWN DIAMONDS
CERTIFIED & SUSTAINABLE

**DATE :**          27/Oct/2015

**Packing List No. :**

**Bill To**

MRS. AYAKO LAWSON
2 ASTOR CLOSE
MAIDENHEAD, SI61XQ
 U.K.
Tel       : 441628298790
Fax       :
EMail     :

**Ship To**

MRS. AYAKO LAWSON
2 ASTOR CLOSE
MAIDENHEAD, SI61XQ
 U.K.
Tel       : 441628298790
Fax       :
EMail     :

### PACKING LIST OF LABORATORY GROWN DIAMONDS

| SNO. | DETAILS | SHAPE | SIZE | COLOR | CLARITY | PCS | CTS | RATE | VALUE |
|------|---------|-------|------|-------|---------|-----|-----|------|-------|
| 1 | LG10226420 | ROUND | 0.30-0.39 | K | VS1 | 1 | 0.380 | 1,375.50 | 522.69 |
| 2 | LG10172714 | PRINCESS | 0.40-0.49 | E | VS1 | 1 | 0.460 | 2,440.00 | 1,122.40 |
| | | | | | | 2 | 0.840 | | 1,645.09 |

| | | |
|---|---|---|
| 1.The above mentioned items are **LAB GROWN DIAMONDS** and/or jewelry that contains of Lab Grown Diamonds.These diamonds are grown by man.<br><br>2. The origin of these diamonds, as well as the process to grow these diamonds,are in a fully conflict free and ecologically friendly environment.<br><br>3. They are optically, chemically and physically identical to mined diamonds.<br><br>4. All subsequent future sales of these diamonds must be accompanied by appropriate disclosure as to their origin. | FOR<br><br>**PURE GROWN DIAMONDS INC.** | FOR<br><br>**MRS. AYAKO LAWSON** |

**58**

# State of Delaware
## Annual Franchise Tax Report

| CORPORATION NAME | | | | | | TAX YR |
|---|---|---|---|---|---|---|
| GEMESIS, INC. | | | | | | 2013 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE | | | | |
|---|---|---|---|---|---|---|
| 5327015 | 2013/04/30 | | | | | |

| PRINCIPAL PLACE OF BUSINESS | PHONE NUMBER |
|---|---|
| 28 WEST 44TH STREET - SUITE 1204 | 646/652-8924 |
| NEW YORK NY 10036 United States | |

| REGISTERED AGENT | AGENT NUMBER |
|---|---|
| NATIONAL CORPORATE RESEARCH, LTD. | 9070044 |
| 615 S DUPONT HWY | |
| DOVER                    DE 19901 | |

| AUTHORIZED STOCK BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2013/04/30 | | COMMON | 1,000 | .001000 |

| OFFICER                NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|
| Michael Chernick | | |
| 28 West 44th Street  Suite 1204 | | Secretary |
| New York NY 10036 United States | | |

| DIRECTORS              NAME | STREET/CITY/STATE/ZIP |
|---|---|
| Suraj J  Mehta | |
| 28 West 44th Street  Suite 1204 | |
| New York NY 10036 United States | |

================================================================

Total number of directors:1

NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| Michael Chernick | | |
| 28 West 44th Street  Suite 1204 | 2014-02-26 | Secretary |
| New York NY 10036 United States | | |





77.91102.100000290176851&type=3&theater

Like · Comment

**Alpesh Vora**
December 14, 2015 at 7:14pm

https://www.facebook.com/photo.php?
fbid=1075780282441634&set=a.3694445897418
77.91102.100000290176851&type=3&theater

**Pure Grown Diamonds**          Like Page
March 18 at 11:36pm ·

The perfect three stone ring, just in time for Spring!

Find a Pure Grown Diamonds retailer near you: http://bit.ly/1S9Xukx

Like       Comment      Share

**IIa Technologies** shared their photo.
March 4 ·

How does a whopping 3 carat #GrownDiamond ring look like? Like this stunner!

The best part -- this diamond has not been dug out of earth so has not destroyed any natural habitat -- a pure background, if you may, yet comes with certified guarantee for its purity and rarity.

Check Out www.puregrowndiamonds.com now for more such stunning #growndiamond jewellery... #TheRightThingToDo #ResponsibleLuxury

**IIa Technologies**          Like Page
April 30, 2015 ·

The World's Largest Grown Diamond -- a 3.04 carat Type IIa diamond, certified and is retailed by Pure Grown Diamonds

Like       Comment      Share

**IIa Technologies**
March 2 · Singapore ·

Happy customers with their #growndiamond ring! #TheRightThingToDo #PureGrownDiamonds

**MAN-MADE DIAMONDS**

Man Made Diamonds
CBS2's Kenneth Craig reports.
MSN.COM

Like       Comment      Share

Shilpi Seth Shukla



2 shares

Write a comment...

**lla Technologies** shared **Pure Grown Diamonds**'s post.
February 16 · 🌐

**Pure Grown Diamonds**                              👍 Like Page
February 14 · 🌐

A great story just before Valentine's Day! Congratulations to the
wonderful couple, Jordan Hill and Kim Pavlacka, on your engagement!
Thank you for choosing Pure Grown Diamonds and for making what
we do such a treasure!

### Man-made diamonds identical to mined gems

Millions will get engaged on Valentine's Day, and most will involve a diamond ring.
But a new option offers authentic diamonds for less money.
WTOL.COM

👍 Like      💬 Comment      ➤ Share

**lla Technologies** shared **Pure Grown Diamonds**'s photo.
December 2, 2015 · 🌐

#ChristmasIsHere #GrownDiamonds #EcoAdvantage

#CreateIt                         PURE GROWN DIAMONDS

**Pure Grown Diamonds**                              👍 Like Page
December 2, 2015 · 🌐

If you can dream it, then you can #CreateIt
Find a #PureGrownDiamonds retailer near you: http://bit.ly/1S9Xukx

👍 Like      💬 Comment      ➤ Share

**lla Technologies**
November 25, 2015 · Singapore · 🌐

Soft, feminine and beautiful, the #PureGrownDiamond #PrincessCut is a
timeless look. #WhereisMyChristmasGift



Pure Grown Diamonds on Instagram: "Soft, feminine and b...
INSTAGRAM

👍 Like      💬 Comment      ➦ Share                    🔔 ▾

lla Technologies shared a link.
November 24, 2015 · 🌐

**WENG** News Talk
1530 AM • 107.5 FM
The Information Station
www.wengradio.com

Pure Grown Diamonds on WENG Radio
Pure Grown Diamonds on WENG Radio discussing Why Lab Grown Diamonds Are Up To 40% Less Than Mined Diamonds.
YOUTUBE.COM

👍 Like      💬 Comment      ➦ Share                    🔔 ▾

See More Results ▾

2015                                    HIGHLIGHTS ▾

lla Technologies
March 22 at 4:03pm · Singapore · 🌐

#LabGrownDiamonds are 100% genuine diamonds and 100% origin guaranteed.

