Addendum
FILED
28 AUG 26 PM 3:26
SECRETARY OF STATE
TALLAHASSEE FLORIDA

**Names and Addresses
of Officers and Directors**

A.  **Directors**

| Name | Title | Address |
|------|-------|---------|
| Thomas V. Buffet | Co-Chairman | 595 Bay Isles Road<br>Longboat Key, FL 34228 |
| Carter W. Clarke | Co-Chairman | 595 Bay Isles Road<br>Longboat Key, FL 34228 |
| Dr. Reza Abbaschian | Director | 595 Bay Isles Road<br>Longboat Key, FL 34228 |
| Christian E. Dante | Director | 595 Bay Isles Road<br>Longboat Key, FL 34228 |
| Wayland R. Hicks | Director | 595 Bay Isles Road<br>Longboat Key, FL 34228 |
| Vladimir V. Kozlov | Director | 595 Bay Isles Road<br>Longboat Key, FL 34228 |
| Yuriy K. Semenov | Director | 595 Bay Isles Road<br>Longboat Key, FL 34228 |

B.  **Officers**

| Name | Title | Address |
|------|-------|---------|
| Carter W. Clarke | President and<br>Chief Executive Officer | 595 Bay Isles Road<br>Longboat Key, FL 34228 |
| Christian E. Dante | Senior Vice President,<br>Secretary and Treasurer | 595 Bay Isles Road<br>Longboat Key, FL 34228 |
| Tom L. Irving | Vice-President Finance<br>and Assistant Secretary | 595 Bay Isles Road<br>Longboat Key, FL 34228 |

### State of Delaware
## Office of the Secretary of State

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "THE GEMESIS CORPORATION" IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE TWENTY-FIFTH DAY OF AUGUST, A.D. 1998.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

FILED 98 AUG 26 PM 3:27 SECRETARY OF STATE TALLAHASSEE, FLORIDA

2672225   8300
981331978



9269728
08-25-98

*Edward J. Freel, Secretary of State*

AUTHENTICATION:

DATE:

**F98000004848** 85

---

(Requestor's Name)

---

(Address)

---

(Address)

---

(City/State/Zip/Phone #)

☐ PICK-UP    ☐ WAIT    ☐ MAIL

---

(Business Entity Name)

---

(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



200214727642

Name Change
Amend    43.75

12/01/11--01021--015   **25.00**

FILED
2011 DEC -1 AM 9: 00
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

APR
12/5/11

# COVER LETTER

**TO:**     Amendment Section
         Division of Corporations

**SUBJECT:** _____ The Gemesis Corporation _____
                                    Name of Corporation

**DOCUMENT NUMBER:** _____ F98000004848 _____

The enclosed Amendment and fee are submitted for filing.

Please return all correspondence concerning this matter to the following:

_____ Bernard A. Wagner _____
                   Name of Contact Person

_____ Gemesis Diamond Company _____
                      Firm/Company

_____ 10530 Portal Crossing #103 _____
                            Address

_____ Lakewood Ranch, FL 34211 _____
                      City/State and Zip Code

_____ bwagner@gemesis.com _____
     E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

_____ Bernard A. Wagner _____ at ( 941 ) _____ 840-6003 _____
        Name of Contact Person          Area Code & Daytime Telephone Number

Enclosed is a check for the following amount:

☐ $35.00 Filing Fee     ☐ $43.75 Filing Fee &     ☑ $43.75 Filing Fee &     ☐ $52.50 Filing Fee,
                            Certificate of Status      Certified Copy            Certificate of Status &
                                                        (Additional copy is      Certified Copy
                                                        enclosed)                (Additional copy is
                                                                                 enclosed)

**Mailing Address:**                    **Street Address:**
Amendment Section                       Amendment Section
Division of Corporations                Division of Corporations
P.O. Box 6327                           Clifton Building
Tallahassee, FL 32314                   2661 Executive Center Circle
                                        Tallahassee, FL 32301

# PROFIT CORPORATION
## APPLICATION BY FOREIGN PROFIT CORPORATION TO FILE AMENDMENT TO APPLICATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA
(Pursuant to s. 607.1504, F.S.)

### SECTION I
**(1-3 MUST BE COMPLETED)**

F98000004848

(Document number of corporation (if known))

1. The Gemesis Corporation

(Name of corporation as it appears on the records of the Department of State)

2. Delaware

(Incorporated under laws of)

3. 08/26/1998

(Date authorized to do business in Florida)

### SECTION II
**(4-7 COMPLETE ONLY THE APPLICABLE CHANGES)**

4. If the amendment changes the name of the corporation, when was the change effected under the laws of its jurisdiction of incorporation? **November 12, 2010**

5. **Gemesis Diamond Company**

(Name of corporation after the amendment, adding suffix "corporation," "company," or "incorporated," or appropriate abbreviation, if not contained in new name of the corporation)

(If new name is unavailable in Florida, enter alternate corporate name adopted for the purpose of transacting business in Florida)

6. If the amendment changes the period of duration, indicate new period of duration.

(New duration)

7. If the amendment changes the jurisdiction of incorporation, indicate new jurisdiction.

(New jurisdiction)

8. Attached is a certificate or document of similar import, evidencing the amendment, authenticated not more than 90 days prior to delivery of the application to the Department of State, by the Secretary of State or other official having custody of corporate records in the jurisdiction under the laws of which it is incorporated.

(Signature of a director, president or other officer - if in the hands of a receiver or other court appointed fiduciary, by that fiduciary)

Bernard A. Wagner

(Typed or printed name of person signing)

CFO

(Title of person signing)

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "THE GEMESIS CORPORATION", CHANGING ITS NAME FROM "THE GEMESIS CORPORATION" TO "GEMESIS DIAMOND COMPANY", FILED IN THIS OFFICE ON THE TWELFTH DAY OF NOVEMBER, A.D. 2010, AT 12:39 O'CLOCK P.M.

Jeffrey W. Bullock, Secretary of State

**AUTHENTICATION: 9182723**

**DATE: 11-28-11**

2672225  8100

111230640

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 12:39 PM 11/12/2010*
*FILED 12:39 PM 11/12/2010*
*SRV 101082134 ~ 2672225 FILE*

**SECOND CERTIFICATE OF AMENDMENT**
**TO THE**
**THIRD AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**THE GEMESIS CORPORATION**

Pursuant to Section 242 of the General Corporation Law of the State of Delaware (the *"General Corporation Law"*), the undersigned Chief Executive Officer of The Gemesis Corporation, a corporation organized and existing under and by virtue of the Delaware General Corporation Law (the *"Corporation"*), for purposes of amending the Third Amended and Restated Certificate of Incorporation of the Corporation, does hereby certify:

I.

The Third Amended and Restated Certificate of Incorporation of the Corporation is hereby amended by deleting Article FIRST thereof and by substituting in lieu of said Article FIRST the following new Article FIRST:

"FIRST: The name of this corporation is Gemesis Diamond Company, (the *"Corporation"*)"

The Board of Directors of the Corporation has approved said amendment and recommended that the stockholders of the Corporation approve said amendment, and the stockholders have approved said amendment by written consent in accordance with the provisions of Section 228 of the General Corporation Law.

IN WITNESS WHEREOF, the undersigned, being the duly elected Secretary of the Corporation, has caused this Second Certificate of Amendment to the Third Amended and Restated Certificate of Incorporation to be signed this 29th day of October, 2010.

THE GEMESIS CORPORATION

By: _____
Name: Bernard A. Wagner
Title: Secretary and Chief Financial Officer

State of Delaware
Secretary of State
Division of Corporations
Delivered 03:51 PM 09/13/2012
FILED 03:46 PM 09/13/2012
SRV 121028842 – 5212499 FILE

**90**

# CERTIFICATE OF INCORPORATION
## OF
## GEMESIS ACQUISITION CORPORATION

The undersigned, for the purposes of incorporating and organizing a corporation under the General Corporation Law of the State of Delaware, does execute this Certificate of Incorporation and does hereby certify as follows:

FIRST. The name of the corporation is GEMESIS ACQUISITION CORPORATION.

SECOND. The registered address of the corporation in the State of Delaware is 615 Dupont Highway, Dover, Kent County Delaware 19901 and its Registered Agent as such address is National Corporate Research, Ltd.

THIRD. The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

FOURTH. The total number of shares of stock which the corporation shall have authority to issue is One Hundred Million (100,000,000) shares, all of which shall be Common Stock. The Common Stock shall have a par value of $0.001 per share.

FIFTH. The incorporator of the corporation is Cherin Silver, Esq. and her address is 1500 Walnut Street, Suite 1900, Philadelphia, PA 19102.

SIXTH. The Board of Directors shall have the power to adopt, amend or repeal the by-laws.

SEVENTH. No director shall be personally liable to the corporation or its stockholders for monetary damages for any breach of fiduciary duty by such director as a director. Notwithstanding the foregoing sentence, a director shall be liable to the extent provided by applicable law, (i) for breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit. No amendment to or repeal of this Article Seventh shall apply to or have any effect on the liability or alleged liability of any director of the corporation for or with respect to any acts or omissions of such director occurring prior to such amendment.

IN WITNESS WHEREOF, the undersigned, being the incorporator herein before named has executed signed and acknowledged this Certificate of Incorporation the 13th day of September, 2012.

_Cherin Silver_
Cherin Silver

State
Secreta
Division o
Delivered 02
FILED 02:5
SRV 121056536

CERTIFICATE OF OWNERSHIP AND MERGER

MERGING

GEMESIS ACQUISITION CORPORATION

WITH AND INTO

GEMESIS DIAMOND COMPANY

(pursuant to Section 253 of the General Corporation Law of the State of Delaware)

Gemesis Acquisition Corporation, a Delaware corporation ("Company"), does hereby certify to the following facts relating to the merger ("Merger") of Company with and into Gemesis Diamond Company ("Subsidiary"), with Subsidiary remaining as the surviving corporation:

FIRST: Company is incorporated pursuant to the General Corporation Law of the State of Delaware ("DGCL"). Subsidiary is incorporated pursuant to the DGCL.

SECOND: Company owns 99 % all of the outstanding shares of the common stock of Subsidiary. Subsidiary only has one class of stock which is common stock.

THIRD: The Board of Directors of the Company, by the following resolutions duly adopted on September 19, 2012, determined to merge Company with and into Subsidiary pursuant to Section 253 of the DGCL:

WHEREAS, Gemesis Acquisition Corporation ("Company"), owns 99 % of the outstanding shares of the capital stock of Gemesis Diamond Company ("Subsidiary"); and

WHEREAS, the Board of Directors of the Company has deemed it advisable that the Company be merged with and into the Subsidiary pursuant to Section 253 of the General Corporation Law of the State of Delaware:

NOW, THEREFORE, BE IT AND IT HEREBY IS RESOLVED, that the Company be merged with and into the Subsidiary (the "Merger"); and it is further

RESOLVED, that the merger shall be effective at 12:01 a.m. September 24, 2012. Notwithstanding the foregoing, at any time before the effective date and time of the Merger, the Merger may be terminated or amended by the Board of Directors of Company, and if required by the DGCL, its shareholders; and it is further

# *State of Delaware*
# *Annual Franchise Tax Report*

| CORPORATION NAME | | | | |
|---|---|---|---|---|
| GEMESIS ACQUISITION CORPORATION | | | | |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/RELOCATION DATE | | TAX YR. |
|---|---|---|---|---|
| 5212499 | 2012/09/13 | | | 2012 |

| PRINCIPAL PLACE OF BUSINESS | STREET/CITY/STATE/ZIP | PHONE NUMBER |
|---|---|---|
| | 10530 Portal Crossing, Suite 103, Lakewood Ranch, FL 34211 | (941) 840-6000 |

**REGISTERED AGENT**

NATIONAL CORPORATE RESEARCH, LTD.

615 S DUPONT HWY

DOVER         DE 19901        9070044

| BEGIN DATE | AUTHORIZED STOCK END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2012/09/13 | | COMMON | 100,000,000 | .001000 |

| OFFICER | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| | Stephen D. Lux | 10530 Portal Crossing, Suite 103, Lakewood Ranch, FL 34211 |
| President | | |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| | Marcin Bogdan Galas | 55 Market Street, Singapore 048941 |

Total number of directors:     1

*NOTICE: Pursuant to 8 Del. C. 502(6). If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

Authorized by (officer, director or incorporator)(street, city, state, postal code(zip) and country)

Stephen D. Lux

10530 Portal Crossing, Suite 103, Lakewood Ranch, FL 34211

Signature(X)      *[signature]*      date 9/21/12 title President

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 03:11 PM 04/30/2013*
*FILED 02:47 PM 04/30/2013*
*SRV 130503251 – 5327015 FILE*

CERTIFICATE OF INCORPORATION
OF
GEM COMPANY

The undersigned, for the purposes of incorporating and organizing a corporation under the General Corporation Law of the State of Delaware, does execute this Certificate of Incorporation and does hereby certify as follows:

FIRST. The name of the corporation is GEM COMPANY.

SECOND. The registered address of the corporation in the State of Delaware is 615 Dupont Highway, Dover, Kent County Delaware 19901 and its Registered Agent as such address is National Corporate Research, Ltd.

THIRD. The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

FOURTH. The total number of shares of stock which the corporation shall have authority to issue is One Thousand (1,000) shares, all of which shall be Common Stock. The Common Stock shall have a par value of $0.001 per share.

FIFTH. The incorporator of the corporation is Cherin Silver, Esq. and her address is 1500 Walnut Street, Suite 1900, Philadelphia, PA 19102.

SIXTH. The Board of Directors shall have the power to adopt, amend or repeal the by-laws.

SEVENTH. No director shall be personally liable to the corporation or its stockholders for monetary damages for any breach of fiduciary duty by such director as a director. Notwithstanding the foregoing sentence, a director shall be liable to the extent provided by applicable law, (i) for breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) pursuant to Section 174 of the Delaware General Corporation Law or (iv) for any transaction from which the director derived an improper personal benefit. No amendment to or repeal of this Article Seventh shall apply to or have any effect on the liability or alleged liability of any director of the corporation for or with respect to any acts or omissions of such director occurring prior to such amendment.

IN WITNESS WHEREOF, the undersigned, being the incorporator herein before named has executed signed and acknowledged this Certificate of Incorporation the 30th day of April, 2013.

*Cherin Silver*
Cherin Silver

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 11:24 AM 05/15/2013*
*FILED 11:12 AM 05/15/2013*
*SRV 130583865 - 5327015 FILE*

STATE OF DELAWARE
CERTIFICATE OF AMENDMENT
OF CERTIFICATE OF INCORPORATION
OF GEM COMPANY

Gem Company, a Delaware corporation ("Corporation") does hereby certify as follows:

1.     The name of the Corporation is Gem Company. The original certificate of incorporation of the Corporation was filed with the office of the Secretary of State of Delaware on April 30, 2013.

2.     This First Amendment to the Certificate of Incorporation has been adopted in accordance with Section 242 of the General Corporation Law of the State of Delaware ("DGCL").

3.     The text of the Corporation's Certificate of Incorporation, Article "FIRST" is hereby amended in its entirety to read as follows;

"FIRST: The name of the corporation is Gemesis, Inc."

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Amendment to be signed this 15th day of May, 2013.

By: _____
Suraj J. Mehta
President

**F130000 02247** 95



**100247855281**

---

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

☐ PICK-UP    ☐ WAIT    ☐ MAIL

_____
(Business Entity Name)

_____
(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only

05/13/13--01025--011   **70.00

FILED
13 MAY 23 PM 4: 06
SECRETARY OF STATE
TALLAHASSEE. FLORIDA

M13-2867



T. Buren MAY 2 4 2013

# COVER LETTER

**TO:**  New Filing Section
Division of Corporations

**SUBJECT:**  GEM COMPANY
_____
Name of corporation - must include suffix

Dear Sir or Madam:

The enclosed "Application by Foreign Corporation for Authorization to Transact Business in Florida," "Certificate of Existence," or "Certificate of Good Standing" and check are submitted to register the above referenced foreign corporation to transact business in Florida.

Please return all correspondence concerning this matter to the following:

Michael Chernick
_____
Name of Person

GEM Company
_____
Firm/Company

28 West 44th Street, Suite 1204
_____
Address

New York, NY 10036
_____
City/State and Zip code

mnchernick@gmail.com
_____
E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

Michael Chernick       at ( 917 ) 743-9092
_____       _____
Name of Person                            Area Code & Daytime Telephone Number

**STREET/COURIER ADDRESS:**         **MAILING ADDRESS:**
New Filing Section                              New Filing Section
Division of Corporations                      Division of Corporations
Clifton Building                                   P.O. Box 6327
2661 Executive Center Circle              Tallahassee, FL 32314
Tallahassee, FL 32301

Enclosed is a check for the following amount:

▣ $70.00 Filing Fee    ☐ $78.75 Filing Fee &    ☐ $78.75 Filing Fee &    ☐ $87.50 Filing Fee,
                                   Certificate of Status         Certified Copy                  Certificate of Status &
                                                                                                            Certified Copy



May 23, 2013

Florida Department of State
Division of Corporations
New Filing Section
Clifton Building
2661 Executive Center Circle
Tallahassee, FL 32301

Re: Gem Company
Ref. Number: W13000028672

Dear Sir or Madam;

We originally filed an application requesting authority for Gem Company, a Delaware corporation, to transact business in Florida. That application was denied since the name was not available in Florida. We filed an amendment in Delaware to change the name of the company to Gemesis, Inc. The Federal EIN did not change. Per your instructions, I have changed the name on the original application to Gemesis, Inc. and respectfully resubmit the application for approval.

I have included the Certificate of Good Standing for Gemesis, Inc. from Delaware.

If you need to contact me, please call me at (941) 840-6003.

Sincerely,

Bernard A. Wagner





### FLORIDA DEPARTMENT OF STATE
Division of Corporations

May 15, 2013

MICHAEL CHERNICK
28 WEST 44TH STREET STE 1204
NEW YORK, NY 10036

SUBJECT: GEM COMPANY
Ref. Number: W13000028672

We have received your document for GEM COMPANY and your check(s) totaling $70.00. However, the enclosed document has not been filed and is being returned for the following correction(s):

The name of your corporation is not available in Florida. An out-of-state corporation whose name is not available must adopt an alternate corporate name for use in Florida. The alternate corporate name must contain "Incorporated," "Company, "Corporation," "Inc.," "Co.," "Corp," "Inc," "Co," or "Corp." Please enter the alternate corporate name in the space provided in number one of the application.

Simply adding "of Florida" or "Florida" to the end of a name is not acceptable.

Please return your document, along with a copy of this letter, within 60 days or your filing will be considered abandoned.

If you have any questions concerning the filing of your document, please call (850) 245-6052.

Tim Burch
Regulatory Specialist II                    Letter Number: 913A00012228

# APPLICATION BY FOREIGN CORPORATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA

*IN COMPLIANCE WITH SECTION 607.1503, FLORIDA STATUTES, THE FOLLOWING IS SUBMITTED TO REGISTER A FOREIGN CORPORATION TO TRANSACT BUSINESS IN THE STATE OF FLORIDA.*

1. **Gemesis, Inc.**

(Enter name of corporation; must include "INCORPORATED," "COMPANY," "CORPORATION," "Inc.," "Co.," "Corp," "Inc," "Co," or "Corp.")

(If name unavailable in Florida, enter alternate corporate name adopted for the purpose of transacting business in Florida)

2. **Delaware**

(State or country under the law of which it is incorporated)

3. **46-2673619**

(FEI number, if applicable)

4. **April 30, 2013**

(Date of incorporation)

5. **Perpetual**

(Duration: Year corp. will cease to exist or "perpetual")

6. _____

(Date first transacted business in Florida, if prior to registration)
(SEE SECTIONS 607.1501 & 607.1502, F.S., to determine penalty liability)

7. **28 West 44th Street, 1204, New York, NY 10036**

(Principal office address)

**28 West 44th Street, 1204, New York, NY 10036**

(Current mailing address)

8. **Retail sales of laboratory grown diamonds via e-commerce**

(Purpose(s) of corporation authorized in home state or country to be carried out in state of Florida)

9. Name and <u>street address</u> of Florida registered agent: (P.O. Box <u>NOT</u> acceptable)

Name: **National Corporate Research LTD, Inc.**

Office Address: **155 Office Plaza Drive**

**Tallahassee** , Florida **32301**

(City) (Zip code)

10. **Registered agent's acceptance:**

*Having been named as registered agent and to accept service of process for the above stated corporation at the place designated in this application, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relative to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.*

_____

(Registered agent's signature)

11. Attached is a certificate of existence duly authenticated, not more than 90 days prior to delivery of this application to the Department of State, by the Secretary of State or other official having custody of corporate records in the jurisdiction under the law of which it is incorporated.

12. Names and business addresses of officers and/or directors:

## A. DIRECTORS

Chairman: _____

Address: _____

_____

Vice Chairman: _____

Address: _____

_____

Director: _____

Address: _____

_____

Director: _____

Address: _____

_____

## B. OFFICERS

President: **Michael Chernick**

Address: **28 West 44th Street, 1204**

**New York, NY 10036**

Vice President: _____

Address: _____

_____

Secretary: _____

Address: _____

Treasurer: _____

Address: _____

**NOTE:** If necessary, you may attach an addendum to the application listing additional officers and/or directors.

13. _____Michael Chernick_____

Signature of Director or Officer

The officer or director signing this document (and who is listed in number 12 above) affirms that the facts stated herein are true and that he or she is aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S.

14. **Michael Chernick**

(Typed or printed name and capacity of person signing application)

# *Delaware*

## *The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "GEMESIS, INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE SEVENTEENTH DAY OF MAY, A.D. 2013.

Jeffrey W. Bullock, Secretary of State

5327015  8300

130602854

**AUTHENTICATION:** *0443030*

**DATE:** *05-17-13*

You may verify this certificate online
at corp.delaware.gov/authver.shtml

# NYS Department of State

## Division of Corporations

## Entity Information

The information contained in this database is current through March 23, 2016.

Selected Entity Name: GEM COMPANY
Selected Entity Status Information

| | |
|---|---|
| Current Entity Name: | GEMESIS, INC. |
| DOS ID #: | 4401481 |
| Initial DOS Filing Date: | MAY 10, 2013 |
| County: | NEW YORK |
| Jurisdiction: | DELAWARE |
| Entity Type: | FOREIGN BUSINESS CORPORATION |
| Current Entity Status: | ACTIVE |

Selected Entity Address Information

DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)
GEMESIS, INC.
28 WEST 44TH STREET
SUITE 1204
NEW YORK, NEW YORK, 10036

Registered Agent

NONE

This office does not record information regarding
the names and addresses of officers, shareholders
or directors of nonprofessional corporations except
the chief executive officer, if provided, which
would be listed above. Professional corporations
must include the name(s) and address(es) of the
initial officers, directors, and shareholders in the
initial certificate of incorporation, however this
information is not recorded and only available by
viewing the certificate.

## *Stock Information

**103**

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|

No Information Available

*Stock information is applicable to domestic business corporations.

## Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| JUN 07, 2013 | Actual | GEMESIS, INC. |
| MAY 10, 2013 | Fictitious | GEMESIS DIAMOND COMPANY |
| MAY 10, 2013 | Actual | GEM COMPANY |

A Fictitious name must be used when the Actual name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results    New Search

**104**

# NYS Department of State

## Division of Corporations

## Entity Information

The information contained in this database is current through March 9, 2016.

Selected Entity Name: GEMESIS, INC.
Selected Entity Status Information

| | |
|---|---|
| Current Entity Name: | GEMESIS, INC. |
| DOS ID #: | 4401481 |
| Initial DOS Filing Date: | MAY 10, 2013 |
| County: | NEW YORK |
| Jurisdiction: | DELAWARE |
| Entity Type: | FOREIGN BUSINESS CORPORATION |
| Current Entity Status: | ACTIVE |

Selected Entity Address Information

DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)

GEMESIS, INC.
28 WEST 44TH STREET
SUITE 1204
NEW YORK, NEW YORK, 10036

Registered Agent

NONE

This office does not record information regarding the names and addresses of officers, shareholders or directors of nonprofessional corporations except the chief executive officer, if provided, which would be listed above. Professional corporations must include the name(s) and address(es) of the initial officers, directors, and shareholders in the initial certificate of incorporation, however this information is not recorded and only available by viewing the certificate.

## *Stock Information

| # of Shares | Type of Stock | $ Value per Share |
|---|---|---|

No Information Available

*Stock information is applicable to domestic business corporations.

## Name History

| Filing Date | Name Type | Entity Name |
|---|---|---|
| JUN 07, 2013 | Actual | GEMESIS, INC. |
| MAY 10, 2013 | Fictitious | GEMESIS DIAMOND COMPANY |
| MAY 10, 2013 | Actual | GEM COMPANY |

A Fictitious name must be used when the Actual name of a foreign entity is unavailable for use in New York State. The entity must use the fictitious name when conducting its activities or business in New York State.

NOTE: New York State does not issue organizational identification numbers.

Search Results    New Search

Services/Programs | Privacy Policy | Accessibility Policy | Disclaimer | Return to DOS Homepage | Contact Us

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 11:44 AM 07/28/2015*
*FILED 11:44 AM 07/28/2015*
*SRV 151101213 - 5327015 FILE*

### CERTIFICATE OF AMENDMENT OF THE
### CERTIFICATE OF INCORPORATION OF
### GEMESIS, INC.
### a Delaware Corporation

Gemesis, Inc., a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware (the "Corporation"),

DOES HEREBY CERTIFY:

FIRST: That Article FIRST of the Certificate of Incorporation of the Corporation is hereby amended in its entirety to read as follows:

"FIRST. The name of the corporation is Pure Grown Diamonds, Inc."

SECOND: That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

THIRD: The remainder of the Certificate of Incorporation, except as to the paragraph modified herein, remains in full force and effect.

IN WITNESS WHEREOF, the Corporation has caused this Certificate of Amendment to be executed this 23th day of July , 2015.

GEMESIS, INC.

By: _____
Lisa Bissell, President

F1300003247    **107**

(Requestor's Name)

(Address)

(Address)

(City/State/Zip/Phone #)

☐ PICK-UP    ☐ WAIT    ☐ MAIL

(Business Entity Name)

(Document Number)

Certified Copies _____    Certificates of Status _____

Special Instructions to Filing Officer:

Office Use Only



500281364195

FILED
2016 JAN 25 AM 9: 07
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

RECEIVED
DEPARTMENT OF STATE
16 JAN 25 PM 12: 17

1-26cm

CORPORATION SERVICE COMPANY
1201 Hays Street
Tallahassee, FL 32301
Phone: 850-558-1500


ACCOUNT NO. : I20000000195

REFERENCE : 969311      4723960

AUTHORIZATION :

COST LIMIT : $ 35.00

-------------------------------------------------------------

ORDER DATE : January 22, 2016

ORDER TIME : 9:56 AM

ORDER NO. : 969311-010

CUSTOMER NO: 4723960

-------------------------------------------------------------

### FOREIGN FILINGS


NAME:     GEMESIS, INC.


XX ___  CORPORATE
_____  LIMITED PARTNERSHIP
_____  LIMITED LIABILITY COMPANY

XXXX AMENDMENT

PLEASE RETURN THE FOLLOWING AS PROOF OF FILING:

_____  CERTIFIED COPY
XX _____ PLAIN STAMPED COPY
_____  CERTIFICATE OF GOOD STANDING


CONTACT PERSON: Melissa Zender -- EXT# 62956

EXAMINER: _____

# COVER LETTER

**TO:** Amendment Section
Division of Corporations

**SUBJECT:** Gemesis, Inc.
_____
Name of Corporation

**DOCUMENT NUMBER:** F13000002247
_____

The enclosed Amendment and fee are submitted for filing.

Please return all correspondence concerning this matter to the following:

Peter B. Phillips, Esq.
_____
Name of Contact Person

Greenbaum, Rowe, Smith & Davis LLP
_____
Firm/Company

P.O. Box 5600
_____
Address

Woodbridge, NJ 07095
_____
City/State and Zip Code

pphillips@greenbaumlaw.com
_____
E-mail address: (to be used for future annual report notification)

For further information concerning this matter, please call:

Peter Phillips                                     732        476-2524
_____ at ( ____ ) _____
Name of Contact Person              Area Code & Daytime Telephone Number

Enclosed is a check for the following amount:

[X] $35.00 Filing Fee    [ ] $43.75 Filing Fee & Certificate of Status    [ ] $43.75 Filing Fee & Certified Copy (Additional copy is enclosed)    [ ] $52.50 Filing Fee, Certificate of Status & Certified Copy (Additional copy is enclosed)

**Mailing Address:**
Amendment Section
Division of Corporations
P.O. Box 6327
Tallahassee, FL 32314

**Street Address:**
Amendment Section
Division of Corporations
Clifton Building
2661 Executive Center Circle
Tallahassee, FL 32301

# PROFIT CORPORATION
## APPLICATION BY FOREIGN PROFIT CORPORATION TO FILE AMENDMENT TO APPLICATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA
### (Pursuant to s. 607.1504, F.S.)

### SECTION I
#### (1-3 MUST BE COMPLETED)

F13000002247
_____
(Document number of corporation (if known))

1. Gemesis, Inc.
_____
(Name of corporation as it appears on the records of the Department of State)

2. Delaware _____  3. May 23, 2013 _____
(Incorporated under laws of)                (Date authorized to do business in Florida)

### SECTION II
#### (4-7 COMPLETE ONLY THE APPLICABLE CHANGES)

4. If the amendment changes the name of the corporation, when was the change effected under the laws of its jurisdiction of incorporation? July 28, 2015 _____

5. Pure Grown Diamonds, Inc.
_____
(Name of corporation after the amendment, adding suffix "corporation," "company," or "incorporated," or appropriate abbreviation, if not contained in new name of the corporation)

n/a
_____
(If new name is unavailable in Florida, enter alternate corporate name adopted for the purpose of transacting business in Florida)

6. If the amendment changes the period of duration, indicate new period of duration.

n/a
_____
(New duration)

7. If the amendment changes the jurisdiction of incorporation, indicate new jurisdiction.

n/a
_____
(New jurisdiction)

8. Attached is a certificate or document of similar import, evidencing the amendment, authenticated not more than 90 days prior to delivery of the application to the Department of State, by the Secretary of State or other official having custody of corporate records in the jurisdiction under the laws of which it is incorporated.

_____
(Signature of a director, president or other officer - if in the hands of a receiver or other court appointed fiduciary, by that fiduciary)

Kenneth B. Rubinstein _____   COO _____
(Typed or printed name of person signing)                (Title of person signing)

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THAT THE SAID "GEMESIS, INC.", FILED A CERTIFICATE OF AMENDMENT, CHANGING ITS NAME TO "PURE GROWN DIAMONDS, INC." ON THE TWENTY-EIGHTH DAY OF JULY, A.D. 2015, AT 11:44 O`CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CORPORATION IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE NOT HAVING BEEN CANCELLED OR DISSOLVED SO FAR AS THE RECORDS OF THIS OFFICE SHOW AND IS DULY AUTHORIZED TO TRANSACT BUSINESS.



Jeffrey W. Bullock, Secretary of State

5327015  8320
SR# 20160364226

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 201718535
Date: 01-22-16

This is the Exhibit marked "**SFW-30**"

referred to in the 12th Affidavit of

**SUSAN JANE FLETCHER WATTS**

affirmed in the United Kingdom

on this ⌐ ⌐ day of March 2018

Before Me,

**A NOTARY PUBLIC**

RICHARD GARETH GRIFFITHS
Solicitor & Notary Public
Downend Lodge
Chieveley
ENGLAND RG20 8TN

## IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

HC/S 26/2016

Between

**ELEMENT SIX TECHNOLOGIES LIMITED**
(United Kingdom Registration No. 08206603)

…Plaintiff

And

**IIa TECHNOLOGIES PTE. LTD.**
(Singapore UEN No. 200516961K)

…Defendant

## THE ANSWER

Of the abovenamed Defendant to the interrogatories for the examination of the abovenamed Plaintiff dated 18th day of December 2017.

In answer to the said interrogatories, I, **MEHTA VISHAL JATIN** (NRIC No: S8187632J), care of 17 Tukang Innovation Drive, Singapore 618300, do affirm and say as follows:

1.  To interrogatory 1(a), namely:

    *Did the Defendant in Singapore make, dispose of or offer to dispose of, import, use and/or keep, whether in part or otherwise, any single crystal CVD diamond material in any form, including as-grown and gemstone,*

which was designated the identifier *"LG10061905"*, regardless of when the aforesaid designation took place and whether the aforesaid designation was by the Defendant or third party?

That the Defendant does not use this format of identification, and is unable to comment on what third parties might or might not have done

2.  To interrogatory 6(a), namely:

Did the Defendant in Singapore make, dispose of or offer to dispose of, import, us and/or keep, whether in part or otherwise, any single crystal CVD diamond material in any form, including as-grown and diamond plate, which was designated the identifier *"2PCVD303004N"*, regardless of when the aforesaid designation took place and whether the aforesaid designation was by the Defendant or a third party?

That the Defendant sold single crystal CVD diamond material which the Defendant designated the identifier *"2PCVD303004N"*. The Defendant is unable to comment on what third parties might or might not have done.

3.  To interrogatory 11(a), namely:

Did the Defendant in Singapore make, dispose of or offer to dispose of, import, us and/or keep, whether in part or otherwise, any single crystal CVD diamond material in any form, including as-grown and diamond plate, which was designated the identifier *"LG10226420"*, regardless of

*when the aforesaid designation took place and whether the aforesaid designation was by the Defendant or a third party?*

That the Defendant does not use this format of identification, and is unable to comment on what third parties might or might not have done.

4. To interrogatory 17(a), namely:

*Did the Defendant in Singapore make, dispose of or offer to dispose of, import, us and/or keep, whether in part or otherwise, any single crystal CVD diamond material in any form, including as-grown and diamond plate, which was designated the identifier "2PCVD505005N", regardless of when the aforesaid designation took place and whether the aforesaid designation was by the Defendant or a third party?*

That the Defendant sold  single crystal CVD diamond material which the Defendant designated the identifier "*2PCVD505005N*". The Defendant is unable to comment on what third parties might or might not have done.

AFFIRMED BY THE ABOVENAMED )
**MEHTA VISHAL JATIN** )
IN SINGAPORE )
ON  THE   19th  day of   Feb   2018 )

Before me,

**A Commissioner of Oaths**

COMMISSIONER FOR OATHS
Thomas Loh
C2017/0204
1 Apr 2017 – 31 Mar 2018
SINGAPORE

This Affidavit is filed on behalf of the Defendant.

