UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In Re* Ex Parte Application of<br><br>ELEMENT SIX TECHNOLOGIES LIMITED<br><br>               Applicant,<br><br>    -against-<br><br>Pure Grown Diamonds, Inc.<br><br>             Respondent. | Case No. 1:18-mc-00418<br><br><br>**RESPONDENT PURE GROWN DIAMONDS' OPPOSITION TO ELEMENT SIX TECHNOLOGIES LIMITED'S APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782** |

**RESPONDENT PURE GROWN DIAMONDS' MEMORANDUM OF LAW
IN OPPOSITION TO ELEMENT SIX TECHNOLOGIES LIMITED'S
APPLICATION PURSUANT TO 28 U.S.C. § 1782**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................1

I.    FACTUAL AND PROCEDURAL BACKGROUND......................................4

    A.    THE GROWN DIAMOND MARKET ...........................................4

    B.    THE SINGAPORE LITIGATION .................................................5

II.    ARGUMENT .........................................................................................7

    A.    LEGAL STANDARD.....................................................................7

    B.    ELEMENT SIX FAILS TO MEET THE STATUTORY "FOR USE" REQUIREMENT .........................................................................8

    C.    THE COURT SHOULD EXERCISE ITS DISCRETION TO DENY THIS APPLICATION UNDER ALL FOUR *INTEL* FACTORS ...............................13

        1.    The Documents and Testimony Sought are Within the Reach of the Singapore Courts Without the Aid of § 1782. ...........................13

        2.    The Singapore Court Would Not Be Receptive to § 1782 Assistance. ...................................................................................14

        3.    The § 1782 Application Seeks to Circumvent the Discovery Orders of the Singapore Court. ...............................................................17

        4.    The Discovery Sought from PGD is Unduly Burdensome. .......................19

    D.    If the Application Is Granted, the Court Should Allow PGD to Object to the Subpoena..............................................................23

CONCLUSION...............................................................................24

# **TABLE OF AUTHORITIES**

**Page**

### **Cases**

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
  785 F. Supp. 2d 434 (S.D.N.Y. 2011) ........................................................................... 9

*Aventis Pharma v. Wyeth*,
  2009 WL 3754191 (S.D.N.Y. Nov. 9, 2009) ...................................................... 18, 23

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
  673 F.3d 76 (2d Cir. 2012) ........................................................................................... 8

*Canales Martinez v. Dow Chem. Co.*,
  219 F. Supp. 2d 719 (E.D. La. 2002) ........................................................................ 15

*In re Cathode Ray Tube (CRT) Antitrust Litig*,
  2013 WL 183944 ......................................................................................................... 19

*Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*,
  798 F.3d 113 (2d Cir. 2015) ......................................................................................... 8

*Evergreen Marine Corp. (Taiwan) v. Glob. Terminal & Container Servs., Inc.*,
   (S.D.N.Y. Nov. 9, 2000) ............................................................................................ 14

*Farrell Lines Inc. v. Columbus Cello-Poly Corp.*,
  32 F. Supp. 2d 118 (S.D.N.Y. 1997) ........................................................................ 15

*Gushlak v. Gushlak*,
  486 F. App'x 215 (2d Cir. 2012) ............................................................................... 23

*In re Apotex Inc.*,
  2009 WL 618243 (S.D.N.Y. Mar. 9, 2009) .............................................................. 20

*In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*,
  121 F.3d 77 (2d Cir. 1997) ......................................................................................... 22

*In re Application of Caratube Int'l Oil Co., LLP*,
  730 F. Supp. 2d 101 (D.D.C. 2010) .......................................................................... 18

*In re Application of Operacion y Supervision de Hoteles, S.A. de C .V. for an Order to
  Conduct Discovery for Use in a Foreign Proceeding*,
  No. 14 MISC. 82 PGG, 2015 WL 82007 (S.D.N.Y. Jan. 6, 2015) .......................... 14

*In re Asia Mar. Pac. Ltd.*,
  253 F. Supp. 3d 701 (S.D.N.Y. 2015) ..................................................................... 8, 9

*In re Bridgestone/Firestone, Inc.*,
  190 F. Supp. 2d 1125 (S.D. Ind. 2002) .................................................................... 15

*In re Digitechnic*,
  2007 WL 1367697 (W.D. Wash. May 8, 2007) ........................................................ 18

*In re Ex Parte Application of Porsche Automobil Holding SE*,
  2016 WL 702327 (S.D.N.Y. Feb. 18, 2016) ............................................................. 23

*In re Kreke Immobilien KG,*
    2013 WL 5966916 (S.D.N.Y. Nov. 8, 2013) .................................................................. 19

*In re Mare Shipping, Inc.,*
    2013 WL 5761104 (S.D.N.Y. Oct. 23, 2013) ................................................................. 18

*In re Application of OOO Promnefstroy*,
    2009 WL 335608 (S.D.N.Y. Oct. 15, 2009) ............................................................... 8, 18

*In re Petition of MT "BALTIC SOUL" Produktentankschiffahrtsgesellschaft mgH & Co.
    KG*, 2015 WL 5824505 at *3 (S.D.N.Y. Oct. 6, 2015)................................................... 22

*In re Schlich,*
    2017 WL 4155405 (S.D.N.Y. Sept. 18, 2017).............................................................. 9, 13

*Intel Corp. v. Advanced Micro Devices, Inc.,*
    542 U.S. 241 (2004)................................................................................................. passim

*Jiangsu Steamship Co., Ltd. v. Success Superior Ltd.,*
    2015 WL 3439220 (S.D.N.Y. Feb. 5, 2015).................................................................. 23

*In re Judicial Assistance Pursuant to 28 U.S.C. § 1782 by Macquarie Bank Ltd.*, 2015
    WL 3439103 (D. Nev. May 28, 2015) ......................................................................... 19

*Kang v. Noro-Moseley Partners,*
    246 F. App'x 662 (11th Cir. 2007) ................................................................................ 9

*Okean BV,*
    60 F. Supp. 3d at 419 .................................................................................................... 22

*Schmitz v. Berstein Liebhard & Lifshitz, LLP,*
    376 F.3d 79 (2d Cir. 2004)............................................................................................. 8