Now, start your 'happily everafter' with the purest of diamonds grown above ground #PureGrownDiamonds

Pure Grown Diamonds on Instagram: "#LOVE is sweet as a...
INSTAGRAM

lla Technologies shared Pure Grown Diamonds's photo.
March 22 at 3:11pm · 🌐

How beautiful these #labgrowndiamonds are!



**Pure Grown Diamonds**
March 18 at 11:36pm · 🌐

[👍 Like Page]

The perfect three stone ring, just in time for Spring!

Find a Pure Grown Diamonds retailer near you: http://bit.ly/1S9Xukx



**Ila Technologies** shared their photo.
March 4 · 🌐

How does a whopping 3 carat #GrownDiamond ring look like? Like this stunner!

The best part -- this diamond has not been dug out of earth so has not destroyed any natural habitat -- a pure background, if you may, yet comes with certified guarantee for its purity and rarity.

Check Out www.puregrowndiamonds.com now for more such stunning #growndiamond jewellery... #TheRightThingToDo #ResponsibleLuxury



**Ila Technologies**
April 30, 2015 · 🌐

[👍 Like Page]

The World's Largest Grown Diamond — a 3.04 carat Type IIa diamond, certified and is retailed by Pure Grown Diamonds

**Ila Technologies**
March 2 · Singapore · 🌐

Happy customers with their #growndiamond ring! #TheRightThingToDo #PureGrownDiamonds



**Man Made Diamonds**
CBS2's Kenneth Craig reports.
MSN.COM

**Ila Technologies** shared **Pure Grown Diamonds**'s post.
February 16 · 

**Pure Grown Diamonds**    [👍 Like Page]
February 14 · 

A great story just before Valentine's Day! Congratulations to the
wonderful couple, Jordan Hill and Kim Pavlacka, on your engagement!
Thank you for choosing Pure Grown Diamonds and for making what
we do such a treasure!



Man-made diamonds identical to mined gems
Millions will get engaged on Valentine's Day, and most will involve a diamond ring.
But a new option offers authentic diamonds for less money.
WTOL.COM

---

**Ila Technologies** shared **Pure Grown Diamonds**'s photo.
December 2, 2015 · 

#ChristmasIsHere #GrownDiamonds #EcoAdvantage



#CreateIt

PURE GROWN DIAMONDS
CERTIFIED & SUSTAINABLE

**Pure Grown Diamonds**    [👍 Like Page]
December 2, 2015 · 

If you can dream it, then you can #CreateIt
Find a #PureGrownDiamonds retailer near you: http://bit.ly/1S9Xukx

---

**Ila Technologies**
November 25, 2015 · Singapore · 

Soft, feminine and beautiful, the #PureGrownDiamond #PrincessCut is a
timeless look. #WhereisMyChristmasGift



Pure Grown Diamonds on Instagram: "Soft, feminine and b...
INSTAGRAM

**Ila Technologies** shared a link.
November 24, 2015 ·



**WENG News · Talk**
1530 AM · 107.5 FM
The Information Station
www.wengradio.com

Pure Grown Diamonds on WENG Radio

Pure Grown Diamonds on WENG Radio discussing Why Lab Grown Diamonds Are Up To 40% Less Than Mined Diamonds.

YOUTUBE.COM

**Ila Technologies**
November 23, 2015 · Singapore ·

Lisa Bissell, CEO of Pure Grown Diamonds, explains the breakthrough technology that's making the revolution possible.

The end product is indistinguishable from the mined product. Best of all there's no mining caused pollution, no conflict blood diamonds.

The prices are substantially less than their mined competitors, with absolutely no diminution of quality. Truly revolutionary!
#SustainableDiamonds



Financial Survival Network Pure Grown Diamonds

Pure Grown Diamonds (www.puregrowndiamonds.com) on the Financial Survival Network. Lisa Bissell, CEO of Pure Grown...

YOUTUBE.COM

👍 Like     💬 Comment     ➡ Share

**Ila Technologies**
November 19, 2015 · Singapore ·

Style expert Michael O'Connor debuts a fashionable first in diamonds, Pure Grown Diamonds epic 76 carat necklace designed by Yanina & Co #Awesomeness #SustainableDiamonds #EcoConscious

Pure Grown Diamonds Emmy Debut

Style expert Michael O'Connor debuts a fashionable first in diamonds - Pure Grown Diamonds epic 76 carat necklace designed by Yanina & Co.

YOUTUBE.COM

👍 Like     💬 Comment     ➡ Share

1 share

Write a comment...

**Ila Technologies**
November 18, 2015 ·

Celebrities and top Hollywood wardrobe stylists admired jewelry from Pure Grown Diamonds at the StyleLab Suite, which took place during Emmy Awards week. Pure Grown Diamonds offer affordable luxury to today's socially responsible consumer; they are the world's only eco-friendly and conflict free diamond.



**Celebrities Admiring Jewelry from Pure Grown Diamonds at the StyleLab Suite During Emmy Awards Week**
**From Left to Right:** Ashley Baumann, Suzanne Cryer, Alexandra Billings, Maitland Ward

Celebrities And Their Stylists Previewed Jewelry From Pure Grown Diamonds At StyleLab's Suite...

LOS ANGELES, Sept. 20, 2015 /PRNewswire/ -- Celebrities and top Hollywood wardrobe stylists admired jewelry from Pure...

PRNEWSWIRE.COM | BY STYLELAB

👍 Like     💬 Comment     ➤ Share

---

Ila Technologies shared Pure Grown Diamonds's video.
October 22, 2015 · ❄

11,998 Views

Pure Grown Diamonds                                    👍 Like Page
October 2, 2015 · ❄

The NEW diamonds for #Millennials are Pure Grown Diamonds!

👍 Like     💬 Comment     ➤ Share

---

Ila Technologies via Pure Grown Diamonds
July 24, 2015 · ❄

6 Things You Should Know About Lab-Grown Diamonds

Demand for diamonds is growing but supply couldn't keep up--until now

POPSCI.COM

👍 Like     💬 Comment     ➤ Share

👍 2

1 share

Write a comment...