# DREW & NAPIER

General Line
T : +65 6535 0733
T : +65 9726 0573 (After Hours)
F : +65 6535 4906

Drew & Napier LLC
10 Collyer Quay
#10-01 Ocean Financial Centre
Singapore 049315

www.drewnapier.com

*We do not accept service
of court documents by fax*

13 March 2018

**BY FAX (6303 6222) AND POST**
**No. of pages: 1**

T : + 65 6531 2512 / 2736 / 2508
E: tony.yeo@drewnapier.com
meryl.koh@drewnapier.com
javier.yeo@drewnapier.com

AMICA LAW LLC
30 Raffles Place #14-01
Chevron House
Singapore 048622

Our Ref
TY/MKJN/JYO/375178

Your Ref
JC/MP/NIC/20120280

**Attn: Mr Jason Chan / Mr Melvin Pang / Mr Nicholas Ong**

Dear Sirs,

**HC/S 26/2016**
**SPECIFIC DISCOVERY**

1.      We refer to your letter to us dated 2 March 2018.

2.      Our client does not see the urgency for this affidavit to be filed prior to the 28 March 2018 deadline for parties to file their applications for specific discovery, especially in light of our client's responses in our letters to you dated 22 January 2018, 12 February 2018 and 28 February 2018 as well as our submissions made at the Pre-Trial Conference on 21 February 2018.

3.      Our client reserves its rights on costs if your client insists on seeking discovery unnecessarily, for any category of documents, notwithstanding our aforementioned letters to you.

Yours faithfully,

**Drew & Napier LLC**

Cc client

---

DREW & NAPIER LLC (UEN 200102509E) is a law corporation with limited liability.

This document is for the addressee(s) only and may contain confidential information and/or may be subject to legal privilege.
If you have received this in error, please contact us immediately.

# AMICA LAW LLC

Advocates & Solicitors
Patent, Trade Mark & Design Agents
Notary Public & Commissioner for Oaths

www.amicalaw.com

Tel +65 6303 6210
Fax +65 6303 6222
+65 6536 9332

30 Raffles Place
#14-01 Chevron House
Singapore 048622

| | | |
|---|---|---|
| Writer | : | Jason Chan / Melvin Pang / Nicholas Ong |
| Direct Dial | : | (65) 6303 6215 / 6303 6220 /6303 8398 |
| Email | : | Jason.chan@amicalaw.com / melvin.pang@amicalaw.com / nicholas.ong@amicalaw.com |
| Our Ref | : | JC/MP/NIC/20120280 |
| Your Ref | : | TY/MKJN/VHWS/375178 |

2 March 2018

**Drew & Napier LLC**
10 Collyer Quay
#10-01 Ocean Financial Centre
Singapore 049315

**BY FAX & POST**
Fax No.: 6535 4906
No. of pages: 1

<u>Attention: Mr Tony Yeo / Ms Meryl Koh / Mr Javier Yeo</u>

Dear Sirs

**HC/S 26/2016**
**SPECIFIC DISCOVERY**

1. We refer to your letter dated 28 February 2018 ("Letter") regarding the Plaintiff's requests for specific discovery.

2. Kindly let us have the affidavit referred to at paragraphs 2-3 of your Letter ("Affidavit") by **13 March 2018**. This is to enable our client sufficient time to review and to consider whether it should discontinue some of its requests in its summons for specific discovery.

3. Given the deadline of 28 March 2018 for parties to file their applications for further discovery, your client's filing of the Affidavit in a timely manner is crucial to avoid expending unnecessary time and costs for both parties.

4. All of our client's rights are hereby expressly reserved, including its rights to seek discovery of any category of documents should your client fail to provide the Affidavit by 13 March 2018 or if the contents of the Affidavit are unsatisfactory, as well as to claim all costs thrown away against your client.

Yours faithfully

cc: client

**119**

# ◪ DREW & NAPIER

General Line
T : +65 6535 0733
T : +65 9726 0573 (After Hours)
F : +65 6535 4906

Drew & Napier LLC
10 Collyer Quay
#10-01 Ocean Financial Centre
Singapore 049315

www.drewnapier.com

28 February 2018

*We do not accept service
of court documents by fax*

**BY FAX (6303 6222) AND POST**

T: + 65 6531 2512 / 2736 / 2508
E: tony.yeo@drewnapier.com
meryl.koh@drewnapier.com
javier.yeo@drewnapier.com

AMICA LAW LLC
30 Raffles Place #14-01
Chevron House
Singapore 048622

Our Ref
TY/MKJN/JYO/375178

Your Ref
JC/MP/NIC/20120280

**Attn: Mr Jason Chan / Mr Melvin Pang / Mr Nicholas Ong**

Dear Sirs,

**HC/S 26/2016**
**SPECIFIC DISCOVERY**

1.      We refer to your letters to us dated 14 February 2018 ("**14 February 2018 Letter**") and 19 February 2018 ("**19 February 2018 Letter**"). We also refer to the Pre-Trial Conference ("**PTC**") heard on 21 February 2018 at 3.30pm before the Learned Assistant Registrar Ms Cheng Pei Feng ("**AR Cheng**").

2.      With respect to paragraph 2(a) of your 14 February 2018 Letter, our client is agreeable to include in the affidavit referred to at paragraph 4 of our letter dated 12 February 2018 that it does not have in its possession, custody and/or power, documents falling within the said categories 8(d) – 8(f) and 11(b) and 11(d).

3.      With respect to paragraphs 2(b) and 3(a) of your 14 February 2018 Letter, our client is agreeable to include its responses in the affidavit referred to at paragraph 4 of our letter dated 12 February 2018.

4.      For the record, our client objects to the allegations raised at paragraph 5 of your 14 February 2018 Letter, viz, that our client failed to meet the timelines as directed by AR Cheng at the PTC heard on 27 December 2017 at 3.30pm.

5.      As stated at paragraph 2 of our letter to you dated 12 February 2018, our client had already stated its position with respect to all of your client's requests for documents in our letter to you dated 22 January 2018. This is in accordance with the timelines as directed by AR Cheng. Our letter to you dated 12 February 2018 merely provided a further response for categories 8, 14, 11(b) and 11(d), viz, whether these documents are in our client's possession, custody and/or power. Accordingly, your client's allegations are baseless. It is completely untrue that your client "only managed to know [our] client's preliminary responses to [your] client's discovery request as late as 12 February 2018".

6.      Further, our client's responses in our letter to you dated 22 January 2018 were sufficient for your client to decide if it was necessary to proceed with any specific discovery application(s) against our client. Any delay or omission on the part of your client in filing the application by 19 February 2018 is a result of your client's own inaction.

DREW & NAPIER LLC (UEN 200102509E) is a law corporation with limited liability.

This document is for the addressee(s) only and may contain confidential information and/or may be subject to legal privilege. If you have received this in error, please contact us immediately.

# DREW & NAPIER

7.      As submitted at the PTC heard on 21 February 2018, it was your client who had failed to comply with AR Cheng's timelines as directed at the PTC heard on 27 December 2017: -

(a)     While your client has stated in your letter to us dated 22 January 2018 that it is agreeable to disclose documents falling within the said categories 3(a), 3(d), 3(g) to 3(i), albeit in the limited manner, none of these documents were forthcoming from your client despite AR Cheng's directions for parties to file their respective lists of documents enumerating the documents that they were willing to disclose by 5 February 2018. Indeed, AR Cheng commented at the PTC heard on 21 February 2018 that your client should not be waiting for our client's response before taking steps to source for the requisite documents and that it was "shocking" that as at 21 February 2018, your client had not approached any of the third parties to request for the documents that your client had already agreed to disclose since 22 January 2018.

(b)     It is also disingenuous for your client to claim that it is unable to provide the documents "given the ambiguity of [our client's] numerous discovery requests". This is no reason to withhold the documents that your client had already agreed to disclose since 22 January 2018. In fact, your client should have disclosed these documents in October 2016 when your client first disclosed the Technical Notes in the Plaintiff's List of Documents at S/Nos 136-139 and 145-148 given that your client agrees that these are relevant and necessary. It is evident that your client had deliberately delayed and is still delaying the disclosure of these documents.

(c)     It is also no excuse for your client to rely on the fact that it is incorporated outside of Singapore, in the United Kingdom, as a reason for requiring so much more time to procure the relevant and necessary documents. Your client chose to commence proceedings against our client in Singapore and should therefore be prepared to overcome any alleged inconveniences and alleged logistical difficulties.

(d)     Further, it is also no excuse to claim that the involvement of third parties made it difficult for your client to produce the documents in a timely fashion. In particular, the fact that third parties are involved does not justify your client's failure to even approach them early on, to request for the requisite documents. We repeat AR Cheng's comments on your client's conduct in this regard as stated at paragraph 7a above. Your client has clearly chosen to sit on its hands instead of diligently complying with its discovery obligations.

8.      Our client reserves its rights to raise the above conduct at the appropriate forum.

Yours faithfully

*[signature]*

**DREW & NAPIER LLC**

Cc:     Client



Date: 15-February-2018

To:

1. AMICA LAW LLC
30, Raffles Place, # 14-01, Chevron House, Singapore - 048622
Tel No: 63036210
Fax No: 63036222
Email: jason.chan@amicalaw.com
File Ref No: JC/MP/NIC/20120280
Solicitor in charge: 1. CHAN KWOK CHUAN JASON
2. NICHOLAS ONG WEI LUN
3. PANG SZE RAY, MELVIN

2. Drew & Napier LLC
10, Collyer Quay, # 10-01, Ocean Financial Centre, Singapore - 049315
Tel No: 65350733
Fax No: 65354906
Email: mail@drewnapier.com
File Ref No: TY/MKJN/JYO 375178
Solicitor in charge: 1. MERYL KOH JUNNING
2. TONY YEO SOO MONG
3. YEO JAVIER

Dear Sir/Madam,

**HC/S 26/2016**
**ELEMENT SIX TECHNOLOGIES LIMITED V IIA TECHNOLOGIES PTE. LTD.**
**- CORRESPONDENCE FROM COURTS**

We refer to the letter dated 14 February 2018 from Messrs Drew & Napier LLC.

2.      Please be informed that the Assistant Registrar Ms Cheng Pei Feng has directed that directions will be given at the upcoming PTC.

Thank you.

Yours faithfully,

JARINAH BTE MUSTAFA
FOR REGISTRAR
SUPREME COURT
SINGAPORE

Tel No: 63324290
Fax No: 63379450

This is computer-generated and requires no signature.

Close    Print

# ℕ DREW & NAPIER

General Line
T : +65 6535 0733
T : +65 9726 0573 (After Hours)
F : +65 6535 4906

Drew & Napier LLC
10 Collyer Quay
#10-01 Ocean Financial Centre
Singapore 049315

www.drewnapier.com

*We do not accept service
of court documents by fax*

14 February 2018

**BY E-LITIGATION**
No. of pages: 1

T : + 65 6531 2512 / 2736 / 2508
E: tony.yeo@drewnapier.com
meryl.koh@drewnapier.com
javier.yeo@drewnapier.com

**THE SUPREME COURT REGISTRY**
Supreme Court of Singapore
1 Supreme Court Lane
Singapore 178879

**Attn: The Learned Assistant Registrar Ms Cheng Pei Feng**

Our Ref
TY/MKJN/JYO/375178

Your Ref

Dear Sirs,

**HC/S 26/2016**
**TIMELINES FOR FILING SPECIFIC DISCOVERY APPLICATIONS**

1.    We act for the Defendant and Amica Law LLC ("**AL**") acts for the Plaintiff in the captioned matter.

2.    We refer to the Pre-Trial Conference ("**PTC**") heard on 27 December 2017 at 3.30pm before the Learned Assistant Registrar Ms Cheng Pei Feng ("**AR Cheng**") where AR Cheng had directed, *inter alia*, for parties to file their respective discovery applications by Monday, 19 February 2018.

3.    We write to inform AR Cheng that further to a series of correspondence between AL and us, parties will not be able to file the necessary specific discovery applications by Monday, 19 February 2018. AL has proposed for the deadline to be extended to Monday, 26 February 2018. We propose instead for this matter to be addressed and for new timelines to be directed at the next PTC, presently fixed for 21 February 2018 at 3.30pm.

4.    We are grateful for this Honourable Court's indulgence to our request above at paragraph 3.

5.    We look forward to this Honourable Court's direction on the above.

Yours faithfully,

*[signature]*

**Drew & Napier LLC**

cc.   1.    Client

      2.    Amica Law LLC
            By Fax Only (6303 6222)
            Attn: Mr Jason Chan / Mr Melvin Pang / Mr Nicholas Ong
            (File Ref: JC/MP/NIC/20120280)

---

DREW & NAPIER LLC (UEN 200102509E) is a law corporation with limited liability.

This document is for the addressee(s) only and may contain confidential information and/or may be subject to legal privilege.
If you have received this in error, please contact us immediately.

# AMICA LAW LLC

Advocates & Solicitors
Patent, Trade Mark & Design Agents
Notary Public & Commissioner for Oaths

www.amicalaw.com

Tel +65 6303 6210
Fax +65 6303 6222
+65 6536 9332

30 Raffles Place
#14-01 Chevron House
Singapore 048622

| | | |
|---|---|---|
| Writer | : | Jason Chan / Melvin Pang / Nicholas Ong |
| Direct Dial | : | (65) 6303 6215 / 6303 6220 /6303 8398 |
| Email | : | jason.chan@amicalaw.com / melvin.pang@amicalaw.com / nicholas.ong@amicalaw.com |
| Our Ref | : | JC/MP/NIC/20120280 |
| Your Ref | : | TY/MKJN/JYO/375178 |

14 February 2018

Drew & Napier LLC
10 Collyer Quay
#10-01 Ocean Financial Centre
Singapore 049315

**BY FAX (6535 4906) & POST**
No. of page(s): 3
(including this page)

**Attention: Mr Tony Yeo / Ms Meryl Koh / Mr Javier Yeo**

Dear Sirs

**HC/S 26 of 2016**

1.      We refer to your letters dated 22 January 2018 (your "**22 Jan Letter**") and 12 February 2018 (your "**12 Feb Letter**") and our letter dated 26 January 2018 (our "**26 Jan Letter**").

   **Affidavit**

2.      At paragraph 3(a)-(b) of your 12 Feb Letter, it was stated that your client does not have documents under Categories 8(d)-(f), 11(b) and 11(d) in its possession, custody and/or power. In respect of these categories of documents, please let us know the following:-

   a.      whether your client is agreeable to affirming by way of an affidavit that it does not have these categories of documents in its possession, custody and/or power; and

   b.      whether your client is agreeable to including in its affidavit:

       i.    whether these categories of documents have, respectively and at any time, been in its possession, custody or power; and

       ii.   if not then in its possession, custody or power, when it parted with these categories of documents and what has become of them, respectively.

3.      At paragraph 4 of your 12 Feb Letter, your client has also agreed to affirm by way of an affidavit that it does not have any document under Categories 7, 9, 10, 11(a),(c) and (e), 12, and 13 in its

possession custody and/or power, excluding documents that have already been disclosed in the parties' respective lists of documents and supplementary lists of documents. In respect of these categories of documents, please let us know the following:-

a.      whether your client is agreeable to including in its affidavit:

   i.   whether these categories of documents have, respectively and at any time, been in its possession, custody or power; and

   ii.  if not then in its possession, custody or power, when it parted with these categories of documents and what has become of them, respectively.

**Extension of Time**

4.      We refer to the Pre-Trial Conference ("**PTC**") held on 27 December 2017 before Assistant Registrar Ms Cheng Pei Feng ("**AR Cheng**"), where she provided the following directions:

a.      Parties to provide their preliminary responses (i.e. whether the other side is entitled to the documents or information requested for) by **22 January 2018**;

b.      Parties to provide substantive responses (if any) by **5 February 2018**; and

c.      Parties to file their respective summons (if necessary) by **19 February 2018**.

5.      We reiterate the point made in our 26 Jan Letter that your client has chosen to disregard timelines set by AR Cheng on 27 December 2017, i.e. by failing to provide preliminary responses to numerous discovery requests by 22 January 2018. In fact, our client only managed to know your client's preliminary responses to our client's discovery requests as late as 12 February 2018, 3 weeks after the 22 January 2018 timeline set by AR Cheng. Further, in your 12 Feb Letter, no reasonable explanation as to your client's delay was offered in respect of your client's failure to meet **both** of AR Cheng's 22 January 2018 and 5 February 2018 timelines.

6.      The timelines provided by AR Cheng are premised on there being reasonable time of at least 2 weeks for parties to consider, at each stage, the other party's preliminary and substantive responses respectively so as to consider whether to file their respective summons, if necessary, by 19 February 2018.

7.      As a result of the delay occasioned by your client, our client will require more time to consider whether to file an application for specific discovery, particularly since its decision may depend on your client's response(s) to its requests at paragraphs 2 and 3 above.

8.      Given the circumstances, please let us know if your client is agreeable to a mutual extension of the 19 February 2018 timeline for parties to file their respective summons by one week, i.e. to 26 February 2018.

9.     Pending your client's response, our client reserves its right to file its application for specific discovery on 19 February 2018 and to seek costs from your client for any wasted work done in respect of categories of documents for which a response from your client is still forthcoming.

10.    All of our client's rights are expressly reserved.


Yours faithfully

cc.    Client

# DREW & NAPIER

General Line
T : +65 6535 0733
T : +65 9726 0573 (After Hours)
F : +65 6535 4906

Drew & Napier LLC
10 Collyer Quay
#10-01 Ocean Financial Centre
Singapore 049315

www.drewnapier.com

*We do not accept service
of court documents by fax*

T : + 65 6531 2512 / 2736 / 2508
E: tony.yeo@drewnapier.com
meryl.koh@drewnapier.com
javier.yeo@drewnapier.com

12 February 2018

RECEIVED
13 FEB 2018

**BY FAX (6303 6222) AND POST**
**No. of pages: 1**

**AMICA LAW LLC**
30 Raffles Place #14-01
Chevron House
Singapore 048622

Our Ref
TY/MKJN/JYO/375178

Your Ref
JC/MP/NIC/20120280

**Attn: Mr Jason Chan / Mr Melvin Pang / Mr Nicholas Ong**

Dear Sirs,

**HC/S 26/2016**
**SPECIFIC DISCOVERY**

1.  We refer to your letter to us dated 26 January 2018.

2.  We do not wish to litigate by correspondence. For the record, our client denies and objects to your client's allegation at paragraph 2. It is clear from paragraphs 2(d) and 2(g) of our letter that our client agrees to disclose documents falling within the categories 8, 14, 11(b) and 11(d) only insofar as these are relevant and necessary.

3.  In any event, we set out our client's response on the said categories below:-

a.  With respect to categories 8 and 14 of your letter to us dated 18 December 2017, our client is agreeable to disclosing documents described at categories 8(a), 8(b), 8(c) and 14. With respect to the other sub-paragraphs in category 8, we are instructed that our client does not have these documents in its possession, custody and/or power.

b.  With respect to categories 11(b) and 11(d), we are instructed that our client does not have these documents in its possession, custody and/or power.

4.  With respect to your client's request at paragraph 4, our client agrees to file the affidavit at the appropriate time.

5.  All of our client's rights are expressly reserved.

Yours faithfully,

*Drew & Napier*

Drew & Napier LLC

Cc client

---

DREW & NAPIER LLC (UEN 200102509E) is a law corporation with limited liability.

This document is for the addressee(s) only and may contain confidential information and/or may be subject to legal privilege.
If you have received this in error, please contact us immediately.

# AM CA LAW LLC

Advocates & Solicitors
Patent, Trade Mark & Design Agents
Notary Public & Commissioner for Oaths

www.amicalaw.com

Tel +65 6303 6210
Fax +65 6303 6222
+65 6536 9332

30 Raffles Place
#14-01 Chevron House
Singapore 048622

Writer : Jason Chan / Melvin Pang / Nicholas Ong
Direct Dial : (65) 6303 6215 / 6303 6220 /6303 8398
Email : Jason.chan@amicalaw.com / melvin.pang@amicalaw.com /
nicholas.ong@amicalaw.com
Our Ref : JC/MP/NIC/20120280
Your Ref : TY/MKJN/VHWS/375178

26 January 2018

**Drew & Napier LLC**
10 Collyer Quay
#10-01 Ocean Financial Centre
Singapore 049315

**BY FAX & POST**
Fax No.: 6535 4906
No. of pages: 2

Attention: Mr Tony Yeo / Ms Meryl Koh / Mr Javier Yeo

Dear Sirs

**HC/S 26/2016**
**SPECIFIC DISCOVERY**

1.  We refer to our letter dated 18 December 2017 and your letter dated 22 January 2018 ("Letter").

2.  Preliminarily, our client objects to your client's blatant disregard for timelines set down by the Court. At the PTC on 27 December 2017, the learned AR Cheng Pei Feng had set down a deadline of 22 January 2018 for your client to provide us with its preliminary responses. This gave your client more than sufficient time to consider the various specific discovery requests. Our client was therefore taken by surprise when on 22 January 2018, we received your Letter stating that you are still "taking instructions" in relation to numerous discovery requests. Indeed, no advance warning or request for an extension of time was received by us.

3.  Be that as it may, we refer specifically to paragraph 2(d) and (g) of your Letter. Please let us have your client's *final* response on whether it agrees to provide the documents under Categories 8, 14, and 11(b) and (d). Insofar as such documents contain confidential information, our client is willing to execute an appropriate confidentiality undertaking.

4.  We refer specifically to paragraphs 2(c) and (e)-(i) or your Letter. Please let us know whether your client is agreeable to affirming by way of an affidavit that it does not have any document under Categories 7, 9, 10, 11(a),(c) and (e), 12, and 13 in its possession, custody and/or power, excluding documents that have already been disclosed in the parties' respective lists of documents and supplementary lists of documents.

5.  Please let us have your client's response to paragraphs 3-4 above by **5 February 2018**.

6.  All of our client's rights are hereby expressly reserved.


Yours faithfully

*Amica*


cc client

# AMICA LAW LLC

Advocates & Solicitors
Patent, Trade Mark & Design Agents
Notary Public & Commissioner for Oaths

www.amicalaw.com

Tel +65 6303 6210
Fax +65 6303 6222
+65 6536 9332

30 Raffles Place
#14-01 Chevron House
Singapore 048622

| Writer | : | Jason Chan / Melvin Pang / Nicholas Ong |
| Direct Dial | : | (65) 6303 6215 / 6303 6220 /6303 8398 |
| Email | : | Jason.chan@amicalaw.com / melvin.pang@amicalaw.com / nicholas.ong@amicalaw.com |
| Our Ref | : | JC/MP/NIC/20120280 |
| Your Ref | : | TY/MKJN/VHWS/375178 |

6 February 2018

**Drew & Napier LLC**
10 Collyer Quay
#10-01 Ocean Financial Centre
Singapore 049315

**BY FAX & POST**
Fax No.: 6535 4906
No. of pages: 1

<u>Attention: Mr Tony Yeo / Ms Meryl Koh / Mr Javier Yeo</u>

Dear Sirs

**HC/S 26/2016**
**SPECIFIC DISCOVERY AND INTERROGATORIES**

1. We refer to our letters dated 22 January 2018 and 26 January 2018, and your letter dated 22 January 2018.

2. Our letter dated 22 January 2018 is our preliminary response to the Defendant's request for documents. We have yet to hear from you regarding our proposal at paragraph 18 of our letter, despite more than two weeks having elapsed.

3. Our letter dated 26 January 2018 relates to the Plaintiff's request for documents. We have yet to hear from you regarding our proposals at paragraphs 3-4 of our letter, despite requesting the same by 5 February 2018.

4. Your letter dated 22 January 2018 is your client's preliminary response to the interrogatories filed by the Plaintiff on 18 December 2017. In said letter, your client agreed to answer interrogatories 1(a), 6(a), 11(a) and 17(a). However, your client has yet to file its answers, despite the deadline of 5 February 2018 set by AR Cheng Pei Feng having passed.

5. Please let us have your responses/answers as specified in paragraphs 2-4 above as soon as possible, and in any event, no later than **4pm on 9 February 2018**.

6. All of our client's rights are hereby expressly reserved.

Yours faithfully

cc client

**130**



# DREW & NAPIER

General Line
T : +65 6535 0733
T : +65 9726 0573 (After Hours)
F : +65 6535 4906

Drew & Napier LLC
10 Collyer Quay
#10-01 Ocean Financial Centre
Singapore 049315

www.drewnapier.com

*We do not accept service*
*of court documents by fax*

22 January 2018

**BY FAX (6303 6222) AND POST**
**No. of pages: 2**

T : + 65 6531 2512 / 2736 / 2508
E: tony.yeo@drewnapier.com
meryl.koh@drewnapier.com
javier.yeo@drewnapier.com

AMICA LAW LLC
30 Raffles Place #14-01
Chevron House
Singapore 048622

Our Ref
TY/MKJN/JYO/375178

Your Ref
JC/MP/NIC/20120280

**Attn: Mr Jason Chan / Mr Melvin Pang / Mr Nicholas Ong**

Dear Sirs,

**HC/S 26/2016**
**SPECIFIC DISCOVERY**

1.     We refer to your letter dated 18 December 2017 with your client's request for specific discovery of various categories of documents as well as discovery of documents based on keyword searches via electronic discovery (**"18 December Letter"**), and the directions given by the Learned Assistant Registrar Ms Cheng Pei Feng (**"AR Cheng"**) at the Pre-Trial Conference heard on 27 December 2017 (**"PTC"**).

2.     Further to AR Cheng's directions at the PTC, we set out our client's preliminary response to your client's requests:-

a.     With respect to categories 1, 2, 3, and 4 of Annex A of your 18 December Letter, the categories of documents are too broad and are irrelevant.

b.     With respect to categories 5 and 6 of Annex A of your 18 December Letter, the categories of documents are too broad, would include irrelevant matters and are oppressive.

c.     With respect to category 7 of Annex A of your 18 December Letter, our client does not have any document in its possession, custody and/or power that falls within the description in category 7.

d.     We are still taking our client's instructions on your client's requests at categories 8 and 14 of Annex A of your 18 December Letter but to the extent that any documents in these categories are relevant and necessary (which is not admitted), our client is agreeable to disclose.

e.     With respect to category 9 of Annex A of your 18 December Letter, we are instructed that our client does not have any document in its possession, custody and/or power that falls within the description in category 9.

---

DREW & NAPIER LLC (UEN 200102509E) is a law corporation with limited liability.

This document is for the addressee(s) only and may contain confidential information and/or may be subject to legal privilege. If you have received this in error, please contact us immediately.

# ◈ DREW & NAPIER

f.   With respect to category 10 of Annex A of your 18 December Letter, we are instructed as follows:-

  i.   Our client does not have any document described in subparagraphs (a), (b) and *"marketing materials provided by the Defendant to third parties"* as referred to in subparagraph (c) in its possession, custody and/or power.

  ii.   With respect to the *"sales invoices, quotation"* referred to in subparagraph (c), our client does not have any further documents in its possession, custody and/or power save for the documents already disclosed to and/or by your client.

  iii.   With respect to subparagraphs (d) and (e), these are irrelevant and in any event, our client does not have any document in its possession, custody and/or power that falls within the description in the aforementioned categories.

g.   With respect to category 11 of Annex A of your 18 December Letter, we are instructed that our client does not have any document in its possession, custody and/or power that falls within the description in subparagraphs (a), (c) and (e). We are still taking our client's instructions on your client's request at subparagraphs (b) and (d) but to the extent that any documents in these categories are relevant and necessary (which is not admitted), our client is agreeable to disclose, but only **on the condition that** your client executes the relevant confidentiality undertakings prior to such disclosure. Our client further reserves its right to redact irrelevant information from any document that falls within subparagraphs (b) and (d) (if any).

h.   With respect to category 12 of Annex A of your 18 December Letter, this category of documents is extremely broad and is a request for documents that are irrelevant. In any event, we have been instructed that our client does not have any document in its possession, custody and/or power that falls within the description in category 12.

i.   With respect to category 13 of Annex A of your 18 December Letter, we are instructed that our client does not have any document in its possession, custody and/or power that falls within the description in category 12.

3.   With respect to your client's request for electronic discovery, our client objects to your client's request in its entirety. It is clear that the keyword searches proposed by your client at paragraph 4(b) of Annex B of your 18 December Letter completely overlaps with the documents your client had requested for at Annex A. Further, our client does not see how electronic discovery in the present proceedings, especially given your client's proposed keyword searches, is useful and/or necessary given the high costs involved. Accordingly, it is a waste of time and costs for both parties to conduct electronic discovery, again especially in light of the more specific requests set out at Annex A of your 18 December Letter.

4.   All of our client's rights are expressly reserved.

Yours faithfully,

**Drew & Napier LLC**

Cc client

# AMICA LAW LLC

Advocates & Solicitors
Patent, Trade Mark & Design Agents
Notary Public & Commissioner for Oaths

www.amicalaw.com

Tel  +65 6303 6210
Fax +65 6303 6222
   +65 6536 9332

30 Raffles Place
#14-01 Chevron House
Singapore 048622

Writer         :  Jason Chan / Melvin Pang / Nicholas Ong
Direct Dial :  (65) 6303 6215 / 6303 6220 /6303 8398
Email        :  Jason.chan@amicalaw.com / melvin.pang@amicalaw.com /
                    nicholas.ong@amicalaw.com
Our Ref    :  JC/MP/NIC/20120280
Your Ref   :  TY/MKJN/JYO/375178

18 December 2017

**Drew & Napier LLC**
10 Collyer Quay
#10-01 Ocean Financial Centre
Singapore 049315

**BY FAX & POST**
Fax No.: 6535 4906
No. of pages: 12

Attention: Mr Tony Yeo / Ms Meryl Koh / Mr Javier Yeo

Dear Sirs

**HC/S 26 of 2016**
**REQUEST FOR SPECIFIC DISCOVERY AND ELECTRONIC DISCOVERY**

1.  We refer to our client's Statement of Claim (Amendment No.1), Reply and Defence to Counterclaim (Amendment No.3). We also refer to your client's List of Documents dated 7 October 2016 ("**DLOD**") and Supplementary List of Documents dated 16 December 2016 ("**DSLOD**").

2.  Our client has pleaded that your client has infringed the '872 Patent and the '508 Patent. In relation to the '872 Patent, infringement of both its process claims as well as its product claims (as evidenced by Samples 1-4) are pleaded. However, we note that in your client's DLOD and DSLOD, your client has not exhibited any documents that would be relevant to the Plaintiff's case on infringement.

3.  Accordingly, please file a supplementary list of documents and provide us with copies of all documents in your client's possession, custody or control that relate to the specific documents and/or categories of documents listed in the enclosed Annex A. Please make it clear in the supplementary list of documents which category each enumerated document belongs to.

4.  Please let us have the said documents within 14 days hereof, failing which our client will take up the necessary application to Court against your client.

5.  Additionally, our client takes the view that some of your client's discovery obligations might be more suited to electronic discovery (i.e. keyword searches). In the spirit of collaboration, we have drafted an Electronic Discovery Protocol which is enclosed in Annex B. Please let us know whether your client is agreeable to the same, including any comments thereto, by within 14 days hereof.

6.   All of our client's rights are expressly reserved.


Yours faithfully

*Amica*


cc client
enc.

# Annex A

**Categories of documents**

1. All R&D reports, material characterization reports and quality control documents which relate to the measurement of birefringence for single crystal CVD diamond material in any form, including as-grown, gemstone and diamond plate, wherein:

    a. the measured material has dimensions of at least 1.3 mm x 1.3 mm x 0.5 mm;

    b. the measured material was made, at least in part, by the Defendant in Singapore in the period of 2012 to date; and

    c. the measured material has an optical birefringence such that the modulus of the sine of the phase shift, $|\sin \delta|$, for at least 98% of the analysed area of the sample remains in the first order ($\delta$ does not exceed $\pi/2$) and the $|\sin \delta|$ does not exceed 0.9.

2. All R&D reports, material characterization reports and quality control documents which relate to the measurement of birefringence for single crystal CVD diamond material in any form, including as-grown, gemstone and diamond plate, wherein:

    a. the measured material has dimensions of at least 1.3 mm x 1.3 mm x 0.5 mm;

    b. the measured material was made, at least in part, by the Defendant in Singapore in the period of 2012 to date; and

    c. the measured material has an optical birefringence such that, for 100% of the area analysed, the sample remains in the first order ($\delta$ does not exceed $\pi/2$) and the maximum value of $\Delta n_{[average]}$, the average value of the difference between the refractive index for light polarised parallel to the slow and fast axes averaged over the sample thickness, does not exceed 1.5 x $10^{-4}$.

3. All documents relating to the measurement of optical absorption for the single crystal CVD diamond material identified in Categories 1 or 2 above wherein:

    a. the measured material has dimensions of at least 1.3 mm x 1.3 mm x 0.5 mm;

    b. the measured material was made, at least in part, by the Defendant in Singapore in the period of 2012 to date; and

    c. the measurement was made at a wavelength of 1.06 μm;

    d. the measured material has an optical absorption coefficient of less than 0.09 cm$^{-1}$.

4. All documents relating to the measurement of nitrogen concentration in single substitutional form for the single crystal CVD diamond material identified in Categories 1 or 2 above wherein:

    a. the measured material has dimensions of at least 1.3 mm x 1.3 mm x 0.5 mm;

    b. the measured material was made, at least in part, by the Defendant in Singapore in the period of 2012 to date; and

    c. the measured material contains more than 3 x $10^{15}$ atoms/cm$^3$ N but less than 5 x $10^{17}$ atoms/cm$^3$ N in single substitutional form as measured by EPR.

5. Documents in the period 2012 to date relating to the Defendant's method(s) of heat treating single crystal CVD diamond material in any form, including as-grown, gemstone and diamond plate, at or above 1200°C, limited to:

   a. process specification documents,

   b. material characterization analyses,

   c. diamond grading reports/certificates, and

   d. product specification documents.

6. Documents relating to the research, development, conceptualisation and/or design of the method(s) disclosed pursuant to Category 5, limited to:

   a. laboratory notebooks,

   b. project proposals,

   c. project reports,

   d. product development reviews,

   e. correspondence (e.g. emails) between management and researchers and correspondence between researchers, and

   f. process revision documents.

7. Documents relating to the single crystal CVD diamond material in any form, including as-grown, gemstone and diamond plate, made by the Defendant in the period 16 October 2010 to 16 April 2012 and supplied by the Defendant directly or indirectly to Gemesis Diamond Company, Inc. in the period 16 October 2010 to 16 April 2012, and from which it may have been possible to make a gemstone having a weight of 0.40 ct, F colour and a VS2 clarity grade, limited to:

   a. sales invoices,

   b. purchase orders,

   c. quotations,

   d. marketing materials,

   e. product specifications,

   f. material characterization analyses, and

   g. diamond grading reports/certificates.

8. Documents relating to the optical grade single crystal CVD diamond plates which are the subject of IIa quote no. 1314-121, limited to:

   a. sales invoices,

    b.   purchase orders,

    c.   quotations,

    d.   marketing materials,

    e.   product specifications, and

    f.   material characterization analyses.