### Rules / Statutes

28 U.S.C. § 1782 ..................................................................................................... passim

Fed. R. Civ. P. 45(c)(3).................................................................................................. 24

Fed. R. Evid. 801 ........................................................................................................... 10

Fed. R. Evid. 802 ........................................................................................................... 10

### Other Authorities

T. Markus Funk, *Mutual Legal Assistance Treaties and Letters Rogatory: A Guide for
    Judges, Fed. Judicial Cent. Int'l Litig. Guide* (2014) ................................................. 15

## PRELIMINARY STATEMENT

Element Six Technologies Limited's ("Element Six's") petition for § 1782 discovery should be denied because it requests discovery that a Singapore court already largely denied. Element Six's *ex parte* petition contended that the discovery is necessary for the underlying Singapore litigation, but failed to provide to the Court recent Singapore court orders denying many similar requests as overbroad and irrelevant.  But for Respondent Pure Grown Diamond, Inc.'s ("PGD") discovery of the *ex parte* petition and request to submit an opposition, the Court may have never received those highly material, if not dispositive, Singapore court discovery orders.

On January 12, 2016, Element Six commenced patent infringement litigation against IIa Technologies Pte. Ltd. ("IIa") in the High Court of the Republic of Singapore ("Singapore Litigation" or "Singapore Action"). Element Six and IIa both produce grown diamonds. Element Six alleges in the Singapore Action that three product samples Element Six purchased from three different U.S. entities, including PGD, infringe its Singapore patents.  Element Six asserted in the Singapore Action that the sample it purchased from PGD must have come from IIa, and sought extensive discovery in an effort to corroborate that alleged origin.  After the Singapore courts denied much of Element Six's discovery as overbroad, Element Six brought this § 1782 action seeking substantially identical discovery.  Far from promoting § 1782's goal of encouraging foreign countries by example to provide stateside litigants with similar means of discovering relevant information from foreign entities, Element Six's petition stands to undermine the authority of Singapore courts and, in turn, hinder cooperation between the two legal systems.

The petition should be denied because it does not satisfy the statutory requirement that the § 1782 discovery requests seek documents and information "for use" in the Singapore patent litigation.  In court orders, the Singapore court has expressly ruled that the relevant issue concerning the diamond sample from PGD, "Sample 3",  is whether it came from IIa.  However,

Element Six's twenty-five broad document requests and thirty-one deposition topics go far beyond the provenance of the diamond sample. The information sought includes marketing strategies of PGD, and its protocols for storing, cutting and polishing diamonds through the present—*i.e.*, long after Element Six purchased Sample 3. The Singapore court has already issued discovery orders finding that much of the discovery sought is overbroad and not sufficiently relevant. It is thus not "for use" in the Singapore litigation. Rather, it is calculated to provide Element Six with business advantages over PGD, as they both do business in the grown diamond industry.

Even assuming the Court deemed the discovery "for use" in the Singapore action, it should still deny the petition because all four discretionary factors set by the Supreme Court in *Intel* weigh against Element Six's application.

The first *Intel* factor considers whether the foreign court has access to the information sought. Here, Element Six seeks documents and information from PGD that it could have obtained through Singapore courts. PGD's expert, Justice VK Rajah, a former judge of Singapore's highest court and Singapore's former Attorney General, explains that Singapore's rules of court allow the court to issue orders against foreign third parties, such as PGD. Those orders are sent to the United States through letters rogatory. Justice Rajah explains that the Singapore rules of court for foreign fact gathering protect "the integrity of the fact-finding and decision-making process in the Singapore courts," adding that "[t]his procedure ought to be followed before a similar application is made to a foreign court, as the latter would obviate the Singapore court's role in policing its process." In spite of this, Element Six never once sought third-party discovery from PGD in the Singapore courts during the two years of litigation in its patent lawsuit. The first factor thus weighs against Element Six.

The second *Intel* factor considers the receptivity of the foreign court to assistance by U.S. courts.  While the Second Circuit has cautioned against wading into the minutiae of foreign discovery rules, the expert evidence from Justice Rajah is unequivocal.  The Singapore rules of court preclude Element Six from using information obtained from a § 1782 deposition as evidence at trial.  Nor is there any rule or precedent permitting use of such depositions in interlocutory applications.  The self-serving declaration of Element Six's Singapore counsel arguing to the contrary merits no weight.  Therefore, the second *Intel* factor weighs against Element Six's deposition request.

The third *Intel* factor considers whether the § 1782 request constitutes an attempt to circumvent foreign-proof gathering restrictions.  Here, it is not simply that Singapore discovery rules are far more limited than U.S. discovery. The § 1782 request blatantly aims to circumvent the discovery orders of the Singapore court, which has already denied as overbroad many of the requests Element Six reasserts in this § 1782 petition.  For example, all twenty-five document requests seek information from the period between "the first date of manufacture of any diamond material that forms . . . Sample 3 . . . and the ***current date***," dkt. 3-2, at 2 (emphasis added)—*i.e.*, the same overbroad time period the Singapore court previously rejected on the grounds that "there is no basis for [documents that post-date the manufacture and purchase of the Samples] to be relevant to the alleged infringing Samples." Ex. I ¶ 7(b). Element Six likewise asks PGD for "all documents" related to its "protocol(s) for the manufacture of CVD diamond material" from before 2014 through the present, Ex. C ¶ 4(a), despite the Singapore court's denial of its interrogatory asking whether IIa "directly suppl[ied] single crystal CVD diamond material in any form" dating back to 2012. Ex. D ¶ 13(b) & ¶ 14(a) ("The request [] for the supply of 'single crystal CVD diamond material in any form' is denied" because it "clearly goes beyond the Samples, and appears

to be a broad-ranging attempt to fish for information."). Element Six's strategy undermines the Singapore court's concern, as explained by Justice Rajah, "not to lose control of its own procedures and policies." Rajah Decl. ¶ 25. The third factor thus weights against Element Six as well.