---

Ila Technologies
July 23, 2015 · ❄

Pure Grown Diamonds has been voted as the "Most Socially Responsible" Brand of the year... A big shoutout to all those who voted .... Thank You



THANK YOU FOR VOTING US AS
THE 'MOST SOCIALLY RESPONSIBLE' BRAND

👍 Like    💬 Comment    ➤ Share

3

Write a comment...

**Ila Technologies**
July 6, 2015 · 🌐

Bee-ing #SociallyResponsible !

At least 30% of the world's crops require the cross pollination of bees to produce our food. Without honeybees and other pollinators, many food crops will die out.

... See More

**Social Responsibility - Need for Honeybees**
Why Are Honeybees So Essential? Because these tiny workers are directly responsible for putting food on our tables. Honeybees transfer pollen from one flower to another, fertilizing them so that th...
PUREGROWNDIAMONDS.COM

👍 Like    💬 Comment    ➤ Share

Shilpi Seth Shukla

Write a comment...

**Ila Technologies** shared Pure Grown Diamonds's post.
July 2, 2015 · 🌐

**Pure Grown Diamonds** added 2 new photos.          👍 Like Page
July 2, 2015 · 🌐

Nothing makes us smile quite like a happy customer...

"Just a note to say how much I adore my pure champagne diamond earrings. I have had an eye on you all for ...

See More

👍 Like    💬 Comment    ➤ Share

**Ila Technologies** shared Pure Grown Diamonds's photo.
July 1, 2015 · 🌐



**YOUR**
# VOTE
**COUNTS**

✓ MOST SOCIALLY RESPONSIBLE

PURE GROWN DIAMONDS
CERTIFIED & SUSTAINABLE

**Pure Grown Diamonds**   👍 Like Page
June 25, 2015 · 🌐

As a Finalist in the 2015 Eco-Excellence Awards by NCW Magazine we strive for excellence in the world of #Sustainability & Social Responsibility.

Please take ...

See More

👍 Like      💬 Comment      ➔ Share

---

**IIa Technologies**
June 30, 2015 · 🌐

Our sister retail brand, Pure Grown Diamonds, has been shortlisted as one of the five finalists for NCW's 2015 Eco-Excellence Awards, the premier award program to recognize excellence in the world of social and environmental sustainability!

Please do cast your vote for Pure Grown Diamonds now. Just visit www.2atechnologies.com and follow the step-by-step guide (PDF guide available on site) to vote. Go team #GrownDiamonds !!!

IIa Technologies Pte Ltd. - Leaders in Grown Diamond Technology

Cutting-edge Grown Diamond Technology for growing pure, eco-friendly IIa Diamonds for high performance industrial applications and the Jewellery industry.

2ATECHNOLOGIES.COM

👍 Like      💬 Comment      ➔ Share

Sandesh Advani

1 share

Write a comment...

---

**IIa Technologies** shared Pure Grown Diamonds's photo
June 23, 2015 · 🌐



WE NEED YOUR

V**O**TE

✓ MOST SOCIALLY RESPONSIBLE

PURE GROWN DIAMONDS
CERTIFIED & SUSTAINABLE

**Pure Grown Diamonds**                    👍 Like Page
June 20, 2015 · 🌐

Dear Fans...We have been selected as Finalist in the 2015 Eco-Excellence
Awards™ by NCW Magazine!
Please take a moment to vote for Pure Grown Diamonds in the Most Socially
Responsible category. #Vote Here http://bit.ly/1BuIQRX

👍 Like    💬 Comment    ↗ Share                          🔔 ▾

Ila Technologies                              Top Comments ▾

Write a comment...                          📷  ☺

Ila Technologies Have you voted yet? Make us the
#MostSociallyResponsible brand!
Like · Reply · June 24, 2015 at 5:03pm

**Ila Technologies**
June 9, 2015 · 🌐

What are #PureGrownDiamonds? This video will answer all your
questions ...Ask for #IlaGrownDiamonds and get the rarest #TypeIIa
#Diamonds , prized for their purity!

A New Choice in Diamonds - Pure
Grown Diamonds

What are #PureGrownDiamonds ? This video will
answer all your questions & more. Check here more
details http://goo.gl/1FUkB7

YOUTUBE.COM

👍 Like    💬 Comment    ↗ Share                          🔔 ▾

Shilpi Seth Shukla

1 share

Write a comment...                          📷  ☺

**Ila Technologies** via **Lisa Bissell CEO**
May 19, 2015 · 🌐

Even the celebrities are sporting our diamonds to red carpets. Because to
be really, truly, beautiful, you need to take the first step towards
#SUSTAINABLE #Diamonds that are #CulturedinSingapore

Heather McDonald

Heather McDonald is all about the bling, and the
truth of Pure Grown Diamonds - at the Hollywood
Domino Artists for Peace and Justice Pre-Oscar
Charity Soiree.

YOUTUBE.COM

👍 Like    💬 Comment    ↗ Share                          🔔 ▾

**Ila Technologies**
May 18, 2015 · 🌐

We have a new #YouTube Page. Come have a look at all the fantastic



news coverage that our sister retail brand, Pure Grown Diamonds got when it unveiled the "Largest Grown Diamond in the US retail markets."
#GrownDiamonds #SustainableLuxury #LargestGrownDiamond

www.youtube.com
YOUTUBE.COM

👍 Like      💬 Comment      ➤ Share

🔵 2

1 share

Write a comment...

Ila Technologies added a new photo to the album: Launch of World's Largest Diamond Greenhouse in Singapore.
May 6, 2015

Ila Grown Diamonds set in exquisite bridal jewellery, retailed by Pure Grown Diamonds

👍 Like      💬 Comment      ➤ Share

Sreejith H Nair

Write a comment...

Ila Technologies shared Pure Grown Diamonds's photo.
May 5, 2015

Give the most precious gift of love to Mom but make it a gift that doesn't require digging up Mother Earth or pumping her with carbon emissions. Buy #GrownDiamonds -- the better way to show your love!

10% OFF
May 1 - May 6

Pure Grown Diamonds          👍 Like Page
May 5, 2015



**71**

We've got the gifts for the one that does it all...

Receive 10% OFF on loose diamonds & finished jewelry.
#MothersDay Sale going on Now - May 6th!
Start sho...

See More

👍 Like      💬 Comment      ➤ Share      🔔 ▾

---

**Ila Technologies**
May 4, 2015 · 🌐

How to explain Grown Diamonds? Think Cultured Pearls!