9.  Documents relating to the single crystal CVD diamond material in any form, including as-grown, gemstone and diamond plate, made by the Defendant in the period 27 April 2014 to 27 October 2015 and supplied by the Defendant directly or indirectly to Pure Grown Diamonds, Inc. in the period 27 April 2014 to 27 October 2015, and from which it may have been possible to make a gemstone having a weight of 0.38 ct, K colour and a VS1 clarity grade, limited to:

    a.   sales invoices,

    b.   purchase orders,

    c.   quotations,

    d.   marketing materials,

    e.   product specifications,

    f.   material characterization analyses, and

    g.   diamond grading reports/certificates.

10. All documents relating to the making, disposal or offer to dispose of, importing, use and/or keeping whether for disposal or otherwise by the Defendant in Singapore of the diamond material having product code no. 2PCVD505005N and which was sold pursuant to IIa invoice no. IIa/INV/1516-0241, limited to:

    a.   product specification documents;

    b.   material characterization analyses,

    c.   sales invoices, quotations and marketing materials provided by the Defendant to third parties,

    d.   importation documentation, and

    e.   inventory lists.

11. Documents in the period 2012 to date relating to the Defendant's method(s) of manufacturing the diamond material having product code no. 2PCVD505005N and which was sold pursuant to IIa invoice no. IIa/INV/1516-0241, including but not limited to:

    a.   process specification documents,

    b.   CVD synthesis run sheets,

c. quality control records,

d. documents specifying surface preparation of substrates pre-synthesis, and any subsequent charaterisation (by selection or otherwise), and

e. documents specifying the level of nitrogen in the synthesis atmosphere and the method by which this is controlled.

12. Documents relating to the research, development, conceptualisation and/or design of the method(s) disclosed pursuant to Category 11 above, limited to:

a. laboratory notebooks,

b. project proposals,

c. project reports,

d. product development reviews,

e. correspondence (e.g. emails) between management and researchers and correspondence between researchers, and

f. process revision documents.

13. All official documents relating to the incorporation of "IIa Holdings Group" and/or "IIa Holdings Group Limited" as issued by the relevant regulatory authority, including but not limited to certificates of incorporation.

**Specific documents**

14. IIa Quote No. 1314-121

Note:

- "supplied directly", as used in requests 7 and 9, means the provision of goods (whether for consideration or otherwise) to a third party wherein ownership of said goods pass from the supplier to the third party without any other party acquiring ownership of said goods in between, regardless of whether the condition/characteristics of said goods changed from the time it left the supplier's possession power and/or custody by, for example, cutting, polishing annealing, doping, irradiation or otherwise.

- "supplied...indirectly", as used in requests 7 and 9, means the provision of goods (whether for consideration or otherwise) to a third party wherein ownership of said goods pass to one or more entities before being acquired by said third party, regardless of whether the supplier intended said third party to acquire ownership of said goods and regardless of whether the condition/characteristics of said goods changed from the time it left the supplier's possession power and/or custody by, for example, cutting, polishing annealing, doping, irradiation or otherwise.

# Annex B

# ELECTRONIC DISCOVERY PROTOCOL

1. **Service Provider**

   The parties agree that Litigation Edge Pte Ltd ("**Service Provider**") will be appointed to execute the searches referred to in paragraph 4 using the search engine and parameters specified in paragraph 2 below. Parties will bear Service Provider's costs equally.

2. **Search Engine**

   The parties agree that Nuix ("**Software**") is to be used to conduct the aforementioned keyword searches. The preparation of the Software prior to conducting the searches (e.g. updating the search index or causing a fresh search index to be made) and any other search parameters not specified and agreed to herein are subject to further agreement between the parties, pending discussions between the parties and the Service Provider.

3. **Scope of electronic discovery**

   a. Discovery of the following class or classes of electronically stored documents shall be given ("**Repositories**"):

      i. All email servers, cloud servers and network drives currently in the Defendant's custody, power, control and/or possession.

   b. The Defendant shall take reasonable steps to decrypt encrypted files or encrypted storage locations, media or devices in order to identify discoverable electronically stored documents. This may include taking reasonable steps to obtain the decryption code and/or using reasonable technical means to perform decryption of the encrypted files or encrypted storage locations, media or devices.

   c. For the avoidance of doubt, electronically stored documents residing in folders or directories in storage locations, media or devices, including folders or directories where temporarily deleted files are located (for example the Recycle Bin folder or Trash folder) are within the scope of discovery. Electronically stored documents that are (i) not reasonably accessible, for example deleted files or file fragments containing information which are recoverable through the use of computer forensic tools or techniques during a forensic inspection of the unallocated file space or file slack, (ii) files and folders which are not known to the party giving discovery to be hidden in the file system, and (iii) documents archived using backup software and stored off-line on backup tapes or other storage media are not within the scope of discovery.

4. **Process for electronic discovery**

   a. The Defendant shall transfer all electronically stored documents in the Repositories to Service Provider for indexing by the Software.

   b. **Reasonable search**. The search terms or phrases specified in the second column will be used by Service Provider in the conduct of a reasonable search of the Repositories for

relevant electronically stored documents. The reasonable search will be limited by the scope described in the third column.

| Search No. | Search Terms | Scope |
|:----------:|-------------|-------|
| 1 | "LG*10061905" | Documents that were created in the period 16 April 2010 and 16 April 2013 |
| 2 | "INV*REF*01*JAN*12*31" | Documents that were created in the period 16 March 2012 and 16 March 2013 |
| 3 | "100005382" | Documents that were created in the period 16 March 2012 and 16 March 2013 |
| 4 | "2*PCVD*303004N" | Documents that were created in the period 12 May 2013 and 12 May 2015 |
| 5 | "3086" | Documents that were created in the period 12 April 2014 and 12 April 2015 |
| 6 | "13*2051" | Documents that were created in the period 24 January 2014 and 24 January 2015 |
| 7 | "1314*121" | Documents that were created in the 24 February 2013 and 24 February 2015 |
| 8 | "LG*10226420" | Documents that were created in the period 27 October 2014 to 27 October 2016 |
| 9 | "1510*00178" | Documents that were created in the period 27 September 2015 to 27 September 2016 |

Under the Search Terms column in the above table, '*' means a single wildcard character. For example, LG*10061905 will match with *inter alia* LG10061905, LG 10061905, LG-10061905, and LG/10061905 etc.

c. **Data sampling**. The Plaintiff shall review the search results within seven (7) days of being provided with the same; and within a further seven (7) days, parties shall meet to discuss whether the keywords and/or the Repositories need to be revised. Data sampling in accordance with the terms of this sub-paragraph shall be performed no more than twice.

d. After the final revisions of the keywords and/or the Repositories (if any), the Defendant will disclose the documents disclosed by the final search in a supplementary list of documents in accordance with paragraph 5.

5. **Format of list**

The supplementary list of documents shall categorise and list electronically stored documents separately from documents in printed or other form. The list of documents enumerating electronically stored documents shall include the following columns: *[contents of table for illustration]*

| Date Created | Description | File name & location | File format | Search No. |
|---|---|---|---|---|
| 12 October 2013 | Distribution agreement with Microwave Enterprises Inc. | //Contract Documents/Contract_M E.doc | Microsoft Word 2007 | 5 |

An index of documents enumerated in the list of documents shall be provided in an electronic spreadsheet in the Excel Workbook (.xlsx) file format.

6. **Review for privileged material**

The Defendant's obligation to conduct a reasonable search is fulfilled upon the Defendant carrying out the search to the extent agreed in this protocol; the Defendant shall not be required to review the search results for relevance.

Nothing in this protocol shall prevent the Defendant from reviewing the documents in any list provided hereunder for the purpose of claiming privilege. If the Defendant claims privilege over any document or record, it shall list the electronic documents or class of electronic documents over which privilege is claimed in the list of documents.

7. **Inspection and copies**

a. **Arrangements for inspection**. The place for inspection of discoverable electronic documents should be stated separately if it is different from the place for inspection of other discoverable documents. If the Plaintiff intends to inspect through or with the assistance of its appointed computer expert, such computer expert shall provide an undertaking of confidentiality to the party giving inspection before he commences his inspection.

b. **Supply of copies**. During inspection, copies shall not be taken. If copies are required, a request should be made. Electronic copies of discoverable documents will be supplied in their native format in a searchable form and in read-only optical discs upon request. Electronic copies of discoverable documents where privilege is claimed only with respect to their internally stored metadata information will be supplied in the Tagged Image File Format

(or TIFF) with privileged metadata information removed. For each of the read-only optical discs supplied, a further list stating the storage format version of the optical disc and enumerating the list of electronic documents stored therein shall be provided.

8. **Inadvertent disclosure of privileged documents**

Notwithstanding compliance with the procedures in this plan, nothing in this plan is intended to be or shall be taken to amount to a waiver of privilege.

9. **Discovery and production only if necessary**

For the avoidance of doubt, nothing in this plan shall compel any party to give discovery of any document or produce any document for inspection which is not otherwise discoverable under Order 24, Rules 7 or 13 of the Rules of Court (Cap 322, R5).

**144**

## IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

Case No.: HC/S 26/2016
Sub-Case No.:

Between

### ELEMENT SIX TECHNOLOGIES LIMITED
(REG NO. 08206603)

...Plaintiff(s)

And

### IIa TECHNOLOGIES PTE. LTD.
(REG. NO. 200516961K)

...Defendant(s)

### AFFIDAVIT

I, **SUSAN JANE FLETCHER WATTS** (United Kingdom Passport No. 099207495), care of Element Six (UK) Ltd, Global Innovation Centre, Fermi Avenue, Harwell Oxford, Didcot, Oxfordshire OX11 0QR, UK do solemnly and sincerely affirm and say as follows:-

1. I am a UK and European Patent Attorney acting as Consultant Patent Attorney (and formerly Head of Intellectual Property) for the Plaintiff and its affiliated companies in the Element Six group. I am duly authorised by the Plaintiff to make this affidavit on its behalf.

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel 01865 781153
email stuart.capel@
freeths.co.uk

**145**

2.  The matters deposed to in this affidavit, which I verily believe to be true to the best of my knowledge, information and belief, are either within my personal knowledge and/or are derived from records to which I have access.

3.  I make this affidavit in support of the Plaintiff's application to obtain gemstones and/or as-grown chemical vapour deposition ("**CVD**") diamond synthesised for the purpose of processing into a gemstone (the "**Neutral Samples**"). In particular, the Plaintiff prays for the following:-

    a.  An order to obtain samples of diamond material as specified in "ANNEX A" from the Defendant and in the manner described in "ANNEX B". The aforementioned annexures A and B are annexed to the summons for this application and marked as such.

    b.  In the alternative, an order to obtain samples of diamond material as specified in "ANNEX A" from the Defendant and in the manner described in "ANNEX C". The aforementioned annexures A and C are annexed hereto and marked as such.

    c.  The costs of and occasioned by this application be costs in the cause; and

    d.  Such further orders be made as this Honourable Court deems fit and just.

**A.    BACKGROUND**

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 751153
email: stuart.capel@
freeths.co.uk

**146**

4.     The Plaintiff commenced the present Suit, HC/S 26/2016, against the Defendant on 12 January 2016 for, *inter alia*, infringement of Singapore Patent Nos. 115872 and 110508 (the "**Patents**"). The Defendant denied infringement of the Patents and instituted a counterclaim alleging invalidity of the Patents.

5.     As of the Plaintiff's Statement of Claim (Amendment No. 1), the Plaintiff has cited 4 samples (i.e. Samples 1-4) (the "**Samples**") which the Plaintiff has found to be infringing and which the Plaintiff believes to have originated from the Defendant in Singapore.

6.     In brief, the circumstances leading up to the present application are as follows:

    a.     On 23 December 2016, the Plaintiff filed its Notice of Experiments ("**NOE**"), which seeks to establish by experimental proof facts such as whether a sample is a CVD synthetic diamond, and whether the values of certain characteristics of the diamond such as birefringence and absorption coefficient fall within the range of values specified in the claims of the Plaintiff's Patents.

    b.     On 13 January 2017, the Defendant responded with a complete refusal to admit any of the facts stated in the NOE and further requested at paragraph 4 of its Response to the Plaintiff's NOE that "*experiments should only be conducted on the samples as specified at paragraphs 4(a)(i) to 4(a)(iv) of the Particulars of Infringement (Amendment No. 1)*" and that "*the*

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

**147**

*experiments are to be conducted in the presence of the Defendant and its experts (if any)."*

c.   On 12 April 2017, the Plaintiff's solicitors ("**AL**") informed the Learned Assistant Registrar Ms Cheng Pei Feng ("**AR Cheng**") at the Pre-Trial Conference ("**PTC**") that it will be looking to conduct the experiments and that the Plaintiff will attempt to reach an agreement with the Defendant before returning to her for further directions. AR Cheng accordingly directed the Plaintiff to write to the Defendant by 12 June 2017 with its proposal on further procedures relating to how the experiments should be conducted.

d.   On 31 May 2017, the Plaintiff wrote to the Defendant proposing that, because the Defendant disputes the provenance of Samples 1 – 3, that a sensible way forward would be  that:

(i)    neutral experiments be conducted on (i) diamond material produced by the Defendant for use in gems, and (ii) diamond material produced by the Defendant for use as optical plates in industrial applications;

(ii)   for the optical plate material, the experiments are conducted on Sample 4 as requested by the Defendant. In other words the experiments will be repeated on current Sample 4;

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel. 01865 781153
email: stuart.capel@
freeths.co.uk

(iii)    for the gem material, because the Defendant disputes the provenance of the two current gem Samples 1 and 3 obtained from third parties, the experiments are carried out on a new gem material sample provided by the Defendant.

e.    By approaching it this way, which appears sensible and reasonable, we had hoped that we were putting forward a solution that would be acceptable to both Parties. It allows an existing sample (Sample 4) to be retained, which conforms in part to the Defendant's response to the Plaintiff's NOE and which the Plaintiff does not have the same degree of concern of establishing provenance, and provides for new samples to be used, obtained directly from the Defendant, for the gem material because the existing samples (Samples 1 and 3) were obtained from third parties and the Defendant is denying provenance.

f.    On 5 June 2017, the Defendant responded to the Plaintiff's proposal by refusing to provide Neutral Samples and reiterating its position that experiments should only be conducted on Samples 1-4. There was no attempt to try to even propose an alternative method for consideration.

g.    That being the case, on 6 June 2017, the Plaintiff wrote to the Court requesting for a PTC to be set down so that the Court may issue directions on the conduct of experiments and/or provision of Neutral Samples. The Defendant responded on 8 June 2017 with its contrary position on the matter. The Court eventually fixed a PTC on 14 June 2017.

STUART PB CAPEL
Notary Public.
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

h. On 14 June 2017 at the PTC, after hearing parties on the matter, AR Cheng provided the following directions:

(i) Plaintiff to file application for obtaining Neutral Samples from the Defendant by 30 June 2017;

(ii) Defendant to file reply affidavit by 14 July 2017;

(iii) Plaintiff to file reply affidavit by 28 July 2017; and

(iv) Special half-day hearing on 11 August 2017 at 9.30 am.

i. On 16 June 2017, the Plaintiff wrote to the Court requesting for the docketed judge, Honourable Justice George Wei ("**Justice Wei**"), to hear the application.

j. On 19 June 2017, the Defendant responded to disagree that Justice Wei needed to hear the application.

7. Copies of the aforementioned correspondences and documents are annexed hereto and marked as "**SFW-22**".

8. In this affidavit, I will only be providing the relevant facts and details and I will leave AL to make the necessary legal submissions. A summary of why I believe the directions should be granted is as follows:

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel 01865 781153
email stuart.capel@
freeths.co.uk

a.    The parties are at an impasse due to the Defendant's intransigent and inconsistent stance with regard to the issue of samples. Neutral Samples are necessary to break this deadlock and are the fairest way of providing the Court with the best possible evidence in its determination of whether patent infringement has occurred;

b.    Allowing this application to obtain Neutral Samples for experiments to be conducted may potentially save time and costs for both parties and the Court that may have to be spent establishing whether or not the samples obtained from third parties (i.e. Samples 1-3) did originate from the Defendant; and

c.    Allowing this application causes no prejudice to the Defendant since the Neutral Samples will originate from them. On the other hand, disallowing this application will greatly prejudice the Plaintiff from obtaining the best evidence of the subject-matter at hand.

## B.    NECESSARY TO OBTAIN BEST EVIDENCE

### i.    *Why Neutral Samples are necessary*

9.    Obtaining Neutral Samples from the Defendant ultimately serves as a reasonably necessary and impartial method of providing the Court with the best possible evidence in its determination of whether patent infringement has occurred. This must be seen in the context of the Defendant's refusal to provide by way of automatic discovery any information regarding its products and processes as well

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

as the Defendant's position of challenging the provenance of Samples 1-3 while insisting that any experiments to be done must be limited to existing Samples. I elaborate further below.

10. To begin, the subject-matter of the present Suit is CVD diamond material grown by the Defendant and used in industrial applications as well as in the gems and jewellery. The main issue is whether such diamond material has infringed the Plaintiff's Patents.

11. To determine whether patent infringement occurred requires the use of sophisticated testing equipment and detailed experiments to be conducted on samples of diamond material to ascertain the values of certain characteristics therein, e.g. the birefringence and optical absorption values. The values of these characteristics can only be ascertained by such laboratory testing, and not by simple visual inspection.

12. If the laboratory testing reveals that certain samples are found to exhibit values of these characteristics which fall within the range of values specified in the claims of the Plaintiff's Patents, a case for patent infringement is established. Hence, experimental evidence is essential to determine the issue of patent infringement with the assistance of the parties' experts.

13. The Plaintiff obtained existing Samples before commencement of trial, which the Plaintiff found to be infringing and which the Plaintiff believes to have originated from the Defendant in Singapore:

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

**152**

a.    Sample 1 was purchased from Gemesis Diamond Company. The Plaintiff has evidence and reasons to believe that Sample 1 was made from CVD diamond material synthesised by the Defendant in Singapore;

b.    Sample 2 was purchased from Microwave Enterprises. The Plaintiff has evidence and reasons to believe that Sample 2 was made from CVD diamond material synthesised by the Defendant in Singapore;

c.    Sample 3 was purchased from Pure Grown Diamonds, Inc. The Plaintiff has evidence and reasons to believe that Sample 3 was made from CVD diamond material synthesised by the Defendant in Singapore; and

d.    Sample 4 was purchased directly from the Defendant in Singapore.

e.    Samples 1 and 3 are gemstones made from CVD diamond material whereas Samples 2 and 4 are CVD diamond plates for use, for example, in industrial optics applications.

14.    In response, the Defendant has indicated in its Defence and Counterclaim (Amendment No. 3) dated 23 June 2017 ("**DCC**") its intention to dispute the provenance of Samples 1-3 given that they were purchased from third party distributors located outside of Singapore.

15.    Given such resistance, the Plaintiff subsequently requested for Neutral Samples (i.e. gemstones made from CVD diamond material) from the Defendant for experiments to be conducted on them and Sample 4 (i.e. diamond plates for use,

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel 01865 781153
email: stuart.capel@
freeths.co.uk

for example, in industrial optics applications) so as to reasonably present the court with a complete set of experimental results. However, the Defendant refused to cooperate and insisted that any experiments to be done must be limited to existing Samples, thus leading to the present impasse.

16.     Further, the Defendant has also not provided, by way of automatic discovery, any written product and process descriptions detailing its manufacturing process or the gemstones and plates which they have produced or are producing for commercialisation. In other words, the Plaintiff has no information whatsoever on how the Defendant intends to prove that there is no factual or technical infringement.

  *ii.* *Difficulties of obtaining Neutral Samples*

17.     The process of obtaining Neutral Samples (diamond materials originating from the Defendant) is particularly complex due to the fundamental nature and composition of CVD diamonds and the nature of the supply chain through which they are processed and sold. To do away with any potential questions regarding the provenance of any Neutral Samples obtained from the Defendant, the Plaintiff seeks the assistance of the Court in granting the present application.

18.     First, diamonds are neither homogenous nor fungible, which means that the characteristics of a diamond vary from diamond to diamond. Theoretical, pure diamond is a homogenous carbon crystal lattice, but actual diamond, whether it is natural diamond or lab-grown (e.g. CVD) diamond, contains a number of

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

impurities and defects. It is these impurities and defects that provide many of diamond's special characteristics. The nature and extent of these impurities and defects vary from diamond to diamond. In other words, no two CVD diamonds are completely identical. Seemingly small changes to the diamond growth process, for example the level of nitrogen in the synthesis gas mixture, or the surface smoothness of the substrate on which the diamond is grown, can have a significant effect on certain characteristics of the resulting diamond material.

19.     With regard to the unique nature and composition of diamonds, the parties appear to be in agreement, as can be seen from the following extract:

> "*Diamond's material properties are extreme and in most aspects, unique. Its mechanical, optical, chemical, thermal, electronic and other properties can be predicted from the extent to which a particular sample of diamond departs from being a theoretically perfect diamond crystal. This departure was known to be determined by the concentration and types of defects, inclusions, impurities, variation of conditions during and after growth, and other influences that affect diamond's properties…*
>
> *…Diamond is a transparent crystalline solid whose **optical properties are simple when perfectly pure and complex when the material includes defects, impurities such as nitrogen and other well-known influences that modify its optical properties…*" [Emphasis added]

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

**155**

The above extract is taken from page 15 of the expert report found in the 1st Affidavit of John Michael Pinneo for the Defendant dated 16 December 2016. A copy of the extract is annexed hereto and marked as "**SFW-23**".

20. What this means is that the selection and purchasing process of diamond materials is, unlike other merchandise, a complicated process which requires the buyer to communicate the specific characteristics and the values desired in the diamond to the seller.

21. This is evident from the trap purchase made by Mr Pascal Pierra from the Defendant on behalf of the Plaintiff for Sample 4 where Mr Pierra had to respond to the queries of the sale representative regarding, for instance, the lateral dimensions, thickness, crystal orientation, impurities level, and thermal conductivity of the diamond material.

   A copy of the correspondence is annexed hereto as part of "**SFW-23**".

22. Secondly, diamond products do not typically bear any indications of origin on the diamond material itself. The absence of such indicators makes it particularly challenging to identify these goods and ensure their integrity. The lack of any indicators of origin, coupled with the complex and opaque supply chain process mentioned above, are likely to be points of contention used by the Defendant to support its arguments to question the integrity of the Samples.

23. Further, even when indicators (whether of origin or not) may be found laser-inscribed on the girdle of diamond material for use in gems e.g. gemstones, the

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel 01865 781163
email stuart.capel@
fisethb.co.uk

lack of any industrial and/or worldwide standards for regulating such indicators further adds to the difficulty and complexity.

24.     For instance, based on the existing Samples, we find that the laser inscription on Sample 1 which was obtained from Gemesis Diamond Company is "GEMESIS CREATED LG10061905" whereas Sample 3 which was obtained from Pure Grown Diamonds, Inc. indicates "LAB GROWN LG10226420". Given that Sample 1 is laser-inscribed with an indicator of origin whereas Sample 3 is laser-inscribed with a mere descriptive label, the variability and lack of any verifiable standards of such laser-inscription (if even any) is further proof of the aforementioned difficulties in obtaining Neutral Samples.

25.     From the above, it is clear that the obtaining of samples in the present Suit is not an easy or straightforward task as compared to other typical patent litigation cases involving, for instance, pharmaceutical or engineering products. This is why the Plaintiff has to come up with varying proposals to obtain such samples (as will be elaborated below) and would require the Court's assistance in obtaining samples.

## C.     SAVINGS IN TIME AND COSTS

26.     Aside from having relevant evidence in the form of Neutral Samples placed before the Court, another reason why this order is being sought is to save costs and time for both parties. I highlight Justice Wei's emphasis at the hearing for SUM 6016/2016, when he dismissed the application to trifurcate the present Suit, for strong case management:

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel 01865 781163
email. stuart.capel@
freeths.co.uk

> *"... I think this is a case where **strong case management** for the actual bifurcated trial is probably the best way to go. So, I'm directing bifurcation, but I can well see that, for the purposes of trial, it will be **advantageous if there is as much agreement between the parties on how it's going to be conducted**, including possibly hot-tubbing. We'll have to go through all the **usual procedures where we can try to have it streamlined**...*
>
> *...and let's **agree to drop some of the more peripheral [issues]**... so that we can get to the roughly correct answer, wherever that answer lies..."*

[Emphasis added]

A scanned copy of the aforementioned extract from the Notes of Evidence of the Trifurcation Hearing is annexed hereto as part of "**SFW-24**".

27.    The Plaintiff's actions are thus taken with a view of moving the case forward expeditiously to resolve the issue of infringement, as Justice Wei suggested.

28.    If the present application were not granted, factual issues relating to the provenance of existing Samples (i.e. Samples 1-3) and integrity of Samples before arriving in the Plaintiff's possession, custody and/or power would have to be dealt with before the crux of the present Suit could be dealt with i.e. whether there was patent infringement.

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel. 01865 781153
email stuart.capel@
freeths.co.uk

29. I have been advised and verily believe that the determination of such factual issues would inadvertently result in significant time and costs from, for instance, the following:

    a. Factual witnesses, such as the employees of the third party distributors Gemesis Diamond Company, Microwave Enterprises and/or Pure Grown Diamonds, Inc., would have to be called and cross-examined. This may mean that many more witnesses will have to attend and give oral evidence at trial.

    b. These factual witnesses are not likely to be in Singapore, hence additional costs would be incurred in having all these witnesses travel to Singapore for trial. If the third party distributors do not wish to give evidence, the Plaintiff may have to apply for subpoenas and also commence proceedings in the relevant foreign and/or Singapore Courts for a deposition(s) to be obtained in the relevant jurisdiction.

30. Conversely, allowing the present application would potentially circumvent the aforementioned factual issues, particularly with the detailed protocols and safeguards that the Plaintiff is proposing below.

31. In fact, granting the present application opens up further possibilities of parties agreeing to drop certain peripheral issues (e.g. factual issues relating to provenance) and find agreement on the most important issues regarding infringement and validity, as suggested by Justice Wei.

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email stuart.capel@
freeths.co.uk

32.  It is to be remembered that the present Suit commenced with the filing of the Writ of Summons on 12 January 2016. The case at present has been ongoing for more than 1.5 years and trial dates have yet to be set. It is clear that the strong case management cited by Justice Wei must take place.

iii.  *Defendant's objections are trivial and misses the point*

33.  The Defendant's main objection to the provision of Neutral Samples for the conduct of experiments is that such samples have not been described in the Plaintiff's NOE and that the Plaintiff is thus precluded from seeking fresh samples from the Defendant and conducting experiments on them. This can be seen from its letter to the Court on 19 June 2017 where it was stated that:

> "*The Plaintiff filed its Notice of Experiments ("NOEs") on 23 December 2016. Any experiments that the Plaintiff intends to conduct must be limited to proving the facts stated in its NOES.* ***The facts stated in the Plaintiff's NOES are limited to facts relating to only Samples 1 to 4 as pleaded by*** *the Plaintiff In its Particulars of Infringement (Amendment No, 1), which are the 4 samples that were trap purchased by the Plaintiff, and which the Plaintiff claims originate from the Defendant.* ***The Plaintiff is therefore precluded by its own NOEs from seeking fresh samples from the Defendant and conducting experiments on them***." [Emphasis added]

34.  From the outset, I have been advised and verily believe that the Defendant has conflated and confused the two distinct issues of obtaining samples and NOE. The

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

NOE procedure is intended to place a party on notice of the evidence (from experiments conducted) that would be relied on by the other party at trial, whereas the provision of Neutral Samples is part of the discovery process. Accordingly, the Defendant has missed the point.

35. In any event, it is clear that when the Plaintiff's NOE was filed on 23 December 2016, the Plaintiff could not possibly have included any mention of Neutral Samples from the Defendant because it possessed none. Further, I have been advised and verily believe that the indication of any prospective samples to be included in the NOE would lead to a situation where any facts asserted in the NOE cannot possibly be admitted or denied by the Defendant. This is because the Defendant cannot possibly admit or deny any statement based on a hypothetical sample especially when it has no knowledge of the values relating to, for instance, the sample's lateral dimensions, thickness, crystal orientation, impurities level, and thermal conductivity. The NOE would thus have been self-defeating and of no practical use.

36. Furthermore, I have been advised and verily believe that the Plaintiff's NOE could be subsequently amended to include references to samples which will be or have been obtained from the Defendant (not unlike amendment of pleadings) and, any prejudice can be compensable by costs.

37. I have also been advised and verily believe that the Court has the power to make suitable orders and directions that are reasonably required to prepare the way for a just and proper trial of the issues between the parties and for evidence to be

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

**161**

gathered, especially in light of Justice Wei's observations that procedures should be streamlined and that the present Suit should have stronger case management. This is further supported by the substantial savings in time and cost that the grant of this application will bring as mentioned above.

## D.    PROPOSED PROTOCOLS FOR OBTAINING NEUTRAL SAMPLES

### i.    *Specification of Neutral Samples to be obtained*

38.    It is currently unclear to the Plaintiff whether, with respect to gemstones, the Defendant holds at one or more of their Singapore facilities either (a) finished gemstones, or (b) as-grown CVD diamond material for processing into gemstones, or (c) material that is at a stage between (a) and (b), ie semi-finished or post-synthesis processed CVD diamond material. Any or all three of these types of product would be suitable for use as Neutral Samples provided it meets the Plaintiff's defined specification as provided below.

39.    Accordingly, we have allowed for the obtaining of neutral samples for any of the above types of product (a), (b) and (c) dependent upon what the Defendant can provide.

40.    We reproduce below the specification of the gemstones created from CVD diamond material made by the Defendant which the Plaintiff seeks to obtain as specified in ANNEX A of the summons to the application.

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel 01865 781153
email stuart.capel@
freeths.co.uk

41. In the first instance, the Plaintiff seeks to obtain gemstones, or if not available, as-grown CVD diamonds synthesised for the purpose of processing into a gemstone (collectively, the "**Sample**" or "**Samples**") made by the Defendant with the following specification, as appropriate:

a. *Gemstone specification*

| Type | Chemical vapour deposition (CVD) synthetic diamond |
|---|---|
| **Production process** | Standard commercial process for gem material production |
| **Date of production** | Between 1 January 2012 and 11 January 2016 |
| **Carat size** | 1.0 – 1.2 carats |
| **Colour** | Near-colourless (H to J colour grade) |
| **Clarity** | VS1 or higher |
| **Cut** | Round brilliant or Princess |
| **Cut grade** | Good or higher |

b. *As-grown CVD diamond specification*

| Type | Chemical vapour deposition (CVD) synthetic diamond |
|---|---|
| **Production process** | Standard commercial process for gem material production |
| **Date of production** | Between 1 January 2012 and 11 January 2016 |
| **Size** | Minimum lateral dimensions of 6.5 mm x 6.5 mm x 3.9mm, after laser-trimming to remove edge growth |
| **Colour** | Near-colourless (H to J colour grade) or capable of being treated, for example annealed, to achieve near-colourless |

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

**163**

(collectively, the "**Defined Neutral Sample**")

42.    In the event that the Defendant does not hold finished gemstones in Singapore, the Plaintiff seeks to obtain as-grown CVD diamond material produced in its standard commercial production process which is capable of being made in a gemstone with the specification as stated in paragraph 41 above. The as-grown CVD diamond material must have the minimum lateral dimensions of 6.5 mm x 6.5 mm x 3.9mm, after laser-trimming to remove edge growth. The process by which the as-grown CVD diamond material is made into gemstone may include the step of annealing (heat-treating).

43.    The Plaintiff seeks to obtain three (3) pairs of Defined Neutral Samples from the Defendant. Each pair of Defined Neutral Samples is to be as near to identical to each other as possible. Each pair of Defined Neutral Samples should be, as far as possible, from the same synthesis run and produced from seeds placed on adjacent, centrally located sites on the substrate.

44.    The reason for proposing to obtain three (3) pairs of Defined Neutral Samples from the Defendant is to safeguard against situations where problems are encountered with the first or second pair such that there is a need for a fresh sample. For instance, a sample cracking whilst it is being tested or a sample failing an authentication test such as a DiamondPlus™ test. Pairs of near-identical samples are required so that the Defendant can conduct the set of experiments as outlined in

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

the Plaintiff's NOE on one of the samples, and provide the results to the Defendant. In the event the Defendant does not accept some or all of these results, the appropriate experiments can be repeated, in the presence of the Parties' experts and other personnel as ordered by the Court, using the other sample of the pair.

45.    To obtain these Defined Neutral Samples, the Plaintiff proposes the Protocol exhibited as ANNEX B, which is annexed to the summons for this application. In the alternative, the Plaintiff proposes the Protocol exhibited as ANNEX C. Details of the two Protocols are reproduced below.

ii.    *Protocol 1*

46.    Under Protocol 1, the Plaintiff proposes the following:

a.    The Plaintiff to send the Defendant a letter notifying of the Plaintiff's intention to commence the Protocol (the "**Protocol Letter**");

b.    The Defendant shall provide an inventory of all gemstones and/or as-grown chemical vapour deposition ("**CVD**") diamonds synthesised for the purpose of processing into a gemstone (collectively, the "**Sample**" or "**Samples**") within the Defendant's possession or control which correspond to the specification provided under ANNEX A (the "**Inventory**") and serve it on the Plaintiff's solicitors within fourteen (14) days from the date of receipt of the Protocol Letter, such Inventory to group the Samples based on whether they originated from the same synthesis run;

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

c.     The Inventory shall, for each listed Sample, also provide:

     (i)     The product code or other unique identifier;

     (ii)     The product characteristics including lateral dimensions, carat size, colour grading, clarity, and cut (the latter if the product is finished gemstone), and

     (iii)     The date on which the CVD diamond material product was synthesised.

d.     Within fourteen (14) days of the service of the Inventory, with at least three (3) days' notice, such notice to be provided in writing by the Plaintiff's solicitors, permit inspection of the Samples under the Inventory and removal of certain Samples in the following manner:

     (i)     Allow access by the Consultant Patent Attorney of the Plaintiff (namely, Ms Susan Jane Fletcher Watts), one of the Plaintiff's solicitors, and the Plaintiff's expert (the "**Inspection Team**") to the Defendant's factory premises in Singapore where the Defendant carries out its commercial production of CVD diamond material for gemstone purposes.

     (ii)     Permit inspection by the Inspection Team of all Samples under the Inventory; and

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

(iii)    Allow the Inspection Team to select such number of Samples from the Inventory as specified under ANNEX A.

e.    Thereafter, for each Sample which the Inspection Team has chosen to take, the Defendant to provide within seven (7) days by service on the Plaintiff's solicitors documents or any class of documents with the following information:

(i)    The product specification for its synthesis run;

(ii)    The CVD synthesis run sheet for its synthesis run; and

(iii)    Details of any post-synthesis treatment carried out on it, if any; and

(iv)    Its certification from Gemological Institute of America, International Gemological Institute or any other institutions, if any

(collectively, the "**Sample Details**").

f.    At the time of providing the Sample Details, the Defendant also to provide the Plaintiff with an affidavit which swears or affirms that the Sample Details provided in the aforementioned documentation are true.