The fourth *Intel* factor considers whether the discovery sought is unduly burdensome and intrusive. PGD is a third party to the Singapore litigation. It is a small company with few employees. The broad discovery requests—which seek documents, materials, and all manner of communications from years before Element Six even purchased Sample 3 through the present—will not only place a financial burden on PGD, it will divert critical manpower from operating its business at the most critical time of the year for diamond sales. With only five months to trial in Singapore, Element Six's decision not to seek discovery from PGD through Singapore courts or even U.S. courts until this late stage (when it could have done so two years ago) will impose excessive burdens on PGD to produce discovery in a short time frame. Even more, the discovery sought is unduly intrusive as its explicitly seeks privileged information that would necessitate producing an extensive privilege log.

This application is a transparent attempt to gain access to PGD's confidential and sensitive business information in order to gain an unfair advantage over PGD. Because Element Six, and its parent De Beers, are now in the grown diamond jewelry business, the petition is a strategic attempt to undermine PGD. The application should be denied.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     THE GROWN DIAMOND MARKET

PGD is a market leader in the manufacture and sale of grown diamonds. *See* Declaration of Marilyn Williams, ¶ 3 ("Williams Decl."). Unlike naturally occurring diamonds that are discovered and mined, grown diamonds are created in hot, pressurized chambers. They are a cheaper, more ethically-sourced alternative to natural diamonds. Exs. A– B. Grown diamonds

have been gaining popularity and are such high quality "that even experts cannot tell which is [mined] and which comes from a factory." *Id.* It has been reported that, because of grown diamonds, "sales of traditional diamonds have stalled in recent years, leading to a steady drop in prices," and in particular, "the price of high-quality diamonds has fallen by as much as 80 percent over the past 30 years." Ex. A. Some have reported that "[grown] diamonds are now the single greatest threat to the [natural diamond] industry." Ex. B.

De Beers, the indirect parent of Petitioner Element Six, currently controls approximately 30 percent of the world's supply of natural diamonds. Ex. C. Reports suggest that De Beers and the rest of the mined-diamond industry believe the rapidly expanding grown diamond industry "is on course to disrupt their business." Ex. D; *see also* Ex. C ("The big miners have held concerns about the growth of the [grown] diamond jewelry market for some time, particularly over the last decade, as the quality of stones has improved and manufacturing costs have started to fall.").

De Beers has long resisted selling jewelry made with grown diamonds. But just over four months ago, it announced it would enter the grown diamond jewelry market through its subsidiary, Element Six. Ex. E. Although Element Six previously made grown diamonds only for industrial use, De Beers recently announced that its $94 million investment in Element Six will fund a new production facility to manufacture jewelry with grown diamonds. *Id.* Notably, De Beers has stated that it "aims to be a dominant player in" the synthetic diamond market and intends to "undercut its competitors by roughly 75 percent." *Id.* De Beers and Element Six thus have a vested interest undermining PGD.

### B. THE SINGAPORE LITIGATION

On January 12, 2016, Element Six filed an action in Singapore against IIa alleging infringement of two Singapore patents based, in part, on a product sample that an agent of Element Six purchased from PGD ("Sample 3"). Element Six has alleged throughout the Singapore

Litigation that IIa manufactured Sample 3 and sold it to PGD for resale in the United States.  Pang Decl., Ex. 2.  Thus, Element Six has long known the relevance of Sample 3's origin.   Indeed, the Singapore court noted that, with respect to Sample 3, "origin" is the relevant triable issue and Element Six "bears the burden of proving that [Sample 3] originated from [IIa] before proceeding to prove that the [Sample 3] infringe[s] the Patents." Exhibit H ¶ 6.

Throughout the Singapore Litigation, IIa has maintained that it did not know the provenance of Sample 3.  For example, on December 18, 2017, Element Six served IIa with several interrogatories, seeking information about the manufacture of Sample 3, which was assigned the product identifier LG10226420 by PGD when it was sold:

> Did the Defendant [IIa] in Singapore make, dispose of or offer to dispose of, import, us [sic] and/or keep, whether in part or otherwise, any single crystal CVD diamond material in any form, including as-grown and diamond plate, which was designated the identifier "LG10226420", regardless of when the aforesaid designation took place and whether the aforesaid designation was by the Defendant or a third party?

Pang Decl., Ex. 10.  Consistent with its position throughout the litigation, IIa responded on February 19, 2018, stating that it did not know the origin of Sample 3.  *Id.*

Until this application and during the pendency of the Singapore Litigation, Element Six never sought from PGD any of what it now alleges to be "critical" discovery.  Singapore law permits obtaining relevant depositions from foreign entities via Letters Rogatory and obtaining relevant documents from foreign entities through the Hague Convention.  But Element Six flouted those domestic options and, despite knowing that PGD sold Sample 3 to its agent, Element Six never sought discovery from PGD directly through the Singapore courts.  Only now—almost ***two years*** after discovery commenced in the Singapore Litigation, ***seven months*** after learning that IIa

did not have the desired information, and *five months* before trial in Singapore—has Element Six *first* sought this information from PGD, electing to use 28 U.S.C. § 1782 in this Court.

Despite its delay, Element Six now imposes upon PGD an urgency to review and produce documents in response to twenty-five broad and complex requests, as well as prepare and sit for a lengthy deposition within a few short months.  Addressing these requests will require significant time and resources, forcing PGD's twenty-one employees to bear a heavy burden that could cripple the business during the busiest retail season of the year for diamonds.  *Id.* ¶ 8.

Even more galling, Element Six filed its petition to the Court merely weeks after the Singapore court denied many of the same requests as overbroad.  Rather than produce the Singapore court orders to the Court, which would reveal the substantial overlap between the discovery sought in the US and Singapore, Element Six chose instead to provide a self-serving declaration of its Singapore counsel, stating without any documentary support that the § 1782 requests are different than the Singapore discovery requests.  Pang Decl. ¶ 29. But many of Element Six's extensive discovery requests here *ignore* the relevant issue in the Singapore litigation and were already denied by the Singapore court.  The subpoena that Element Six now seeks is clearly nothing more than a fishing expedition into PGD's business practices, intended primarily to undermine PGD.

## II.     ARGUMENT

### A. LEGAL STANDARD

In order to grant a § 1782 application, Element Six must satisfy three statutory requirements: "(1) the person from whom discovery is sought reside[s] (or [is] found) in the district of the district court to which the application is made, (2) the discovery [is] for use in a proceeding before a foreign tribunal, and (3) the application [is] made by a foreign or international tribunal or any interested person."  *Schmitz v. Berstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83 (2d Cir.