Grown Diamonds (retailed by Pure Grown Diamonds ) are genuine
diamonds which are sustainable, certified and conflict free.

We call it -- "The better way to start your journey of love ..."
#SustainableLuxury #GrownDiamonds

### Lab grows discount diamonds -- real ones

They sparkle and shine like real diamonds -- because they are real diamonds.
They're just a lot younger -- and cheaper -- than the stone on your finger. But will
they sell?

MYFOXTAMPABAY.COM | BY FOX

👍 Like      💬 Comment      ➤ Share      🔔 ▾

🔵 Lisa Pgd

👤  Write a comment...                          📷 ☺

---

**Ila Technologies**
April 30, 2015 · 🌐

Celebrities share their feelings about the #sociallyresponsible benefits of
Pure Grown Diamonds at the Artists for Peace and Justice Pre-Oscar
Charity Soiree.

Featuring #OscarWinner Patricia Arquette, Kevin and Danielle Jonas,
AnnaLynne McCord, Omar and Keisha Epps and Heather McDonald.



### Celebrity Love For Pure Grown Diamonds

Celebrities share their feelings about the socially
responsible benefits of Pure Grown Diamonds at the
Artists for Peace and Justice Pre-Oscar Charity...

YOUTUBE.COM

👍 Like      💬 Comment      ➤ Share      🔔 ▾

🔵 Sidali Germano-phile

👤  Write a comment...                          📷 ☺

---

**Ila Technologies** via Pure Grown Diamonds
April 30, 2015 · 🌐



### Earth Day: 45th Anniversary!
Visit the post for more.

PUREGROWNDIAMONDS.COM

👍 Like      💬 Comment      ➤ Share

**IIa Technologies** added a new photo to the album: Launch of World's Largest Diamond Greenhouse in Singapore.
April 30, 2015 · 🌐

Our Pink Diamonds -- retailed by Pure Grown Diamonds -- are Type IIa quality which is the rarest diamond grade

👍 Like      💬 Comment      ➤ Share

**IIa Technologies** added a new photo to the album: Launch of World's Largest Diamond Greenhouse in Singapore.
April 30, 2015 · 🌐

The World's Largest Grown Diamond -- a 3.04 carat Type IIa diamond, certified and is retailed by Pure Grown Diamonds

👍 Like      💬 Comment      ➤ Share

1 share

Write a comment...

End of Results

http://gemesis.com/privacy/                                      Go

INTERNET ARCHIVE
**WaybackMachine**

24 captures
15 Mar 12 - 21 Nov 14

NOV    JAN    FEB
◄      2      ►
2012   2014   2015

CLOSE
Help



Enter keywords or item nun   Search
Log In / Register   My Account   Wish List   Shopping Bag 0   Checkout

Diamonds    Bridal    Create Your Own    Preset Jewelry    Education    About Us    Blog    Industry

## Privacy Policy

Last Update: March 6, 2012

Introduction. Welcome to Gemesis. We appreciate your business and are pleased that you have chosen to visit our website. We are committed to respecting and safeguarding the information you provide to us in the course of your interactions with our site. Because the privacy of our customers' information is important to us, we have created the following Privacy Policy. The information provided below is designed to explain 1) what kinds of information we collect; 2) why we collect it; and 3) what we do with it. Please also review our Terms of Use, into which this Policy is incorporated.

By submitting personal information to use, you give us your consent to collect, use, and disclose your information in accordance with the terms set forth in this Policy. If you have questions about, or would like to discuss, this policy or concerns you might have about it, please contact our Legal Compliance Officer, via telephone at (646) 912-8315, or via email at complianceofficer@gemesis.com.

Updates. Gemesis may, from time to time, update this Privacy Policy. We encourage visitors to check the word "Updated" above, which will always reflect the date of the most recent revisions to this Policy. Use of this site constitutes consent to this Policy, including any updates or changes. Such updates or changes may include additional features, functionality, offers, activities, or events. Such additions may subject visitors and users to new or altered privacy policies in connection with those updates.

You will be deemed to have agreed to the revisions to this policy if you continue to access this site after the passage of thirty (30) days from the time the revised Privacy Policy is first posted (whichever is sooner). It shall be your responsibility to review this page for possible modifications.

International Data Transfers. Information collected on this site may be stored and processed in the United States or any other country in which Gemesis or its affiliates, subsidiaries or agents maintain facilities. By using this site, you consent to any such transfer of information outside of your country. Gemesis will abide by the safe-harbor framework as set forth by the U.S. Department of Commerce regarding the collection, use, and retention of data from the European Union. By using the site and providing personal information to us, you consent to any such transfer of information outside of your country. Be advised that personal information may be made available, without your knowledge, to the United States government or its agencies, or those of governments in any other country in which we or our service providers store or process personal information, under a lawful order made in that country.

Collection and Use of Information.

In General. You may browse our website without revealing your identity or disclosing any information about yourself. On occasion, you may elect to provide us with personal information. We receive and may elect, at our sole discretion, to store all information, written or oral, provided by you to us, through any means by which you provide it to us (e.g., through this website, via email, over the telephone). For purposes of this Policy "personal information" is defined as any information used to identify an individual. Such information may include, but is not limited to, a first and last name; home, billing, or other physical address, or email address; and information associated with the foregoing. In addition to your contact information, we may collect information about your purchases, billing address, shipping address, gender, occupation, birthday, marital status, anniversary, interests, phone number or other contact information, and credit-card information. We may, in our sole discretion, combine the information you provide to us over time and we may combine such information with information that is publicly available, collected through data collection devices, and information that we receive from partners, affiliates, and other third parties.

Use of your personal information. Uses of information we collect from and/or you may include, but are not necessarily limited to:

Facilitating purchases and providing requested services;

Order confirmation and tracking;

Responding to requests and inquiries;

Comparing and reviewing your data for accuracy, errors, or omissions;

Detecting and preventing fraud or abuse;

Understanding customer demographics, preferences, interests, and behavior;

Identifying and addressing your product and service preferences

Making improvements to our site, services, product offerings, marketing and promotional efforts, and customer experiences in general;

Providing you with information, via e-mail, telephone, or conventional mail, regarding products or services of Gemesis or our partners, which we believe to be of interest to you. (If you do not wish to be contacted by us, please see our Opt-out information below, in Section 8 of this Policy.)