*iii.*    *Protocol 2*

47.    Under Protocol 2, the Plaintiff proposes the following:

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, Ox4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

a.   The Plaintiff to send the Defendant a letter notifying of the Plaintiff's intention to commence the Protocol (the "**Protocol Letter**");

b.   The Defendant shall provide an inventory of all gemstones and/or as-grown chemical vapour deposition ("**CVD**") diamonds synthesised for the purpose of processing into a gemstone (collectively, the "**Sample**" or "**Samples**") within the Defendant's possession or control which correspond to the specification provided under ANNEX A (the "**Inventory**") and serve it on the Plaintiff's solicitors within fourteen (14) days from the date of receipt of the Protocol Letter, such Inventory to group the Samples based on whether they originated from the same synthesis run;

c.   The Inventory shall, for each listed Sample, also provide:

(i)   The product code or other unique identifier

(ii)  The product characteristics including lateral dimensions, carat size, colour grading, clarity, and cut (the latter if the product is finished gemstone), and

(iii) The date on which the CVD diamond material product was synthesised

d.   The Plaintiff to select within fourteen (14) days such number of Samples from the List provided as specified under ANNEX A and to serve notice of

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk
such selection on the Defendant's solicitors within that time;

e.   For each Sample selected, the Defendant to provide documents or any class of documents with the following information:

   (i)   The product specification for its synthesis run;

   (ii)   The CVD synthesis run sheet for its synthesis run;

   (iii)   Details of any post-synthesis annealing treatment carried out on it, if any; and

   (iv)   Its certification from Gemological Institute of America, International Gemological Institute or any other institutions, if any

   (collectively, the "**Sample Details**").

f.   The Defendant to make available to the Defendant's solicitors the Samples selected and the Sample Details within seven (7) days of the notice as stated at paragraph 47(d) above;

g.   The Plaintiff's solicitors to collect the aforementioned Samples and documentation exhibiting the Sample Details from the Defendant's solicitors; and

h.   At the time of providing the Samples and Sample Details the Defendant also to provide the Plaintiff with an affidavit which swears or affirms that the Sample Details provided in the aforementioned documentation are true.

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2PH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

**169**

48.     The reason why the Plaintiff requires such detailed Protocols is to ensure that any Neutral Samples obtained are representative of the products made by the Defendant's usual commercial process and are not manufactured and grown solely for the purposes of this litigation. The Protocols are also designed to mitigate some of the difficulties inherent in obtaining Neutral Samples of diamond material as highlighted at paragraphs 17 to 25 above.

**E.     NO PREJUDICE CAUSED TO THE DEFENDANT WHICH CANNOT BE COMPENSATED BY COSTS AND/OR PROTECTED BY SAFEGUARDS**

49.     Granting this application will also not cause any prejudice to the Defendant which cannot be compensated by costs and/or protected by safeguards. In fact, given the Defendant's express admissions that dealing with issues regarding the provenance of Samples 1-3 will greatly increase the time and costs required, the grant of the present application will likely benefit the Defendant as well.

50.     Indeed, since the Defendant has pleaded that its products and processes do not fall within the claims of the Patents, the provision and testing of Neutral Samples would, in fact, aid the Defendant's case as it would represent the best way for it to vindicate its position.

51.     Further, I have been advised and verily believe that the timing of this application – which is being made at a stage of proceedings where specific discovery applications have not been made, no affidavits of evidence-in-chief filed, and is

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel 01865 781153
email stuart.capel@
freeths.co.uk

before the commencement of trial – would not cause the Defendant to suffer any prejudice.

52. As for any concerns that the Defendant may have regarding the Protocols for obtaining Neutral Samples – e.g. authorising certain persons to enter the Defendant's premises to, among other things, take Defined Neutral Samples or providing a list of Defined Neutral Samples to the Plaintiff to select from, I have been advised and verily believe that appropriate safeguards can be put in place to sufficiently protect the Defendant's interests, such as the provision of confidentiality undertaking and any further or other orders that the Court deems fit and just.

53. On the other hand, I verily believe that disallowing the application will greatly lead to additional and unnecessary expenditure of costs and time, as well as prejudice the Plaintiff from obtaining best evidence of subject-matter which deals directly with the issues of patent infringement.

54. Not allowing the Plaintiff to obtain Neutral Samples from the Defendant would be tantamount to tying the Plaintiff's metaphorical hands and limiting its ability to put forward its best case, especially when experimental evidence based on samples obtained from the Defendant may lead to substantial savings in time and costs.

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

## F. CONCLUSION

55. For the above reasons, I respectfully pray that this application be granted.

| | | |
|---|---|---|
| Affirmed by the abovenamed | ) | |
| **SUSAN JANE FLETCHER WATTS** | ) | *Susan J. Fletcher Watts* |
| in the United Kingdom | ) | |
| on the 29 th day of June 2017 | ) | |

Before Me,



**A NOTARY PUBLIC**

This affidavit is filed on behalf of the Plaintiff.

STUART PB CAPEL
Notary Public
5000 Oxford Business Park South,
Oxford, OX4 2BH England (UK)
Tel: 01865 781153
email: stuart.capel@
freeths.co.uk

# ⋈ DREW & NAPIER

General Line
T : +65 6535 0733
T : +65 9726 0573 (After Hours)
F : +65 6535 4906

Drew & Napier LLC
10 Collyer Quay
#10-01 Ocean Financial Centre
Singapore 049315

www.drewnapier.com

*We do not accept service*
*of court documents by fax*

T : + 65 6531 2512 / 2736 / 2508
E: tony.yeo@drewnapier.com
meryl.koh@drewnapier.com
javier.yeo@drewnapier.com

Our Ref
TY/MKJN/JYO/375178

Your Ref
JC/MP/NIC/20120280

14 February 2018

**BY FAX (6303 6222) AND POST**
**No. of pages: 2**

AMICA LAW LLC
30 Raffles Place #14-01
Chevron House
Singapore 048622

**Attn: Mr Jason Chan / Mr Melvin Pang / Mr Nicholas Ong**

Dear Sirs,

**HC/S 26/2016**
**SPECIFIC DISCOVERY**

1.      We refer to your letter to us dated 22 January 2018. In this letter, we will adopt the definitions and abbreviations used in our letter to you dated 22 December 2017.

2.      First, we note that you had erroneously referred to "*paragraphs 5(a) – 5(o)*" of our letter to you dated 22 December 2017. We will assume that you were referring to paragraphs 3(a) to 3(o) instead.

3.      With respect to paragraphs 3(a) and 3(b) of your letter, our client denies that the original request is "*overly broad and would include numerous documents with very little probative value*". First, it was your client's position in HC/SUM 2935/2017 ("**SUM 2935**") when our client had requested for particulars relating to chain of custody of the Trap-Purchased Diamonds that these relate to "*matters of evidence*" and the information that our client was seeking was "*more appropriate to ... discovery*" (emphasis added) (see paragraphs 45 to 57 of the Plaintiff's Written Submissions for SUM 2935 dated 1 August 2017). As you know, our client has put in issue the provenance of the Trap-Purchased Diamonds. Accordingly, the evidence relating to chain of custody of these Trap-Purchased Diamonds is clearly relevant and necessary to the proceedings. This is further compounded by the fact that, as admitted by your client in the 9th affidavit of Susan Jane Fletcher Watts dated 30 June 2017 filed in these proceedings, "*diamond products do not typically bear any indications of origin on the diamond material itself* [and] [t]*he absence of such indicators makes it particularly challenging to identify these goods and ensure their integrity*" (emphasis added). In the premises, **every handling, transfer of possession and/or custody of the Trap-Purchased Diamonds is relevant and material to the issue of provenance**, and our client is unable to agree to your client's limitation at your paragraphs 3(a) and 3(b). In any event, it is also unclear what your client means by "*material transfer*" since, in our client's view, every transfer is a material transfer. For completeness, we note that your client has not denied that it has documents described in paragraph 3(a) of our letter to you dated 22 December 2017 in its possession, custody and/or power.

**DREW & NAPIER LLC (UEN 200102509E) is a law corporation with limited liability.**

This document is for the addressee(s) only and may contain confidential information and/or may be subject to legal privilege.
If you have received this in error, please contact us immediately.

## ◭ DREW & NAPIER

4.      With respect to paragraph 5 of your letter, it is clear from the ordinary meaning of the words *"standard"* and *"benchmark"* what our client was referring to. Nevertheless, by way of example, the following are the **non-exhaustive** references in your client's Technical Notes which your client had relied on as "standards" and/or "benchmarks" for the purposes of your client's experiments:-

a.      In the Technical Note S/N 136 at page 9, your client had referred to a *"Gemesis CVD synthetic diamond (NL486-02)"*.

b.      In the Technical Note S/N 145 at page 3, your client had referred to De Beers' research where it was stated that *"in the course of such research carried out at De Beers Technologies we have captured images of CVD synthetic diamond samples of various kinds in their as-grown form and after heat treatments at different temperatures"* and had relied on such research in the said Technical Note.

c.      In the Technical Note S/N 145 at page 5, your client had further referred to a study of *"ten CVD synthetic diamond plates (NL625-1 to -10)"*.

The above should be sufficient to clarify what our client means by "standard" and "benchmark".

5.      With respect to paragraphs 4, 6, 8, 9, 11, 12, 13, and 14, for the avoidance of doubt, our client denies the allegations that the documents requested for are irrelevant. In any event, we note that your client has not stated that it does not have such documents in its possession, custody and/or power.

6.      With respect to paragraph 15, insofar as these *"further relevant documents"* are within your client's possession, custody and/or power now, your client should disclose them now.

7.      With respect to paragraphs 16 and 17, our client does not agree to your client's request to hold back on the provision of documents until the determination of the relevant specific discovery hearing (including appeals). Your client should not be starting to source for these documents only *"after a relevant order has been issued"*, especially when our client's request was sent to you on 22 December 2017 and AR Cheng had given directions for the filing of the discovery application on 27 December 2017 at the PTC, and your client did not raise any issues then.

8.      In the premises, please let us have all relevant documents that your client has agreed to disclose in your letter to us dated 22 January 2018. Our client is agreeable to disclose the documents that our client has agreed to disclose to your client in our letter to you dated 12 February 2018, and will do so by Monday, 19 February 2018. Please also let us have your client's instructions on its position with respect to the disclosure of documents pursuant to our requests at paragraphs 3(a) and 3(c) of our letter to you dated 22 December 2017 in light of our paragraphs 3 and 4 above.

9.      Please let us have your response and/or the requested documents by **Monday, 19 February 2018**.

10.     In the meantime, we propose for timeline for parties to file the necessary specific discovery application to be addressed at the next Pre-Trial Conference, presently fixed for 21 February 2018.

11.     All of our client's rights are expressly reserved.

Yours faithfully,

**Drew & Napier LLC**

Cc client

174

This is the Exhibit marked "**SFW-31**"

referred to in the 12th Affidavit of

**SUSAN JANE FLETCHER WATTS**

affirmed in the United Kingdom

on this 17 day of March 2018

Before Me,

_____

**A NOTARY PUBLIC**

RICHARD GARETH GRIFFITHS
Solicitor & Notary Public
Downend Lodge
Chieveley
ENGLAND RG20 8TN

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)


**REPORTS AND FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 31 MARCH 2012**

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

REPORTS AND FINANCIAL STATEMENTS
31 MARCH 2012

C O N T E N T S

|  | Page |
|---|---|
| Directors' Report | 1 - 2 |
| Statement by Directors | 3 |
| Independent Auditor's Report | 4 - 5 |
| Balance Sheet | 6 |
| Statement of Comprehensive Income | 7 |
| Statement of Changes in Equity | 8 |
| Statement of Cash Flow | 9 |
| Notes to the Financial Statements | 10 - 40 |



**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**DIRECTORS' REPORT**

The directors present their report to the members together with the audited consolidated financial statements of The Gemesis Company (S) Pte. Ltd. (the "Company") and its subsidiaries (collectively, the "Group") for the financial year ended 31 March 2012, and the balance sheet of the Company as at 31 March 2012.

**Directors**

The directors of the Company in office at the date of this report are as follows:

Vishal Jatin Mehta
Sonia Jatin Mehta
Tan Teck Nguan Michael
Girija Prasad Pande                    (appointed on 1 April 2012)

**Arrangements to enable directors to acquire shares and debentures**

Neither at the end of nor at any time during the financial year was the Company a party to any arrangement whose object was to enable the directors of the Company to acquire benefits by means of the acquisition of shares in, or debentures of, the Company or any other body corporate.

**Directors' interests in shares and debentures**

The interest of the directors who held office at the end of the financial year in the shares and debentures of the Company and related corporation were as follows:

| | Holdings registered in name of director or nominee | | Holdings in which a director is deemed to have an interest | |
|---|---|---|---|---|
| | At 31.03.2012 | At 01.04.2011 | At 31.03.2012 | At 01.04.2011 |
| | (No. of Ordinary shares) | | (No. of Ordinary shares) | |
| **Holding Company** | | | | |
| **JRD International Ltd** | | | | |
| Sonia Jatin Mehta | 1 | 1 | - | - |
| **Immediate Holding Company** | | | | |
| **The Gemesis Company (S) Pte. Ltd.** | | | | |
| Sonia Jatin Mehta | 1,000,000 | 1,000,000 | 40,081,508 | 2,500,001 |

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**DIRECTORS' REPORT**

**Directors' contractual benefits**

Since the end of the previous financial year, no director has received or become entitled to receive a benefit by reason of a contract made by the Company or a related corporation with the director or with a firm of which he is a member or with a company in which he has a substantial financial interest, except as disclosed in the accompanying financial statements and in this report.

**Share options**

(a)  *Options to take up unissued shares*

    During the financial year, no option to take up unissued shares of the Company or its subsidiaries was granted.

(b)  *Unissued shares under option and options exercised*

    During the financial year, there were no shares of the Company or its subsidiaries issued by virtue of the exercise of an option to take up unissued shares.

    At the end of the financial year, there were no unissued shares under option.

**Independent auditor**

The independent auditor, AT ADLER, Public Accountants and Certified Public Accountants, has expressed its willingness to accept re-appointment.

On behalf of the Board of Directors

**Vishal Jatin Mehta**
Director

**Tan Teck Nguan Michael**
Director

Dated:  3 September 2012

2

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

## STATEMENT BY DIRECTORS

In the opinion of the directors,

(a)  the financial statements of the Company and the consolidated financial statements of the Group are drawn up so as to give a true and fair view of the state of affairs of the Company and of the Group as at 31 March 2012 and of the results of the business, changes in equity and cash flows of the Group for the financial year then ended on that date in accordance with the provision of the Singapore Companies Act, Chapter 50 and Singapore Financial Reporting Standards; and

(b)  at the date of this statement, there are reasonable grounds to believe that the Company will be able to pay its debts as and when they fall due.

On behalf of the Board of Directors

**Vishal Jatin Mehta**
Director

**Tan Teck Nguan Michael**
Director

Dated:   3 September 2012

**INDEPENDENT AUDITOR'S REPORT TO THE MEMBERS OF THE GEMESIS COMPANY (S) PTE. LTD.**
**for the financial year ended 31 March 2012**
Company Registration No. 200516961K
(Incorporated in Singapore)



### Report on the Financial Statements

We have audited the accompanying financial statements of The Gemesis Company (S) Pte. Ltd. (the "Company") and its subsidiaries (collectively, the "Group"), which comprise the balance sheets of the Company and of the Group as at 31 March 2012, and the consolidated statement of comprehensive income, consolidated statement of changes in equity and the consolidated statement of cash flow of the Group for the financial year then ended, and a summary of significant accounting policies and other explanatory notes. The financial statements for the financial year ended 31 March 2011 were audited by another firm of independent auditors, whose report dated 10 August 2011 expressed a qualified opinion.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation of financial statements that give a true and fair view in accordance with the provisions of the Singapore Companies Act, Chapter 50 (the "Act") and Singapore Financial Reporting Standards, and for devising and maintaining a system of internal accounting controls sufficient to provide a reasonable assurance that assets are safeguarded against loss from unauthorised use or disposition; and transactions are properly authorised and that they are recorded as necessary to permit the preparation of true and fair profit and loss accounts and balance sheets and to maintain accountability of assets.

*Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with Singapore Standards on Auditing. Those Standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgement, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation of the financial statements that give a true and fair view in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.



**INDEPENDENT AUDITOR'S REPORT TO THE MEMBERS OF
THE GEMESIS COMPANY (S) PTE. LTD.**
**for the financial year ended 31 March 2012**
Company Registration No. 200516961K
(Incorporated in Singapore)

*Opinion*

In our opinion, the consolidated financial statements of the Group and the balance sheet of the Company, are properly drawn up in accordance with the provisions of the Act and Singapore Financial Reporting Standards so as to give a true and fair view of the state of affairs of the Group and of the Company as at 31 March 2012, and the results, changes in equity and cash flows of the Group for the financial year ended on that date.

**Report on Other Legal and Regulatory Requirements**

In our opinion, the accounting and other records required by the Act to be kept by the Company and by the subsidiary incorporated in Singapore of which we are the auditors have been properly kept in accordance with the provisions of the Act.

AT ADLER

AT **ADLER**
Public Accountants and Certified Public Accountants

Singapore, 3 September 2012

**THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**BALANCE SHEET**
as at 31 March 2012

| | Note | The Group 2012 USD | The Group 2011 USD | The Company 2012 USD | The Company 2011 USD |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Non-current assets** | | | | | |
| Plant and equipment | 4 | 18,614,188 | 6,627,032 | 18,741,363 | 6,627,032 |
| Construction and projects work-in-progress | 5 | 14,608,374 | 2,551,787 | 14,608,374 | 2,551,787 |
| Intangible assets | 6 | 94,565 | 72,717 | 81,560 | 59,712 |
| Investment in subsidiaries | 7 | - | - | 201 | 1 |
| | | 33,317,127 | 9,251,536 | 33,431,498 | 9,238,532 |
| **Current assets** | | | | | |
| Inventories | 8 | 9,044,417 | 1,633,202 | 3,100,927 | 1,431,771 |
| Trade and other receivables | 9 | 20,896,747 | 16,293,869 | 23,201,725 | 16,279,127 |
| Cash and bank balances | | 4,077,244 | 26,810 | 3,629,473 | 19,504 |
| | | 34,018,408 | 17,953,881 | 29,932,125 | 17,730,402 |
| **TOTAL ASSETS** | | 67,335,535 | 27,205,417 | 63,363,623 | 26,968,934 |
| **EQUITY AND LIABILITIES** | | | | | |
| **Equity attributable to equity holders of the Company** | | | | | |
| Share capital | 10 | 54,767,830 | 17,186,323 | 54,767,830 | 17,186,323 |
| Accumulated losses | | (4,172,271) | (6,049,235) | (4,300,961) | (6,036,944) |
| **Total equity** | | 50,595,559 | 11,137,088 | 50,466,869 | 11,149,379 |
| **Non-current liabilities** | | | | | |
| Finance lease obligations | 11 | 244,136 | 253,528 | 244,136 | 253,528 |
| | | 244,136 | 253,528 | 244,136 | 253,528 |
| **Current liabilities** | | | | | |
| Trade and other payables | 12 | 16,415,352 | 7,745,830 | 12,585,130 | 7,497,056 |
| Finance lease obligations | 11 | 67,488 | 62,305 | 67,488 | 62,305 |
| Bank loan | 13 | - | 8,006,666 | - | 8,006,666 |
| Income tax liabilities | | 13,000 | - | - | - |
| | | 16,495,840 | 15,814,801 | 12,652,618 | 15,566,027 |
| **Total liabilities** | | 16,739,976 | 16,068,329 | 12,896,754 | 15,819,555 |
| **TOTAL EQUITY AND LIABILITIES** | | 67,335,535 | 27,205,417 | 63,363,623 | 26,968,934 |

*The annexed notes form an integral part of and should be read in conjunction with these financial statements.*

6

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**STATEMENT OF COMPREHENSIVE INCOME**
for the financial year ended 31 March 2012

| | Note | The Group 2012 USD | 2011 USD |
|---|---|---|---|
| **Continuing operations** | | | |
| Revenue | 14 | 20,860,110 | 10,582,260 |
| Cost of sales | | (16,528,314) | (7,695,471) |
| | | 4,331,796 | 2,886,789 |
| Other income | 15 | 7,598 | 2,687 |
| Jobs credit scheme | | - | 3,654 |
| | | 4,339,394 | 2,893,130 |
| Administrative expenses | | (1,704,960) | (863,380) |
| Distribution and selling expenses | | (336,774) | (134,687) |
| Financial expenses | 16 | (219,454) | (387,333) |
| Other expenses | | (188,242) | (46,199) |
| Profit before income tax | 17 | 1,889,964 | 1,461,531 |
| Income tax expense | 18 | (13,000) | - |
| **Total profit after income tax** | | 1,876,964 | 1,461,531 |
| **Other comprehensive income** | | - | - |
| **Total comprehensive income** | | 1,876,964 | 1,461,531 |

*The annexed notes form an integral part of and should be read in conjunction with these financial statements.*

**THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**STATEMENT OF CHANGES IN EQUITY**
for the financial year ended 31 March 2012

| | Share capital USD | Accumulated losses USD | Total equity USD |
|---|---|---|---|
| **2012** | | | |
| **Beginning of financial year** | 17,186,323 | (6,049,235) | 11,137,088 |
| Issuance of share capital (Note 10) | 37,581,507 | - | 37,581,507 |
| Total comprehensive income for the year | - | 1,876,964 | 1,876,964 |
| **End of financial year** | 54,767,830 | (4,172,271) | 50,595,559 |
| **2011** | | | |
| **Beginning of financial year** | 1,590,128 | (7,510,766) | (5,920,638) |
| Issuance of share capital (Note 10) | 15,596,195 | - | 15,596,195 |
| Total comprehensive income for the year | - | 1,461,531 | 1,461,531 |
| **End of financial year** | 17,186,323 | (6,049,235) | 11,137,088 |

*The annexed notes form an integral part of and should be read in conjunction with these financial statements.*

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**STATEMENT OF CASH FLOW**
for the financial year ended 31 March 2012

| | The Group | |
|---|---|---|
| | 2012 USD | 2011 USD |
| **Cash flows from operating activities** | | |
| Profit before income tax | 1,889,964 | 1,461,531 |
| Adjustments for: | | |
| - Depreciation of plant and equipment | 1,857,607 | 1,401,613 |
| - Gain on disposal of plant and equipment | - | (14,636) |
| - Amortisation of intangible assets | 3,148 | 3,148 |
| - Interest expenses | 205,152 | 385,083 |
| Operating cash flow before working capital changes | 3,955,871 | 3,236,739 |
| | | |
| Changes in working capital: | | |
| - Inventories | (7,411,215) | (1,633,202) |
| - Trade and other receivables | (4,063,755) | (6,305,340) |
| - Trade and other payables | 8,213,731 | 1,920,712 |
| Cash generated from/(used in) operations | 694,632 | (2,781,091) |
| Income tax paid | - | - |
| **Net cash flows generated from/(used in) operating activities** | 694,632 | (2,781,091) |
| | | |
| **Cash flows from investing activities** | | |
| Acquisition of plant and equipment | (12,044,579) | (803,753) |
| Payment of construction and project work-in-progress | (13,799,361) | (2,551,787) |
| Acquisition of intangible assets | (24,996) | (62,860) |
| Sales proceeds from disposal of motor vehicles | - | 57,288 |
| **Net cash flows used in investing activities** | (25,868,936) | (3,361,112) |
| | | |
| **Cash flows from financing activities** | | |
| Amount due to holding company | 41,164,308 | 7,510,657 |
| Amount due to subsidiary company | - | 17,797 |
| Amount due to related parties | (3,666,133) | 3,070,288 |
| Interest paid | (205,152) | (371,649) |
| Repayment of bank loan | (8,006,666) | (4,003,333) |
| Repayment of finance lease obligations | (61,619) | (63,696) |
| **Net cash flows generated from financing activities** | 29,224,738 | 6,160,064 |
| | | |
| **Net increase in cash and bank balances** | 4,050,434 | 17,861 |
| Cash and bank balances at beginning of financial year | 26,810 | 8,949 |
| **Cash and bank balances at end of financial year** | 4,077,244 | 26,810 |

*The annexed notes form an integral part of and should be read in conjunction with these financial statements.*

9

THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

These notes form an integral part of and should be read in conjunction with the accompanying financial statements.

1.     **General information**

The Gemesis Company (S) Pte. Ltd. (the "Company") is incorporated and domiciled in Singapore. The address of its registered office and principal place of business is at 1 Raffles Place #18-01 OUB Centre, Singapore 048616 and 2 Woodlands Sector 1 #03-14 Woodlands Spectrum, Singapore 738068 respectively.

The principal activities of the Company are growing of diamonds. The principal activities of its subsidiaries are set up in Note 7 to the financial statements. There have been no significant changes in such activities during the financial year.

The consolidated financial statements relate to the Company and its subsidiaries.

The Company is a subsidiary of JRD International Limited, a company incorporated in the Bahamas Island, which is also its ultimate holding company.

2.     **Significant accounting policies**

2.1    **Basis of preparation**

The consolidated financial statements of the Company and the Group have been prepared in accordance with Singapore Financial Reporting Standards ("FRS"). The consolidated financial statements have been prepared under the historical cost convention, except as otherwise disclosed in the accounting policies stated below.

The preparation of financial statements in conformity with FRS requires management to make judgements, estimates and assumptions that affect the application of accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results may differ from these estimates. The areas involving a higher degree of judgement or complexity, or areas where assumptions and estimates are significant to the financial statements, are disclosed in Note 3.

2.2    **Adoption of new and revised standards**

On 1 April 2011, the Company and the Group has adopted all the new or revised FRS and Interpretations to FRS ("INT FRS") that are relevant to its operations and mandatory for application from that date. Changes to the Company's and the Group's accounting policies have been made as required, in accordance with the relevant transitional provisions in the respective FRS and INT FRS.

The adoption of these new or amended FRS and INT FRS did not result in substantial changes to the Company's accounting policies and had no material effect on the amounts reported for the current year or prior financial period.

**THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

2. **Significant accounting policies (cont'd)**

2.3 **Group accounting**

(a) Basis of consolidation

Subsidiaries are entities (including special purpose entities) over which the Group has power to govern the financial and operating policies so as to obtain benefits from its activities, generally accompanied by a shareholding giving rise to a majority of the voting rights. The existence and effect of potential voting rights that are currently exercisable or convertible are considered when assessing whether the Group controls another entity. Subsidiaries are consolidated from the date on which control is transferred to the Group. They are deconsolidated from the date on which control ceases. In preparing the consolidated financial statements, transactions, balances and unrealised gains on transactions between group entities are eliminated. Unrealised losses are also eliminated but are considered an impairment indicator of the assets transferred. Accounting policies of subsidiaries have been changed where necessary to ensure consistency with the policies adopted by the Group.

(b) Acquisition of businesses

The acquisition method of accounting is used to account for business combinations by the Group.

The consideration transferred for the acquisition of a subsidiary comprises the fair value of the assets transferred, the liabilities incurred and the equity interests issued by the Group. The consideration transferred also includes the fair value of any contingent consideration arrangement and the fair value of any pre-existing equity interest in the subsidiary.

Acquisition-related costs are expenses as incurred.

Identifiable assets acquired and liabilities and contingent liabilities assumed in a business combination are, with limited exceptions, measured initially at their fair values at the acquisition date.

The excess of the consideration transferred, the amount of any non-controlling interest in the acquire and acquisition-date fair value of any previous equity interest in the acquiree over the fair value of the net identifiable assets acquired is recorded as goodwill.

2.4 **Currency translation**

(a) Functional and presentation currency

Items included in the financial statements of the Company and the Group are measured using the currency of the primary economic environment in which the Company and the Group operates ("functional currency"). The financial statements are presented in United States Dollar, which is the functional currency of the Company and the Group.

**THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

2.    **Significant accounting policies (cont'd)**

2.4    **Currency translation (cont'd)**

(b)    Transactions and balances

Transactions in a currency other than the functional currency ("foreign currency") are translated into the functional currency using the exchange rates at the dates of the transaction. Currency translation differences resulting from the settlement of such transactions and from the translation of monetary assets and liabilities denominated in foreign currencies at the closing rates at the balance sheet date are recognised in the profit or loss.

Non-monetary items measured at fair value in a foreign currency are translated using the exchange rates at the date when the fair value was determined.

2.5    **Revenue recognition**

Revenue is recognised to the extent that it is probable that the economic benefits will flow to the Group and the revenue can be reliably measured.

Revenue from sales of goods is recognised when the significant risks and rewards of ownership have been transferred to the buyer, recovery of the consideration is probable, the associated costs and possible return of goods can be estimated reliably, there is no continuing management involvement with the goods, and the amount of revenue can be measured reliably.

2.6    **Intangible assets**

Intangible assets acquired separately are measured initially at cost. The cost of intangible assets acquired in a business combination is their fair value as at the date of acquisition. Subsequent to the initial acquisition, intangible assets are measured at cost less any accumulated amortisation and accumulated impairment losses.

Intangible assets with finite useful lives are amortised over the estimated useful lives and assessed for impairment whenever there is an indication that the intangible asset may be impaired. The amortisation period and the amortisation method are reviewed at least at the end of each reporting period.

Intangible assets with indefinite useful lives or not yet available for use are tested for impairment annually or more frequently if the events and circumstances indicate that the carrying value may be impaired either individually or at the cash-generating unit level. Such intangible assets are not amortised. The useful life of an intangible asset with an indefinite useful life is reviewed annually to determine whether the useful life assessment continues to be supportable.

**THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

2.    **Significant accounting policies (cont'd)**

2.7    **Inventories**

Inventories are valued at lower of cost and net realisable value. Cost is being determined on the first-in first-out basis and includes all costs in bringing the inventories to their present location and condition. In the case of manufactured inventories and work-in-progress, cost includes an appropriate share of production overheads based on normal operating capacity. Net realisable value is the price at which the inventories can be realised in the normal course of business after allowing for the cost of realisation. Provision is made, where necessary, for all obsolete and slow moving items.

2.8    **Plant and equipment**

Plant and equipment are stated at cost less accumulated depreciation and accumulated impairment loss. The cost of plant and equipment includes expenditure that is directly attributable to the acquisition of the items. Dismantlement, removal or restoration costs are included as part of the cost of plant and equipment if the obligation for dismantlement, removal or restoration is incurred as a consequence of acquiring or using the items.

Depreciation is calculated on the straight-line method to allocate the depreciable amount over their estimated useful lives as follows:-

|  | Years |
|---|---|
| Computers | 3 |
| Electrical installation | 10 |
| Furniture & fittings | 3 |
| Motor vehicle | 6 |
| Office equipment | 3 |
| Plant and machinery | 3 – 10 |
| Renovation | 3 – 10 |
| Control system | 3 |

The residual values and useful lives of plant and equipment are reviewed and adjusted as appropriate at the end of each reporting period. On disposal of an item of plant and equipment, the difference between the net disposal proceeds and its carrying amount is taken to the statement of comprehensive income. Fully depreciated items are retained in the financial statements until they are no longer in use and no further charge for the depreciation is made in respect of these items.

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

2.    **Significant accounting policies (cont'd)**

2.9    **Related party**

A related party is an entity or person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common or joint control with, the entity in governing the financial and operating policies, or that has an interest in the entity that gives it significant influence over the entity in financial and operating decisions, it also includes members of the key management personnel or close members of family of any individual referred to herein and others who have the ability to control, jointly control or significantly influence by or for which significant voting power in such entity resides with, directly or indirectly, any such individual.    This includes parents, subsidiaries, fellow subsidiaries, associates, joint ventures and post-employment benefit plans, if any.

2.10    **Construction and projects work-in-progress**

Construction and projects work-in-progress are related to factory building and plant and equipment to be constructed or developed for the Company and the Group and are stated at cost.

2.11    **Impairment of non-financial assets**

The Company and the Group assesses at each reporting date whether there is an indication that an asset may be impaired.  If any such indication exists, or when annual impairment assessment for an asset is required, the Company and the Group makes an estimate of the asset's recoverable amount.

An asset's recoverable amount is the higher of an asset's or cash-generating unit's fair value less costs to sell and its value in use and is determined for an individual asset, unless the asset does not generate cash inflows that are largely independent of those from other assets or group of assets.  Where the carrying amount of an asset or cash-generating unit exceeds its recoverable amount, the asset is considered impaired and is written down to its recoverable amount.  In assessing value in use, the estimated future cash flows expected to be generated by the asset are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset.

Impairment losses are recognised in the profit or loss, except for assets that are previously revalued where the revaluation was taken to other comprehensive income.  In this case the impairment is also recognised in other comprehensive income up to the amount of any previous revaluation.

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

2. Significant accounting policies (cont'd)

2.11 Impairment of non-financial assets (cont'd)

For assets excluding goodwill, an assessment is made at each reporting date as to whether there is any indication that previously recognised impairment losses may no longer exist or may have decreased. If such indication exists, the Company and the Group estimates the asset's or cash-generating unit's recoverable amount. A previously recognised impairment loss is reversed only if there has been a change in the estimates used to determine the asset's recoverable amount since the last impairment loss was recognised. If that is the case, the carrying amount of the asset is increased to its recoverable amount. That increase cannot exceed the carrying amount that would have been determined, net of depreciation, had no impairment loss be recognised previously. Such reversal is recognised in the profit or loss unless the asset is measured at revalued amount, in which case the reversal is treated as a revaluation increase.

2.12 Financial instruments

(a) Non-derivative financial assets

The Company the Group initially recognises loans and receivables and deposits on the date that they are originated. All other financial assets (including assets designated at fair value through profit or loss) are recognised initially on the trade date at which the Company and the Group becomes a party to the contractual provisions of the instrument.

The Company and the Group derecognises a financial asset when the contractual rights to the cash flows from the asset expire, or it transfers the rights to receive the contractual cash flows on the financial asset in a transaction in which substantially all the risks and rewards of ownership of the financial asset are transferred. Any interest in transferred financial assets that is created or retained by the Company and the Group is recognised as a separate asset or liability.

Financial assets and liabilities are offset and the net amount presented in the balance sheet when, and only when, the Company and the Group has a legal right to offset the amounts and intends either to settle on a net basis or to realise the asset and settle the liability simultaneously.

The Company and the Group classifies its non-derivative financial assets into the following category: loan and receivables.

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

2.    **Significant accounting policies (cont'd)**

2.12  **Financial instruments (cont'd)**

(a)   Non-derivative financial assets (cont'd)

*Loans and receivables*
Loans and receivables are financial assets with fixed or determinable payments that are not quoted in an active market. Such assets are recognised initially at fair value plus any directly attributable transaction costs. Subsequent to initial recognition, loans and receivables are measured at amortised costs using the effective interest method, less any impairment losses.

Loans and receivables comprise cash and bank balances, and trade and other receivables.