2004) (internal citations and quotations omitted).  If only one requirement is not met, the application must be denied.

Even if the statutory requirements are met, this court has broad discretion to deny the § 1782 application.  *See In re Application of OOO Promnefstroy*, No. M 19-99(RJS), 2009 WL 3335608, at *4 (S.D.N.Y. Oct. 15, 2009) (noting that district courts "exercise broad discretion" over whether to grant applications meeting the statutory prerequisites).  The Supreme Court and lower courts have articulated four relevant considerations that guide this discretion: (1) whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent § 1782's aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign tribunal to federal-court assistance; (3) whether the request appears to be an attempt to circumvent foreign proof-gathering restrictions or policies; and (4) whether the request is overly intrusive or burdensome.  *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004).

## B. ELEMENT SIX FAILS TO MEET THE STATUTORY "FOR USE" REQUIREMENT

Element Six fails to prove the statutory requirement that the discovery sought is "for use" in foreign proceedings because the vast majority of the discovery sought is irrelevant to the single issue in the Singapore Litigation that forms the basis of Element Six's application: the provenance of Sample 3. As a threshold statutory requirement to obtain discovery pursuant to § 1782, Element Six must prove that the discovery sought is "for use in a foreign proceeding before a foreign tribunal."  *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012).  Element Six bears the burden of proof.  *See Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015); *see also In re Asia Mar. Pac. Ltd.*,

253 F. Supp. 3d 701, 706 (S.D.N.Y. 2015) ("An applicant must show that the evidence will provide it some advantage in the foreign proceeding or be useful in the proceeding.").

Courts regularly deny § 1782 applications where evidence sought is irrelevant to the foreign proceedings. *See, e.g., Kang v. Noro-Moseley Partners*, 246 F. App'x 662, 664 (11th Cir. 2007) (upholding denial of application "where the information sought [was] irrelevant to the causes of action"); *In re Asia Mar. Pac. Ltd.*, 2015 WL 5037129, at *3-4 (denying application where petitioner failed to show how or why the evidence "would be relevant or would increase Petitioner's chance of success in that proceeding"); *In re Schlich*, 2017 WL 4155405 at *7 (S.D.N.Y. Sept. 18, 2017) (denying application where the discovery sought was "plainly irrelevant to the foreign proceeding"); *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011) (considering relevance in determining whether the discovery would be "for use" in the foreign proceedings).

Element Six's claim that the Singapore court "agreed that seeking the discovery directly from PGD in the United States would be a more direct and  effective course of action" is insufficiently supported by evidence and does not satisfy the "for use" requirement.  Dkt. 3 at 1. It supports this bold contention with only a single hearsay statement by its Singapore counsel that the Singapore Assistant Registrar "expressed the view that it would be more direct and effective for Element Six to obtain discovery from these third party retailers (*e.g.*, from PGD in relation to Sample 3) . . . ."  Pang Decl. ¶ 27. But you will not find this "view" in the Singapore court's decisions and orders on Element Six's discovery requests.  The statement is therefore unreliable and deserves no weight. *See* Fed. R. Evid. 801 & 802.  In fact, the Singapore court decisions on Element Six's discovery requests denied many requests as overbroad and irrelevant. These decisions, which Element Six has not provided to this Court, indicate that the court did not deny

Element Six's requests on the grounds that it could more efficiently seek discovery from PGD in the United States.  *See* Exs. F–J. Accordingly, Element Six has fallen far short of showing that the information sought is "for use" in Singapore based on the uncorroborated hearsay declaration of its interested Singapore counsel.

Nor can it make this showing. The information sought could not possibly be "for use" in the Singapore litigation because the Singapore court has already denied the vast majority of the requested discovery as irrelevant to the only applicable issue: the provenance of Sample 3.  In its decision on interrogatories, dated August 14, 2018, the Singapore court rejected discovery requests that were "not directly relevant to the key question in the proceedings, *i.e.*, the source of the specific Samples in question."  Exhibit H ¶ 13(a).  The Singapore court also denied discovery requests that "relate to diamond material that is *not* tied to the Samples in question." (emphasis in original). *Id.* ¶ 14(b).  Likewise, in its decision on specific discovery, dated August 27, 2018, the Singapore court denied discovery seeking "all documents relating all diamonds . . . from 2012 to date" because it was an "attempt to fish for more evidence of infringement."  (emphasis in original) Exhibit I ¶ 5. In that decision, the Singapore court also denied requests relating to the "entirety of the Defendant's process,"  *Id.* ¶ 7, and requests for documents "to date" because "there is no basis for such documents to be relevant to the alleged infringing samples." *Id.* ¶ 7(b).  The Singapore court also rejected Element Six's e-discovery request involving search terms relating to Samples 1, 2 and 3 on "all email servers, cloud servers, and network drives currently in the Defendant's custody, power, control and/or possession" because this "effectively compels the Defendant to turn out its cupboards on nothing more than a mere suspicion . . . ." *Id.* ¶ 16.

Remarkably, even though on September 7, 2018 at 11:35am Singapore time, Element Six wrote to the Singapore court for clarification of the court's rejection of its proposed discovery

order (proving they had received the court decisions), Ex. K, Element Six chose to withhold these written Singapore court decisions from this Court when it filed its petition on September 7, 2018 in the United States (which is 12 hours behind Singapore).   This conduct is particularly troubling given the heightened duty of disclosure required of the party instigating an ex parte proceeding like this one. *See Four Star Fin. Servs., LLC v. Commonwealth Mgmt. Assocs.*, 166 F. Supp. 2d 805, 810 (S.D.N.Y. 2001) ("[W]hen [attorneys] come before a Judge seeking extraordinary relief ex parte, they will be held to the highest standards of candor."); *In re Dinova*, 212 B.R. 437, 447 (B.A.P. 2d Cir. 1997) ("Candor to the Court, though desirable under any circumstances, is mandated in ex parte proceedings[.]"); *In re WinNet R CJSC*, No. 16-MC-484-DLC, 2017 WL 1373918, at *9 (S.D.N.Y. Apr. 13, 2017) ("The duty of candor is, if anything, more critical when ex parte applications are made to a court.").