Personal Information that may be Shared with Others. Under certain circumstances, we may elect to share personal information you have provided to us with trusted partners, including: Service Providers – We may, from time to time, use trusted, third-party service providers to perform certain tasks on our behalf, which may include but are not limited to: payment processing, shipping, data storage and/or management, web hosting, web analytics, fulfillment, assembly, marketing, mailing, emailing, etc. Such providers receive personal information only in instances where such information is needed to perform their function(s); they are not authorized to use any personal information for any purpose(s) other than those set forth by Gemesis.

Special Events – If we offer, and you elect to participate, in a special event (e.g., a promotion, contest, or sweepstakes), Gemesis may share your personal information with those organizations participating in such an event. Unless we tell you otherwise in connection with a special event, these third parties do not use your information for any other purpose other than to manage the event.

Partners; Products & Services – Gemesis may provide information to carefully selected partners. We may authorize these partners to send you information about products and services that we believe may be of interest to you. In such cases, we might share and/or cross-reference information, including personal information about you that will enable such persons or entities to contact you regarding products and services, like financing or insuring Gemesis purchases, that may be of interest to you.

Business Transfer – Your personal information may be disclosed as part of any merger, acquisition, or sale of company assets, as well as in the event of an insolvency, bankruptcy, or receivership, in which personal information would be transferred as one of the business assets of the company.

Compliance with Law; Fraud Protection – We may, and you authorize us to, use and disclose any information, including personal information: (1) we deem necessary, in our sole discretion, to comply with any applicable law, regulation, legal process, or governmental request; (2) in order to investigate, prevent or take action regarding illegal activities, suspected fraud, situations involving potential threats to the physical safety of any person, or as otherwise required by law; (3) to other companies and organizations for credit fraud protection and risk reduction; and (4) to enforce any agreement we have with you.

Anonymous Information - We may use personal information to create anonymous records by excluding information (e.g., your name) that makes the information personally identifiable. We may use these records for internal purposes (e.g., analyzing usage patterns to help us enhance our services); we also reserve the right to use and disclose any information in such records at our discretion.

Comments - We value your feedback, including comments and testimonials, and any information that helps us improve our website, products, and services.

Other Uses of Your Information.

IP Address. When you visit our site, we collect your IP address for reasons that include: helping to diagnose problems with our server, administering and fine-tuning our site's operation, analyzing trends, tracking traffic patterns, gathering and aggregating demographic information, and tracking the time and duration of each session within our site. Your IP address may also be used in combination with your personal information to prevent fraud or abuse, understand your preferences, patterns and interests, customize your shopping experience, and make improvements to our site, customer service, products, and promotional efforts.

Data Collection Devices, Including Cookies. In some instances, we may collect data through cookies, web logs, web beacons (also known as pixel gifs or action tags), and other monitoring technologies to enhance your browsing and shopping experience on our site. Web beacons are small strings of code placed on a web page or within an email for the purpose of transferring information. "Cookies" are small pieces of information that are stored by your browser on your computer's hard drive to collect information about your activities on our site.

INTERNET ARCHIVE
WayBack Machine

http://gemesis.com/privacy/    Go

24 captures
15 Mar 12 - 21 Nov 14

NOV   JAN   FEB
◀   2   ▶
2012   2014   2015

Close

74

Help

certain pages.     e may authorize third parties to use cookies, web beacons, and other monitoring technologies to compile information about the use of the site or interaction with advertisements that appear on the site. ou may, if your browser permits, always decline cookies; however, by declining the use of cookies, you may be unable to use certain features on the site.

<u>Security.</u> Gemesis takes seriously the protection of any personally identifiable information that you share with us. We employ a combination of physical and electronic security technologies, procedures, and organizational measures to help protect your personally identifiable information from unauthorized access, use, or disclosure. When we transfer sensitive personal information (e.g., credit card information) over the Internet, we protect it using Secure Sockets Layer (SSL) encryption technology. While we strive to safeguard your personal information once we receive it, no transmission of data over the Internet or any other public network can be guaranteed to be 100% secure and, accordingly, we cannot guarantee or warrant the security of any information you disclose or transmit to us.

<u>Children Under 13.</u> Gemesis does not knowingly collect personal information from children under the age of 13. If we learn that we have collected personally identifiable information from a child under the age of 13, we will delete that data from our systems. Please visit the Federal Trade Commission's (FTC's) website at <u>www.ftc.gov</u> for tips on protecting children's privacy online.

<u>Links.</u> Our site may provide links to other third-party sites which are outside our control and not covered by this Policy. We encourage you to review the privacy policies posted on these (and all) websites.

<u>Accessing and Updating Your Information.</u> If the personally identifiable information we have gathered from you changes or you would like to access, correct, or delete such information, we will gladly provide you access to, correct, or delete (to the extent allowed by law) any personal information we have collected about you. To request access to, a correction to, or the deletion of your personal information, please send an e-mail to <u>customerservice[at]gemesisinc.com</u> or contact one of our customer-service representatives at (866) 799-8885.

<u>Opting Out.</u> It is our policy to communicate with you only if you want and choose to hear from us. There are two methods by which you may opt out of receiving email promotions that we send you: (1) by sending an email to <u>customerservice[at]gemesisinc com</u> with the word "Unsubscribe" in the subject line, or by following the unsubscribe instructions in any of our promotional emails; or (2) via a "postal request," by writing to Customer Service at 28 W. 44th St., Suite 1204, New York City, NY 10036. To opt out of telephone promotions, you can tell us when we call you or you can send us a postal request. To opt out of postal mail promotions, please send us a postal request.

    lea Be note: Opting out of receiving promotional communications from us does not affect our communications with you via telephone or email related to your orders with us. It also does not affect our use of your non-personally identifiable information.

<u>California Resident Information Sharing.</u> Any California resident who wishes to receive a copy of our notice describing the categories of personal information we share with third parties or corporate affiliates for direct-marketing purposes, as well as the names and addresses of the third parties and affiliates that received our California customers' information in the past year, may submit a written request to: 28 W 44th St # 1204, New York, NY 10036, USA, ATTN: California Privacy. You may submit one (1) such request per year. Please allow up to thirty (30) days for us to process your request.

Facebook
Twitter
Pinterest

About   Careers   FAQs   Terms & Conditions   Privacy Policy   Our Guarantee   Shipping   Contact Us © 2012–2013 by Gemesis. All Rights Reserved.
All diamonds from Gemesis are lab-created, guaranteeing a socially and ecologically responsible point of origin.