(b)   Non-derivative financial liabilities

The Company and the Group initially recognises debt securities issued and subordinated liabilities on the date that they are originated. All other financial liabilities (including liabilities designated at fair value through profit or loss) are recognised initially on the trade date, which is the date that the Company and the Group becomes a party to the contractual provisions of the instrument.

The Company and the Group derecognises a financial liability when its contractual obligations are discharged, cancelled or expired.

Financial assets and liabilities are offset and the net amount presented in the balance sheet when, and only when the Company and the Group has a legal right to offset the amounts and intends either to settle on a net basis or to realise the asset and settle the liability simultaneously.

Non-derivative financial liabilities are recognised initially at fair value plus any directly attributable transaction costs. Subsequent to initial recognition, these financial liabilities are measured at amortised cost using the effective interest method.

The Company and the Group has the following non-derivative financial liabilities: trade and other payables.

(c)   Share capital

*Ordinary shares*
Ordinary shares are classified as equity. Incremental costs directly attributable to the issue of ordinary shares are recognised as a deduction from equity, net of any tax effects.

THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

2.      Significant accounting policies (cont'd)

2.13    Impairment of non-derivative financial assets

A financial asset not carried at fair value through profit or loss is assessed at each reporting date to determine whether there is objective evidence that it is impaired. A financial asset is impaired if objective evidence indicates that a loss event has occurred after the initial recognition of the asset, and that the loss event has a negative effect on the estimated future cash flows of that asset that can be estimated reliably.

Objective evidence that financial assets (including equity securities) are impaired can include default or delinquency by a debtor, restructuring of an amount due to the Company and the Group on terms that the Company and the Group would not consider otherwise, indications that a debtor or issuer will enter bankruptcy, adverse changes in the payment status of borrowers or issuers in the Company and the Group, economic conditions that correlate with defaults or the disappearance of an active market for a security. In addition, for an investment in an equity security, a significant or prolonged decline in its fair value below its cost is objective evidence of impairment.

*Loans and receivables*
The Company and the Group considers evidence of impairment for loans and receivables at both a specific asset and collective level. All individually significant loans and receivables are assessed for specific impairment. All individually significant loans and receivables found not to be specifically impaired are then collectively assessed for any impairment that has been incurred but not yet identified. Loans and receivables that are not individually significant are collectively assessed for impairment by grouping together loans and receivables with similar risk characteristics.

In assessing collective impairment, the Company and the Group uses historical trends of the probability of default, timing of recoveries and the amount of loss incurred, adjusted for management's judgement as to whether current economic and credit conditions are such that the actual losses are likely to be greater or less than suggested by historical trends.

An impairment loss in respect of a financial asset measured at amortised cost is calculated as the difference between its carrying amount and the present value of the estimated future cash flows, discounted at the asset's original effective interest rate. Losses are recognised in profit or loss and reflected in an allowance account against loans and receivables. Interest on the impaired asset continues to be recognised. When a subsequent event (e.g. repayment by a debtor) causes the amount of impairment loss to decrease, the decrease in impairment loss is reversed through profit or loss.

2.14    Fair value estimation of financial assets and liabilities

The fair values of current financial assets and liabilities carried at amortised cost approximate their carrying amounts.

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

2.    **Significant accounting policies (cont'd)**

2.15   **Operating leases (when the Company and the Group is the lessee)**

Leases where a significant portion of the risks and rewards of ownership are retained by the lessor are classified as operating leases. Payments made under operating leases are taken to the statement of comprehensive income on a straight-line basis over the period of the lease.

When an operating lease is terminated before the lease period has expired, any payment required to be made to the lessor by way of penalty is recognised as an expense in the period in which termination takes place.

2.16   **Employee compensation**

The Company's and the Group's contributions are recognised as employee compensation expense when they are due, unless they can be capitalised as an asset.

*Defined contribution plans*

Defined contribution plans are post-employment benefit plans under which the Company and the Group pays fixed contributions into separate entities such as the Central Provident Fund on a mandatory, contractual or voluntary basis. The Company and the Group has no further payment obligations once the contributions have been paid. The Company's and the Group's contributions are recognised as employee compensation expense when they are due.

2.17   **Income taxes**

Income tax expense comprises current and deferred tax. Current tax and deferred tax is recognised in profit or loss except to the extent that it relates to a business combination, or items recognised directly in equity or in other comprehensive income.

Current tax is the expected tax payable or receivable on the taxable income or loss for the years, using tax rates enacted or substantively enacted at the reporting date, and any adjustment to tax payable in respect of previous years.

Deferred tax is recognised in respect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes. Deferred tax is not recognised for:
- temporary differences on the initial recognition of assets or liabilities in a transaction that is not a business combination and that affects neither accounting nor taxable profit or loss;
- temporary differences related to investments in subsidiaries and jointly controlled entities to the extent that it is probable that they will not reverse in the foreseeable future; and
- taxable temporary differences arising on the initial recognition of goodwill.

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

2.      **Significant accounting policies (cont'd)**

2.17    **Income taxes (cont'd)**

Deferred tax is measured at the tax rates that are expected to be applied to temporary differences when they reverse, based on the laws that have been enacted or substantively enacted by the reporting date.

Deferred tax assets and liabilities are offset if there is a legally enforceable right to offset current tax liabilities and assets, and they relate to income taxes levied by the same tax authority on the same taxable entity, or on different tax entities, but they intend to settle current tax liabilities and assets on a net basis or their tax assets and liabilities will be realised simultaneously.

A deferred tax asset is recognised for unused tax losses, tax credits and deductible temporary differences, to the extent that it is probable that future taxable profits will be available against which they can be utilised. Deferred tax assets are reviewed at each reporting date and are reduced to the extent that it is no longer probable that the related tax benefit will be realised.

2.18    **Investment in subsidiaries**

A subsidiary is an entity over which the Group has the power to govern the financial and operating policies so as to obtain benefits from its activities. The Group generally has such power when it directly or indirectly holds more than 50% of the issued share capital, or controls more than half of the voting power, or controls the composition of the board of directors.

Investment in subsidiary are stated at cost less any impairment loss in the Company's balance sheet. On disposal of a subsidiary, the difference between net disposal proceeds and the carrying amount of the investment is taken to the statement of comprehensive income.

3.      **Critical accounting estimates, assumptions and judgements**

Estimates, assumptions and judgements are continually evaluated and are based on historical experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances.

The Company and the Group makes estimates and assumptions concerning the future. The resulting accounting estimates will, by definition, seldom equal the related actual results. The estimates and assumptions that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below: -

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

3. **Critical accounting estimates, assumptions and judgements (cont'd)**

(a)  Useful lives of plant and equipment

The cost of plant and equipment is depreciated on a straight-line basis over the plant and equipment's estimated economic useful lives. Management estimates the useful lives of these property, plant and equipment to be within 3 to 10 years. These are common life expectancies applied in the industry. Changes in the expected level of usage and technological developments could impact the economic useful lives and the residual values of these assets, therefore, future depreciation charges could be revised. The carrying amount of the Company's and the Group's plant and equipment at the end of the reporting period is disclosed in Note 4 to the financial statements.

(b)  Impairment of loans and receivables

The Company and the Group assess at the end of each reporting period whether there is any objective evidence that a financial asset is impaired. To determine whether there is objective evidence of impairment, the Company and the Group considers factors such as the probability of insolvency or significant financial difficulties of the receivable and default or significant delay in payments.

Where there is objective evidence of impairment, the amount and timing of future cash flows are estimated based on historical loss experience for assets with similar credit risk characteristics. Based on the directors assessments, no impairment is required. The carrying amounts of the Company's and the Group's loans and receivables at the end of the reporting period are disclosed in Note 9 to the financial statements.

(c)  Allowance for obsolete inventories

A review is made periodically on inventory for excess inventory, obsolescence and declines in net realisable value below cost and record an allowance against the inventory balance for any such declines. These reviews require management to estimate future demand for the products. Possible changes in these estimates could result in revisions to the valuation of inventory. The carrying amount of the Group's inventories were disclosed in Note 8 to the financial statements.

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

4.    **Plant and equipment**

| | Computers USD | Electrical installation USD | Furniture & fittings USD | Motor vehicles USD | Office equipment USD | Plant & Machinery USD | Renovation USD | Control system USD | Total USD |
|---|---|---|---|---|---|---|---|---|---|
| **GROUP** | | | | | | | | | |
| **2012** | | | | | | | | | |
| *Cost* | | | | | | | | | |
| Beginning of financial year | 50,644 | 168,428 | 25,983 | 439,076 | 61,015 | 14,824,910 | 1,227,189 | 125,756 | 16,923,001 |
| Additions | 73,026 | 37,311 | 46,016 | 59,819 | 95,960 | 11,198,286 | 254,892 | 336,679 | 12,101,989 |
| Transfer from/(to) construction and project work-in-progress | - | 1,593,284 | - | - | (30,921) | 180,411 | - | - | 1,742,774 |
| End of financial year | 123,670 | 1,799,023 | 71,999 | 498,895 | 126,054 | 26,203,607 | 1,482,081 | 462,435 | 30,767,764 |
| | | | | | | | | | |
| *Accumulated depreciation* | | | | | | | | | |
| Beginning of financial year | 41,902 | 3,816 | 22,661 | 121,536 | 15,823 | 9,003,261 | 1,073,714 | 13,256 | 10,295,969 |
| Depreciation charged | 13,956 | 55,595 | 8,598 | 78,946 | 22,527 | 1,530,259 | 73,542 | 74,184 | 1,857,607 |
| End of financial year | 55,858 | 59,411 | 31,259 | 200,482 | 38,350 | 10,533,520 | 1,147,256 | 87,440 | 12,153,576 |
| | | | | | | | | | |
| *Net book value* | | | | | | | | | |
| End of financial year | 67,812 | 1,739,612 | 40,740 | 298,413 | 87,704 | 15,670,087 | 334,825 | 374,995 | 18,614,188 |

The carrying amount of motor vehicles acquired under finance lease obligations for the Group and Company were USD298,413 and USD298,413 (2011: USD192,510 and USD192,510) respectively.

During the financial year, the Group and the Company acquired plant and equipment costing USD12,101,989 and USD12,229,164 (2011: USD989,874 and USD989,874) of which USD57,410 and USD57,410 (2011: USD240,566 and USD240,566) was acquired by finance lease obligations. Cash payments of USD12,044,579 and USD12,171,754 (2011: USD749,308 and USD989,874) were made to purchase these plant and equipment.

As at 31 March 2011, plant and equipment with net book value of USD1,876,822 (2011: USD2,339,498) were pledged to secure bank loan granted to the Company (Note 13).

THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

4.   Plant and equipment (cont'd)

| GROUP | Computers USD | Electrical installation USD | Furniture & fittings USD | Motor vehicles USD | Office equipment USD | Plant & Machinery USD | Renovation USD | Control system USD | Total USD |
|---|---|---|---|---|---|---|---|---|---|
| **2011** | | | | | | | | | |
| *Cost* | | | | | | | | | |
| Beginning of financial year | 40,334 | 4,867 | 23,145 | 267,971 | 9,664 | 14,432,982 | 1,223,625 | - | 16,002,588 |
| Additions | 10,310 | 163,561 | 2,838 | 240,566 | 51,351 | 391,928 | 3,564 | 125,756 | 989,874 |
| Disposal | - | - | - | (69,461) | - | - | - | - | (69,461) |
| End of financial year | 50,644 | 168,428 | 25,983 | 439,076 | 61,015 | 14,824,910 | 1,227,189 | 125,756 | 16,923,001 |
| | | | | | | | | | |
| *Accumulated depreciation* | | | | | | | | | |
| Beginning of financial year | 40,334 | 1,982 | 21,318 | 75,461 | 8,310 | 7,743,405 | 1,030,355 | - | 8,921,165 |
| Depreciation charged | 1,568 | 1,834 | 1,343 | 72,884 | 7,513 | 1,259,856 | 43,359 | 13,256 | 1,401,613 |
| Disposals | - | - | - | (26,809) | - | - | - | - | (26,809) |
| End of financial year | 41,902 | 3,816 | 22,661 | 121,536 | 15,823 | 9,003,261 | 1,073,714 | 13,256 | 10,295,969 |
| | | | | | | | | | |
| *Net book value* | | | | | | | | | |
| End of financial year | 8,742 | 164,612 | 3,322 | 317,540 | 45,192 | 5,821,649 | 153,475 | 112,500 | 6,627,032 |

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

4.  **Plant and equipment (cont'd)**

|  | Computers USD | Electrical installation USD | Furniture & fittings USD | Motor vehicles USD | Office equipment USD | Plant & Machinery USD | Renovation USD | Control system USD | Total USD |
|---|---|---|---|---|---|---|---|---|---|
| **COMPANY** | | | | | | | | | |
| **2012** | | | | | | | | | |
| *Cost* | | | | | | | | | |
| Beginning of financial year | 50,644 | 168,428 | 25,983 | 439,076 | 61,015 | 14,824,910 | 1,227,189 | 125,756 | 16,923,001 |
| Additions | 73,026 | 37,311 | 46,016 | 59,819 | 95,960 | 11,325,461 | 254,892 | 336,679 | 12,229,164 |
| Transfer from/(to) construction and project work-in-progress | - | 1,593,284 | - | - | (30,921) | 180,411 | - | - | 1,742,774 |
| End of financial year | 123,670 | 1,799,023 | 71,999 | 498,895 | 126,054 | 26,330,782 | 1,482,081 | 462,435 | 30,894,939 |
| | | | | | | | | | |
| *Accumulated depreciation* | | | | | | | | | |
| Beginning of financial year | 41,902 | 3,816 | 22,661 | 121,536 | 15,823 | 9,003,261 | 1,073,714 | 13,256 | 10,295,969 |
| Depreciation charged | 13,956 | 55,595 | 8,598 | 78,946 | 22,527 | 1,530,259 | 73,542 | 74,184 | 1,857,607 |
| End of financial year | 55,858 | 59,411 | 31,259 | 200,482 | 38,350 | 10,533,520 | 1,147,256 | 87,440 | 12,153,576 |
| | | | | | | | | | |
| *Net book value* | | | | | | | | | |
| End of financial year | 67,812 | 1,739,612 | 40,740 | 298,413 | 87,704 | 15,797,262 | 334,825 | 374,995 | 18,741,363 |

THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

4.  Plant and equipment (cont'd)

| | Computers USD | Electrical installation USD | Furniture & fittings USD | Motor vehicles USD | Office equipment USD | Plant & Machinery USD | Renovation USD | Control system USD | Total USD |
|---|---|---|---|---|---|---|---|---|---|
| **COMPANY** | | | | | | | | | |
| **2011** | | | | | | | | | |
| *Cost* | | | | | | | | | |
| Beginning of financial year | 40,334 | 4,867 | 23,145 | 267,971 | 9,664 | 14,432,982 | 1,223,625 | - | 16,002,588 |
| Additions | 10,310 | 163,561 | 2,838 | 240,566 | 51,351 | 391,928 | 3,564 | 125,756 | 989,874 |
| Disposal | - | - | - | (69,461) | - | - | - | - | (69,461) |
| End of financial year | 50,644 | 168,428 | 25,983 | 439,076 | 61,015 | 14,824,910 | 1,227,189 | 125,756 | 16,923,001 |
| | | | | | | | | | |
| *Accumulated depreciation* | | | | | | | | | |
| Beginning of financial year | 40,334 | 1,982 | 21,318 | 75,461 | 8,310 | 7,743,405 | 1,030,355 | - | 8,921,165 |
| Depreciation charged | 1,568 | 1,834 | 1,343 | 72,884 | 7,513 | 1,259,856 | 43,359 | 13,256 | 1,401,613 |
| Disposals | - | - | - | (26,809) | - | - | - | - | (26,809) |
| End of financial year | 41,902 | 3,816 | 22,661 | 121,536 | 15,823 | 9,003,261 | 1,073,714 | 13,256 | 10,295,969 |
| | | | | | | | | | |
| *Net book value* | | | | | | | | | |
| End of financial year | 8,742 | 164,612 | 3,322 | 317,540 | 45,192 | 5,821,649 | 153,475 | 112,500 | 6,627,032 |

THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

5.  Construction and projects work-in-progress

| | Building USD | Electrical installation USD | Software USD | Machinery USD | Total USD |
|---|---|---|---|---|---|
| **Group and Company** | | | | | |
| **2012** | | | | | |
| *Cost* | | | | | |
| Beginning of financial year | 2,410,634 | - | 94,300 | 46,853 | 2,551,787 |
| Additions | 10,854,763 | 2,018,249 | 838,683 | 87,666 | 13,799,361 |
| Transfer to plant and equipment | - | (1,608,255) | - | (134,519) | (1,742,774) |
| End of financial year | 13,265,397 | 409,994 | 932,983 | - | 14,608,374 |
| | | | | | |
| **2011** | | | | | |
| Beginning of financial year | - | - | - | - | - |
| Additions | 2,410,634 | - | 94,300 | 46,853 | 2,551,787 |
| End of financial year | 2,410,634 | - | 94,300 | 46,853 | 2,551,787 |

Construction and projects work-in-progress are related to factory building and plant and equipment to be constructed or developed for the Company and the Group and are stated at costs.

6.  Intangible assets

| | Goodwill on consolidation USD | Patent USD | Total USD |
|---|---|---|---|
| **Group** | | | |
| **2012** | | | |
| *Cost* | | | |
| Beginning of financial year | 13,005 | 62,860 | 75,865 |
| Additions | - | 24,996 | 24,996 |
| End of financial year | 13,005 | 87,856 | 100,861 |
| | | | |
| *Accumulated amortisation* | | | |
| Beginning of financial year | - | 3,148 | 3,148 |
| Amortisation charged | - | 3,148 | 3,148 |
| End of financial year | - | 6,296 | 6,296 |
| | | | |
| *Net book value* | | | |
| End of financial year | 13,005 | 81,560 | 94,565 |

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)


**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012


6. Intangible assets (cont'd)

|  | Goodwill on consolidation USD | Patent USD | Total USD |
|---|---|---|---|
| **Group** | | | |
| **2011** | | | |
| *Cost* | | | |
| Beginning of financial year | - | - | - |
| Additions | 13,005 | 62,860 | 75,865 |
| End of financial year | 13,005 | 62,860 | 75,865 |
| | | | |
| *Accumulated amortisation* | | | |
| Beginning of financial year | - | - | - |
| Amortisation charged | - | 3,148 | 3,148 |
| End of financial year | - | 3,148 | 3,148 |
| | | | |
| *Net book value* | | | |
| End of financial year | 13,005 | 59,712 | 72,717 |

Goodwill on consolidation arose from the acquisition of the subsidiary, Helios International Pte. Ltd.

|  | Goodwill on consolidation USD | Patent USD | Total USD |
|---|---|---|---|
| **Company** | | | |
| **2012** | | | |
| *Cost* | | | |
| Beginning of financial year | - | 62,860 | 62,860 |
| Additions | - | 24,996 | 24,996 |
| End of financial year | - | 87,856 | 87,856 |
| | | | |
| *Accumulated amortisation* | | | |
| Beginning of financial year | - | 3,148 | 3,148 |
| Amortisation charged | - | 3,148 | 3,148 |
| End of financial year | - | 6,296 | 6,296 |
| | | | |
| *Net book value* | | | |
| End of financial year | - | 81,560 | 81,560 |

THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

6.      Intangible assets (cont'd)

| | Goodwill on consolidation USD | Patent USD | Total USD |
|---|---|---|---|
| <u>Company</u> | | | |
| **2011** | | | |
| *Cost* | | | |
| Beginning of financial year | - | - | - |
| Additions | - | 62,860 | 62,860 |
| End of financial year | - | 62,860 | 62,860 |
| | | | |
| *Accumulated amortisation* | | | |
| Beginning of financial year | - | - | - |
| Amortisation charged | - | 3,148 | 3,148 |
| End of financial year | - | 3,148 | 3,148 |
| | | | |
| *Net book value* | | | |
| End of financial year | - | 59,712 | 59,712 |

7.      Investment in subsidiaries

| | 2012 USD | 2011 USD |
|---|---|---|
| <u>The Company</u> | | |
| Unquoted equity shares, at cost | 201 | 1 |

| Name of Company | Principal activities | Country of incorporation and place of business | Percentage of effective equity held by the Group 2012 % | 2011 % |
|---|---|---|---|---|
| Helios International Pte Ltd | Business of assembly, construction and sale of chemical vapour deposition machine | Singapore | 100 | 100 |
| Nozomi Technology Inc* | Stock management | United States of America | 100 | - |

* Not required to be audited in the country of incorporation

THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

8.    Inventories

| | Group | | Company | |
|---|---|---|---|---|
| | 2012 USD | 2011 USD | 2012 USD | 2011 USD |
| Raw materials | 177,217 | - | 177,217 | - |
| Components and parts | 2,141,934 | 201,431 | - | - |
| Work-in-progress | 2,401,290 | 1,235,854 | 2,401,290 | 1,235,854 |
| Finished goods | 4,323,976 | 195,917 | 522,420 | 195,917 |
| | 9,044,417 | 1,633,202 | 3,100,927 | 1,431,771 |

9.    Trade and other receivables

| | Group | | Company | |
|---|---|---|---|---|
| | 2012 USD | 2011 USD | 2012 USD | 2011 USD |
| Trade receivable | | | | |
| - Non-related parties | 1,252,809 | 194,345 | 1,252,809 | 194,345 |
| - Related parties | 13,115,711 | 15,641,046 | 12,735,765 | 15,641,046 |
| | 14,368,520 | 15,835,391 | 13,988,574 | 15,835,391 |
| Other receivables | 7,273 | 15,722 | 7,273 | 1,941 |
| Amounts due from subsidiaries (non-trade) | - | - | 3,698,485 | - |
| Amounts due from related parties (non-trade) | 539,123 | - | 539,123 | - |
| Prepayment | 70,380 | 50,087 | 69,478 | 49,126 |
| Deposits | 5,187,790 | 392,669 | 4,523,854 | 392,669 |
| GST receivables | 723,661 | - | 374,938 | - |
| | 20,896,747 | 16,293,869 | 23,201,725 | 16,279,127 |

Amounts due from related parties and subsidiaries are unsecure, non-interest bearing and repayable on demand.

As at 31 March 2011, trade receivables of the Company are pledged to a bank as securities for bank loan granted to the Company (Note 13).

Subsequent to the financial year end, the Company entered into agreement between its holding company and a related party so as to offset the balances outstanding as at June 2012 amounted to USD11,264,187 (Note 12).

THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

10.    Share capital

| | Group and Company | |
| --- | --- | --- |
| | Number of ordinary shares | Amount USD |
| **2012** | | |
| Beginning of financial year | 3,500,001 | 17,186,323 |
| Issuance of shares | 37,581,507 | 37,581,507 |
| End of financial year | 41,081,508 | 54,767,830 |
| **2011** | | |
| Beginning of financial year | 2,500,000 | 1,590,128 |
| Issuance of shares | 1,000,001 | 15,596,195 |
| End of financial year | 3,500,001 | 17,186,323 |

All issued ordinary shares are fully paid. There is no par value for these ordinary shares.

The holders of ordinary shares are entitled to receive dividends as and when declared by the Company. All ordinary shares carry one vote per share without restrictions.

During the financial year, the Company issued 37,581,507 ordinary shares for a total consideration of USD37,581,507 by way of utilisation of credit balance due to holding company.

11.    Finance lease obligations

| | Minimum payments | | Present value of minimum payments | |
| --- | --- | --- | --- | --- |
| | 2012 USD | 2011 USD | 2012 USD | 2011 USD |
| **Group and Company** | | | | |
| Finance lease payments payable | | | | |
| Within one year | 79,607 | 62,122 | 67,488 | 62,305 |
| Within two to five years | 220,388 | 298,840 | 197,682 | 253,528 |
| After five years | 48,449 | - | 46,454 | - |
| | 348,444 | 360,962 | 311,624 | 315,833 |
| Interest allocated to future periods | (36,820) | (45,129) | - | - |
| | 311,624 | 315,833 | 311,624 | 315,833 |

The average effective interest rate is 4.77% (2011: 4.31%) per annum. The terms of the finance lease obligations do not contain any restrictions on the Company's activities concerning dividend payments, obtaining additional borrowings or further leasing.

THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

12.    **Trade and other payable**

| | Group | | Company | |
|---|---|---|---|---|
| | 2012 USD | 2011 USD | 2012 USD | 2011 USD |
| Trade payables | | | | |
| - Non-related parties | 6,069,435 | 363,284 | 4,389,376 | 153,984 |
| - Related parties | 260,772 | - | 251,631 | - |
| | 6,330,207 | 363,284 | 4,641,007 | 153,984 |
| Other payables | 3,806,889 | 1,795,681 | 3,806,665 | 1,795,681 |
| Amounts due to a director (non-trade) | 22,514 | - | 22,514 | - |
| Amounts due to related parties (non-trade) | 1,965,669 | 5,092,679 | - | 5,060,968 |
| Amounts due to holding company (non-trade) | 4,004,187 | 421,386 | 4,004,187 | 421,386 |
| Accruals | 285,886 | 72,800 | 110,757 | 65,037 |
| | 16,415,352 | 7,745,830 | 12,585,130 | 7,497,056 |

Amounts due from related parties, holding company and a director are unsecure, non-interest bearing and repayable on demand.

Subsequent to the financial year end, the Company entered into agreement between its holding company and a related party so as to offset the balances outstanding as at June 2012 amounted to USD11,264,187 (Note 9).

13.    **Bank loan**

The bank loan is secured by Company's plant and equipment and trade receivables of the Company.  The loan bears interest of 3.35% (2011: 3.25%) per annum.  The bank loan had been fully repaid as at year end.

14.    **Revenue**

This represents invoiced value of sales and services rendered during the financial year, less discounts, returns and Goods and Services Tax.

THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

15.    **Other income**

| | Group | |
|---|---|---|
| | 2012 USD | 2011 USD |
| Exchange gain | 3,610 | - |
| Other income | 3,988 | 2,687 |
| | 7,598 | 2,687 |

16.    **Financial expenses**

| | Group | |
|---|---|---|
| | 2012 USD | 2011 USD |
| Bank charges | 14,302 | 1,975 |
| Interest on bank overdrafts | 54 | 177 |
| Interest on finance lease obligations | 14,064 | 13,434 |
| Interest on late payments | 913 | 229 |
| Interest on bank loan | 190,121 | 371,518 |
| | 219,454 | 387,333 |

17.    **Profit before income tax**

The following items have been included in arriving at profit before income tax:-

| | Group | |
|---|---|---|
| | 2012 USD | 2011 USD |
| Depreciation of plant and equipment | 1,857,607 | 1,401,613 |
| Amortisation of intangible assets | 3,148 | 3,148 |
| Directors' remuneration and fees | 127,826 | 89,098 |
| Inventories recognised as cost in cost of sales | 8,152,978 | 3,207,000 |
| (Gain)/loss on foreign exchange | (3,610) | 57,667 |
| Rental of premises and equipment | 661,494 | 263,599 |
| Staff cost | | |
| - salaries, bonuses and benefits | 2,101,364 | 1,064,987 |
| - Central Provident Fund | 208,088 | 87,252 |

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

18. **Income tax expense**

|  | Group | |
|---|---|---|
|  | 2012 USD | 2011 USD |
| Tax expense attributable to profit is made up of:- | | |
| *Current tax* | | |
| Current year | 13,000 | - |

The tax expense on the results for the financial year differs from the amount of income tax determined by applying the Singapore Standard rate of income tax to profit before income tax due to the following factors:-

|  | Group | |
|---|---|---|
|  | 2012 USD | 2011 USD |
| Profit before income tax | 1,889,964 | 1,461,531 |
| Tax at statutory tax rate of 17% | 321,294 | 248,460 |
| Income not subject to tax | (46,400) | (930) |
| Tax exemption | (12,892) | - |
| Expenses that are not deductible | 57,719 | 6,651 |
| Deferred tax asset not previously recognised | (307,506) | (253,864) |
| Others | 785 | (317) |
|  | 13,000 | - |

The Company was granted a 15-year Pioneer Incentive – Manufacturing with effect from 1 April 2012 subject to the Company meeting certain terms and conditions set out in the letter of offer dated 4 April 2012.

19. **Significant related party transactions**

In addition to the information disclosed elsewhere in the financial statements, the following significant transactions took place between the Company, the holding company and related parties at terms agreed between the parties:

|  | Group | | Company | |
|---|---|---|---|---|
|  | 2012 USD | 2011 USD | 2012 USD | 2011 USD |
| Revenue | | | | |
| - Sale of goods to related parties | 3,439,789 | 10,582,260 | 3,439,789 | 10,582,260 |

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

19. **Related party transactions (cont'd)**

|  | Group | | Company | |
|---|---|---|---|---|
|  | 2012<br>USD | 2011<br>USD | 2012<br>USD | 2011<br>USD |
| Expenses paid/payable<br>to subsidiary company | | | | |
| - Purchase of plant and<br>equipment | - | - | 9,923,618 | - |
| Expenses paid/payable<br>to related parties | | | | |
| - Purchase of goods | 965,106 | 15,336,721 | 965,106 | 4,638,770 |
| - Management fee | 583,947 | - | 583,947 | - |
| Expenses paid/payable<br>to a company in which<br>a director is an officer | | | | |
| - Professional fee | 131,732 | 176,304 | 121,156 | 120,109 |

Related parties comprise companies which are controlled or significantly influenced by the Company's directors and their close family members.

There were also advances to and from related parties and payments on behalf for and by related parties. Outstanding balances as at 31 March 2012 are set out in Notes 9 and 12 to the financial statements.

20. **Operating lease commitment**

The future aggregate minimum lease payments under non-cancellable operating leases (with lease term of more than 1 year) contracted for by the company for factory and land at the end of the reporting period but not recognised as liabilities, are as follows:-

|  | Group and Company | |
|---|---|---|
|  | 2012<br>USD | 2011<br>USD |
| Not later than 1 year | 716,315 | 257,547 |
| Later than 1 year but not later than 5 years | 1,030,206 | 149,173 |
| Later than 5 years | 3,932,117 | - |

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

21. **New or revised accounting standards and interpretations**

Certain new standards, amendments and interpretations to existing standards have been published and are mandatory for the Company's accounting periods beginning after 1 April 2011 or later periods and which the Company has not early adopted. The Company has assessed that these standards, amendments and interpretations are not relevant to the Company and the Group.

22. **Financial risk management**

The Company's and the Group's overall risk management strategy seeks to minimise adverse effects from the unpredictability of financial markets on the Company's and the Group's financial performance.

The Board is responsible for setting the objectives and underlying principles of financial risk management for the Company and the Group.

The Board reviews and agrees the risk management policies and systems regularly to reflect changes in market conditions, the Company's and the Group's financial position and the nature of its activities. The significant financial risks to which the Company and the Group is exposed are set out below:-

Credit risk

Credit risk refers to the risk that a counter party will default on its contractual obligations resulting in financial loss to the Company and the Group. The major classes of financial assets of the Company and the Group are bank deposits and trade and other receivables.

(a) Financial assets that are neither past due nor impaired

Bank deposits that are neither past due nor impaired are mainly deposits with banks with high credit-ratings assigned by international credit-rating agencies.

(b) Financial assets that are past due and/or impaired

There is no other class of financial assets that is past due and/or impaired except for trade receivables.

At the end of the reporting period, age analysis of trade receivables past due but not impaired and the concentration of credit risk of trade receivables are as follows:-

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

22.     **Financial risk management (cont'd)**

Credit risk (cont'd)

(b)     Financial assets that are past due and/or impaired (cont'd)

| | Group | | Company | |
|---|---|---|---|---|
| | 2012 USD | 2011 USD | 2012 USD | 2011 USD |
| Past due < 3 months | 651,460 | 2,974,816 | 651,460 | 2,974,816 |
| Past due 3 to 6 months | 2,391,977 | 2,200,953 | 2,391,977 | 2,200,953 |
| Past due over 6 months | 9,723,321 | 8,536,166 | 9,723,321 | 8,536,166 |
| | 12,766,758 | 13,711,935 | 12,766,758 | 13,711,935 |
| Top 1 customer | 12,654,108 | 15,641,046 | 12,654,108 | 9,836,702 |
| Top 2 – 3 customers | 1,172,973 | - | 1,172,973 | - |
| | 13,827,081 | 15,641,046 | 13,827,081 | 9,836,702 |

Capital risk

The Company's and the Group's objectives when managing capital are to safeguard to the Company's and the Group's ability to continue as a going concern and to maintain an optimal capital structure so as to maximise shareholder value. In order to maintain or achieve an optimal capital structure, the Company and the Group may adjust the amount of dividend payment, return capital to shareholders, issue new shares, buy back issued shares, obtain new borrowings or sell assets to reduce borrowings.

The gearing ratio is calculated as net debt divided by total capital. Net debt is calculated as borrowings plus trade and other payables less cash and bank balances. Total capital is calculated as equity plus net debt.

| | Group | | Company | |
|---|---|---|---|---|
| | 2012 USD | 2011 USD | 2012 USD | 2011 USD |
| Net debt | | | | |
| Borrowings | 311,624 | 8,322,499 | 311,624 | 8,322,499 |
| Trade and other payables | 16,415,352 | 7,745,830 | 12,585,130 | 7,497,056 |
| Less: Cash and bank balances | (4,077,244) | (26,810) | (3,629,473) | (19,504) |
| | 12,649,732 | 16,041,519 | 9,267,281 | 15,800,051 |

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

22.    **Financial risk management (cont'd)**

Capital risk (cont'd)

|  | Group | | Company | |
|---|---|---|---|---|
|  | 2012<br>USD | 2011<br>USD | 2012<br>USD | 2011<br>USD |
| Total equity |  |  |  |  |
| Share capital | 54,767,830 | 17,186,323 | 54,767,830 | 17,186,323 |
| Reserves | (4,172,271) | (6,049,235) | (4,300,961) | (6,036,944) |
|  | 50,595,559 | 11,137,088 | 50,466,869 | 11,149,379 |
| Total capital | 63,245,291 | 27,178,607 | 59,734,150 | 26,949,430 |
| Gearing ratio | 20% | 59% | 16% | 59% |

The Company and the Group is not subject to external capital and gearing requirements for the financial years ended 31 March 2012 and 2011.

Liquidity risk

Liquidity risk is the risk that the Company and the Group will encounter difficulty in meeting financial obligations due to shortage of funds. The Company's and the Group's exposure to liquidity risk arises primarily from mismatches of the maturities of financial assets and liabilities. The Company and the Group monitors its liquidity risk and maintains a level of cash and bank balances deemed adequate by management to finance the Company's and the Group's operations and to mitigate the effects of fluctuations in cash flows.