It appears Element Six withheld from this Court the written discovery decisions of the Singapore court because they directly undermine its contention that its § 1782 application "do[es] not seek the same breadth of discovery from PGD." Dkt. 3 at 4. Many of its requests seek the very discovery that the Singapore Court denied as overbroad and irrelevant:

- Contrary to the Singapore court's order that the only relevant issue is the provenance of the Samples, Element Six seeks all communications regarding the Singapore litigation. Proposed Subpoena, Request No. 14, Topic Nos. 11–12, 31.

- Contrary to the Singapore court's orders denying as irrelevant information and processes unrelated to the Samples and requests for information "to date," Element Six seeks information relating to "protocol(s) at any time for the shape and surface processing, including cutting, polishing,  and/or annealing, of CVD diamond material." *Id.*, Request No. 21.

- Contrary to the Singapore court's order denying e-discovery on servers for documents relating to Samples 1, 2 and 3, every one of requests before this Court seeks "data stored in any computer media." Dkt 3-2, ¶ 17.

- Contrary to the Singapore order denying requests for information concerning general processes, Element Six once again asks for information on general

protocols, including protocols unrelated to Sample 3.   Proposed Subpoena, Topic Nos. 15–29.

Having already seen its requests rejected *in Singapore*, Element Six cannot reasonably contend that the same irrelevant requests it has reasserted in its § 1782 application are "for use" *in Singapore*. Given this clear evidence showing that Element Six's pleas have been asked and answered in Singapore, its application before this Court necessarily fails the "for use" requirement.

Even without the Singapore court decisions rejecting many of Element Six's discovery requests, the plain language and scope of its § 1782 requests illustrate that they are not "for use" in the Singapore litigation.  In that case, Element Six must prove that IIa manufactured Sample 3 in Singapore and sold it to PGD for resale in the United States.  Dkt. 3, at 7.  Its seemingly aimless § 1782 application, however, bears no connection to that objective; it includes twenty-five all-encompassing document requests and thirty-one different deposition topics that go far beyond the narrow issue of who made Sample 3. Such broad discovery requests are not tailored to the Singapore Litigation—and that's the point. The § 1782 application intentionally targets confidential competitive information that Element Six wants to take from PGD.

Illustrating this reality, Element Six seeks the following:

- "all communications" between PGD and Gemesis concerning Samples 1 and 3 and the Singapore litigation;

- "all communications" between PGD and Microwave concerning Samples 2 and 3 and the Singapore litigation;

- "all communications" between IIa and PGD concerning the samples and the Singapore litigation; and

- "all communications" concerning the Singapore litigation generally.

*See* Proposed Subpoena, Request Nos. 12-18.   Element Six has not explained how these communications could help it identify the origin of Sample 3. Nor can they. Element Six alleged that IIa, not Microwave or Gemesis, grew Sample 3 and sold it to PGD. Communications involving

12

those two entities therefore offer no help in the search for Sample 3's creator. As such, Element Six has no need for *any* communications between PGD and these other entities, much less *all* communications.

Because Element Six and PGD both operate in the grown diamonds industry, the discovery sought will give Element Six (and thus De Beers) an unfair and highly damaging advantage over PGD. The *only* use that most of this discovery could possibly have for Element Six is to give it— and, by extension, De Beers—an insider understanding of PGD's products and confidential business practices and a leg up in the grown diamond market.  Having failed to show that its discovery requests target information "for use" in the Singapore Litigation, Element Six's § 1782 application must be denied.  *See In re Schlich*, 2017 WL 4155405 (denying §1782 petition where petitioner failed to show that the material sought was not "for use" in a foreign proceeding because the material was only "marginally relevant" to the issue in the foreign dispute).

### C.   THE COURT SHOULD EXERCISE ITS DISCRETION TO DENY THIS APPLICATION UNDER ALL FOUR *INTEL* FACTORS

Even if Element Six satisfies the statutory requirement for § 1782 discovery, the Court should still deny the petition because the *Intel* discretionary factors weigh against Element Six.

#### 1.   The Documents and Testimony Sought are Within the Reach of the Singapore Courts Without the Aid of § 1782.

The first factor looks to whether the documents or testimony sought are within the foreign court's reach and accessible without the aid of § 1782.  The expert evidence of Justice Rajah, Singapore's former attorney general and judge of its highest court, establishes that the Singapore rules of court permit Element Six to request an order to take discovery and depositions from PGD, a foreign third party.  Rajah Decl. ¶ 26 ("[I]n the case of evidence to be secured from overseas parties, the procedure and means to get that evidence exist under the [rules of court through] an application through the Singapore court.").  Such an order would then be sent as Letters Rotatory

to the United States. The Office of International Affairs ("OIA") receives incoming Letters Rogatory from foreign or international tribunals and transmits each request to the federal court in the district where the evidence is located or witness resides.  After reviewing the request, the district court may order the taking of testimony or production of evidence for use in the foreign proceeding. The evidence is subsequently routed to the requesting foreign party by the OIA.  *See* T. Markus Funk, *Mutual Legal Assistance Treaties and Letters Rogatory: A Guide for Judges*, Fed. Judicial Cent. Int'l Litig. Guide 18 (2014). According to Justice Rajah, "this procedure ought to be followed before a similar application is made to a foreign court in the United States, as the latter approach would obviate the Singapore court's role in policing its process."  Rajah Decl. ¶ 27.  This Court should not permit Element Six to obviate the Singapore court's role in policing its own process of third-party foreign discovery, especially when Element Six sat on its hands for two years before seeking discovery from PGD. *Cf., In re Application of Operacion y Supervision de Hoteles, S.A. de C .V. for an Order to Conduct Discovery for Use in a Foreign Proceeding*, No. 14 MISC. 82 PGG, 2015 WL 82007, at *1 (S.D.N.Y. Jan. 6, 2015) (granting § 1782 petition where petitioner had sought and obtained letters rogatory from Mexican courts).

Accordingly, the first *Intel* factor weighs strongly against Element Six.