PURE GROWN DIAMONDS™

CERTIFIED & SUSTAINABLE

## Privacy Policy

*Last Update: October 6, 2014*

1. **Introduction.**

   Welcome to Pure Grown Diamonds. We appreciate your business and are pleased that you have chosen to visit our website. We are committed to respecting and safeguarding the information you provide to us in the course of your interactions with our site. Because the privacy of our customers' information is important to us, we have created the following Privacy Policy. The information provided below is designed to explain 1) what kinds of information we collect; 2) why we collect it; and 3) what we do with it. Please also review our Terms of Use, into which this Policy is incorporated.

   By submitting personal information, you give us your consent to collect, use, and disclose your information in accordance with the terms set forth in this Policy. If you have questions about, or would like to discuss, this policy or concerns you might have about it, please contact our Legal Compliance Officer, via telephone at (646) 652-8927, or via email at complianceofficer@puregrowndiamonds.com.

   a. Updates.

   Pure Grown Diamonds may, from time to time, update this Privacy Policy. We encourage visitors to check the word "Updated" above, which will always reflect the date of the most recent revisions to this Policy. Use of this site constitutes consent to this Policy, including any updates or changes. Such updates or changes may include additional features, functionality, offers, activities, or events. Such additions may subject visitors and users to new or altered privacy policies in connection with those updates.

   You will be deemed to have agreed to the revisions to this policy if you continue to access this site after the passage of thirty (30) days from the time the revised Privacy Policy is first posted. It will be your responsibility to review this page for possible modifications.

   b. International Data Transfers.

   Information collected on this site may be stored and processed in the United States or any other country in which Pure Grown Diamonds or its affiliates, subsidiaries or agents maintain facilities. By using this site, you consent to any such transfer of information outside of your country. Pure Grown Diamonds will abide by the safe-harbor framework as set forth by the U.S. Department of Commerce regarding the collection, use, and retention of data. By using the site and providing personal information to us, you consent to any such transfer of information outside of your country. Be advised that personal information may be made available, without your knowledge, to the United States government or its agencies, or those of governments in any other country in which we or our service providers store or process personal information, under a lawful order made in that country.

2. **Collection and Use of Information.**

   a. In General.

   You may browse our website without revealing your identity or disclosing any information about yourself. On occasion, you may elect to provide us with personal information. We receive and may elect, at our sole discretion, to store all information, written or oral, provided by you to us, through any means by which you provide it to us (e.g., through this website, via email, over the telephone). For purposes of this Policy "personal information" is defined as any information used to identify an individual. Such information may include, but is not limited to, a first and last name; home, billing, or other physical address, or email address; and information associated with the foregoing. In addition to your contact information, we may collect information about your purchases, billing address, shipping address, gender, occupation, birthday, marital status, anniversary, interests, phone number or other contact information, and credit-card information. We may, in our sole discretion, combine such information you provide to us over time and we may combine such information with information that is publicly available, collected through data collection devices, and information that we receive from partners, affiliates, and third parties.

   b. Use Of Your Personal Information.

   Uses of information we collect from and/or about you may include, but are not necessarily limited to:

   i. Facilitating purchases and providing requested services;

   ii. Order confirmation and tracking;

   iii. Responding to requests and inquiries;

   iv. Comparing and reviewing your data for accuracy, errors, or omissions;

   v. Detecting and preventing fraud or abuse;

   vi. Understanding customer demographics, preferences, interests, and behavior;

   vii. Identifying and addressing your product and service preferences;

   viii. Making improvements to our site, services, product offerings, marketing and promotional efforts, and customer experiences in general;

   ix. Providing you with information, via e-mail, telephone, or conventional mail, regarding products or services of Pure Grown Diamonds, which we believe to be of interest to you. (If you do not wish to be contacted by us, please see our Opt-out information below, in Section 8 of this Policy.)

   c. Personal Information That May Be Shared With Others.

   Under certain circumstances, we may elect to share personal information you have provided to us with trusted partners, including:

   i. **Service Providers** – We may, from time to time, use trusted, third-party service providers to perform certain tasks on our behalf, which may include but are not limited to: payment processing, shipping, data storage and/or management, web hosting, web analytics, fulfillment, assembly, marketing, mailing, emailing, etc. Such providers receive personal information only in instances where such information is needed to perform their function(s); they are not authorized to use any personal information for any purpose(s) other than those set forth by Pure Grown Diamonds.

   ii. **Special Events** – If we offer, and you elect to participate, in a special event (e.g., a promotion, contest, or sweepstakes), Pure Grown Diamonds may share your personal information with those organizations participating in such an event. Unless we tell you otherwise in connection with a special event, these third parties do not use your information for any purpose other than to manage the event.

   iii. **Partners; Products & Services** – Pure Grown Diamonds may provide information to carefully selected partners. We may authorize these partners to send you information about products and services that we believe may be of interest to you. In such cases, we might share and/or cross-reference information, including personal information about you that will enable such persons or entities to contact you regarding products and services, like financing or insuring Pure Grown Diamonds purchases, that may be of interest to you.

   iv. **Business Transfer** – Your personal information may be disclosed as part of any merger, acquisition, or sale of company assets, as well as in the event of an insolvency, bankruptcy, or receivership, in which personal information would be transferred as one of the business assets of the company.

   v. **Compliance With Law; Fraud Protection** – We may, and you authorize us to, use and disclose any information, including personal information: (1) we deem necessary, in our sole discretion, to comply with any applicable law, regulation, legal process, or governmental request; (2) in order to investigate, prevent or take action regarding illegal activities, suspected fraud, situations involving potential threats to the physical safety of any person, or as otherwise required by law; (3) to other companies and organizations for credit fraud protection and risk reduction; and (4) to enforce any agreement we have with you.

   d. Anonymous Information

   We may use personal information to create anonymous records by excluding information (e.g., your name) that makes the information personally identifiable. We may use these records for internal purposes (e.g., analyzing usage patterns to help us enhance our services); we also reserve the right to use and disclose any information in such records at our discretion.

   e. Comments

   We value your feedback, including comments and testimonials, and any information that helps us improve our website, products, and services. Any comments, feedback or testimonials you supply will be used on our website, social media networks, and in print advertising.

3. **Other Uses of Your Information.**
   a. IP Address.
   When you visit our site, we collect your IP address for reasons that include: helping to diagnose problems with our server, administering and fine-tuning our site's operation, analyzing trends, tracking traffic patterns, gathering and aggregating demographic information, and tracking the time and duration of each session within our site. Your IP address may also be used in combination with your personal information to prevent fraud or abuse, understand your preferences, patterns and interests, customize your shopping experience, and make improvements to our site, customer service, products, and promotional efforts.

   b. Data Collection Devices, Including Cookies.
   In some instances, we may collect data through cookies, web logs, web beacons (also known as pixel gifs or action tags), and other monitoring technologies to enhance your browsing and shopping experience on our site. Web beacons are small strings of code placed on a web page or within an email for the purpose of transferring information. "Cookies" are small pieces of information that are stored by your browser on your computer's hard drive to collect information about your activities on our site.