The following are the contractual maturities of financial liabilities, including estimated interest payments and excluding the impact of netting agreements.

|  | Group | | | | |
|---|---|---|---|---|---|
|  | Carrying<br>amount<br>USD | Contractual<br>cash flows<br>USD | One year or<br>less<br>USD | One to five<br>years<br>USD | Over five<br>years<br>USD |
| **2012** |  |  |  |  |  |
| **Non-derivative**<br>**financial liabilities** |  |  |  |  |  |
| Finance lease<br>obligations | 311,624 | 348,444 | 79,607 | 220,388 | 48,449 |
| Trade and other<br>payables | 16,415,532 | 16,415,532 | 16,415,532 | - | - |
|  | 16,727,156 | 16,763,976 | 16,495,139 | 220,388 | 48,449 |

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

22.    Financial risk management (cont'd)

Liquidity risk (cont'd)

| | Group | | | | |
|---|---|---|---|---|---|
| | Carrying amount USD | Contractual cash flows USD | One year or less USD | One to five years USD | Over five years USD |
| **2011** | | | | | |
| **Non-derivative financial liabilities** | | | | | |
| Finance lease obligations | 315,833 | 360,962 | 62,122 | 298,840 | - |
| Trade and other payables | 7,745,830 | 7,745,830 | 7,745,830 | - | - |
| Bank loan | 8,006,666 | 8,196,787 | 8,196,787 | - | - |
| | 16,068,329 | 16,303,579 | 16,004,739 | 298,840 | - |

| | Company | | | | |
|---|---|---|---|---|---|
| | Carrying amount USD | Contractual cash flows USD | One year or less USD | One to five years USD | Over five years USD |
| **2012** | | | | | |
| **Non-derivative financial liabilities** | | | | | |
| Finance lease obligations | 311,624 | 348,444 | 79,607 | 220,388 | 48,449 |
| Trade and other payables | 12,585,130 | 12,585,130 | 12,585,130 | - | - |
| | 12,896,754 | 12,933,574 | 12,664,737 | 220,388 | 48,449 |
| **2011** | | | | | |
| **Non-derivative financial liabilities** | | | | | |
| Finance lease obligations | 315,833 | 360,962 | 62,122 | 298,840 | - |
| Trade and other payables | 7,497,056 | 7,497,056 | 7,497,056 | - | - |
| Bank loan | 8,006,666 | 8,196,787 | 8,196,787 | - | - |
| | 15,819,555 | 16,054,805 | 15,755,965 | 298,840 | - |

**214**

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

22. **Financial risk management (cont'd)**

Foreign currency risk

The Company and the Group are exposed to foreign currency risk on sales and purchases that are denominated in a currency other than its functional currency. The currencies giving rise to this risk are primarily Singapore dollar.

The Company and the Group do not have a hedging policy on its foreign currency exposure.

The Company's and the Group's exposure to foreign currency are as follows:

|  | 2012 USD | 2011 USD |
|---|---|---|
| **Group** | | |
| Trade and other receivables | 5,889,154 | 603,913 |
| Cash and cash equivalents | 597,642 | 21,376 |
| Finance lease obligations | (311,624) | (315,833) |
| Trade and other payables | (5,510,144) | (2,211,213) |
|  | 665,028 | (1,901,757) |
| **Company** | | |
| Trade and other receivables | 4,936,343 | 589,171 |
| Cash and cash equivalents | 427,105 | 15,106 |
| Finance lease obligations | (311,624) | (315,833) |
| Trade and other payables | (4,238,224) | (1,994,150) |
|  | 813,600 | (1,705,706) |

Sensitivity analysis for foreign currency risk

A 10% strengthening of US dollar against the following currencies at the reporting date would increase/ (decrease) equity and profit or loss by the amounts shown below. This analysis assumes that all other variables, in particular interest rates, remain constant.

|  | Equity USD | Profit or loss USD |
|---|---|---|
| **Group** | | |
| **2012** | | |
| SGD | 55,197 | 55,197 |
| **2011** | | |
| SGD | (157,846) | (157,846) |

THE GEMESIS COMPANY (S) PTE. LTD.
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2012

22.   **Financial risk management (cont'd)**

Sensitivity analysis for foreign currency risk (cont'd)

|  | Equity USD | Profit or loss USD |
|---|---|---|
| **Company** | | |
| **2012** | | |
| SGD | 67,529 | 67,529 |
| | | |
| **2011** | | |
| SGD | (141,574) | (141,574) |

A 10% weakening of US dollar against the above currencies would have had the equal but opposite effect on the above currencies to the amounts shown above, on the basis that all other variables remain constant.

23.   **Capital commitment**

As at the end of the year, commitments for capital expenditure not provided for in the financial statement are as follows:

|  | 2012 USD | 2011 USD |
|---|---|---|
| Expenditure approved and contracted for in respect of construction works and other projects | 3,266,598 | 15,563,288 |
| Expenditure approved in respect of construction works and other projects | 9,176,025 | - |

**THE GEMESIS COMPANY (S) PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2012

24. **Comparative figures**

Construction and work-in-progress relating to the building and construction of the Company's factory has been reclassified from current assets to non-current assets so as to more appropriately reflect the nature of this class of asset.

The effect of the reclassification in the consolidated financial statements for the financial year 2011 are as follows:-

| | Group USD | Company USD |
|---|---|---|
| **2011** | | |
| **Balance Sheet** | | |
| **Non-current assets** | | |
| Construction and projects work-in-progress increase by | 2,551,787 | 2,551,787 |
| | | |
| **Current assets** | | |
| Construction and projects work-in-progress decrease by | (2,551,787) | (2,551,787) |

25. **Authorisation of financial statements**

These financial statements were authorised for issue in accordance with a resolution of the Board of Directors of The Gemesis Company (S) Pte. Ltd. on 3 September 2012.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**REPORTS AND FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 31 MARCH 2013**



**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**REPORTS AND FINANCIAL STATEMENTS**
**31 MARCH 2013**

**C O N T E N T S**

|  | Page |
|---|---|
| Directors' Report | 1 - 2 |
| Statement by Directors | 3 |
| Independent Auditor's Report | 4 - 5 |
| Balance Sheet | 6 |
| Statement of Comprehensive Income | 7 |
| Statement of Changes in Equity | 8 |
| Statement of Cash Flow | 9 |
| Notes to the Financial Statements | 10 - 43 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**DIRECTORS' REPORT**

The directors present their report to the members together with the audited consolidated financial statements of IIA Technologies Pte. Ltd. (formerly known as The Gemesis Company (S) Pte. Ltd.) (the "Company") and its subsidiaries (collectively, the "Group") for the financial year ended 31 March 2013, and the balance sheet of the Company as at 31 March 2013.

**Directors**

The directors of the Company in office at the date of this report are as follows:

Vishal Jatin Mehta
Sonia Jatin Mehta
Tan Teck Nguan Michael
Girija Prasad Pande                  (appointed on 1 April 2012)
Misra Devi Shanker                   (appointed on 31 January 2013)
Mehta Suraj Jatin                    (appointed on 31 January 2013)

**Arrangements to enable directors to acquire shares and debentures**

Neither at the end of nor at any time during the financial year was the Company a party to any arrangement whose object was to enable the directors of the Company to acquire benefits by means of the acquisition of shares in, or debentures of, the Company or any other body corporate.

**Directors' interests in shares and debentures**

The interest of the directors who held office at the end of the financial year in the shares and debentures of the Company and related corporation were as follows:

| | Holdings registered in name of director or nominee | | Holdings in which a director is deemed to have an interest | |
| --- | --- | --- | --- | --- |
| | At 31.03.2013 | At 01.04.2012 | At 31.03.2013 | At 01.04.2012 |
| | (No. of Ordinary shares) | | (No. of Ordinary shares) | |
| **Holding Company** **JRD International Ltd** | | | | |
| Sonia Jatin Mehta | - | 5,000 | - | - |
| **Company** **IIA Technologies Pte. Ltd.** | | | | |
| Sonia Jatin Mehta | 1,000,000 | 1,000,000 | 57,081,508 | 40,081,508 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**DIRECTORS' REPORT**

**Directors' contractual benefits**

Since the end of the previous financial year, no director has received or become entitled to receive a benefit by reason of a contract made by the Company or a related corporation with the director or with a firm of which he is a member or with a company in which he has a substantial financial interest, except as disclosed in the accompanying financial statements and in this report.

**Share options**

(a) *Options to take up unissued shares*

During the financial year, no option to take up unissued shares of the Company or its subsidiaries was granted.

(b) *Unissued shares under option and options exercised*

During the financial year, there were no shares of the Company or its subsidiaries issued by virtue of the exercise of an option to take up unissued shares.

At the end of the financial year, there were no unissued shares under option.

**Independent auditor**

The independent auditor, AT ADLER, Public Accountants and Chartered Accountants, has expressed willingness to accept re-appointment.

On behalf of the Board of Directors

Vishal Jatin Mehta
Director

Tan Teck Nguan Michael
Director

Dated: 31 July 2013

2

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

## STATEMENT BY DIRECTORS

In the opinion of the directors,

(a)     the financial statements of the Company and the consolidated financial statements of the Group are drawn up so as to give a true and fair view of the state of affairs of the Company and of the Group as at 31 March 2013 and of the results of the business, changes in equity and cash flows of the Group for the financial year then ended on that date in accordance with the provision of the Singapore Companies Act, Chapter 50 and Singapore Financial Reporting Standards; and

(b)     at the date of this statement, there are reasonable grounds to believe that the Company will be able to pay its debts as and when they fall due.

On behalf of the Board of Directors

_____
**Vishal Jatin Mehta**
Director

_____
**Tan Teck Nguan Michael**
Director

Dated: 31 July 2013

3

**INDEPENDENT AUDITOR'S REPORT TO THE MEMBERS OF
IIA TECHNOLOGIES PTE. LTD.
(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)
for the financial year ended 31 March 2013**
Company Registration No. 200516961K
(Incorporated in Singapore)



## Report on the Financial Statements

We have audited the accompanying financial statements of IIA Technologies Pte. Ltd. (formerly known as The Gemesis Company (S) Pte. Ltd.) (the "Company") and its subsidiaries (collectively, the "Group"), which comprise the balance sheets of the Company and of the Group as at 31 March 2013, and the consolidated statement of comprehensive income, consolidated statement of changes in equity and the consolidated statement of cash flow of the Group for the financial year then ended, and a summary of significant accounting policies and other explanatory notes.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation of financial statements that give a true and fair view in accordance with the provisions of the Singapore Companies Act, Chapter 50 (the "Act") and Singapore Financial Reporting Standards, and for devising and maintaining a system of internal accounting controls sufficient to provide a reasonable assurance that assets are safeguarded against loss from unauthorised use or disposition; and transactions are properly authorised and that they are recorded as necessary to permit the preparation of true and fair profit and loss accounts and balance sheets and to maintain accountability of assets.

### Auditor's Responsibility

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with Singapore Standards on Auditing. Those Standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgement, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation of the financial statements that give a true and fair view in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

AT ADLER | 146 Robinson Road, #09-01, Singapore 068909 | tel. *65.6438 6867 | fax. *65.6438 4806 | email. admin@atadler.com | web.www.atadler.com

**INDEPENDENT AUDITOR'S REPORT TO THE MEMBERS OF
IIA TECHNOLOGIES PTE. LTD.
(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)
for the financial year ended 31 March 2013**
Company Registration No. 200516961K
(Incorporated in Singapore)



*Opinion*

In our opinion, the consolidated financial statements of the Group and the balance sheet of the Company, are properly drawn up in accordance with the provisions of the Act and Singapore Financial Reporting Standards so as to give a true and fair view of the state of affairs of the Group and of the Company as at 31 March 2013, and the results, changes in equity and cash flows of the Group for the financial year ended on that date.

**Report on Other Legal and Regulatory Requirements**

In our opinion, the accounting and other records required by the Act to be kept by the Company and by the subsidiary incorporated in Singapore of which we are the auditors have been properly kept in accordance with the provisions of the Act.

AT ADLER

**AT ADLER**
Public Accountants and Chartered Accountants

Singapore,  31 July 2013

AT ADLER | 146 Robinson Road, #09-01, Singapore 068909 | tel. *65.6438 6867 | fax. *65.6438 4806 | email. admin@atadler.com | web.www.atadler.com

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**BALANCE SHEET**
as at 31 March 2013

| | Note | The Group 2013 USD | The Group 2012 USD | The Company 2013 USD | The Company 2012 USD |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Non-current assets** | | | | | |
| Property, plant and equipment | 4 | 64,711,704 | 18,614,188 | 65,060,740 | 18,741,363 |
| Construction and projects work-in-progress | 5 | 1,438,128 | 14,608,374 | 1,438,128 | 14,608,374 |
| Intangible assets | 6 | 142,560 | 94,565 | 129,555 | 81,560 |
| Investment in subsidiaries | 7 | - | - | 50,201 | 201 |
| | | 66,292,392 | 33,317,127 | 66,678,624 | 33,431,498 |
| **Current assets** | | | | | |
| Inventories | 8 | 8,169,395 | 9,044,417 | 4,817,686 | 3,100,927 |
| Trade and other receivables | 9 | 27,723,165 | 20,896,747 | 31,393,272 | 23,201,725 |
| Cash and bank balances | | 1,321,490 | 4,077,244 | 952,445 | 3,629,473 |
| | | 37,214,050 | 34,018,408 | 37,163,403 | 29,932,125 |
| **TOTAL ASSETS** | | 103,506,442 | 67,335,535 | 103,842,027 | 63,363,623 |
| **EQUITY AND LIABILITIES** | | | | | |
| **Equity attributable to equity holders of the Company** | | | | | |
| Share capital | 10 | 71,767,830 | 54,767,830 | 71,767,830 | 54,767,830 |
| Accumulated losses | | (2,609,121) | (4,172,271) | (1,264,386) | (4,300,961) |
| Total equity | | 69,158,709 | 50,595,559 | 70,503,444 | 50,466,869 |
| **Non-current liabilities** | | | | | |
| Finance lease obligations | 11 | 7,675,914 | 244,136 | 7,675,914 | 244,136 |
| Bank loan | 12 | 6,093,132 | - | 6,093,132 | - |
| | | 13,769,046 | 244,136 | 13,769,046 | 244,136 |
| **Current liabilities** | | | | | |
| Trade and other payables | 13 | 19,577,228 | 16,415,352 | 18,607,938 | 12,585,130 |
| Finance lease obligations | 11 | 603,794 | 67,488 | 603,794 | 67,488 |
| Bank loan | 12 | 357,805 | - | 357,805 | - |
| Income tax liabilities | | 39,860 | 13,000 | - | - |
| | | 20,578,687 | 16,495,840 | 19,569,537 | 12,652,618 |
| **Total liabilities** | | 34,347,733 | 16,739,976 | 33,338,583 | 12,896,754 |
| **TOTAL EQUITY AND LIABILITIES** | | 103,506,442 | 67,335,535 | 103,842,027 | 63,363,623 |

*The annexed notes form an integral part of and should be read in conjunction with these financial statements.*

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**STATEMENT OF COMPREHENSIVE INCOME**
for the financial year ended 31 March 2013

|  | Note | The Group 2013 USD | 2012 USD |
|---|---|---|---|
| **Continuing operations** |  |  |  |
| Revenue | 14 | 42,223,496 | 20,860,110 |
| Cost of sales |  | (36,727,927) | (16,528,314) |
|  |  | 5,495,569 | 4,331,796 |
| Other income | 15 | 81,797 | 7,598 |
|  |  | 5,577,366 | 4,339,394 |
| Administrative expenses |  | (2,620,300) | (1,704,960) |
| Distribution and selling expenses |  | (458,080) | (336,774) |
| Financial expenses | 16 | (304,370) | (219,454) |
| Other expenses |  | (604,606) | (188,242) |
| Profit before income tax | 17 | 1,590,010 | 1,889,964 |
| Income tax expense | 18 | (26,860) | (13,000) |
| **Total profit after income tax** |  | 1,563,150 | 1,876,964 |
| **Other comprehensive income** |  | - | - |
| **Total comprehensive income** |  | 1,563,150 | 1,876,964 |

*The annexed notes form an integral part of and should be read in conjunction with these financial statements.*

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**STATEMENT OF CHANGES IN EQUITY**
for the financial year ended 31 March 2013

| | Share capital USD | Accumulated losses USD | Total equity USD |
|---|---|---|---|
| **2013** | | | |
| **Beginning of financial year** | 54,767,830 | (4,172,271) | 50,595,559 |
| Issuance of share capital (Note 10) | 17,000,000 | - | 17,000,000 |
| Total comprehensive income for the year | - | 1,563,150 | 1,563,150 |
| **End of financial year** | 71,767,830 | (2,609,121) | 69,158,709 |
| | | | |
| **2012** | | | |
| **Beginning of financial year** | 17,186,323 | (6,049,235) | 11,137,088 |
| Issuance of share capital (Note 10) | 37,581,507 | - | 37,581,507 |
| Total comprehensive income for the year | - | 1,876,964 | 1,876,964 |
| **End of financial year** | 54,767,830 | (4,172,271) | 50,595,559 |

*The annexed notes form an integral part of and should be read in conjunction with these financial statements.*

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**STATEMENT OF CASH FLOW**
for the financial year ended 31 March 2013

|  | The Group | |
|---|---|---|
|  | 2013 USD | 2012 USD |
| **Cash flows from operating activities** | | |
| Profit before income tax | 1,590,010 | 1,889,964 |
| Adjustments for: | | |
| - Depreciation of property, plant and equipment | 6,186,007 | 1,857,607 |
| - Amortisation of intangible assets | 3,148 | 3,148 |
| - Inventories written down to net realisable value | 2,659,016 | - |
| - Interest expenses | 267,482 | 205,152 |
| - Interest income | (75) | - |
| Operating cash flow before working capital changes | 10,705,588 | 3,955,871 |
| | | |
| Changes in working capital: | | |
| - Inventories | (1,783,994) | (7,411,215) |
| - Trade and other receivables | (6,793,870) | (4,063,755) |
| - Trade and other payables | 1,917,651 | 8,213,731 |
| Cash generated from operations | 4,045,375 | 694,632 |
| Income tax paid | - | - |
| **Net cash flows generated from operating activities** | 4,045,375 | 694,632 |
| | | |
| **Cash flows from investing activities** | | |
| Acquisition of property, plant and equipment | (9,654,731) | (12,044,579) |
| Payment of construction and project work-in-progress | (17,462,101) | (13,799,361) |
| Acquisition of intangible assets | (51,143) | (24,996) |
| Interest received | 75 | - |
| **Net cash flows used in investing activities** | (27,167,900) | (25,868,936) |
| | | |
| **Cash flows from financing activities** | | |
| Amount due to holding company | 18,065,204 | 41,164,308 |
| Amount due from directors | (55,062) | - |
| Amount due to/(from) related parties | 201,535 | (3,666,133) |
| Interest paid | (267,482) | (205,152) |
| Proceeds from/(repayment of) bank loans | 6,450,937 | (8,006,666) |
| Repayment of finance lease obligations | (4,028,361) | (61,619) |
| **Net cash flows generated from financing activities** | 20,366,771 | 29,224,738 |
| | | |
| **Net (decrease)/increase in cash and bank balances** | (2,755,754) | 4,050,434 |
| Cash and bank balances at beginning of financial year | 4,077,244 | 26,810 |
| **Cash and bank balances at end of financial year** | 1,321,490 | 4,077,244 |

*The annexed notes form an integral part of and should be read in conjunction with these financial statements.*

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

These notes form an integral part of and should be read in conjunction with the accompanying financial statements.

1. **General information**

   IIA Technologies Pte. Ltd. (the "Company") is incorporated and domiciled in Singapore. The address of its registered office and principal place of business is at 65 Chulia Street #38-02/3 OCBC Centre, Singapore 049513 and 2 Woodlands Sector 1 #03-14 Woodlands Spectrum, Singapore 738068 respectively.

   The principal activities of the Company are growing of diamonds. The principal activities of its subsidiaries are set up in Note 7 to the financial statements. There have been no significant changes in such activities during the financial year.

   On 14 November 2012, the Company changed its name from The Gemesis Company (S) Pte. Ltd. to IIA Technologies Pte. Ltd.

   The Company is a subsidiary of JRD International Limited, a company incorporated in the Bahamas Island, which is also its ultimate holding company.

   The consolidated financial statements relate to the Company and its subsidiaries.

2. **Significant accounting policies**

2.1 **Basis of preparation**

   The consolidated financial statements of the Company and the Group have been prepared in accordance with Singapore Financial Reporting Standards ("FRS"). The consolidated financial statements have been prepared under the historical cost convention, except as otherwise disclosed in the accounting policies stated below.

   The preparation of financial statements in conformity with FRS requires management to make judgements, estimates and assumptions that affect the application of accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results may differ from these estimates. The areas involving a higher degree of judgement or complexity, or areas where assumptions and estimates are significant to the financial statements, are disclosed in Note 3.

2.2 **Adoption of new and revised standards**

   In the current financial year, the Company has adopted all the new or revised FRS and Interpretations to FRS ("INT FRS") that are relevant to its operations and effective for annual periods beginning on 1 April 2012. Changes to the Company's accounting policies have been made as required, in accordance with the relevant transitional provisions in the respective FRS and INT FRS.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

2. **Significant accounting policies (cont'd)**

2.2 **Adoption of new and revised standards (cont'd)**

The adoption of these new or amended FRS and INT FRS did not result in substantial changes to the Company's accounting policies and had no material effect on the amounts reported for the current or prior financial years.

2.3 **Group accounting**

(a) Basis of consolidation

Subsidiaries are entities (including special purpose entities) over which the Group has power to govern the financial and operating policies so as to obtain benefits from its activities, generally accompanied by a shareholding giving rise to a majority of the voting rights. The existence and effect of potential voting rights that are currently exercisable or convertible are considered when assessing whether the Group controls another entity. Subsidiaries are consolidated from the date on which control is transferred to the Group. They are deconsolidated from the date on which control ceases. In preparing the consolidated financial statements, transactions, balances and unrealised gains on transactions between group entities are eliminated. Unrealised losses are also eliminated but are considered an impairment indicator of the assets transferred. Accounting policies of subsidiaries have been changed where necessary to ensure consistency with the policies adopted by the Group.

(b) Acquisition of businesses

The acquisition method of accounting is used to account for business combinations by the Group.

The consideration transferred for the acquisition of a subsidiary comprises the fair value of the assets transferred, the liabilities incurred and the equity interests issued by the Group. The consideration transferred also includes the fair value of any contingent consideration arrangement and the fair value of any pre-existing equity interest in the subsidiary.

Acquisition-related costs are expenses as incurred.

Identifiable assets acquired and liabilities and contingent liabilities assumed in a business combination are, with limited exceptions, measured initially at their fair values at the acquisition date.

The excess of the consideration transferred, the amount of any non-controlling interest in the acquire and acquisition-date fair value of any previous equity interest in the acquiree over the fair value of the net identifiable assets acquired is recorded as goodwill.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

2. **Significant accounting policies (cont'd)**

2.4 **Currency translation**

(a) Functional and presentation currency

Items included in the financial statements of the Company and the Group are measured using the currency of the primary economic environment in which the Company and the Group operates ("functional currency"). The financial statements are presented in United States Dollar, which is the functional currency of the Company and the Group.

(b) Transactions and balances

Transactions in a currency other than the functional currency ("foreign currency") are translated into the functional currency using the exchange rates at the dates of the transaction. Currency translation differences resulting from the settlement of such transactions and from the translation of monetary assets and liabilities denominated in foreign currencies at the closing rates at the balance sheet date are recognised in the profit or loss.

Non-monetary items measured at fair value in a foreign currency are translated using the exchange rates at the date when the fair value was determined.

2.5 **Revenue recognition**

Revenue is recognised to the extent that it is probable that the economic benefits will flow to the Group and the revenue can be reliably measured.

Revenue from sales of goods is recognised when the significant risks and rewards of ownership have been transferred to the buyer, recovery of the consideration is probable, the associated costs and possible return of goods can be estimated reliably, there is no continuing management involvement with the goods, and the amount of revenue can be measured reliably.

2.6 **Intangible assets**

Intangible assets acquired separately are measured initially at cost. The cost of intangible assets acquired in a business combination is their fair value as at the date of acquisition. Subsequent to the initial acquisition, intangible assets are measured at cost less any accumulated amortisation and accumulated impairment losses.

Intangible assets with finite useful lives are amortised over the estimated useful lives and assessed for impairment whenever there is an indication that the intangible asset may be impaired. The amortisation period and the amortisation method are reviewed at least at the end of each reporting period.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

2. **Significant accounting policies (cont'd)**

2.6 **Intangible assets (cont'd)**

Intangible assets with indefinite useful lives or not yet available for use are tested for impairment annually or more frequently if the events and circumstances indicate that the carrying value may be impaired either individually or at the cash-generating unit level. Such intangible assets are not amortised. The useful life of an intangible asset with an indefinite useful life is reviewed annually to determine whether the useful life assessment continues to be supportable.

2.7 **Inventories**

Inventories are valued at lower of cost and net realisable value. Cost is being determined on the first-in first-out basis and includes all costs in bringing the inventories to their present location and condition. In the case of manufactured inventories and work-in-progress, cost includes an appropriate share of production overheads based on normal operating capacity. Net realisable value is the price at which the inventories can be realised in the normal course of business after allowing for the cost of realisation. Provision is made, where necessary, for all obsolete and slow moving items.

2.8 **Property, plant and equipment**

Property, plant and equipment are stated at cost less accumulated depreciation and accumulated impairment loss. The cost of property, plant and equipment includes expenditure that is directly attributable to the acquisition of the items. Dismantlement, removal or restoration costs are included as part of the cost of property, plant and equipment if the obligation for dismantlement, removal or restoration is incurred as a consequence of acquiring or using the items.

Depreciation is calculated on the straight-line method to allocate the depreciable amount over their estimated useful lives as follows:-

| | Years |
|---|---|
| Leasehold building | 30 |
| Computers & office equipment | 3 – 5 |
| Furniture & fittings | 3 |
| Motor vehicle | 6 |
| Plant and machinery | 3 – 10 |
| Renovation | 3 – 10 |

IIA TECHNOLOGIES PTE. LTD.
(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2013

2.      Significant accounting policies (cont'd)

2.8     Property, plant and equipment (cont'd)

The residual values and useful lives of property, plant and equipment are reviewed and adjusted as appropriate at the end of each reporting period. On disposal of an item of property, plant and equipment, the difference between the net disposal proceeds and its carrying amount is taken to the statement of comprehensive income. Fully depreciated items are retained in the financial statements until they are no longer in use and no further charge for the depreciation is made in respect of these items.

2.9     Construction and projects work-in-progress

Construction and projects work-in-progress relates to the construction of the factory building and plant and equipment for the Company and the Group and are stated at cost.

2.10    Related party

A related party is an entity or person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common or joint control with, the entity in governing the financial and operating policies, or that has an interest in the entity that gives it significant influence over the entity in financial and operating decisions, it also includes members of the key management personnel or close members of family of any individual referred to herein and others who have the ability to control, jointly control or significantly influence by or for which significant voting power in such entity resides with, directly or indirectly, any such individual. This includes parents, subsidiaries, fellow subsidiaries, associates, joint ventures and post-employment benefit plans, if any.

2.11    Impairment of non-financial assets

The Company and the Group assesses at each reporting date whether there is an indication that an asset may be impaired. If any such indication exists, or when annual impairment assessment for an asset is required, the Company and the Group makes an estimate of the asset's recoverable amount.

An asset's recoverable amount is the higher of an asset's or cash-generating unit's fair value less costs to sell and its value in use and is determined for an individual asset, unless the asset does not generate cash inflows that are largely independent of those from other assets or group of assets. Where the carrying amount of an asset or cash-generating unit exceeds its recoverable amount, the asset is considered impaired and is written down to its recoverable amount. In assessing value in use, the estimated future cash flows expected to be generated by the asset are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

2. **Significant accounting policies (cont'd)**

2.11 **Impairment of non-financial assets (cont'd)**

Impairment losses are recognised in the profit or loss, except for assets that are previously revalued where the revaluation was taken to other comprehensive income. In this case the impairment is also recognised in other comprehensive income up to the amount of any previous revaluation.

For assets excluding goodwill, an assessment is made at each reporting date as to whether there is any indication that previously recognised impairment losses may no longer exist or may have decreased. If such indication exists, the Company and the Group estimates the asset's or cash-generating unit's recoverable amount. A previously recognised impairment loss is reversed only if there has been a change in the estimates used to determine the asset's recoverable amount since the last impairment loss was recognised. If that is the case, the carrying amount of the asset is increased to its recoverable amount. That increase cannot exceed the carrying amount that would have been determined, net of depreciation, had no impairment loss be recognised previously. Such reversal is recognised in the profit or loss unless the asset is measured at revalued amount, in which case the reversal is treated as a revaluation increase.

2.12 **Financial instruments**

(a) **Non-derivative financial assets**

The Company and the Group initially recognises loans and receivables and deposits on the date that they are originated. All other financial assets (including assets designated at fair value through profit or loss) are recognised initially on the trade date at which the Company and the Group becomes a party to the contractual provisions of the instrument.

The Company and the Group derecognises a financial asset when the contractual rights to the cash flows from the asset expire, or it transfers the rights to receive the contractual cash flows on the financial asset in a transaction in which substantially all the risks and rewards of ownership of the financial asset are transferred. Any interest in transferred financial assets that is created or retained by the Company and the Group is recognised as a separate asset or liability.

Financial assets and liabilities are offset and the net amount presented in the balance sheet when, and only when, the Company and the Group has a legal right to offset the amounts and intends either to settle on a net basis or to realise the asset and settle the liability simultaneously.

The Company and the Group classifies its non-derivative financial assets into the following category: loan and receivables.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

2.    **Significant accounting policies (cont'd)**

2.12   **Financial instruments (cont'd)**

   (a)    Non-derivative financial assets (cont'd)

   *Loans and receivables*
   Loans and receivables are financial assets with fixed or determinable payments that
   are not quoted in an active market. Such assets are recognised initially at fair value
   plus any directly attributable transaction costs. Subsequent to initial recognition, loans
   and receivables are measured at amortised costs using the effective interest method,
   less any impairment losses.

   Loans and receivables comprise cash and bank balances, and trade and other
   receivables.

   (b)    Non-derivative financial liabilities

   The Company and the Group initially recognises debt securities issued and
   subordinated liabilities on the date that they are originated. All other financial liabilities
   (including liabilities designated at fair value through profit or loss) are recognised
   initially on the trade date, which is the date that the Company and the Group becomes
   a party to the contractual provisions of the instrument.

   The Company and the Group derecognises a financial liability when its contractual
   obligations are discharged, cancelled or expired.

   Financial assets and liabilities are offset and the net amount presented in the balance
   sheet when, and only when the Company and the Group has a legal right to offset the
   amounts and intends either to settle on a net basis or to realise the asset and settle
   the liability simultaneously.

   Non-derivative financial liabilities are recognised initially at fair value plus any directly
   attributable transaction costs. Subsequent to initial recognition, these financial
   liabilities are measured at amortised cost using the effective interest method.

   The Company and the Group has the following non-derivative financial liabilities: trade
   and other payables.

   (c)    Share capital

   *Ordinary shares*
   Ordinary shares are classified as equity. Incremental costs directly attributable to the
   issue of ordinary shares are recognised as a deduction from equity, net of any tax
   effects.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

2. **Significant accounting policies (cont'd)**

2.13 **Impairment of non-derivative financial assets**

A financial asset not carried at fair value through profit or loss is assessed at each reporting date to determine whether there is objective evidence that it is impaired. A financial asset is impaired if objective evidence indicates that a loss event has occurred after the initial recognition of the asset, and that the loss event has a negative effect on the estimated future cash flows of that asset that can be estimated reliably.

Objective evidence that financial assets (including equity securities) are impaired can include default or delinquency by a debtor, restructuring of an amount due to the Company and the Group on terms that the Company and the Group would not consider otherwise, indications that a debtor or issuer will enter bankruptcy, adverse changes in the payment status of borrowers or issuers in the Company and the Group, economic conditions that correlate with defaults or the disappearance of an active market for a security. In addition, for an investment in an equity security, a significant or prolonged decline in its fair value below its cost is objective evidence of impairment.

*Loans and receivables*
The Company and the Group considers evidence of impairment for loans and receivables at both a specific asset and collective level. All individually significant loans and receivables are assessed for specific impairment. All individually significant loans and receivables found not to be specifically impaired are then collectively assessed for any impairment that has been incurred but not yet identified. Loans and receivables that are not individually significant are collectively assessed for impairment by grouping together loans and receivables with similar risk characteristics.

In assessing collective impairment, the Company and the Group uses historical trends of the probability of default, timing of recoveries and the amount of loss incurred, adjusted for management's judgement as to whether current economic and credit conditions are such that the actual losses are likely to be greater or less than suggested by historical trends.

An impairment loss in respect of a financial asset measured at amortised cost is calculated as the difference between its carrying amount and the present value of the estimated future cash flows, discounted at the asset's original effective interest rate. Losses are recognised in profit or loss and reflected in an allowance account against loans and receivables. Interest on the impaired asset continues to be recognised. When a subsequent event (e.g. repayment by a debtor) causes the amount of impairment loss to decrease, the decrease in impairment loss is reversed through profit or loss.

2.14 **Fair value estimation of financial assets and liabilities**

The fair values of current financial assets and liabilities carried at amortised cost approximate their carrying amounts.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

2. **Significant accounting policies (cont'd)**

2.15 **Leases**

*When the Company and the Group is the lessee:*

The Company and the Group leases certain property, plant and equipment under finance leases from third parties.

*Finance leases*

Leases where the Company and the Group assumes substantially all risks and rewards incidental to ownership of the leased assets are classified as finance leases.

The leased assets and the corresponding lease liabilities (net of finance charges) under finance leases are recognised on the balance sheet as property, plant and equipment and borrowings respectively, at the inception of the leases based on the lower of the fair values of the leased assets and the present values of the minimum lease payments.

Each lease payment is apportioned between the finance expense and the reduction of the outstanding lease liability. The finance expense is recognised in the profit or loss on a basis that reflects a constant periodic rate of interest on the finance lease liability.

*Operating leases*

Leases where a significant portion of the risks and rewards of ownership are retained by the lessor are classified as operating leases. Payments made under operating leases are taken to the statement of comprehensive income on a straight-line basis over the period of the lease.

When an operating lease is terminated before the lease period has expired, any payment required to be made to the lessor by way of penalty is recognised as an expense in the period in which termination takes place.

2.16 **Employee compensation**

The Company's and the Group's contributions are recognised as employee compensation expense when they are due, unless they can be capitalised as an asset.

*Defined contribution plans*

Defined contribution plans are post-employment benefit plans under which the Company and the Group pays fixed contributions into separate entities such as the Central Provident Fund on a mandatory, contractual or voluntary basis. The Company and the Group has no further payment obligations once the contributions have been paid. The Company's and the Group's contributions are recognised as employee compensation expense when they are due.