### 2.    The Singapore Court Would Not Be Receptive to § 1782 Assistance.

The second factor considers the receptivity of the foreign tribunal to federal-court assistance.  Here, the Court need not make any speculative foray into Singapore law.  The former attorney general and justice of Singapore's Court of Appeal has stated in clear terms that, under Singapore law, "only depositions that are obtained through an order of the Singapore Court (*i.e.*, under O 39 r 1) are admissible at trial." Rajah Decl. ¶ 35. This is "another facet of the principle that the Singapore court wants to keep control of its own processes." *Id.*  Element Six's Singapore counsel, Melvin Pang, does not dispute this in his declaration.

Although Mr. Pang, Element Six's Singapore counsel, claims that deposition information can be used in interlocutory applications, Pang Decl. ¶ 40, that reading of Singapore law deserves no weight because Mr. Pang is obviously not neutral. *See Evergreen Marine Corp. (Taiwan) v. Glob. Terminal & Container Servs., Inc.*, 2000 WL 1683449, at *4 (S.D.N.Y. Nov. 9, 2000) ("Rather than offer independent expert testimony, the parties have submitted affidavits from their own counsel in the prior Italian proceeding to urge their views of Italian law. These submissions provide an insufficient basis for us to reach a determination concerning the relevant Italian law. The submissions are from interested sources who may be motivated to justify their own prior conduct."); *Farrell Lines Inc. v. Columbus Cello-Poly Corp.*, 32 F. Supp. 2d 118, 128 (S.D.N.Y. 1997) (holding that defendants "failed to demonstrate that Italian law would mandate a result different from United States law" where defendants "have [not] submitted affidavits of experts in Italian law" but instead only submitted a "certification of their Italian lawyer" which the court deemed "insufficient evidence of foreign law because he is not a disinterested expert and has provided little basis for assessing his expertise or weighing his opinions"); *In re Bridgestone/Firestone, Inc.*, 190 F. Supp. 2d 1125, 1131–32 & n.5 (S.D. Ind. 2002) (finding defendants' purported expert on Venezuelan law unreliable where expert was "a partner in the law firm . . . [which] personally handles litigation for [one of the defendants] in Venezuela" stating that "[t]he unreliability of their experts, in light of the burden [defendants] bear, is fatal to their contention that Venezuelan courts could exercise jurisdiction over these cases" and noting that "[i]t is possible that [the expert] is involved in the very cases for which he offers his expert opinion,"); *Canales Martinez v. Dow Chem. Co.*, 219 F. Supp. 2d 719, 730 (E.D. La. 2002) (where defendant's foreign law expert's opinions "were formed while representing" defendant in a similar case, the court found that his "dual role as expert and counsel for defendant . . . [was] problematic,

and call[ed] into question whether his testimony [was] competent to carry defendants' burden of persuasion").

Mr. Pang's statements on Singapore law are even more suspect because other portions of his declaration are misleading.   He states that "[Assistant Registrar] Yeo expressed the view that it would be more direct and effective for Element Six to obtain discovery from these third party retailers (*e.g.*, from PGD for Sample 3) as these were the retailers who sold Samples 1–3 to Element Six's purchasers." Pang Decl. ¶ 27.  However, Mr. Pang failed to cite any court document in support of his statement.  He likewise neglected to disclose to this Court that his purported view of the Singapore court appears nowhere in that court's decisions denying Element Six's discovery requests for being overbroad and irrelevant.   Exs. H–J.  Worse, it is clear Mr. Pang received and reviewed the court's discovery decisions by September 7, before this § 1782 petition was filed, because at 11:35 a.m. Singapore time (12 hours ahead of Eastern Standard Time) that day he wrote to the Singapore court seeking clarification of the court's rejection of Element Six's proposed discovery order based on the  transcript of the order.  Ex K.  It appears Mr. Pang was therefore not fully candid when he did not correct his declaration, signed merely one day before on September 6, 2018, that "the parties are still awaiting the issuance of A.R. Yeo's written grounds for his decisions in the interrogatories and discovery applications."  Pang Decl. ¶ 28.  Given that the *ex parte* Petition was also filed on September 7 in the United States, it is difficult to excuse Mr. Pang's misstatement.   This error, whether intentional, negligent or otherwise, further undermines the credibility of Mr. Pang's statements about Singapore law.  His opinions deserve no weight.

In contrast, Justice Rajah's expert opinion on Singapore law is dispositive.  He explains that because the Singapore rules of court provide a procedure for gathering information from a person in a foreign jurisdiction:

> "a Singapore court would not be ordinarily inclined to admit or consider evidence that has been obtained in a matter that effectively sidesteps the procedure and safeguards laid down by O 39 rr1-3. Not only would it frown upon procedural foreign shopping, it would also closely query why such a course of action in the foreign court had been adopted in the first place."

Rajah Decl. ¶ 41. Thus, the second *Intel* factor also weighs against Element Six.

### 3.   The § 1782 Application Seeks to Circumvent the Discovery Orders of the Singapore Court.

The third *Intel* factor examines whether the § 1782 application aims to circumvent the proof-gathering restrictions of the foreign court. Because Element Six has largely reasserted its rejected discovery requests from the Singapore Action, this factor weighs heavily against Element Six.

To be sure, Singapore discovery restrictions are far greater than in the United States, and Singapore courts "will not allow discovery to be used as a speculative exercise mounted in the hope of finding new evidence (*i.e.*, a fishing expedition)." *Id.* ¶ 33. But even more illustrative of Element Six's circumvention is the fact that the Singapore court has already denied many of the discovery requests Element Six makes in its § 1782 petition. Ex. H, at 4. In one particular instance, the Singapore court denied Element Six's request for documents "from 2012 to date," explaining that such a broad scope would capture documents that "post-date the manufacture and purchase of the Samples." Ex. I, ¶ 7(b). Nevertheless, Element Six now asks non-party PGD for "[a]ll documents and things concerning Sample 3" for the period between "(1) the first date of manufacture of any diamond material that forms (in whole or in part) Sample 3 and (2) ***the current date***." *See* Proposed Subpoena, ¶ 10 (emphasis added). Element Six also asks this court for all documents concerning PGD's "protocol(s) at any time for the shape or surface processing, including cutting, polishing, and/or annealing, of CVD diamond material." *Id.* Request No. 21. This encompasses documents pertaining to various processes for ***all*** CVD diamond material, not

just the CVD diamond material in Sample 3.   Again, the Singapore court already rejected a virtually identical request from Element Six, deeming it excessive because it "would cover documents relating to non-infringing processes." Ex. B, ¶ 7(a).