   We use such devices to deliver advertisements, improve and measure usability, track visits from affiliates and partners, evaluate the performance and effectiveness of our site, improve and measure the effectiveness of our marketing programs, learn how customers use our site, estimate audience size, deliver co-branded services, and to customize your shopping experience. We may also use cookies as a means of notifying returning users of changes to the Terms of Use and/or Privacy Policy since their last visit.

   Examples of the type of information that we collect through these collection devices, include: total visitors to the site, pages viewed, unique visitors, time spent on our site and on certain pages. We may authorize third parties to use cookies, web beacons, and other monitoring technologies to compile information about the use of the site or interaction with advertisements that appear on the site. You may, if your browser permits, always decline cookies; however, by declining the use of cookies, you may be unable to use certain features on the site.

4. **Security.**
   Pure Grown Diamonds takes seriously the protection of any personally identifiable information that you share with us. We employ a combination of physical and electronic security technologies, procedures, and organizational measures to help protect your personally identifiable information from unauthorized access, use, or disclosure. When we transfer sensitive personal information (e.g., credit card information) over the Internet, we protect it using Secure Sockets Layer (SSL) encryption technology. While we strive to safeguard your personal information once we receive it, no transmission of data over the Internet or any other public network can be guaranteed to be 100% secure and, accordingly, we cannot guarantee or warrant the security of any information you disclose or transmit to us.

5. **Children Under 13.**
   Pure Grown Diamonds does not knowingly collect personal information from children under the age of 13. If we learn that we have collected personally identifiable information from a child under the age of 13, we will delete that data from our systems. Please visit the Federal Trade Commission's (FTC's) website at www.ftc.gov for tips on protecting children's privacy online.

6. **Links.**
   Our site may provide links to other third-party sites which are outside our control and not covered by this Policy. We encourage you to review the privacy policies posted on these (and all) websites.

7. **Accessing and Updating Your Information.**
   If the personally identifiable information we have gathered from you changes or you would like to access, correct, or delete such information, we will gladly provide you access to, correct, or delete (to the extent allowed by law) any personal information we have collected about you. To request access to, a correction to, or the deletion of your personal information, please send an e-mail to customerservice[at]puregrowndiamonds.com or contact one of our customer-service representatives at (866) 799-8885.

8. **Opting Out.**
   It is our policy to communicate with you only if you want and choose to hear from us. There are two methods by which you may opt out of receiving email promotions that we send you: (1) by sending an email to customerservice[at]puregrowndiamonds.com with the word "Unsubscribe" in the subject line, or by following the unsubscribe instructions in any of our promotional emails; or (2) via a "postal request," by writing to Customer Service at 28 W. 44th St., Suite 1204, New York City, New York 10036. To opt out of telephone promotions, you can tell us when we call you or you can send us a postal request. To opt out of postal mail promotions, please send us a postal request.

   Please note: Opting out of receiving promotional communications from us does not affect our communications with you via telephone or email related to your orders with us. It also does not affect our use of your non-personally identifiable information.

9. **California Resident Information Sharing.**
   Any California resident who wishes to receive a copy of our notice describing the categories of personal information we share with third parties or corporate affiliates for direct-marketing purposes, as well as the names and addresses of the third parties and affiliates that received our California customers' information in the past year, may submit a written request to: 28 W 44th St # 1204, New York, NY 10036, USA, ATTN: California Privacy. You may submit one (1) such a request per year. Please allow up to thirty (30) days for us to process your request.

| ABOUT US | CUSTOMER CARE | EDUCATION | CONTACT US | Stay Up-To-Date With Our Newsletters, Updates And Offers |
|---|---|---|---|---|
| Who We Are | Upgrade Program | Grown Diamonds | Email Us | |
| Delighted Customers | Ring Sizing | Sustainability | Authorized Retailers | Email Address |
| In The Media | Shipping | Conflict-Free | Wholesale Inquiries | |
| Careers | Returns | Eco-Conscious | Corporate Information | |
| Blog | Become A Retailer | Certification | 1.866.799.8885 | |
| | FAQ | 4Cs | | |

© 2014 - 2015 PURE GROWN DIAMONDS    PRIVACY POLICY    TERMS OF USE







EMAIL US | FIND A STORE



## What can we do for you?

Have a question about a product or feedback on your Pure Grown experience? Use the form below to let us know. To speak directly to one of our Diamond & Jewelry Representatives call us at: 866-799-8885 (available 24/7).

FIRST NAME *

LAST NAME *

E-MAIL ADDRESS *

TELEPHONE

BUSINESS NAME

COUNTRY OF ORIGIN

MESSAGE *

CAPTCHA

1169

Type the text

Privacy & Terms

* Required Fields

SUBMIT

### About Us | Who We Are

Message from
the CEO

It is both a unique honor and pleasure to bring this message as the President and CEO of Pure Grown Diamonds. Every day, I am greeted with the reality that the beautiful diamonds we offer are symbols not only love and admiration, but of innovative technology, sustainability, and a promise to

Looking ahead, we are focused on building the our brand by offering a new choice to customer while providing quality, beauty and value, along dedicated commitment to education, transparent disclosure. I am passionate about this journey believe the best of Pure Grown Diamonds is to come.

Lisa Bissell
**President & CEO**
PURE GROWN DIAMONDS

## Pure Mission

is our mission to remain the leader in wn diamonds by providing the highest lity, value, innovation and choice using latest technology in an environment of sty, transparency and fairness with our omers, employees, vendors and society at large.

### Pure Choice

**Customer Focus**
Our commitment to customers to forge trust through education, and always putting you, our customer, first.

**H**armony & Diversity
Our commitment to respect and celebrate every individual, everywhere.

**O**ne Earth
Our commitment to sustainability and our environment.

**I**ntegrity and Transparency
Our commitment to ethics, honesty, and full disclosure.

**C**onflict-Free
Our commitment and guarantee that it will never be necessary to choose between beauty and conscience.

**E**xcellence
Our commitment to innovation, challenging ourselves, and expanding our products and services as industry leaders.

treasures unearthed by mankind. Their durability, beauty, and brilliance are evidence of the miracles produced by thousands of years of geological movements and processes. And yet the efforts required to bring these treasures forth from the earth have had a detrimental impact on our environment.