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

2.      **Significant accounting policies (cont'd)**

2.17    **Income taxes**

Income tax expense comprises current and deferred tax. Current tax and deferred tax is recognised in profit or loss except to the extent that it relates to a business combination, or items recognised directly in equity or in other comprehensive income.

Current tax is the expected tax payable or receivable on the taxable income or loss for the years, using tax rates enacted or substantively enacted at the reporting date, and any adjustment to tax payable in respect of previous years.

Deferred tax is recognised in respect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for taxation purposes. Deferred tax is not recognised for:
*   temporary differences on the initial recognition of assets or liabilities in a transaction that is not a business combination and that affects neither accounting nor taxable profit or loss;
*   temporary differences related to investments in subsidiaries and jointly controlled entities to the extent that it is probable that they will not reverse in the foreseeable future; and
*   taxable temporary differences arising on the initial recognition of goodwill.

Deferred tax is measured at the tax rates that are expected to be applied to temporary differences when they reverse, based on the laws that have been enacted or substantively enacted by the reporting date.

Deferred tax assets and liabilities are offset if there is a legally enforceable right to offset current tax liabilities and assets, and they relate to income taxes levied by the same tax authority on the same taxable entity, or on different tax entities, but they intend to settle current tax liabilities and assets on a net basis or their tax assets and liabilities will be realised simultaneously.

A deferred tax asset is recognised for unused tax losses, tax credits and deductible temporary differences, to the extent that it is probable that future taxable profits will be available against which they can be utilised. Deferred tax assets are reviewed at each reporting date and are reduced to the extent that it is no longer probable that the related tax benefit will be realised.

2.18    **Investment in subsidiaries**

A subsidiary is an entity over which the Group has the power to govern the financial and operating policies so as to obtain benefits from its activities. The Group generally has such power when it directly or indirectly holds more than 50% of the issued share capital, or controls more than half of the voting power, or controls the composition of the board of directors.

Investment in subsidiary are stated at cost less any impairment loss in the Company's balance sheet. On disposal of a subsidiary, the difference between net disposal proceeds and the carrying amount of the investment is taken to the statement of comprehensive income.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

2.      **Significant accounting policies (cont'd)**

2.19    **Borrowing costs**

Borrowing costs are recognised in the profit or loss using the effective interest method except for those costs that are directly attributable to borrowings acquired specifically for the acquisition, construction or production of an asset which necessarily takes a substantial period of time to be prepared for its intended use or sale of property, plant and equipment.

3.      **Critical accounting estimates, assumptions and judgements**

Estimates, assumptions and judgements are continually evaluated and are based on historical experience and other factors, including expectations of future events that are believed to be reasonable under the circumstances.

The Company and the Group makes estimates and assumptions concerning the future. The resulting accounting estimates will, by definition, seldom equal the related actual results. The estimates and assumptions that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year are discussed below: -

(a)     Useful lives of property, plant and equipment

The cost of property, plant and equipment is depreciated on a straight-line basis over the property, plant and equipment's estimated economic useful lives. Management estimates the useful lives of these property, plant and equipment to be within 3 to 30 years. These are common life expectancies applied in the industry. Changes in the expected level of usage and technological developments could impact the economic useful lives and the residual values of these assets, therefore, future depreciation charges could be revised. The carrying amount of the Company's and the Group's property, plant and equipment at the end of the reporting period is disclosed in Note 4 to the financial statements.

(b)     Depreciation of plant and equipment

Property, plant and equipment are depreciated on a straight-line basis over their estimated useful lives. The Company and the Group assesses annually the useful life of the property, plant and equipment and if the expectation differs from the original estimate, such difference will impact the depreciation in the year in which such estimate has been changed. The carrying amount of the Company's and the Group's property, plant and equipment at the end of the reporting period is disclosed in Note 4 to the financial statements.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

3. **Critical accounting estimates, assumptions and judgements (cont'd)**

(c) Impairment of plant and equipment

The Company assesses annually whether property, plant and equipment has any indication of impairment in accordance with the accounting policy. The recoverable amounts of property, plant and equipment have been determined based on the higher of the fair value less cost to sell and value-in-use which requires the use of judgement and estimates. The carrying amount of the Company's and the Group's property, plant and equipment at the end of the reporting period is disclosed in Note 4 to the financial statements.

(d) Impairment of loans and receivables

The Company and the Group assess at the end of each reporting period whether there is any objective evidence that a financial asset is impaired. To determine whether there is objective evidence of impairment, the Company and the Group considers factors such as the probability of insolvency or significant financial difficulties of the receivable and default or significant delay in payments.

Where there is objective evidence of impairment, the amount and timing of future cash flows are estimated based on historical credit loss experience for assets with similar credit risk characteristics. Based on the directors assessments, no impairment is required. The carrying amounts of the Company's and the Group's loans and receivables at the end of the reporting period are disclosed in Note 9 to the financial statements.

(e) Allowance for obsolete inventories

A review is made periodically on inventory for excess inventory, obsolescence and declines in net realisable value below cost and record an allowance against the inventory balance for any such declines. These reviews require management to estimate future demand for the products. Possible changes in these estimates could result in revisions to the valuation of inventory. The carrying amount of the Group's inventories were disclosed in Note 8 to the financial statements.

(f) Tax incentive scheme

The Company was granted the Pioneer Incentive - Manufacturing for an initial period of 15 years by EDB Singapore commencing 1 April 2012 which subject to meeting certain terms and conditions as stipulated in the letter of award. As at 31 March 2013, based on the directors' judgement, these conditions are likely to be met.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

4. **Property, plant and equipment**

| | Leasehold building USD | Computers & office equipment USD | Furniture & fittings USD | Motor vehicles USD | Plant & machinery USD | Renovation USD | Total USD |
|---|---|---|---|---|---|---|---|
| **GROUP** | | | | | | | |
| **2013** | | | | | | | |
| *Cost* | | | | | | | |
| Beginning of financial year | - | 249,724 | 71,999 | 498,895 | 26,666,042 | 3,281,104 | 30,767,764 |
| Additions | - | 342,588 | 77,541 | 143,120 | 18,490,827 | 2,597,100 | 21,651,176 |
| Transfer from construction and project work-in-progress | 14,029,280 | 970,008 | - | - | - | 15,633,059 | 30,632,347 |
| Disposal | - | - | - | - | (27,585) | - | (27,585) |
| End of financial year | 14,029,280 | 1,562,320 | 149,540 | 642,015 | 45,129,284 | 21,511,263 | 83,023,702 |
| | | | | | | | |
| *Accumulated depreciation* | | | | | | | |
| Beginning of financial year | - | 94,208 | 31,259 | 200,482 | 10,620,960 | 1,206,667 | 12,153,576 |
| Depreciation charged | 165,050 | 280,685 | 33,197 | 84,106 | 3,561,971 | 2,060,998 | 6,186,007 |
| Disposal | - | - | - | - | (27,585) | - | (27,585) |
| End of financial year | 165,050 | 374,893 | 64,456 | 284,588 | 14,155,346 | 3,267,665 | 18,311,998 |
| | | | | | | | |
| *Net book value* | | | | | | | |
| End of financial year | 13,864,230 | 1,187,427 | 85,084 | 357,427 | 30,973,938 | 18,243,598 | 64,711,704 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

4. **Property, plant and equipment (cont'd)**

The carrying amount of property, plant and equipment acquired under finance lease obligations for the Company and the Group were USD11,564,178 and USD11,564,178 (2012: USD298,413 and USD298,413) respectively.

During the financial year, the Company and the Group acquired property, plant and equipment costing USD21,858,802 and USD21,651,176 (2012: USD12,229,164 and USD12,101,989) of which USD11,996,445 and USD11,996,445 (2012: USD57,410 and USD57,410) was acquired by finance lease obligations. Cash payments of USD9,862,357 and USD9,654,731 (2012: USD12,171,754 and USD12,044,579) were made to purchase these property, plant and equipment .

As at 31 March 2013, leasehold building with net book value of USD13,864,230 (2012: USD1,876,822) were pledged to secure bank loan granted to the Company and the Group (Note 12).

The estimated fair values of the leasehold building are approximately S$26,000,000 (equivalent to USD20,906,600) based on independent valuation dated 6 June 2012.

**Changes in estimates**

During the financial year, the Company and the Group reviewed the useful lives of its property, plant and equipment which resulted in changes in the expected usage of certain items of property, plant and equipment. The expected useful lives of these assets was assessed to be shorter and as a result, the changes expected on depreciation expenses, recognised in profit and loss account, in current and future years are as follows:

|  | 2013 USD | 2014 USD | 2015 USD | 2016 USD | 2017 USD | Total USD |
|---|---|---|---|---|---|---|
| Increase/(decrease) in depreciation expense | 1,102,171 | 270,237 | (336,732) | (188,533) | (148,264) | 698,879 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) P.TE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

4.      Property, plant and equipment (cont'd)

|  | Computers & office equipment USD | Furniture & fittings USD | Motor vehicles USD | Plant & machinery USD | Renovation USD | Total USD |
|---|---|---|---|---|---|---|
| **GROUP** | | | | | | |
| **2012** | | | | | | |
| *Cost* | | | | | | |
| Beginning of financial year | 111,659 | 25,983 | 439,076 | 14,950,666 | 1,395,617 | 16,923,001 |
| Additions | 168,986 | 46,016 | 59,819 | 11,534,965 | 292,203 | 12,101,989 |
| Transfer from/(to) construction and project work-in-progress | (30,921) | - | - | 180,411 | 1,593,284 | 1,742,774 |
| End of financial year | 249,724 | 71,999 | 498,895 | 26,666,042 | 3,281,104 | 30,767,764 |
| | | | | | | |
| *Accumulated depreciation* | | | | | | |
| Beginning of financial year | 57,725 | 22,661 | 121,536 | 9,016,517 | 1,077,530 | 10,295,969 |
| Depreciation charged | 36,483 | 8,598 | 78,946 | 1,604,443 | 129,137 | 1,857,607 |
| End of financial year | 94,208 | 31,259 | 200,482 | 10,620,960 | 1,206,667 | 12,153,576 |
| | | | | | | |
| *Net book value* | | | | | | |
| End of financial year | 155,516 | 40,740 | 298,413 | 16,045,082 | 2,074,437 | 18,614,188 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

4. Property, plant and equipment (cont'd)

| | Leasehold building USD | Computers & office equipment USD | Furniture & fittings USD | Motor vehicles USD | Plant & machinery USD | Renovation USD | Total USD |
|---|---|---|---|---|---|---|---|
| **COMPANY** | | | | | | | |
| **2013** | | | | | | | |
| *Cost* | | | | | | | |
| Beginning of financial year | - | 249,724 | 71,999 | 498,895 | 26,793,217 | 3,281,104 | 30,894,939 |
| Additions | - | 335,819 | 69,347 | 141,545 | 18,983,337 | 2,328,754 | 21,858,802 |
| Transfer from/(to) construction and project work-in-progress | 14,029,280 | 970,008 | - | - | - | 15,633,059 | 30,632,347 |
| Disposal | - | - | - | - | (36,968) | - | (36,968) |
| End of financial year | 14,029,280 | 1,555,551 | 141,346 | 640,440 | 45,739,586 | 21,242,917 | 83,349,120 |
| | | | | | | | |
| *Accumulated depreciation* | | | | | | | |
| Beginning of financial year | - | 94,208 | 31,259 | 200,482 | 10,620,960 | 1,206,667 | 12,153,576 |
| Depreciation charged | 165,050 | 280,685 | 31,745 | 84,106 | 3,578,326 | 2,023,728 | 6,163,640 |
| Disposal | - | - | - | - | (28,836) | - | (28,836) |
| End of financial year | 165,050 | 374,893 | 63,004 | 284,588 | 14,170,450 | 3,230,395 | 18,288,380 |
| | | | | | | | |
| *Net book value* | | | | | | | |
| End of financial year | 13,864,230 | 1,180,658 | 78,342 | 355,852 | 31,569,136 | 18,012,522 | 65,060,740 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

4.    Property, plant and equipment (cont'd)

| | Computers & office equipment USD | Furniture & fittings USD | Motor vehicles USD | Plant & machinery USD | Renovation USD | Total USD |
|---|---|---|---|---|---|---|
| **COMPANY** | | | | | | |
| **2012** | | | | | | |
| *Cost* | | | | | | |
| Beginning of financial year | 111,659 | 25,983 | 439,076 | 14,950,666 | 1,395,617 | 16,923,001 |
| Additions | 168,986 | 46,016 | 59,819 | 11,662,140 | 292,203 | 12,229,164 |
| Transfer from/(to) construction and project work-in-progress | (30,921) | - | - | 180,411 | 1,593,284 | 1,742,774 |
| End of financial year | 249,724 | 71,999 | 498,895 | 26,793,217 | 3,281,104 | 30,894,939 |
| | | | | | | |
| *Accumulated depreciation* | | | | | | |
| Beginning of financial year | 57,725 | 22,661 | 121,536 | 9,016,517 | 1,077,530 | 10,295,969 |
| Depreciation charged | 36,483 | 8,598 | 78,946 | 1,604,443 | 129,137 | 1,857,607 |
| End of financial year | 94,208 | 31,259 | 200,482 | 10,620,960 | 1,206,667 | 12,153,576 |
| | | | | | | |
| *Net book value* | | | | | | |
| End of financial year | 155,516 | 40,740 | 298,413 | 16,172,257 | 2,074,437 | 18,741,363 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

5. **Construction and projects work-in-progress**

| | Building USD | Electrical installation USD | Software USD | Machinery USD | Renovation USD | Total USD |
|---|---|---|---|---|---|---|
| **Group and Company** | | | | | | |
| **2013** | | | | | | |
| *Cost* | | | | | | |
| Beginning of financial year | 13,265,397 | 409,994 | 932,983 | - | - | 14,608,374 |
| Additions | 763,883 | 196,745 | 1,475,153 | - | 15,026,320 | 17,462,101 |
| Transfer to property, plant and equipment | (14,029,280) | (606,739) | (970,008) | - | (15,026,320) | (30,632,347) |
| End of financial year | - | - | 1,438,128 | - | - | 1,438,128 |
| | | | | | | |
| **2012** | | | | | | |
| *Cost* | | | | | | |
| Beginning of financial year | 2,410,634 | - | 94,300 | 46,853 | - | 2,551,787 |
| Additions | 10,854,763 | 2,018,249 | 838,683 | 87,666 | - | 13,799,361 |
| Transfer to property, plant and equipment | - | (1,608,255) | - | (134,519) | - | (1,742,774) |
| End of financial year | 13,265,397 | 409,994 | 932,983 | - | - | 14,608,374 |

Construction and projects work-in-progress are related to property, plant and equipment to be constructed or developed for the Company and the Group and are stated at cost. Transfers are made to property, plant and equipment upon completion.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

6.   Intangible assets

| | Goodwill on consolidation USD | Patent USD | Total USD |
|---|---|---|---|
| **Group** | | | |
| **2013** | | | |
| *Cost* | | | |
| Beginning of financial year | 13,005 | 87,856 | 100,861 |
| Additions | - | 51,143 | 51,143 |
| End of financial year | 13,005 | 138,999 | 152,004 |
| | | | |
| *Accumulated amortisation* | | | |
| Beginning of financial year | - | 6,296 | 6,296 |
| Amortisation charged | - | 3,148 | 3,148 |
| End of financial year | - | 9,444 | 9,444 |
| | | | |
| *Net book value* | | | |
| End of financial year | 13,005 | 129,555 | 142,560 |
| | | | |
| **2012** | | | |
| *Cost* | | | |
| Beginning of financial year | 13,005 | 62,860 | 75,865 |
| Additions | - | 24,996 | 24,996 |
| End of financial year | 13,005 | 87,856 | 100,861 |
| | | | |
| *Accumulated amortisation* | | | |
| Beginning of financial year | - | 3,148 | 3,148 |
| Amortisation charged | - | 3,148 | 3,148 |
| End of financial year | - | 6,296 | 6,296 |
| | | | |
| *Net book value* | | | |
| End of financial year | 13,005 | 81,560 | 94,565 |

Goodwill on consolidation arose from the acquisition of the subsidiary, Helios International Pte. Ltd.

IIA TECHNOLOGIES PTE. LTD.
(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2013

6. **Intangible assets (cont'd)**

| | Goodwill on consolidation USD | Patent USD | Total USD |
|---|---|---|---|
| **Company** | | | |
| **2013** | | | |
| *Cost* | | | |
| Beginning of financial year | - | 87,856 | 87,856 |
| Additions | - | 51,143 | 51,143 |
| End of financial year | - | 138,999 | 138,999 |
| | | | |
| *Accumulated amortisation* | | | |
| Beginning of financial year | - | 6,296 | 6,296 |
| Amortisation charged | - | 3,148 | 3,148 |
| End of financial year | - | 9,444 | 9,444 |
| | | | |
| *Net book value* | | | |
| End of financial year | - | 129,555 | 129,555 |
| | | | |
| **2012** | | | |
| *Cost* | | | |
| Beginning of financial year | - | 62,860 | 62,860 |
| Additions | - | 24,996 | 24,996 |
| End of financial year | - | 87,856 | 87,856 |
| | | | |
| *Accumulated amortisation* | | | |
| Beginning of financial year | - | 3,148 | 3,148 |
| Amortisation charged | - | 3,148 | 3,148 |
| End of financial year | - | 6,296 | 6,296 |
| | | | |
| *Net book value* | | | |
| End of financial year | - | 81,560 | 81,560 |

7. **Investment in subsidiaries**

| | 2013 USD | 2012 USD |
|---|---|---|
| The Company | | |
| Unquoted equity shares, at cost | 50,201 | 201 |

29

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

7. **Investment in subsidiaries (cont'd)**

| Name of Company | Principal activities | Country of incorporation and place of business | Percentage of effective equity held by the Group 2013 % | 2012 % |
|---|---|---|---|---|
| Nozomi Technology Inc** | Stock management | United States of America | 100 | 100 |
| Sungate Oriental Limited** | Investment holding company | British Virgin Islands | 100 | - |
| *Held through Sungate Oriental Limited* | | | | |
| Helios International Pte Ltd* | Business of assembly, construction and sale of chemical vapour deposition machine | Singapore | 100 | 100 |

\* Audited by AT ADLER, Public Accountants and Chartered Accountants, Singapore

\*\* Not required to be audited in the country of incorporation

8. **Inventories**

| | Group 2013 USD | 2012 USD | Company 2013 USD | 2012 USD |
|---|---|---|---|---|
| Raw materials | 461,604 | 177,217 | 440,548 | 177,217 |
| Components and parts | 3,330,653 | 2,141,934 | - | - |
| Work-in-progress | 1,740,197 | 2,401,290 | 1,740,197 | 2,401,290 |
| Finished goods | 2,636,941 | 4,323,976 | 2,636,941 | 522,420 |
| | 8,169,395 | 9,044,417 | 4,817,686 | 3,100,927 |

IIA TECHNOLOGIES PTE. LTD.
(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

NOTES TO THE FINANCIAL STATEMENTS
for the financial year ended 31 March 2013

9.    **Trade and other receivables**

| | Group | | Company | |
|---|---|---|---|---|
| | 2013 USD | 2012 USD | 2013 USD | 2012 USD |
| Trade receivable | | | | |
| - Third parties | 21,795,084 | 1,252,809 | 21,716,092 | 1,252,809 |
| - Fellow subsidiary | - | - | 934,528 | - |
| - Related parties | 3,365,889 | 13,115,711 | 3,239,111 | 12,735,765 |
| | 25,160,973 | 14,368,520 | 25,889,731 | 13,988,574 |
| Other receivables | 1,023 | 7,273 | 2,052 | 7,273 |
| Amounts due from subsidiaries (non-trade) | - | - | 4,267,335 | 3,698,485 |
| Amounts due from related parties (non-trade) | - | 539,123 | - | 539,123 |
| Amounts due from a director | 32,548 | - | 32,548 | - |
| Prepayments | 140,525 | 70,380 | 134,652 | 69,478 |
| Deposits | 1,837,168 | 5,187,790 | 600,817 | 4,523,854 |
| GST receivables | 550,928 | 723,661 | 466,137 | 374,938 |
| | 27,723,165 | 20,896,747 | 31,393,272 | 23,201,725 |

Amounts due from related parties, a director and subsidiaries are unsecure, non-interest bearing and repayable on demand.

In 2012, the Company entered into agreement between its holding company and a related party to offset the balances outstanding as at June 2012 amounting to USD11,264,187 (Note 13). However, during the financial year, the Company has made settlements of the amounts via bank instead of the set-off.

10.   **Share capital**

| | Group and Company | |
|---|---|---|
| | Number of ordinary shares | Amount USD |
| **2013** | | |
| Beginning of financial year | 41,081,508 | 54,767,830 |
| Issuance of shares | 17,000,000 | 17,000,000 |
| End of financial year | 58,081,508 | 71,767,830 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

10. **Share capital (cont'd)**

| | Group and Company | |
| --- | --- | --- |
| | Number of ordinary shares | Amount USD |
| **2012** | | |
| Beginning of financial year | 3,500,001 | 17,186,323 |
| Issuance of shares | 37,581,507 | 37,581,507 |
| End of financial year | 41,081,508 | 54,767,830 |

All issued ordinary shares are fully paid. There is no par value for these ordinary shares.

The holders of ordinary shares are entitled to receive dividends as and when declared by the Company. All ordinary shares carry one vote per share without restrictions.

During the financial year, the Company issued 17,000,000 (2012: 37,581,507) ordinary shares for a total consideration of USD17,000,000 (2012: USD37,581,507) by way of utilisation of credit balance due to holding company.

11. **Finance lease obligations**

| | Minimum payments | | Present value of minimum payments | |
| --- | --- | --- | --- | --- |
| | 2013 USD | 2012 USD | 2013 USD | 2012 USD |
| **Group and Company** | | | | |
| Finance lease payments payable | | | | |
| Within one year | 832,087 | 79,607 | 603,794 | 67,488 |
| Within two to five years | 7,346,772 | 220,388 | 6,409,586 | 197,682 |
| After five years | 1,307,628 | 48,449 | 1,266,328 | 46,454 |
| | 9,486,487 | 348,444 | 8,279,708 | 311,624 |
| Interest allocated to future periods | (1,206,779) | (36,820) | - | - |
| | 8,279,708 | 311,624 | 8,279,708 | 311,624 |

The average effective interest rate is 4.78% (2012: 4.77%) per annum. The terms of the finance lease obligations do not contain any restrictions on the Company's activities concerning dividend payments, obtaining additional borrowings or further leasing.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

12. **Bank loan**

|  | Group and Company | |
|---|---|---|
|  | 2013 USD | 2012 USD |
| Current | 357,805 | - |
| Non-current |  |  |
| - Within 2 to 5 years | 1,587,138 | - |
| - After 5 years | 4,505,994 | - |
|  | 6,450,937 | - |

Bank loan are secured by the Company's leasehold building (Note 4). The loan bears interest at 1.85% (2012: 3.35%) per annum.

13. **Trade and other payable**

|  | Group | | Company | |
|---|---|---|---|---|
|  | 2013 USD | 2012 USD | 2013 USD | 2012 USD |
| Trade payables |  |  |  |  |
| - Third parties | 2,549,494 | 6,069,435 | 389,868 | 4,389,376 |
| - Subsidiaries | - | - | 3,562,421 | - |
| - Related parties | 1,103,485 | 260,772 | 1,103,485 | 251,631 |
|  | 3,652,979 | 6,330,207 | 5,055,774 | 4,641,007 |
| Other payables | 5,968,224 | 3,806,889 | 5,886,580 | 3,806,665 |
| Amounts due to a director (non-trade) | - | 22,514 | - | 22,514 |
| Amounts due to related parties (non-trade) | 2,062,822 | 1,965,669 | 97,153 | - |
| Amounts due to holding company (non-trade) | 5,069,391 | 4,004,187 | 5,069,391 | 4,004,187 |
| Amount due to subsidiary company (non-trade) | - | - | 50,000 | - |
| Accruals | 2,823,812 | 285,886 | 2,449,040 | 110,757 |
|  | 19,577,228 | 16,415,352 | 18,607,938 | 12,585,130 |

Amounts due from related parties, holding company, subsidiary and a director are unsecured, non-interest bearing and repayable on demand.

In 2012, the Company entered into agreement between its holding company and a related party to offset the balances outstanding as at June 2012 amounting to USD11,264,187 (Note 9). However, during the financial year, the Company has made settlements of the amounts via bank instead of the set-off.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

14. **Revenue**

   This represents invoiced value of sales and services rendered during the financial year, less discounts, returns and Goods and Services Tax.

15. **Other income**

| | Group | |
|---|---|---|
| | **2013 USD** | **2012 USD** |
| Interest income | 75 | - |
| Management fees | 55,483 | - |
| Exchange gain | - | 3,610 |
| Other income | 26,239 | 3,988 |
| | 81,797 | 7,598 |

16. **Financial expenses**

| | Group | |
|---|---|---|
| | **2013 USD** | **2012 USD** |
| Bank charges | 36,888 | 14,302 |
| Interest on bank overdrafts | 55 | 54 |
| Interest on finance lease obligations | 168,284 | 14,064 |
| Interest on late payments | 629 | 913 |
| Interest on bank loan | 98,514 | 190,121 |
| | 304,370 | 219,454 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

17. **Profit before income tax**

The following items have been included in arriving at profit before income tax:-

| | Group | |
|---|---|---|
| | **2013**<br>**USD** | **2012**<br>**USD** |
| Depreciation of property, plant and equipment | 6,186,007 | 1,857,607 |
| Amortisation of intangible assets | 3,148 | 3,148 |
| Directors' remuneration and fees | 327,677 | 127,826 |
| Inventories written down to net realisable value | 2,659,016 | - |
| Inventories recognised as cost in cost of sales | 16,840,138 | 8,152,978 |
| Loss/(gain) on foreign exchange | 157,716 | (3,610) |
| Rental of premises and equipment | 1,117,493 | 661,494 |
| Staff cost | | |
| - salaries, bonuses and benefits | 4,727,499 | 2,101,364 |
| - Central Provident Fund | 389,598 | 208,088 |

18. **Income tax expense**

| | Group | |
|---|---|---|
| | **2013**<br>**USD** | **2012**<br>**USD** |
| Tax expense attributable to profit is made up of:- | | |
| *Current tax* | | |
| Under provision for previous year | 26,860 | 13,000 |

The tax expense on the results for the financial year differs from the amount of income tax determined by applying the Singapore Standard rate of income tax to profit before income tax due to the following factors:-

| | Group | |
|---|---|---|
| | **2013**<br>**USD** | **2012**<br>**USD** |
| Profit before income tax | 1,590,010 | 1,889,964 |
| Tax at statutory tax rate of 17% | 270,303 | 321,294 |
| Income not subject to tax | (708) | (46,400) |
| Tax exemption | - | (12,892) |
| Expenses that are not deductible | 494,140 | 57,719 |
| Investment allowance forfeited | 743,349 | - |
| Enhanced allowance | (532,927) | - |
| Pioneer incentive | (1,567,314) | - |
| Under provision for previous year | 26,860 | - |
| Deferred tax asset previously not recognised | 593,157 | (307,506) |
| Others | - | 785 |
| | 26,860 | 13,000 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

18.     **Income tax expense (cont'd)**

The Company was granted a 15-year Pioneer Incentive – Manufacturing with effect from 1 April 2012 subject to the Company meeting certain terms and conditions set out in the letter of offer dated 4 April 2012.

19.     **Significant related party transactions**

In addition to the information disclosed elsewhere in the financial statements, the following significant transactions took place between the Company, the holding company and related parties at terms agreed between the parties:

|  | Group | | Company | |
|---|---|---|---|---|
|  | 2013<br>USD | 2012<br>USD | 2013<br>USD | 2012<br>USD |
| Revenue<br>received/receivable<br>from related parties |  |  |  |  |
| - Sale of goods<br>received/receivable<br>from related parties | 1,985,899 | 3,439,789 | 1,985,899 | 3,439,789 |
| - Management fee | 55,483 | - | 55,483 | - |
| Revenue<br>received/receivable<br>from a subsidiary<br>company |  |  |  |  |
| - Sales of plant and<br>equipment | - | - | 12,178 | - |
| - Management fee | - | - | 934,528 | - |
| Expenses paid/payable<br>to a subsidiary<br>company |  |  |  |  |
| - Purchase of plant and<br>equipment | - | - | 17,314,032 | 9,923,618 |
| Expenses paid/payable<br>to related parties |  |  |  |  |
| - Purchase of goods | 1,177,868 | 965,106 | 1,073,486 | 965,106 |
| - Purchase of plant and<br>equipment | 746,836 | - | 738,704 | - |
| - Management fee | - | 583,947 | - | 583,947 |
| - Purchase of spare parts<br>and tools | 308,938 | - | 308,938 | - |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

19. **Significant related party transactions (cont'd)**

| | Group | | Company | |
|---|---|---|---|---|
| | 2013 USD | 2012 USD | 2013 USD | 2012 USD |
| Expenses paid/payable to a company in which a director is an officer | | | | |
| - Professional fee | 195,754 | 131,732 | 177,568 | 121,156 |

Related parties comprise companies which are controlled or significantly influenced by the Company's directors and their close family members.

There were also advances to and from related parties and payments on behalf for and by related parties. Outstanding balances as at 31 March 2012 are set out in Notes 9 and 13 to the financial statements.

20. **Operating lease commitment**

The future aggregate minimum lease payments under non-cancellable operating leases (with lease term of more than 1 year) contracted for by the company for factory and land at the end of the reporting period but not recognised as liabilities, are as follows:-

| | Group | | Company | |
|---|---|---|---|---|
| | 2013 USD | 2012 USD | 2013 USD | 2012 USD |
| Not later than 1 year | 1,399,905 | 716,315 | 1,121,043 | 716,315 |
| Later than 1 year but not later than 5 years | 1,569,097 | 1,030,206 | 1,313,474 | 1,030,206 |
| Later than 5 years | 4,301,179 | 3,932,117 | 4,301,178 | 3,932,117 |

21. **New or revised accounting standards and interpretations**

Certain new standards, amendments and interpretations to existing standards have been published and are mandatory for the Company's accounting periods beginning after 1 April 2012 or later periods and which the Company has not early adopted. The Company has assessed that these standards, amendments and interpretations are not relevant to the Company and the Group.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

22. **Financial risk management**

The Company's and the Group's overall risk management strategy seeks to minimise adverse effects from the unpredictability of financial markets on the Company's and the Group's financial performance.

The Board is responsible for setting the objectives and underlying principles of financial risk management for the Company and the Group.

The Board reviews and agrees the risk management policies and systems regularly to reflect changes in market conditions, the Company's and the Group's financial position and the nature of its activities. The significant financial risks to which the Company and the Group is exposed are set out below:-

Credit risk

Credit risk refers to the risk that a counter party will default on its contractual obligations resulting in financial loss to the Company and the Group. The major classes of financial assets of the Company and the Group are bank deposits and trade and other receivables.

(a)    Financial assets that are neither past due nor impaired

Bank deposits that are neither past due nor impaired are mainly deposits with regulated financial institutions

(b)    Financial assets that are past due and/or impaired

There is no other class of financial assets that is past due and/or impaired except for trade receivables.

At the end of the reporting period, age analysis of trade receivables past due but not impaired and the concentration of credit risk of trade receivables are as follows:-

| | Group | | Company | |
|---|---|---|---|---|
| | 2013 USD | 2012 USD | 2013 USD | 2012 USD |
| Past due < 3 months | 7,477,401 | 651,460 | 7,477,401 | 651,460 |
| Past due 3 to 6 months | 6,120,501 | 2,391,977 | 6,120,501 | 2,391,977 |
| Past due over 6 months | 5,612,424 | 9,723,321 | 5,612,423 | 9,723,321 |
| | 19,210,326 | 12,766,758 | 19,210,325 | 12,766,758 |
| | | | | |
| Top 1 customer | 12,306,965 | 12,654,108 | 12,306,965 | 12,654,108 |
| Top 2 customers | 10,695,399 | 1,172,973 | 10,695,399 | 1,172,973 |
| | 23,002,364 | 13,827,081 | 23,002,364 | 13,827,081 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

22.   **Financial risk management (cont'd)**

<u>Concentration risk</u>

The Company purchases raw materials from two suppliers for processing and sells the finished product to the suppliers. The total sales and purchases made during the financial year amounted to USD38,159,341 and USD15,555,900 of total sales and purchases.

<u>Capital risk</u>

The Company's and the Group's objectives when managing capital are to safeguard to the Company's and the Group's ability to continue as a going concern and to maintain an optimal capital structure so as to maximise shareholder value. In order to maintain or achieve an optimal capital structure, the Company and the Group may adjust the amount of dividend payment, return capital to shareholders, issue new shares, buy back issued shares, obtain new borrowings or sell assets to reduce borrowings.

The gearing ratio is calculated as net debt divided by total capital. Net debt is calculated as borrowings plus trade and other payables less cash and bank balances. Total capital is calculated as equity plus net debt.

|  | Group | | Company | |
|---|---|---|---|---|
|  | 2013 USD | 2012 USD | 2013 USD | 2012 USD |
| <u>Net debt</u> |  |  |  |  |
| Borrowings | 14,730,645 | 311,624 | 14,730,645 | 311,624 |
| Trade and other payables | 19,577,228 | 16,415,352 | 18,607,938 | 12,585,130 |
| Less: Cash and bank balances | (1,321,490) | (4,077,244) | (952,445) | (3,629,473) |
|  | 32,986,383 | 12,649,732 | 32,386,138 | 9,267,281 |
| <u>Total equity</u> |  |  |  |  |
| Share capital | 71,767,830 | 54,767,830 | 71,767,830 | 54,767,830 |
| Reserves | (2,609,121) | (4,172,271) | (1,264,386) | (4,300,961) |
|  | 69,158,709 | 50,595,559 | 70,503,444 | 50,466,869 |
| Total capital | 102,145,092 | 63,245,291 | 102,889,582 | 59,734,150 |
| Gearing ratio | 32% | 20% | 31% | 16% |

The Company and the Group is not subject to external capital and gearing requirements for the financial years ended 31 March 2013 and 2012.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

22. **Financial risk management (cont'd)**

Liquidity risk

Liquidity risk is the risk that the Company and the Group will encounter difficulty in meeting financial obligations due to shortage of funds. The Company's and the Group's exposure to liquidity risk arises primarily from mismatches of the maturities of financial assets and liabilities. The Company and the Group monitors its liquidity risk and maintains a level of cash and bank balances deemed adequate by management to finance the Company's and the Group's operations and to mitigate the effects of fluctuations in cash flows.