While Element Six contends that it must take discovery from PGD because IIa denies knowledge about the source of Sample 3, Dkt. 3, at 3, that pretext does not give it free rein to make requests of from PGD that the Singapore court has already deemed overbroad.   See *In re Application of OOO Promnefstroy*, No. M 19-99(RJS), 2009 WL 3335608, at *9 (rejecting §1782 application seeking documents already requested and denied in Dutch litigation). This is especially true given that Element Six knew the relevance of Sample 3's origin in 2016 and did nothing for two years.   By itself, Element Six's refusal to avail itself of the Singapore court's procedure for obtaining documents and information from foreign third-parties unmasks this § 1782 application for what it is: a means of circumventing the proof-gathering restrictions imposed in the Singapore Action.   *See, e.g., id.* (finding that the applicant's "lack of interest in pursuing any discovery under the laws of the Entitlement Proceeding forums indicates an attempt to circumvent those rules"); *In re Application of Caratube Int'l Oil Co., LLP*, 730 F. Supp. 2d 101, 107 (D.D.C. 2010) ("[T]he district court may, in its discretion, properly consider a party's failure first to attempt discovery measures in the foreign jurisdiction.  Here, the evidence suggests that [Petitioner] is using § 1782 in an attempt to circumvent the Tribunal's control over the arbitration's procedures, and this factor thus weighs against granting the petition."); *In re Mare Shipping, Inc.*, 2013 WL 5761104 at *5 (S.D.N.Y. Oct. 23, 2013) ("Courts in this district have previously denied § 1782 requests when a party had not first sought production in the foreign forum."); *Aventis Pharma v. Wyeth*, 2009 WL 3754191 at *1 (S.D.N.Y. Nov. 9, 2009) ("[D]espite the fact that it appears that the French Court has the jurisdictional reach over these documents, in five years, [Petitioner] has never sought the

subject § 1782 documents from the French Tribunal. . . . [Petitioner's] motion is clearly an attempt to circumvent foreign proof gathering restrictions."); *In re Digitechnic*, 2007 WL 1367697 at *4-5 (W.D. Wash. May 8, 2007) (holding that the "Court should hesitate to order discovery at a late stage of French litigation when such discovery was not sought . . . in that forum.").

### 4. The Discovery Sought from PGD is Unduly Burdensome.

The fourth discretionary factor, which looks to "[w]hether the subpoena contains highly intrusive or burdensome requests," weighs heavily against granting the present petition. In this regard, § 1782 applications should be narrowly tailored, and should only be granted where they seek "either a single document or only those documents relating to a particular event." *In re Kreke Immobilien KG*, 2013 WL 5966916 at *7 (S.D.N.Y. Nov. 8, 2013). "When a party chooses to serve overly broad [§ 1782] discovery, it runs the risk that the discovery will be denied outright." *In re Judicial Assistance Pursuant to 28 U.S.C. § 1782 by Macquarie Bank Ltd.*, 2015 WL 3439103 at *9 (D. Nev. May 28, 2015); *see also In re Cathode Ray Tube (CRT) Antitrust Litig*, 2013 WL 183944, at *4 (rejecting argument that overbroad § 1782 request had to be trimmed rather than denied outright).

Here, the discovery sought is unduly intrusive and burdensome to PGD, a non-party to the underlying litigation. Contrary to prevailing law, Element Six seeks twenty-five categories of documents, many of which include multiple subcategories, and an extensive deposition on thirty-one topics. And despite having over two years to seek discovery from PGD using the available process through Singapore courts, Element Six now seeks to have PGD collect, review, and produce potentially thousands of documents on an expedited basis, and subsequently subject its employees to a deposition, just to satisfy Element Six's newly "critical" need for almost entirely irrelevant information. This is patently unreasonable.

Unlike Element Six and its ultimate parent, De Beers, PGD is a small business. It is a twenty-one employee operation with limited resources at its disposal. Williams Decl. ¶ 3.  The company does not have a litigation or compliance department to bear the brunt of production. *Id.* ¶ 8. Culling through the vast amount of potentially responsive documents—most of which are in hard copy form—will force PGD to "take at least 50% of its workforce away from their daily responsibilities and dedicate them full time for a minimum of three to four weeks to the process of manually reviewing each individual document." *Id.* ¶ 9. This loss would strike a crippling blow to PGD at the worst possible time: "the winter months (Thanksgiving to Valentine's Day) are typically the busiest of the year." *Id.* To avoid that outcome, the company will have to expand its workforce to 150% of its current size to account for the estimated 840 to 1,120 man hours required to complete the requested production. *Id.* ¶ 10. Even assuming PGD is able to avoid a sharp decline in performance as a result of this business interruption, complying with the requests will "likely cost [the company] more than $200,000 over a three- to four-week period," *id.,* not including attorneys' fees and costs incurred for reviewing and producing documents and related tasks in this proceeding, or the cost of a discovery vendor.

In similar situations, courts within this district have denied § 1782 applications as unduly burdensome.  *See, e.g., In re Apotex Inc.*, 2009 WL 618243 at *3 (S.D.N.Y. Mar. 9, 2009) (discovery was unduly intrusive and burdensome where "[t]he requested discovery require[d] Pfizer, a non-party, to devote substantial resources to perform onerous searches and then review voluminous documents for a potentially small subset of [documents] . . . ," adding that "both the lateness and the breadth of this discovery request raise the additional concern that this § 1782 application may be a fishing expedition").