The spirit of sustainability is one in which mankind coexists harmoniously with our planet, never tipping the balance between that which we need to survive, and the renewable resources which we give back to the earth. Pure Grown Diamonds uses advanced technology which allows for the creation of these treasures with substantially less environmental impact than mining, which is something you can be proud to wear.

## Quality & Value

ourselves to the highest standards in quality Pure Grown Diamonds offer lliance and scintillation of mine compared to stones of equal and carat weight, provide you with savings, so you will never have to choose between quality and conscience.


SiteLoc SECUR

## Supply Chain

Our diamonds are grown by a proprietary process that recreates the miracle of nature. Like mined diamonds, our grown diamonds are faceted and polished by highly skilled diamond cutters, certified by leading gemological institutes, then fashioned into elegant jewelry to be cherished for generations. As the world's largest distributor of gem-quality grown diamonds, we guarantee a sustainable and steady supply of white and fancy colored diamonds.



### Eco-Conscious

When you hold a grown diamond, you hold a diamond made more beautiful by the commitment to sustainability it represents. Growing diamonds creates significantly less environmental impact than mining diamonds.





### Guarantee

Pure Grown Diamonds represent more than a technological advancement. We represent an increase in confidence that the diamonds our customers adorn



### Customer Service

Pure Grown Diamonds offers the convenience of shopping online with the customized experience found

themselves with are guaranteed to come from a source free from conflict and a strain on fragile ecosystems.

Conflict-Free

Each Pure Grown Diamond is grown in a controlled, safe, and pristine laboratory, guaranteed free of any conflict zones worldwide.

in a fine jewelry boutique. As such, We want you to be delighted with your purchase and your shopping experience. Our 60 day money back guarantee gives you time to make sure your purchase is perfect, but if you ever have any questions, concerns, or just want to provide feedback, we want to hear from you.

**79**

| ABOUT US | CUSTOMER CARE | EDUCATION | CONTACT US |
|---|---|---|---|
| Who We Are | Upgrade Program | Grown Diamonds | Email Us |
| Delighted Customers | Ring Sizing | Sustainability | Authorized Retailers |
| In The Media | Shipping | Conflict-Free | Wholesale Inquiries |
| Careers | Returns | Eco-Conscious | Corporate Information |
| Blog | Become A Retailer | Certification | 1.866.799.8885 |
| | FAQ | 4Cs | |

Stay Up-To-Date With Our Newsletters, Updates And Offers

Email Address






© 2014 - 2015 PURE GROWN DIAMONDS   |   PRIVACY POLICY   |   TERMS OF USE

**80**

F98000004848



CSC  **THE UNITED STATES CORPORATION** C O M P A N Y

```
ACCOUNT NO.  :  072100000032

 REFERENCE  :  939541        8796A

AUTHORIZATION  :

  COST LIMIT  :  $ 70.00
```

ORDER DATE : August 25, 1998

ORDER TIME :  2:14 PM

ORDER NO.  :  939541-005        500002625975--9

CUSTOMER NO:      8796A

CUSTOMER:  Ms. Lina Angelici
Schifino & Fleischer
One Tampa City Center, #2700
201 North Franklin Street
Tampa, FL  33602

----------------------------------------------

FOREIGN FILINGS


NAME:    THE GEMESIS CORPORATION


XXXX  QUALIFICATION    (TYPE: CO)


PLEASE RETURN THE FOLLOWING AS PROOF OF FILING:

_____  CERTIFIED COPY
XX____  PLAIN STAMPED COPY
_____  CERTIFICATE OF GOOD STANDING


CONTACT PERSON:  Robert Maxwell

**81**

## CONFORMED COPY

# APPLICATION BY FOREIGN CORPORATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA

*IN COMPLIANCE WITH SECTION 607.1503, FLORIDA STATUTES, THE FOLLOWING IS SUBMITTED TO REGISTER A FOREIGN CORPORATION TO TRANSACT BUSINESS IN THE STATE OF FLORIDA:*

1.  The Gemesis Corporation
    (Name of corporation: must include the word "INCORPORATED", "COMPANY", "CORPORATION" or words or abbreviations of like import in language as will clearly indicate that it is a corporation instead of a natural person or partnership if not so contained in the name at present.

2.  Delaware
    (State or country under the law of which it is incorporated)
3.  59-3423268
    (FEI number, if applicable)

4.  10-9-96
    (Date of Incorporation)
5.  Perpetual
    (Duration: Year corp. will cease to exist or "perpetual")

6.  April 1, 1998
    (Date first transacted business in Florida. *(See sections 607.1501, 607.1502, and 817.155, F.S.)*

7.  595 Bay Isles Road

    Longboat Key, Florida 34228
    (Current mailing address)

8.
    Engage in any lawful act or activity
    (Purpose(s) of corporation authorized in home state or country to be carried out in the state of Florida)

9.  **Name and street address of Florida registered agent:** (P.O. Box or Mail Drop Box **NOT** acceptable)

    Name: Tom L. Irving

    Office Address: 595 Bay Isles Road

    Longboat Key , Florida, 34228
    (Zip Code)

10. **Registered agent's acceptance:**

    *Having been named as registered agent and to accept service of process for the above stated corporation at the place designated in this application, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.*

    By: _____
    (Registered agent's signature)

11. Attached is a certificate of existence duly authenticated, not more than 90 days prior to delivery of this application to the Department of State, by the Secretary of State or other         official having custody of corporate records in the jurisdiction under the law of which it is         incorporated.

12. Names and addresses of officers and/or directors: (Street address **ONLY**- P.O. Box **NOT** acceptable)

**A.  DIRECTORS (Street address only- P.O. Box NOT acceptable)**

Chairman: _____See Addendum_____

Address: _____

Vice Chairman: _____

Address: _____

Director: _____

Address: _____

Director: _____

Address: _____

**B.  OFFICERS (Street address only- P.O. Box NOT acceptable)**

President: _____See Addendum_____

Address: _____

Vice President: _____

Address: _____

Secretary: _____

Address: _____

Treasurer: _____

Address: _____

**NOTE:** If necessary, you may attach an addendum to the application listing additional officers and/or directors.

13. _____
(Signature of Chairman, Vice Chairman, or any officer listed in number 12 of the application.)

14.  Tom L. Irving, Vice President Finance, Assistant Secretary
_____
(Typed or printed name and capacity of person signing application)