The following are the contractual maturities of financial liabilities, including estimated interest payments and excluding the impact of netting agreements.

| | Group | | | | |
|---|---|---|---|---|---|
| | Carrying amount USD | Contractual cash flows USD | One year or less USD | One to five years USD | Over five years USD |
| **2013** | | | | | |
| **Non-derivative financial liabilities** | | | | | |
| Finance lease obligations | 8,279,708 | 9,486,487 | 832,087 | 7,346,772 | 1,307,628 |
| Bank loan | 6,450,937 | 7,541,209 | 475,591 | 1,993,420 | 5,072,198 |
| Trade and other payables | 19,577,228 | 19,577,228 | 19,577,228 | - | - |
| | 34,307,873 | 36,604,924 | 20,884,906 | 9,340,192 | 6,379,826 |
| | | | | | |
| **2012** | | | | | |
| **Non-derivative financial liabilities** | | | | | |
| Finance lease obligations | 311,624 | 348,444 | 79,607 | 220,388 | 48,449 |
| Trade and other payables | 16,415,532 | 16,415,532 | 16,415,532 | - | - |
| | 16,727,156 | 16,763,976 | 16,495,139 | 220,388 | 48,449 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

22. **Financial risk management (cont'd)**

Liquidity risk (cont'd)

| | Company | | | | |
|---|---|---|---|---|---|
| | Carrying amount USD | Contractual cash flows USD | One year or less USD | One to five years USD | Over five years USD |
| **2013** | | | | | |
| **Non-derivative** **financial liabilities** | | | | | |
| Finance lease obligations | 8,279,708 | 9,486,487 | 832,087 | 7,346,772 | 1,307,628 |
| Bank loan | 6,450,937 | 7,541,209 | 475,591 | 1,993,420 | 5,072,198 |
| Trade and other payables | 18,607,938 | 18,607,938 | 18,607,938 | - | - |
| | 33,338,583 | 35,635,634 | 19,915,616 | 9,340,192 | 6,379,826 |
| **2012** | | | | | |
| **Non-derivative** **financial liabilities** | | | | | |
| Finance lease obligations | 311,624 | 348,444 | 79,607 | 220,388 | 48,449 |
| Trade and other payables | 12,585,130 | 12,585,130 | 12,585,130 | - | - |
| | 12,896,754 | 12,933,574 | 12,664,737 | 220,388 | 48,449 |

Foreign currency risk

The Company and the Group are exposed to foreign currency risk on sales and purchases that are denominated in a currency other than its functional currency. The currencies giving rise to this risk are primarily Singapore dollar.

The Company and the Group do not have a hedging policy on its foreign currency exposure.

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

22. **Financial risk management (cont'd)**

Foreign currency risk (cont'd)

The Company's and the Group's exposure to foreign currency are as follows:

|  | 2013 USD | 2012 USD |
|---|---|---|
| **Group** | | |
| Trade and other receivables | 2,164,136 | 5,889,154 |
| Cash and cash equivalents | 357,385 | 597,642 |
| Finance lease obligations | (8,279,708) | (311,624) |
| Bank loan | (6,450,937) | - |
| Trade and other payables | (7,510,915) | (5,510,144) |
|  | (19,720,039) | 665,028 |
| **Company** | | |
| Trade and other receivables | 1,186,508 | 4,936,343 |
| Cash and cash equivalents | 182,315 | 427,105 |
| Finance lease obligations | (8,279,708) | (311,624) |
| Bank loan | (6,450,937) | - |
| Trade and other payables | (7,044,746) | (4,238,224) |
|  | (20,406,568) | 813,600 |

A 10% strengthening of US dollar against the following currencies at the reporting date would increase/(decrease) equity and profit or loss by the amounts shown below. This analysis assumes that all other variables, in particular interest rates, remain constant.

|  | Equity USD | Profit or loss USD |
|---|---|---|
| **Group** | | |
| **2013** | | |
| SGD | (1,636,763) | (1,636,763) |
| **2012** | | |
| SGD | 55,197 | 55,197 |

**IIA TECHNOLOGIES PTE. LTD.**
**(FORMERLY KNOWN AS THE GEMESIS COMPANY (S) PTE. LTD.)**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2013

22. **Financial risk management (cont'd)**

Sensitivity analysis for foreign currency risk (cont'd)

| | Equity USD | Profit or loss USD |
|---|---|---|
| **Company** | | |
| **2013** | | |
| SGD | (1,693,745) | (1,693,745) |
| | | |
| **2012** | | |
| SGD | 67,529 | 67,529 |

A 10% weakening of US dollar against the above currencies would have had the equal but opposite effect on the above currencies to the amounts shown above, on the basis that all other variables remain constant.

23. **Capital commitment**

As at the end of the year, commitments for capital expenditure not provided for in the financial statement are as follows:

| | 2013 USD | 2012 USD |
|---|---|---|
| Expenditure approved and contracted for in respect of construction works and other projects | 1,361,938 | 3,266,598 |
| | | |
| Expenditure approved in respect of construction works and other projects | 4,991,056 | 9,176,025 |

24. **Subsequent events**

Subsequent to the balance sheet date, the Company had paid SGD195,805 (equivalent to USD157,447) for the termination of the lease of one of the rented factories.

25. **Authorisation of financial statements**

These financial statements were authorised for issue in accordance with a resolution of the Board of Directors of IIA Technolges Pte. Ltd. (formerly known as The Gemesis Company (S) Pte. Ltd.) on 31 July 2013.

**IIA TECHNOLOGIES PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)


**REPORTS AND FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 31 MARCH 2014**

**IIA TECHNOLOGIES PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

REPORTS AND FINANCIAL STATEMENTS
31 MARCH 2014

C O N T E N T S

| | Page |
|---|---|
| Directors' Report | 1 - 2 |
| Statement by Directors | 3 |
| Independent Auditor's Report | 4 - 5 |
| Balance Sheet | 6 |
| Statement of Comprehensive Income | 7 |
| Statement of Changes in Equity | 8 |
| Statement of Cash Flow | 9 - 10 |
| Notes to the Financial Statements | 11 - 47 |

**IIA TECHNOLOGIES PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**DIRECTORS' REPORT**

The directors present their report to the members together with the audited consolidated financial statements of IIA Technologies Pte. Ltd. (the "Company") and its subsidiaries (collectively, the "Group") for the financial year ended 31 March 2014, and the balance sheet of the Company as at 31 March 2014.

**Directors**

The directors of the Company in office at the date of this report are as follows:

Vishal Jatin Mehta
Sonia Jatin Mehta                                       (Non-executive director)
Girija Prasad Pande
Suraj Jatin Mehta                                       (Non-executive director)
Misra Devi Shanker
Tan Teck Nguan Michael

**Arrangements to enable directors to acquire shares and debentures**

Neither at the end of nor at any time during the financial year was the Company a party to any arrangement whose object was to enable the directors of the Company to acquire benefits by means of the acquisition of shares in, or debentures of, the Company or any other body corporate.

**Directors' interests in shares and debentures**

The interest of the directors who held office at the end of the financial year in the shares and debentures of the Company and related corporation were as follows:

|  | Holdings registered in name of director or nominee | | Holdings in which a director is deemed to have an interest | |
| --- | --- | --- | --- | --- |
|  | At 31.03.2014 | At 01.04.2013 | At 31.03.2014 | At 01.04.2013 |
|  | (No. of Ordinary shares) | | (No. of Ordinary shares) | |
| Company IIA Technologies Pte. Ltd. |  |  |  |  |
| Sonia Jatin Mehta | 1,000,000 | 1,000,000 | 18,266,083 | 57,081,508 |
| Vishal Jatin Mehta | - | - | 35,961,350 | - |
| Misra Devi Shanker | - | - | 2,854,075 | - |

**IIA TECHNOLOGIES PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

## DIRECTORS' REPORT

**Directors' contractual benefits**

Since the end of the previous financial year, no director has received or become entitled to receive a benefit by reason of a contract made by the Company or a related corporation with the director or with a firm of which he is a member or with a company in which he has a substantial financial interest, except as disclosed in the accompanying financial statements and in this report.

**Share options**

*(a)  Options to take up unissued shares*

During the financial year, no option to take up unissued shares of the Company or its subsidiaries was granted.

*(b)  Unissued shares under option and options exercised*

During the financial year, there were no shares of the Company or its subsidiaries issued by virtue of the exercise of an option to take up unissued shares.

At the end of the financial year, there were no unissued shares under option.

**Independent auditor**

The independent auditor, AT ADLER, Public Accountants and Chartered Accountants, has expressed willingness to accept re-appointment.

On behalf of the Board of Directors

**Vishal Jatin Mehta**
Director

**Tan Teck Nguan Michael**
Director

Dated: 9 June 2014

2

IIA TECHNOLOGIES PTE. LTD.
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

## STATEMENT BY DIRECTORS

In the opinion of the directors,

(a) the financial statements of the Company and the consolidated financial statements of the Group are drawn up so as to give a true and fair view of the state of affairs of the Company and of the Group as at 31 March 2014 and of the results of the business, changes in equity and cash flows of the Group for the financial year then ended in accordance with the provision of the Singapore Companies Act, Chapter 50 and Singapore Financial Reporting Standards; and

(b) at the date of this statement, there are reasonable grounds to believe that the Company will be able to pay its debts as and when they fall due.

On behalf of the Board of Directors

**Vishal Jatin Mehta**
Director

**Tan Teck Nguan Michael**
Director

Dated: 9 June 2014

3

**INDEPENDENT AUDITOR'S REPORT TO THE MEMBERS OF
IIA TECHNOLOGIES PTE. LTD.**
**for the financial year ended 31 March 2014**
Company Registration No. 200516961K
(Incorporated in Singapore)

**AT ADLER**
Chartered Accountants

**Report on the Financial Statements**

We have audited the accompanying financial statements of IIA Technologies Pte. Ltd. (the "Company") and its subsidiaries (collectively, the "Group"), which comprise the balance sheets of the Company and of the Group as at 31 March 2014, and the consolidated statement of comprehensive income, consolidated statement of changes in equity and the consolidated statement of cash flow of the Group for the financial year then ended, and a summary of significant accounting policies and other explanatory notes.

*Management's Responsibility for the Financial Statements*

Management is responsible for the preparation of financial statements that give a true and fair view in accordance with the provisions of the Singapore Companies Act, Chapter 50 (the "Act") and Singapore Financial Reporting Standards, and for devising and maintaining a system of internal accounting controls sufficient to provide a reasonable assurance that assets are safeguarded against loss from unauthorised use or disposition; and transactions are properly authorised and that they are recorded as necessary to permit the preparation of true and fair profit and loss accounts and balance sheets and to maintain accountability of assets.

*Auditor's Responsibility*

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with Singapore Standards on Auditing. Those Standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgement, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation of the financial statements that give a true and fair view in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

4

**INDEPENDENT AUDITOR'S REPORT TO THE MEMBERS OF**
**IIA TECHNOLOGIES PTE. LTD.**
**for the financial year ended 31 March 2014**
Company Registration No. 200516961K
(Incorporated in Singapore)

ATADLER
Chartered Accountants

*Opinion*

In our opinion, the consolidated financial statements of the Group and the balance sheet of the Company, are properly drawn up in accordance with the provisions of the Act and Singapore Financial Reporting Standards so as to give a true and fair view of the state of affairs of the Group and of the Company as at 31 March 2014, and the results, changes in equity and cash flows of the Group for the financial year ended on that date.

*Emphasis of Matter*

Without qualifying our opinion, we draw your attention to Note 22(ii) to the financial statements. Due to the specialised nature of the Group's operations, the Group's sales and purchases are concentrated with 2 key customers who are also the suppliers. For the year ended 31 March 2014, the sales with these customers amounted to USD66,173,000 of the Group's total revenue of USD78,939,539. Changes to the business of the key customers or the credit standing of the key customers may result in significant financial impact to the Group and the Company as the operating cash flows of the Group and the Company are dependent on the collections from these customers.

**Report on Other Legal and Regulatory Requirements**

In our opinion, the accounting and other records required by the Act to be kept by the Company and by the subsidiary incorporated in Singapore of which we are the auditors have been properly kept in accordance with the provisions of the Act.

*AT ADLER*

**AT ADLER**
Public Accountants and Chartered Accountants

Singapore, 9 June 2014

**IIA TECHNOLOGIES PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**BALANCE SHEET**
as at 31 March 2014

| | | The Group | | The Company | |
|---|---|---|---|---|---|
| | Note | 2014 USD | 2013 USD | 2014 USD | 2013 USD |
| **ASSETS** | | | | | |
| **Non-current assets** | | | | | |
| Property, plant and equipment | 4 | 73,923,442 | 64,711,704 | 74,291,416 | 65,060,740 |
| Construction and projects work-in-progress | 5 | 808,877 | 1,438,128 | 808,877 | 1,438,128 |
| Intangible assets | 6 | 352,588 | 142,560 | 339,583 | 129,555 |
| Investment in subsidiaries | 7 | - | - | 50,001 | 50,201 |
| | | 75,084,907 | 66,292,392 | 75,489,877 | 66,678,624 |
| **Current assets** | | | | | |
| Inventories | 8 | 14,840,716 | 9,349,211 | 11,166,153 | 4,817,686 |
| Trade and other receivables | 9 | 30,902,138 | 26,543,349 | 35,493,357 | 31,393,272 |
| Cash and bank balances | | 980,540 | 1,321,490 | 802,540 | 952,445 |
| | | 46,723,394 | 37,214,050 | 47,462,050 | 37,163,403 |
| **TOTAL ASSETS** | | 121,808,301 | 103,506,442 | 122,951,927 | 103,842,027 |
| **EQUITY AND LIABILITIES** | | | | | |
| **Equity attributable to equity holders of the Company** | | | | | |
| Share capital | 10 | 71,767,830 | 71,767,830 | 71,767,830 | 71,767,830 |
| Retained earnings/ (accumulated losses) | | 7,392,454 | (2,609,121) | 10,302,973 | (1,264,386) |
| **Total equity** | | 79,160,284 | 69,158,709 | 82,070,803 | 70,503,444 |
| **Non-current liabilities** | | | | | |
| Finance lease obligations | 11 | 6,169,317 | 7,675,914 | 6,169,317 | 7,675,914 |
| Bank loans | 12 | 20,270,913 | 6,093,132 | 20,270,913 | 6,093,132 |
| | | 26,440,230 | 13,769,046 | 26,440,230 | 13,769,046 |
| **Current liabilities** | | | | | |
| Trade and other payables | 13 | 10,988,995 | 19,577,228 | 9,222,102 | 18,607,938 |
| Finance lease obligations | 11 | 1,527,254 | 603,794 | 1,527,254 | 603,794 |
| Bank loans | 12 | 3,691,538 | 357,805 | 3,691,538 | 357,805 |
| Income tax liabilities | | - | 39,860 | - | - |
| | | 16,207,787 | 20,578,687 | 14,440,894 | 19,569,537 |
| **Total liabilities** | | 42,648,017 | 34,347,733 | 40,881,124 | 33,338,583 |
| **TOTAL EQUITY AND LIABILITIES** | | 121,808,301 | 103,506,442 | 122,951,927 | 103,842,027 |

*The annexed notes form an integral part of and should be read in conjunction with these financial statements.*

IIA TECHNOLOGIES PTE. LTD.
AND ITS SUBSIDIARIES
Company Registration No. 200516961K
(Incorporated in Singapore)

## STATEMENT OF COMPREHENSIVE INCOME
for the financial year ended 31 March 2014

| | | The Group | |
| --- | --- | --- | --- |
| | Note | 2014 USD | 2013 USD |
| **Continuing operations** | | | |
| Revenue | 14 | 78,939,539 | 42,223,496 |
| Cost of sales | | (62,486,900) | (36,727,927) |
| Gross profit | | 16,452,639 | 5,495,569 |
| Other income | 15 | 328,900 | 81,797 |
| | | 16,781,539 | 5,577,366 |
| Administrative expenses | | (3,384,885) | (2,620,300) |
| Distribution and selling expenses | | (405,554) | (458,080) |
| Financial expenses | 16 | (856,183) | (304,370) |
| Other expenses | | (2,166,124) | (604,606) |
| Profit before income tax | 17 | 9,968,793 | 1,590,010 |
| Income tax credit/(expense) | 18 | 32,782 | (26,860) |
| **Total profit after income tax** | | 10,001,575 | 1,563,150 |
| **Other comprehensive income** | | - | - |
| **Total comprehensive income** | | 10,001,575 | 1,563,150 |

*The annexed notes form an integral part of and should be read in conjunction with these financial statements.*

**IIA TECHNOLOGIES PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**STATEMENT OF CHANGES IN EQUITY**
for the financial year ended 31 March 2014

| | Share capital USD | Retained earnings/ (Accumulated losses) USD | Total equity USD |
|---|---|---|---|
| **2014** | | | |
| **Beginning of financial year** | 71,767,830 | (2,609,121) | 69,158,709 |
| Total comprehensive income for the year | - | 10,001,575 | 10,001,575 |
| **End of financial year** | 71,767,830 | 7,392,454 | 79,160,284 |
| | | | |
| **2013** | | | |
| **Beginning of financial year** | 54,767,830 | (4,172,271) | 50,595,559 |
| Issuance of share capital (Note 10) | 17,000,000 | - | 17,000,000 |
| Total comprehensive income for the year | - | 1,563,150 | 1,563,150 |
| **End of financial year** | 71,767,830 | (2,609,121) | 69,158,709 |

*The annexed notes form an integral part of and should be read in conjunction with these financial statements.*

**IIA TECHNOLOGIES PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**STATEMENT OF CASH FLOW**
for the financial year ended 31 March 2014

| | The Group | |
| --- | --- | --- |
| | 2014 USD | 2013 USD |
| **Cash flows from operating activities** | | |
| Profit before income tax | 9,968,793 | 1,590,010 |
| Adjustments for: | | |
| - Depreciation of property, plant and equipment | 7,882,239 | 6,186,007 |
| - Amortisation of intangible assets | 14,855 | 3,148 |
| - Inventories written down to net realisable value | - | 2,659,016 |
| - Loss on disposal of property, plant and equipment | 210,065 | - |
| - Gain on disposal of subsidiary | (57,202) | - |
| - Interest expenses | 856,183 | 267,482 |
| - Interest income | (81) | (75) |
| Operating cash flow before working capital changes | 18,874,852 | 10,705,588 |
| | | |
| Changes in working capital: | | |
| - Inventories | (6,671,321) | (1,783,994) |
| - Trade and other receivables | (3,217,867) | (6,793,870) |
| - Trade and other payables | (7,364,696) | 1,917,651 |
| Cash generated from operations | 1,620,968 | 4,045,375 |
| Income tax paid | (7,078) | - |
| **Net cash flows generated from operating activities** | 1,613,890 | 4,045,375 |
| | | |
| **Cash flows from investing activities** | | |
| Acquisition of property, plant and equipment | (15,944,856) | (9,654,731) |
| Proceeds from disposal of property, plant and equipment | 538,447 | - |
| Net cash inflow on disposal of subsidiary (Note A) | 1,200 | - |
| Payment of construction and project work-in-progress | (863,934) | (17,462,101) |
| Acquisition of intangible assets | (224,883) | (51,143) |
| Interest received | 81 | 75 |
| **Net cash flows used in investing activities** | (16,493,945) | (27,167,900) |
| | | |
| **Cash flows from financing activities** | | |
| Amount due (from)/to holding company | (114,043) | 18,065,204 |
| Amount due to/(from) directors | 11,001 | (55,062) |
| Amount due (from)/to related parties | (999,913) | 201,535 |
| Interest paid | (856,183) | (267,482) |
| Proceeds from/(repayment of) bank loans (net) | 17,511,514 | 6,450,937 |
| Repayment of finance lease obligations | (1,013,271) | (4,028,361) |
| **Net cash flows generated from financing activities** | 14,539,105 | 20,366,771 |
| | | |
| **Net decrease in cash and bank balances** | (340,950) | (2,755,754) |
| Cash and bank balances at beginning of financial year | 1,321,490 | 4,077,244 |
| **Cash and bank balances at end of financial year** | 980,540 | 1,321,490 |

*The annexed notes form an integral part of and should be read in conjunction with these financial statements.*

**IIA TECHNOLOGIES PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**STATEMENT OF CASH FLOW**
for the financial year ended 31 March 2014

Note A – Cash inflow on disposal of subsidiary

The net assets of subsidiary disposed are:

|  | The Group 2014 USD |
|---|---|
| Property, plant and equipment | 26,307 |
| Cash and cash equivalents | 98,800 |
| Trade and other receivables | 231,158 |
| Trade and other payables | (313,467) |
| Net assets | 42,798 |
| Gain on disposal of subsidiary | 57,202 |
| Consideration | 100,000 |
| Less: Cash and cash equivalents in subsidiary disposed | (98,800) |
| Net cash inflow on disposal | 1,200 |

**IIA TECHNOLOGIES PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)


**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2014


These notes form an integral part of and should be read in conjunction with the accompanying financial statements.


1. **General information**

    IIA Technologies Pte. Ltd. (the "Company") is incorporated and domiciled in Singapore. The address of its registered office is at 65 Chulia Street #38-02/3 OCBC Centre, Singapore 049513 and the principal place of business is at 17 Tukang Innovation Drive, Singapore 618300.

    The principal activities of the Company are growing of diamonds. The principal activities of its subsidiaries are set up in Note 7 to the financial statements. There have been no significant changes in such activities during the financial year.

    The Company is a subsidiary of JRD International Limited, a company incorporated in the Bahamas Island, which is also its ultimate holding company.

    The consolidated financial statements relate to the Company and its subsidiaries.


2. **Significant accounting policies**

2.1 **Basis of preparation**

    The consolidated financial statements of the Company and the Group have been prepared in accordance with Singapore Financial Reporting Standards ("FRS"). The consolidated financial statements have been prepared under the historical cost convention, except as otherwise disclosed in the accounting policies stated below.

    The preparation of financial statements in conformity with FRS requires management to make judgements, estimates and assumptions that affect the application of accounting policies and the reported amounts of assets, liabilities, income and expenses. Actual results may differ from these estimates. The areas involving a higher degree of judgement or complexity, or areas where assumptions and estimates are significant to the financial statements, are disclosed in Note 3.

2.2 **Adoption of new and revised standards**

    In the current financial year, the Company has adopted all the new or revised FRS and Interpretations to FRS ("INT FRS") that are relevant to its operations and effective for annual periods beginning on 1 April 2013. Changes to the Company's accounting policies have been made as required, in accordance with the relevant transitional provisions in the respective FRS and INT FRS.

**IIA TECHNOLOGIES PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2014

2.    **Significant accounting policies (cont'd)**

2.2    **Adoption of new and revised standards (cont'd)**

The adoption of these new or amended FRS and INT FRS did not result in substantial changes to the Company's accounting policies and had no material effect on the amounts reported for the current or prior financial years.

2.3    **Group accounting**

(a)    Basis of consolidation

Subsidiaries are entities (including special purpose entities) over which the Group has power to govern the financial and operating policies so as to obtain benefits from its activities, generally accompanied by a shareholding giving rise to a majority of the voting rights. The existence and effect of potential voting rights that are currently exercisable or convertible are considered when assessing whether the Group controls another entity. Subsidiaries are consolidated from the date on which control is transferred to the Group. They are deconsolidated from the date on which control ceases. In preparing the consolidated financial statements, transactions, balances and unrealised gains on transactions between group entities are eliminated. Unrealised losses are also eliminated but are considered an impairment indicator of the assets transferred. Accounting policies of subsidiaries have been changed where necessary to ensure consistency with the policies adopted by the Group.

(b)    Acquisition of businesses

The acquisition method of accounting is used to account for business combinations by the Group.

The consideration transferred for the acquisition of a subsidiary comprises the fair value of the assets transferred, the liabilities incurred and the equity interests issued by the Group. The consideration transferred also includes the fair value of any contingent consideration arrangement and the fair value of any pre-existing equity interest in the subsidiary.

Acquisition-related costs are expenses as incurred.

Identifiable assets acquired and liabilities and contingent liabilities assumed in a business combination are, with limited exceptions, measured initially at their fair values at the acquisition date.

The excess of the consideration transferred, the amount of any non-controlling interest in the acquire and acquisition-date fair value of any previous equity interest in the acquiree over the fair value of the net identifiable assets acquired is recorded as goodwill.

**IIA TECHNOLOGIES PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2014

2. **Significant accounting policies (cont'd)**

2.4 **Currency translation**

(a) Functional and presentation currency

Items included in the financial statements of the Company and the Group are measured using the currency of the primary economic environment in which the Company and the Group operates ("functional currency"). The financial statements are presented in United States Dollar, which is the functional currency of the Company and the Group.

(b) Transactions and balances

Transactions in a currency other than the functional currency ("foreign currency") are translated into the functional currency using the exchange rates at the dates of the transaction. Currency translation differences resulting from the settlement of such transactions and from the translation of monetary assets and liabilities denominated in foreign currencies at the closing rates at the balance sheet date are recognised in the profit or loss.

Non-monetary items measured at fair value in a foreign currency are translated using the exchange rates at the date when the fair value was determined.

2.5 **Revenue recognition**

Revenue is recognised to the extent that it is probable that the economic benefits will flow to the Group and the revenue can be reliably measured.

Revenue from sales of goods is recognised when the significant risks and rewards of ownership have been transferred to the buyer, recovery of the consideration is probable, the associated costs and possible return of goods can be estimated reliably, there is no continuing management involvement with the goods, and the amount of revenue can be measured reliably.

Revenue from services are recognised upon completion of services.

2.6 **Intangible assets**

Intangible assets acquired separately are measured initially at cost. The cost of intangible assets acquired in a business combination is their fair value as at the date of acquisition. Subsequent to the initial acquisition, intangible assets are measured at cost less any accumulated amortisation and accumulated impairment losses.

Intangible assets with finite useful lives are amortised over the estimated useful lives and assessed for impairment whenever there is an indication that the intangible asset may be impaired. The amortisation period and the amortisation method are reviewed at least at the end of each reporting period.

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2014

2. **Significant accounting policies (cont'd)**

2.6 **Intangible assets (cont'd)**

Intangible assets with indefinite useful lives or not yet available for use are tested for impairment annually or more frequently if the events and circumstances indicate that the carrying value may be impaired either individually or at the cash-generating unit level. Such intangible assets are not amortised. The useful life of an intangible asset with an indefinite useful life is reviewed annually to determine whether the useful life assessment continues to be supportable.

2.7 **Inventories**

Inventories are valued at lower of cost and net realisable value. Cost is being determined on the specific identification basis and includes all costs in bringing the inventories to their present location and condition. In the case of manufactured inventories and work-in-progress, cost includes an appropriate share of production overheads based on normal operating capacity. Net realisable value is the price at which the inventories can be realised in the normal course of business after allowing for the cost of realisation. Provision is made, where necessary, for all obsolete and slow moving items.

2.8 **Property, plant and equipment**

Property, plant and equipment are stated at cost less accumulated depreciation and accumulated impairment loss. The cost of property, plant and equipment includes expenditure that is directly attributable to the acquisition of the items. Dismantlement, removal or restoration costs are included as part of the cost of property, plant and equipment if the obligation for dismantlement, removal or restoration is incurred as a consequence of acquiring or using the items.

Depreciation is calculated on the straight-line method to allocate the depreciable amount over their estimated useful lives as follows:-

|  | Useful lives |
| --- | --- |
| Leasehold building | 30 years |
| Computers & office equipment | 3 – 5 years |
| Furniture & fittings | 3 years |
| Motor vehicle | 6 years |
| Plant and machinery | 3 – 10 years |
| Renovation | 3 – 10 years |

The residual values and useful lives of property, plant and equipment are reviewed and adjusted as appropriate at the end of each reporting period. On disposal of an item of property, plant and equipment, the difference between the net disposal proceeds and its carrying amount is taken to the statement of comprehensive income. Fully depreciated items are retained in the financial statements until they are no longer in use and no further charge for the depreciation is made in respect of these items.

**IIA TECHNOLOGIES PTE. LTD.
AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2014

2.  **Significant accounting policies (cont'd)**

2.9  **Construction and projects work-in-progress**

Construction and projects work-in-progress relates to the construction of the factory building and plant and equipment for the Company and the Group and are stated at cost, less impairment. Construction and projects work-in-progress for capital expenditure are transferred to property, plant and equipment upon completion.

2.10  **Related party**

A related party is an entity or person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common or joint control with, the entity in governing the financial and operating policies, or that has an interest in the entity that gives it significant influence over the entity in financial and operating decisions, it also includes members of the key management personnel or close members of family of any individual referred to herein and others who have the ability to control, jointly control or significantly influence by or for which significant voting power in such entity resides with, directly or indirectly, any such individual. This includes parents, subsidiaries, fellow subsidiaries, associates, joint ventures and post-employment benefit plans, if any.

2.11  **Impairment of non-financial assets**

The Company and the Group assesses at each reporting date whether there is an indication that an asset may be impaired. If any such indication exists, or when annual impairment assessment for an asset is required, the Company and the Group makes an estimate of the asset's recoverable amount.

An asset's recoverable amount is the higher of an asset's or cash-generating unit's fair value less costs to sell and its value in use and is determined for an individual asset, unless the asset does not generate cash inflows that are largely independent of those from other assets or group of assets. Where the carrying amount of an asset or cash-generating unit exceeds its recoverable amount, the asset is considered impaired and is written down to its recoverable amount. In assessing value in use, the estimated future cash flows expected to be generated by the asset are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset.

Impairment losses are recognised in the profit or loss, except for assets that are previously revalued where the revaluation was taken to other comprehensive income. In this case the impairment is also recognised in other comprehensive income up to the amount of any previous revaluation.

**IIA TECHNOLOGIES PTE. LTD.
AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2014

2.      **Significant accounting policies (cont'd)**

2.11    **Impairment of non-financial assets (cont'd)**

For assets excluding goodwill, an assessment is made at each reporting date as to whether there is any indication that previously recognised impairment losses may no longer exist or may have decreased. If such indication exists, the Company and the Group estimates the asset's or cash-generating unit's recoverable amount. A previously recognised impairment loss is reversed only if there has been a change in the estimates used to determine the asset's recoverable amount since the last impairment loss was recognised. If that is the case, the carrying amount of the asset is increased to its recoverable amount. That increase cannot exceed the carrying amount that would have been determined, net of depreciation, had no impairment loss be recognised previously. Such reversal is recognised in the profit or loss unless the asset is measured at revalued amount, in which case the reversal is treated as a revaluation increase.

2.12    **Financial instruments**

(a)     Non-derivative financial assets

The Company and the Group initially recognises loans and receivables and deposits on the date that they are originated. All other financial assets (including assets designated at fair value through profit or loss) are recognised initially on the trade date at which the Company and the Group becomes a party to the contractual provisions of the instrument.

The Company and the Group derecognises a financial asset when the contractual rights to the cash flows from the asset expire, or it transfers the rights to receive the contractual cash flows on the financial asset in a transaction in which substantially all the risks and rewards of ownership of the financial asset are transferred. Any interest in transferred financial assets that is created or retained by the Company and the Group is recognised as a separate asset or liability.

Financial assets and liabilities are offset and the net amount presented in the balance sheet when, and only when, the Company and the Group has a legal right to offset the amounts and intends either to settle on a net basis or to realise the asset and settle the liability simultaneously.

The Company and the Group classifies its non-derivative financial assets into the following category: loan and receivables.

**IIA TECHNOLOGIES PTE. LTD.
AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)

**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2014

2.  **Significant accounting policies (cont'd)**

2.12  **Financial instruments (cont'd)**

(a)  Non-derivative financial assets (cont'd)

*Loans and receivables*
Loans and receivables are financial assets with fixed or determinable payments that are not quoted in an active market. Such assets are recognised initially at fair value plus any directly attributable transaction costs. Subsequent to initial recognition, loans and receivables are measured at amortised costs using the effective interest method, less any impairment losses.

Loans and receivables comprise cash and bank balances, and trade and other receivables.

(b)  Non-derivative financial liabilities

The Company and the Group initially recognises debt securities issued and subordinated liabilities on the date that they are originated. All other financial liabilities (including liabilities designated at fair value through profit or loss) are recognised initially on the trade date, which is the date that the Company and the Group becomes a party to the contractual provisions of the instrument.

The Company and the Group derecognises a financial liability when its contractual obligations are discharged, cancelled or expired.

Financial assets and liabilities are offset and the net amount presented in the balance sheet when, and only when the Company and the Group has a legal right to offset the amounts and intends either to settle on a net basis or to realise the asset and settle the liability simultaneously.

Non-derivative financial liabilities are recognised initially at fair value plus any directly attributable transaction costs. Subsequent to initial recognition, these financial liabilities are measured at amortised cost using the effective interest method.

The Company and the Group has the following non-derivative financial liabilities: trade and other payables, bank loans and finance lease obligatons.

(c)  Share capital

*Ordinary shares*
Ordinary shares are classified as equity. Incremental costs directly attributable to the issue of ordinary shares are recognised as a deduction from equity, net of any tax effects.

**IIA TECHNOLOGIES PTE. LTD.**
**AND ITS SUBSIDIARIES**
Company Registration No. 200516961K
(Incorporated in Singapore)


**NOTES TO THE FINANCIAL STATEMENTS**
for the financial year ended 31 March 2014


## 2.    Significant accounting policies (cont'd)

### 2.13    Impairment of non-derivative financial assets

A financial asset not carried at fair value through profit or loss is assessed at each reporting date to determine whether there is objective evidence that it is impaired. A financial asset is impaired if objective evidence indicates that a loss event has occurred after the initial recognition of the asset, and that the loss event has a negative effect on the estimated future cash flows of that asset that can be estimated reliably.

Objective evidence that financial assets (including equity securities) are impaired can include default or delinquency by a debtor, restructuring of an amount due to the Company and the Group on terms that the Company and the Group would not consider otherwise, indications that a debtor or issuer will enter bankruptcy, adverse changes in the payment status of borrowers or issuers in the Company and the Group, economic conditions that correlate with defaults or the disappearance of an active market for a security. In addition, for an investment in an equity security, a significant or prolonged decline in its fair value below its cost is objective evidence of impairment.

*Loans and receivables*
The Company and the Group considers evidence of impairment for loans and receivables at both a specific asset and collective level. All individually significant loans and receivables are assessed for specific impairment. All individually significant loans and receivables found not to be specifically impaired are then collectively assessed for any impairment that has been incurred but not yet identified. Loans and receivables that are not individually significant are collectively assessed for impairment by grouping together loans and receivables with similar risk characteristics.

In assessing collective impairment, the Company and the Group uses historical trends of the probability of default, timing of recoveries and the amount of loss incurred, adjusted for management's judgement as to whether current economic and credit conditions are such that the actual losses are likely to be greater or less than suggested by historical trends.

An impairment loss in respect of a financial asset measured at amortised cost is calculated as the difference between its carrying amount and the present value of the estimated future cash flows, discounted at the asset's original effective interest rate. Losses are recognised in profit or loss and reflected in an allowance account against loans and receivables. Interest on the impaired asset continues to be recognised. When a subsequent event (e.g. repayment by a debtor) causes the amount of impairment loss to decrease, the decrease in impairment loss is reversed through profit or loss.

### 2.14    Fair value estimation of financial assets and liabilities

The fair values of current financial assets and liabilities carried at amortised cost approximate their carrying amounts.