Furthermore, Element Six's conclusory statements that the discovery sought is "targeted" to "relate[ to] the specific infringing samples and Singapore litigation," dkt. 3, at 4, are unmoored from reality. Each of the twenty-five lengthy requests seek "*all* documents and things" or "*all* communications" relating to that category.  Additionally, "documents" are defined to include:

> all written or graphic communications and all written or graphic matter of every kind and description however produced or reproduced, whether draft or final, original or reproduction, internal or otherwise, including, but not limited to, delivery tickets, order forms, purchase orders, letters, correspondence, memoranda, internal or otherwise, minutes, notes (whether typed or handwritten), films, recordings of any type, transcripts, contracts, memoranda of telephone conversations, personal conversations or meetings, diaries, desk calendars, telegrams, circulars, pamphlets, manuals, statements, notices, reports, telexes, interoffice or interoffice communications, minutes of meetings, reports, studies, books or records of accounts, bank account records, checks, bank drafts, invoices, requisitions, microfilms, movies, slides, photographs, data stored in any computer media, CD-ROM, computer runs or printouts, tabulations, charts, guides, outlines, summaries, abstracts, plans, drawings, specifications, blueprints, graphs, studies, drafts of any one or more of the foregoing or material similar to any of the foregoing, however denominated and by whomever prepared and to whomever addressed.

Dkt. 3-2, at 2. "Things" is further defined to include "any physical specimen or tangible item other than a document," and "communications" is defined as "all inquiries, discussions, conferences, conversations, negotiations, agreements, meetings, interviews, telephone conversations, letters, correspondence, notes (whether typed or handwritten), telegrams, telexes or other forms of communications, including, but not limited to, both oral and written communications."  Dkt. 3-2, at 3.  On their face, these requests are likely to cover hundreds, if not thousands of documents. Williams Decl. ¶ 7.

And as discussed above, *see supra* II.B, the vast majority of these requests have limited relevance, if any, to the Singapore Litigation.  Thus, even if some of the requests potentially

encompass documents tangentially related to the provenance of Sample 3, others seek entirely unrelated discovery—*e.g.*, communications with other non-parties, communications with IIa regardless of its relationship to Sample 3, all of PGD's protocols for purchases, processing, storage, sale, and manufacture, among others.  Moreover, Element Six's assertions that this overbroad subpoena is "narrowly tailored" rings particularly hollow given that Element Six has provided *only one* justification for all of these irrelevant categories of documents: determining Sample 3's origin.  *See, e.g., In re Petition of MT "BALTIC SOUL" Produktentankschiffahrtsgesellschaft mgH & Co. KG*, 2015 WL 5824505 at *3 (S.D.N.Y. Oct. 6, 2015) ("[T]he only potentially appropriate discovery purpose Petitioners have identified is adjudication of the issue of the affiliates' alter ego status.  Their request for disclosure of every financial transaction these companies have engaged in with eleven different banks, along with considerable additional financial information, sweeps far too broadly to be proper for that limited purpose.").

Given the limited scope of the only relevant issue, Element Six has not demonstrated the need for both documents *and* a deposition of PGD. Nor can it.  It is clear that this subpoena simply attempts to harass PGD with absurd and overbroad discovery requests in order to unfairly compete with PGD.  *See, e.g., In re Application for an Order Permitting Metallgesellschaft AG to take Discovery*, 121 F.3d 77, 79 (2d Cir. 1997) ("if the judge suspects that the § 1782 discovery request is a 'fishing expedition' or a vehicle for harassment, the district court should deny the request") (internal citations and quotations omitted).

Moreover, the § 1786 requests are unduly burdensome because they seek privileged information, including express requests for communications with counsel, and communications about the Singapore litigation. *See* Proposed Subpoena, Request Nos. 19-24. This would require

the creation of extensive privilege logs at great cost to PGD.  *See Okean BV*, 60 F. Supp. 3d at 419 (§ 1782 discovery was unduly intrusive and burdensome because "the request implicated privileged communications" and would "require creation of an extensive privilege log").

Finally, the request is unduly burdensome because Element Six has created a fire drill by not seeking discovery from PGD sooner even though it has long been told that IIa did not know the origins of Sample 3. Pang Decl. ¶ 16.  By waiting until five months before trial, Element Six has placed PGD in the impossible position of having to respond in a short time frame to very broad requests, with the real possibility that the information may not even be collected before the trial in Singapore.  *See Aventis v Wyeth*, 2009 WL 3754191 (denying § 1782 petition as overly burdensome where respondent would be made to "participate in a 'fire drill' over documents").

### D.  IF THE APPLICATION IS GRANTED, THE COURT SHOULD ALLOW PGD TO OBJECT TO THE SUBPOENA.

In the event Element Six's application is granted, PGD reserves the right to object to the subpoena pursuant to Rule 45 and move to quash if need be.  This Court has routinely granted § 1782 subpoena recipients the opportunity to object, meet and confer, and/or move to quash pursuant to the normal federal rules governing all subpoenas.  *See, e.g., Gushlak v. Gushlak*, 486 F. App'x 215, 217 (2d Cir. 2012) ("The respondent's due process rights are not violated because he can later challenge any discovery request by moving to quash pursuant to Federal Rule of Civil Procedure 45(c)(3)."); *In re Ex Parte Application of Porsche Automobil Holding SE*, 2016 WL 702327 at *1 n.3 (S.D.N.Y. Feb. 18, 2016) (In § 1782 proceedings, "all questions with respect to the propriety of the grant of leave and with respect to the content of the subpoenas are available to every subpoenaed party via a motion to quash or the defense of an application to compel compliance with the subpoenas"); *Jiangsu Steamship Co., Ltd. v. Success Superior Ltd.*, 2015 WL

3439220 at *8 (S.D.N.Y. Feb. 5, 2015) ("[W]itnesses can raise objections and exercise their due process rights by motions to quash the subpoenas.") (internal quotations and citations omitted).

## III.   CONCLUSION

For the foregoing reasons, PGD respectfully requests that the Court deny Element Six's § 1782 application.

DATED:      New York, New York
            October 12, 2018

                            QUINN EMANUEL URQUHART
                            & SULLIVAN, LLP


                             /s/ Tai-Heng Cheng
                            Tai-Heng Cheng
                            Eric Huang
                            Margaret Schmidt
                            51 Madison Avenue, 22nd Floor
                            New York, New York 10010-1601
                            (212) 849-7000
                            Taihengcheng@quinnemanuel.com

                            *Attorneys for Respondent Pure Grown
                            Diamonds, Inc.*